## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| THE ARC OF IOWA; CHARMAINE ALEXANDER, individually and on behalf of C.B., a minor; JONATHAN  CRAIG, individually and on behalf of E.C. and J.C., minors; MICHELLE CROFT, individually and on behalf of J.J.B., a minor; AMANDA DEVEREAUX, individually and on behalf of P.D., a minor; CARISSA FROYUM ROISE, individually and on behalf of H.J.F.R., a minor; LIDIJA GEEST, individually and on behalf of K.G., a minor; MELISSA HADDEN, individually and on behalf of V.M.H., a minor; HEATHER LYNN PRESTON, individually and on behalf of M.P. and S.P, minors; LISA HARDISTY SITHONNORATH, individually and on behalf of A.S., a minor; REBEKAH STEWART, individually and on behalf of E.M.S., a minor; and ERIN VERCANDE, individually and on behalf of S.V., a minor, | Case No. 4:21-cv-264 |
| *Plaintiffs*,<br>        v. | **MEMORANDUM OF AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** |
| KIM REYNOLDS, in her official capacity as Governor of Iowa; ANN LEBO, in her official capacity as Director of the Iowa Department of Education; ANKENY COMMUNITY SCHOOL DISTRICT; COUNCIL BLUFFS COMMUNITY SCHOOL DISTRICT; DAVENPORT COMMUNITY SCHOOL DISTRICT; DECORAH  COMMUNITY SCHOOL DISTRICT;  DENVER COMMUNITY SCHOOL DISTRICT; DES MOINES PUBLIC SCHOOLS; IOWA CITY COMMUNITY SCHOOL DISTRICT; JOHNSTON COMMUNITY SCHOOL DISTRICT; LINN MAR COMMUNITY SCHOOL DISTRICT; and WATERLOO COMMUNITY SCHOOL DISTRICT, | **EXPEDITED RELIEF REQUESTED** |
| *Defendants*. | |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

FACTS ........................................................................................................................2

    1.    The Risk Posed by COVID-19 to Students with Disabilities ...................................2

    2.    COVID-19 Prevention in Schools ..........................................................................4

    3.    HF 847 and Actions of the Defendant State Officials ...........................................6

    4.    Harm to the Named Plaintiffs ................................................................................8

LEGAL STANDARD ................................................................................................13

ARGUMENT .............................................................................................................13

I.     THE PLAINTIFFS WILL SUFFER IRREPARABLE INJURY UNLESS
     AN INJUNCTION ISSUES. ..............................................................................13

II.    THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...............16

    A.    The Defendants are Discriminating Against Students with Disabilities in
        Violation of Federal Law. .................................................................................16

        1.    The Plaintiffs have disabilities, are otherwise qualified to receive a
            public education, and have standing to bring this action. ..........................18

        2.    The Plaintiffs have been discriminated against by a public entity by
            virtue of disability, excluded from participation in or been denied
            the benefits of the services, programs, or activities of a public
            entity ......................................................................................................20

    B.    HF 847 is Preempted by Federal Law ...............................................................24

III.   THE BALANCE OF EQUITIES WEIGHS HEAVILY IN THE
     PLAINTIFFS' FAVOR AND THE INJUNCTION SERVES THE PUBLIC
     INTEREST. .......................................................................................................27

CONCLUSION .........................................................................................................27

## PRELIMINARY STATEMENT

As the school year begins and COVID-19 cases soar, school districts face a dilemma: whether to comply with the state law HF 847, which precludes them from imposing mask mandates, or whether to meet their obligations under federal disability rights laws, to integrate, not exclude, children with disabilities from public education. Parents too face a dilemma: whether to risk their children's health by sending them to school or to keep them home and safe but without the education to which they are entitled. The Hobson's choice is particularly acute for parents whose children have disabilities, leaving them to decide whether to expose their medically vulnerable children to an unsafe educational environment or to remove them from in-person schooling and thereby deprive them of a safe and integrated public school education.

The U.S. Centers for Disease Control ("CDC") recommends universal masking. So does the American Association of Pediatrics. And so does the American Medical Association, and hundreds of physicians and educators across the state. Yet under the challenged law—HF 847—all masking requirements are illegal. HF 847, which went into effect immediately upon signing on May 20, 2021, provides that "school district[s] . . . shall not adopt, enforce, or implement a policy that requires its employees, students, or members of the public to wear a facial covering for any purpose while on the school district's . . . property unless the facial covering is necessary for a specific extracurricular or instructional purpose . . . ." This directive reversed the Iowa Department of Education's prior policy which deferred to local districts . . . to determine how and when" school activities could be conducted, and required numerous school districts around the state to end policies requiring students, staff, and visitors to wear masks while at school. Most relevant now, the directive is preventing schools from taking action at this moment, at time of high transmission of COVID-19 in all but three of Iowa's twenty-nine counties, due to the highly contagious Delta variant. Waddell ¶ 9.

1

By prohibiting that basic public health measure, the Defendant State Officials are preventing public entities statewide from complying with the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.  The Defendant State Officials are illegally forcing Iowa families who have children with disabilities to choose between their child's education and their child's health and safety, in violation of the ADA and Section 504 of the Rehabilitation Act. Further, the enforcement of HF 847 needlessly and unconscionably exposes Iowa school children and their families to a heightened risk of infection, hospitalization, and death. It is against the calamitous consequences of HF 847's enforcement that the Plaintiffs seek emergency injunctive relief.

## FACTS

1.   <u>The Risk Posed by COVID-19 to Students with Disabilities</u>

For many students with disabilities across Iowa, it is too risky to return to brick-and-mortar schools if schools do not follow recommended health guidelines to protect them from COVID-19. These students have underlying health conditions—all of which are disabilities—that would make COVID-19 infections much more likely to lead to severe illnesses. According to the American Academy of Pediatrics, "the Delta variant has created a new and pressing risk to children and adolescents across this country" and pediatric cases of COVID-19 have been "skyrocketing." [1] *See generally* Waddell Decl. ¶¶ 12-13; Srinivas Decl. ¶¶ 13-18.

All children and staff in schools are at risk but school-aged children with certain disabilities, including a range of underlying medical conditions, can face a higher rate of severe illness from COVID-19 as compared to other children without those underlying medical

---

[1] Letter from American Academy of Pediatrics to Acting FDA Commissioner Janet Woodcock (Aug. 5, 2021), https://downloads.aap.org/DOFA/AAP%20Letter%20to%20FDA%20on%20Timeline%20for%20Authorization%20of%20COVID-19%20Vaccine%20for%20Children_08_05_21.pdf.

conditions. Waddell Decl. ¶ 17; Srinivas Decl. ¶¶ 29-36.  For the 2020-2021 school year, of

Iowa's 485,581 students enrolled in public schools, the State identified 12.9% (approximately

62,000 students) as students with disabilities.[2]  According to the CDC, "current evidence suggests

children with medical complexity, with genetic, neurologic, metabolic conditions, or with

congenital heart disease" can be at increased risk for severe illness from COVID-19.[3]  Waddell

Decl. ¶ 17; Srinivas Decl. ¶ 29.  And "children with obesity, diabetes, asthma or chronic lung

disease, sickle cell disease, or immunosuppression can also be at increased risk for severe illness

from COVID-19-19."[4]  Waddell Decl. ¶ 17; Srinivas Decl. ¶ 29.

Individuals with intellectual disabilities are also at increased risk of contracting COVID-

19. Waddell Decl. ¶ 19.  A recent study published in the New England Journal of Medicine

found that individuals with intellectual disabilities were more likely to contract COVID-19; if

diagnosed with COVID-19, more likely to be admitted to the hospital; and more likely to die

following admission.[5]  Waddell Decl. ¶ 19.

The beginning of the school year coincides with a dramatic increase in COVID-19

transmission in recent weeks in Iowa.  Waddell Decl. ¶ 9.  Since the end of July, Iowa has

---

[2] *State Summary: Reporting Year: 2020*, Iowa Dep't of Education (2020),
https://www.iaschoolperformance.gov/ECP/StateDistrictSchool/StateSummary?y=2020.
[3] *People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (Aug. 20, 2021 update),
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
[4] *Id.*
[5] Jonathan Gleason et. al., *Commentary: The Devastating Impact of Covid-19 on Individuals with Intellectual Disabilities in the United States*, New Eng. J. Med. (Mar. 5, 2021),
https://catalyst.nejm.org/doi/full/10.1056/CAT.21.0051.

reported 3,500 new cases among children.[6]  Recent numbers show children accounting for over 22% of all Iowa COVID-19 cases.[7]

The risk to school children and staff is already apparent. Though most Iowa schools have only just opened, schools across the state had (by August 29) reported 464 cases, including 62 from the Des Moines district, 47 from Iowa City, 27 from Cedar Rapids, 24 from College Community, 23 from Marshalltown, and 22 from Keokuk and Ankeny.[8]

2.    COVID-19 Prevention in Schools

The CDC unambiguously recommends "universal indoor masking for all students, staff, teachers, and visitors to K-12 schools, regardless of vaccination status." [9] Waddell Decl. ¶ 22; Srinivas Decl. ¶ 41.  In making this recommendation, the CDC has noted "At least ten studies have confirmed the benefit of universal masking in community level analyses . . . Each analysis demonstrated that, following directives from organizational and political leadership for universal masking, new infections fell significantly."[10]

Leading medical organizations, including the American Academy of Pediatrics and the American Medical Association, the Infectious Disease Society of America, and the American

---

[6] *Children and COVID-19: State Data Report: Version: 8/26/21*, Am. Acad. Pediatrics (Aug. 26, 2021 update), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/at 25 (reporting 48,618 cumulative child cases in Iowa) *with Children and COVID-19: State Data Report: Version: 7/29/21*, Am. Acad. Pediatrics (July 29, 2021 update), https://downloads.aap.org/AAP/PDF/AAP%20and%20CHA%20-%20Children%20and%20COVID-19%20State%20Data%20Report%207.29%20FINAL.pdf at 24 (reporting 45,121 cumulative child cases in Iowa).
[7] Tim Webber, *Children make up nearly a quarter of new COVID-19 cases in Iowa*, Des Moines Reg. (Sept. 1, 2021), https://www.desmoinesregister.com/story/news/health/2021/09/01/covid-19-iowa-testing-data-shows-kids-make-up-22-percent-cases/8167419002/.
[8] Compilation from School District COVID-19 Dashboards (Aug. 29, 2021).
[9] *Guidance for COVID-19 Prevention in K-12 Schools*, Ctrs. for Disease Control & Prevention (Aug. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.
[10] *Use of Cloth Masks to Control the Spread of SARS-CoV-2*, Ctrs. for Disease Control & Prevention (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html.

Academy of Family Physicians all strongly recommend universal masking as part of school openings.[11] Waddell Decl. ¶ 23; Srinivas Decl. ¶¶ 37, 41.

The health departments in Iowa's three most populous counties, as well as the Iowa Medical Society and the Iowa Chapter of the American Academy of Pediatrics have similarly recommended universal indoor masking by all students (age two and older), staff, teachers, and visitors to K-12 schools, regardless of vaccination status.[12] Waddell Decl. ¶ 24.

Recent studies have confirmed that wearing masks is one of the most powerful tools to thwart the transmission of COVID-19 in indoor settings, such as schools.[13] Waddell Decl. ¶ 25; Srinivas Decl. ¶ 38. Researchers at Duke University conducted a study on COVID-19 transmission considering over 1 million students in North Carolina K-12 schools and concluded that "wearing masks is an effective strategy to prevent in-school COVID-19 transmission."[14] Waddell Decl. ¶ 25.

In the opinion of Dr. Joel Waddell, a specialist in pediatric infectious diseases at Blank Children's Hospital, "the only safe course at this time is universal masking at school and school-related functions. . . ."  Waddell Decl. ¶ 28.  And as Dr. Megan Srinivas, the infectious disease consultant for Broadlawns Medical Center says, "masks matter." Srinivas Decl. ¶ 25.

---

[11] *Guidance for COVID-19 Prevention in K-12 Schools*, Ctrs. for Disease Control & Prevention (Aug. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.
; Gerald Harmon, *AMA statement on CDC's updated mask guidance to combat COVID-19 spread*, Am. Medical Ass'n (July 27, 2021), https://www.ama-assn.org/press-center/ama-statements/ama-statement-cdc-s-updated-mask-guidance-combat-covid-19-spread.
[12] Sydney Maras, *IMS & IA AAP: Back to School Face Mask Usage Statement*, Iowa Medical Society (Aug. 19, 2021), https://www.iowamedical.org/news/10941537.
[13] *Use of Cloth Masks to Control the Spread of SARS-CoV-2*, Ctrs. for Disease Control & Prevention (May 7, 2021) (referencing ten studies), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html.
[14] *The ABCs of North Carolina's Plan A*, ABC Science Collaborative (July 1, 2021), https://abcsciencecollaborative.org/the-abcs-of-north-carolinas-plan-a/.

3.      HF 847 and Actions of the Defendant State Officials

On May 20, 2021, the Iowa legislature enacted HF 847, its education bill, which contained a mask mandate ban. The bill, which went into effect immediately upon signing, provides that "school district[s] . . . shall not adopt, enforce, or implement a policy that requires its employees, students, or members of the public to wear a facial covering for any purpose while on the school district's . . . property unless the facial covering is necessary for a specific extracurricular or instructional purpose . . . ."[15]

This directive reversed the Department of Education's prior policy which "adopts . . . CDC guidelines in all of our training manuals," "encourage[d] the use of cloth face coverings when feasible, and "deferred to local districts . . . to determine how and when" school activities could be conducted."[16]  Since HF 847 was passed, the Department of Education has not posted COVID guidance or policies for school districts on its website.  And numerous school districts around the state which had mask mandates prior to HF 847 – including Des Moines, West Des Moines, Waukee, Sioux City, Urbandale, Linn-Mar, and Norwalk – have rescinded them.[17]

In the months since HF 847 was enacted, COVID-19 infection rates, daily cases, and COVID-19-related hospitalizations have ballooned in Iowa.[18] With the emergence of the Delta variant, the number of reported new cases is seven times higher; hospitalizations are at the

---

[15] 2021 Iowa Acts ch. 139, § 28 (codified at Iowa Code § 280.31).

[16] *COVID-19 Guidance and Information*, Iowa Dep't of Educ. (Oct. 7, 2020), http://web.archive.org/web/20210109052728/https://educateiowa.gov/article/2021/01/07/covid-19-guidance-and-information.and *Reopening Guidance for Schools: Frequently Asked Questions*, Iowa Dep't of Educ. (June 30, 2020), http://web.archive.org/web/20201028011619/https://educateiowa.gov/sites/files/ed/documents/COVID-19%20Reopening%20FAQ%206%2030%2020.pdf.

[17] Grant Gerlock, *Schools Review Mask Policies After IDPH Issues New Guidelines,* Iowa Public Radio (May 18, 2021), https://www.iowapublicradio.org/state-government-news/2021-05-18/schools-review-mask-policies-after-idph-issues-new-guidelines.

[18] Nick Coltrain, *Iowa COVID hospitalizations highest since January, 25% increase since last week to nearly 500*, Des Moines Reg. (Aug. 26, 2021), https://www.desmoinesregister.com/story/news/health/2021/08/26/iowa-covid-19-hospitalization-rate-positive-cases-surges-delta-variant/5541193001/.

highest point since January of 2021; and COVID-19-related deaths are rapidly climbing.[19]  Over

the week of August 18 to 25, 2021, more than 7,000 new cases were reported in Iowa.[20]

Notwithstanding the reemergence of COVID-19, Governor Reynolds has doubled down

on the prohibition on mask mandates, issuing a press release that she was "proud" to "protect

Iowans against unnecessary government mandates in our schools." [21] Earlier this week, on

August 30, after the U.S. Department of Education announced an investigation into potential

civil rights violations, Governor Reynolds proclaimed, "In Iowa, we will continue to support

individual liberty over government mandates."[22]  Yesterday (on September 2) she said "it doesn't

really matter" whether the Iowa Department of Public Health recommended students wear masks

in schools, because "it's the law at this point."[23]  Ignoring the numerous public studies the CDC

cited in support of its mask mandate recommendation, she has publicly challenged guidance

from public health officials, asking, "Where's the data that the CDC is using to justify mask

mandates."[24] While Director Lebo has refused to comment publicly on HF 847, her department

has warned that "school districts that choose not to follow the ban could receive citations" and

---

[19] *Id.*

[20] Tim Webber, *Children make up nearly a quarter of new COVID-19 cases in Iowa*, Des Moines Reg. (Sept. 1, 2021), https://www.desmoinesregister.com/story/news/health/2021/09/01/covid-19-iowa-testing-data-shows-kids-make-up-22-percent-cases/8167419002/.

[21] *Reynolds Statement on New COVID-19 Guidance from the Biden Administration*, Office of the Governor of Iowa (July 27, 2021), https://governor.iowa.gov/press-release/reynolds-statement-on-new-covid-19-guidance-from-the-biden-administration%C2%A0%C2%A0.

[22] *Gov. Reynolds issues a statement in response to the Biden Administration's latest letter*, Office of the Governor of Iowa (Aug. 30, 2021), https://governor.iowa.gov/press-release/%C2%A0gov-reynolds-issues-a-statement-in-response-to-the-biden-administration%E2%80%99s-latest.

[23] Ian Richardson & Stephen Gruber-Miller, *Gov. Kim Reynolds declines to recommend masks for students: 'It doesn't really matter because it's a law'*, Des Moines Reg. (Sept. 2, 2021), https://www.desmoinesregister.com/story/news/politics/2021/09/02/kim-reynolds-declines-recommend-masks-iowa-students-citing-ban-school-mandates/5696537001/.

[24] Rod Boshart, *Iowa Gov. Kim Reynolds vows to 'hold strong' against mask mandates in schools*, Gazette (Aug. 19, 2021), https://www.thegazette.com/state-government/iowa-gov-kim-reynolds-vows-to-hold-strong-against-mask-mandates-in-schools/; Ian Richardson, *As Gov. Kim Reynolds shares uncertainty on masks, Iowa health experts say their benefit is clear*, Des Moines Reg. (Aug. 27, 2021), https://www.desmoinesregister.com/story/news/politics/2021/08/26/iowa-medical-experts-say-masks-work-covid-governor-kim-reynolds-wavers-delta-variant-transmission/8214830002/.

"be referred to the State Board of Education"; under state law, the Board of Education has the power to assume oversight over school districts, and districts can lose accreditation.[25]

The enforcement of HF 847 by State officials places all children at risk. Waddell Decl. ¶¶ 7, 29; Srinivas Decl. ¶¶ 9, 25-26.

### 4.   Harm to the Named Plaintiffs

As Dr. Waddell succinctly describes the dilemma families face as result of Provision 1.108:

> In communities where COVID-19 is prevalent, parents with children with conditions that can make them vulnerable to severe illness in particular will face a terrible dilemma of whether to risk their children's health and even life, or to keep the children out of school.  That is not a decision they should be forced to make, when we have the option of masks to protect the safety of those in the school. . . . No child should risk serious illness if we can prevent it.

Waddell Decl. ¶¶ 29-30.

That is the dilemma faced by families across the state, including the children of the named Plaintiffs and those represented by The Arc of Iowa, who have disabilities that make them susceptible to severe illness if they contract COVID-19.  Compl. ¶ 10. Whether these children live with Down Syndrome, asthma, heart disease, lung conditions, sickle cell anemia, Autism Spectrum Disorder, or other conditions that make them more vulnerable to contracting COVID-19, they face losing equal access to their education.

Because of HF 847, for the Plaintiffs' children in this case, going to school is nothing short of perilous.  To a one, they have disabilities that put them at risk of severe illness should they contract COVID-19.

---

[25] Ian Richardson, *Can Iowa Schools Defy the State's COVID Mask Ban Like Florida and Texas Schools Are?* Des Moines Reg. (Aug. 16, 2021), https://www.desmoinesregister.com/story/news/politics/2021/08/16/what-backlash-could-schools-face-if-they-defy-iowas-mask-mandate-ban-kim-reynolds-cdc-covid/5512069001/.

Ten year old S.V. has a brain injury, cerebral palsy, and a history of strokes and epilepsy. Vercande ¶¶ Decl. 4, 8.  E.M.S. is entering fourth grade.  She has a condition known as Williams Syndrome, which is a genetic condition that results in heart problems, gastrointestinal issues, slow growth, and learning disabilities.  Stewart Decl. ¶ 3.  A.S. and E.C., both just five, have Down syndrome, amongst other conditions.  Sithonnorath ¶ 6; Craig Decl. ¶ 2. E.C. also has chronic respiratory problems. Craig Decl. ¶ 2. E.C.'s sibling, J.C., a new fifth grader, has sickle cell anemia, functional asplenia, and a compromised immune system. Craig Decl. ¶ 3.  M.P. and S.P. are eleven year old siblings.  Preston Decl. ¶ 2.  M.P. has a rare condition – heterotaxy – where many organs can be formed abnormally.  Preston Decl. ¶ 4. Because of his condition, M.P. has heart and lung defects among other issues.  Preston Decl. ¶ 5.  S.P. has hypertension because of small kidneys and experiences seizures, amongst other conditions.  Preston Decl. ¶ 8. C.B, K.G., and J.J.B. have asthma.  Alexander Decl. ¶5. Geest Decl. ¶ 4; Croft Decl. ¶ 3.  H.J.F.R often has to use a ventilator because of his condition – congenital central hypoventilation syndrome; he is in fifth grade. Roise Decl. ¶ 3.  P.D. is in kindergarten.  She has symptomatic congenital cytomegalovirus, amongst other conditions; she uses a feeding tube and has intellectual and developmental delays.  Devereaux Decl. ¶ 3.  And preschooler V.M.H. has heart disease, autism, and cerebral palsy, among other conditions.  Hadden Decl. ¶ 2.

In every case, the CDC and/or the Plaintiffs' doctors recognize these children as having a condition that puts them at risk of severe illness should they contract COVID-19.  Alexander Decl. ¶¶ 5, 7; Craig Decl. ¶¶ 2-3; Croft Decl. ¶ 3; Devereaux Decl. ¶ 7; Geest Decl. ¶¶ 4, 6; Hadden Decl. ¶ 2; Preston Decl. ¶¶ 6, 9, 11; Roise Decl. ¶ 3; Sithonnorath Decl. ¶¶ 7, 10; Stewart Decl. ¶ 4; Vercande Decl. ¶¶ 9, 11.  In every case, the children are too young to get vaccinated. Alexander Decl. ¶ 4; Craig Decl. ¶ 5; Croft Decl. ¶ 4. Devereaux Decl. ¶ 5; Geest Decl. ¶ 3;

Hadden Decl. ¶ 3; Preston Decl. ¶ 3; Roise Decl. ¶ 5; Sithonnorath Decl. ¶ 5; Stewart Decl. ¶ 6;

Vercande Decl. ¶ 7.

The Plaintiff parents want their children to go to school, for the learning, the social

interaction, the intellectual and emotion development.  Their doctors, like the CDC, have

identified masking for students and staff as essential to the children's safety.  Both the CDC and

their doctors say in person learning is essential.  Compl. ¶ 39; Devereaux Decl. ¶ 7.  The

Plaintiffs report that many teachers and students in their schools are not masked.  Alexander

Decl. ¶ 11; Craig Decl. ¶ 12; Geest Decl. ¶10; Hadden Decl. ¶¶ 9-10; Roise Decl. ¶ 11.  In some

cases, there are already infections in the school district.  Alexander Decl. ¶ 13; Craig Decl. Decl.

¶ 13; Croft Decl. ¶ 11; Devereaux Decl. ¶ 12; Roise Decl. ¶ 12.

And the parents repeatedly report that remote learning did not work for their children.

*See, e.g.*, Craig Decl. ¶ 10; Croft Decl. ¶¶ 9, 12; Preston Decl. ¶¶ 12-14.  Their parents saw their

children regress when learning in school was not an option. Craig Decl. ¶ 10; Preston Decl. ¶¶

12-14, Sithonnorath Decl. ¶¶ 12-14; Stewart Decl. ¶ 9.  K.G.'s "mental health suffered greatly,"

Geest Decl. ¶ 8; "M.P. has regressed," Preston Decl. ¶ 13; "S.P. faced mental health issues that

were exacerbated by the online learning," Preston Decl. ¶ 14, and "A.S. has regressed in several

areas, even with significant parental involvement." Sithonnorath Decl. ¶ 13.

But without universal masking, because of their disabilities, these children can't be safe.

HF 847's bar on universal masking makes it impossible for school districts to provide a safe

learning environment.

The Plaintiff parents are afraid to send their children to school, and both parents and

children are experiencing enormous anxiety.  Alexander Decl. ¶ 10, Preston Decl. ¶ 19;

Sithonnorath Decl. ¶ 17.  M.P. is "very afraid of getting sick and potentially dying."  Preston

Decl. ¶ 20; *see also* Alexander Decl. ¶ 12; Sithonnorath Decl. ¶ 18.  M.P's sibling is in "fear of

what might happen to his brother if he is exposed." Preston Decl. ¶ 21.  And the Plaintiff parents

are afraid for themselves and other family members who are at increased risk for severe illness

risk should their children contract COVID-19 at school.  Alexander Decl. ¶ 14; Devereaux Decl.

¶ 14; Hadden Decl. ¶ 12; Preston Decl. ¶ 22; Sithonnorath Decl. ¶19.

Faced with the prospect of school without any requirement of masks, S.V.'s parents have

pulled him out of school.  Vercande Decl. ¶ 15.  His neurologist said S.V. otherwise risked more

severe seizures and further brain damage if he were to contract COVID.  Vercande Decl. ¶ 11.

E.C.'s parents too have pulled her out of school, even though she was held back last year in part

because of the challenges online learning presented for her.  Craig Decl. ¶¶ 10, 14.

Most other Plaintiff parents feel they have no choice but to send their child to school.

Roise Decl. ¶ 13; Hadden Decl. ¶ 11. Some of their schools are not offering virtual learning for

their children.  Alexander Decl. ¶ 9; Hadden Decl. ¶ 6; Roise Decl. ¶ 13.  Even when they do, for

most of the Plaintiffs' children, the virtual learning is no learning.  In many cases, it is nothing

more than prerecorded videos, a mode of education highly unsuited to many children with

disabilities.  Devereaux Decl. ¶¶ 8 13; Geest Decl. ¶ 7; Preston Decl. ¶ 15; Sithonnorath Decl. ¶

15; Stewart Decl. ¶¶ 8, 11.

For many of the Plaintiff parents, homeschooling, remote learning, or private instruction

is not an option.  As the parent of M.P. and S.P. explained, "either my husband or I would have

to quit our jobs to teach them."  Preston Decl. ¶ 15.  That's just not an option.  *See, e.g.*, Croft

Decl. ¶ 12 ("we were unable to give our child the attention and support he needed during online

learning and homeschooling"); Devereaux Decl. ¶ 13 ("My husband and I work full-time

remotely so we can't pick up the instruction"); Roise Decl. ¶ 13 ("Both my husband and I work

full-time. Therefore, homeschooling is not an option for our family."); *see also* Hadden Decl. ¶ 11; Stewart Decl. ¶ 11.

The Plaintiff parents face an impossible choice, if it can even be called a choice. "I am in the horrible position of deciding between my child's physical safety and mental health." Geest Decl. ¶ 8. "I am extremely nervous about M.P. returning to school . . . . Recently, due to this stress, I have had difficulty sleeping and have experienced debilitating spells of anxiety. I don't know if I am doing the right thing but I feel as though I have no choice in the matter." Preston Decl. ¶ 19.

Absent relief from this court, parents are sending their children to school at significant threat to their health, because they have no other real choice. Alexander Decl. ¶ 9; Croft Decl. ¶ 12; Hadden Decl. ¶ 11; Preston Decl. ¶ 12-16; Roise Decl. ¶ 13; Sithonnorath Decl. ¶ 13; Stewart Decl. ¶ 11. If everyone were wearing a mask, the parents would feel their children would be safe in school. Alexander Decl. ¶ 15; Craig Decl. ¶ 8; Croft Decl. ¶ 13. Devereaux Decl. ¶ 15; Geest Decl. ¶ 11; Hadden Decl. ¶ 7; Preston Decl. ¶ 23; Roise Decl. ¶ 9-10; Sithonnorath Decl. ¶ 20; Stewart Decl. ¶ 12; Vercande Decl. ¶ 17.

In short, C.B., J.J.B., P.D., K.G., V.M.H., M.P., S.P., H.J.F.R., A.S., and E.M.S – all of whom have disabilities that put them at risk of severe illness from COVID – are forced to take greater, and unnecessary, risks to get their education. Alexander Decl. ¶ 16; Croft Decl. ¶ 14. Devereaux Decl. ¶ 16; Geest Decl. ¶ 6; Hadden Decl. ¶ 13; Preston Decl. ¶¶ 6, 9, 11; Roise Decl. ¶ 14; Sithonnorath Decl. ¶ 21; Stewart Decl. ¶ 13. And E.C. and S.V. are excluded from school. Craig Decl. ¶ 14: Vercande Decl. ¶ 15. As their parents say, it is unfair. *E.g.*, Alexander ¶ 16; Sithonnorath ¶ 21. And it is discriminatory.

## LEGAL STANDARD

The standards for the issuance of a preliminary injunction are the same as for the issuance of a temporary restraining order.  The Court must weigh four factors: "(1) the probability of success on the merits; (2) the threat of irreparable injury to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest." *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir. 1993) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*)).

## ARGUMENT

## I.  THE PLAINTIFFS WILL SUFFER IRREPARABLE INJURY UNLESS AN INJUNCTION ISSUES.

The Plaintiffs need only demonstrate that irreparable harm "is *likely* in the absence of an injunction."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  Here, the Plaintiffs can show three types of irreparable harm that flow directly from Defendants' enforcement of HF 847.

First, the Plaintiffs, because of HF 847, face heightened risk of exposure to a deadly viral contagion—COVID-19.  As the Eighth Circuit has noted, "[W]e entertain no question but that irreparable injury exist[s]" when the harm is a "life threatening interest."  *Harris v. Blue Cross Blue Shield of Mo.,* 995 F.2d 877, 879 (8th Cir. 1993).  *See also Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003) ("[T]he danger to plaintiffs' health, and perhaps even their lives, gives them a strong argument of irreparable injury.").  Courts throughout the country have repeatedly found that exposure to a life-threatening virus, or one that can cause life-long complications such as COVID-19, is an irreparable harm that cannot be remedied at law. *See, e.g., Coreas v. Bounds*,

451 F. Supp. 3d 407, 428-29 (D. Md. 2020) (finding COVID-19 exposure risks irreparable harm); *Banks v. Booth*, 459 F.Supp.3d 143, 159 (D.D.C. 2020) (same); *Peregrino Guevara v. Witte*, No. 6:20-CV-01200, 2020 WL 6940814, at *8 (W.D. La. Nov. 17, 2020) (noting that "[i]t is difficult to dispute that an elevated risk of contracting COVID-19 poses a threat of irreparable harm"). Furthermore, when the risk of contraction or serious illness is augmented due to a person's disability, including an underlying health condition, emergency injunctive relief is necessary. *Thakker v. Doll*, 451 F. Supp. 3d 358, 362, 365 (M.D. Pa. 2020) (in granting an injunction to release petitioners in civil detention who suffered from "chronic medical conditions and face[d] an imminent risk of death or serious injury if exposed to COVID-19," the court determined that "[t]here can be no injury more irreparable" than the "very real risk of serious, lasting illness or death").

Second, the Plaintiffs face loss of educational opportunities.  Given the heightened risks posed by COVID-19 to the Individual Plaintiffs, several parents have opted to temporarily remove their child from public school. *See* McDougald Scott Decl. ¶¶ 8-9; Finny Decl. ¶ 9. But that merely substitutes one irreparable harm for another. The loss of educational opportunities is a paradigmatic example of irreparable harm, as it is both intangible and deeply damaging. *See, e.g., Issa v. School Dist. of Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017) ("[E]ven a few months in an unsound program can make a world of difference in harm to a child's educational development") (citing *Nieves-Marquez v. Puerto Rico*, 53 F.3d 108, 121-22 (1st Cir. 2003)) (internal quotation marks omitted).  "[T]he gravity of the harm is vast and far reaching" when a child is deprived of his or her education. *Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005) (citing *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954) ("[E]ducation is perhaps the most important function of state and local governments" because "it

is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.")).

On those grounds, courts have issued preliminary injunctions in order to immediately stop the irreparable harm deriving from a child's absence in school. *See, e.g., Alejandro v. Palm Beach State Coll.*, 843 F. Supp. 2d 1263, 1270-71 (S.D. Fla. 2011) (concluding that missing school classes constitutes irreparable harm, and granting temporary injunctive relief); *Borough of Palmyra, Bd. of Educ. v. F.C. ex rel. R.C.*, 2 F. Supp. 2d 637, 645 (D.N.J. 1998) (holding that the loss of an appropriate education is an irreparable harm under preliminary injunction analysis).

Finally, HF 847 causes irreparable harm because it violates federal disability laws. *See* Part II (below). Where a "defendant has violated a civil rights statute," courts can "presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 827 (9th Cir. 2001) (citing cases); *see also Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir. 1984) ("[I]rreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes"). Thus, the Defendants' violation of the ADA and the Rehabilitation Act alone can give rise to a presumption of irreparable injury.

Without emergency relief from this Court, the Individual Plaintiffs—and many others like them—are forced to decide *which* irreparable injury they would rather endure: an imminent risk of infection for their child with disability, or the exclusion, alienation, and deprivation of services that would result from being removed from school. Waddell Decl. ¶¶ 29-33; Croft Decl. ¶¶ 12, 14; Geest Decl. ¶ 8; Devereaux Decl. ¶¶ 13. 16; Stewart Decl. ¶¶ 11, 13; Alexander Decl. ¶¶ 10, 16; Preston Decl. ¶ 19; Vercande Decl. ¶ 15; Sithonnorath Decl. ¶¶ 17, 21; Roise Decl. ¶¶

13; Craig Decl. ¶¶ 15-16; Hadden Decl. ¶¶ 13-14. The Court has authority to spare Plaintiffs

from this cruel choice, and the law weighs heavily in favor of it doing so.

## II.      THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.      The Defendants are Discriminating Against Students with Disabilities in Violation of Federal Law.

By their enforcement of HF 847, the Defendants have violated the ADA and Section 504

of the Rehabilitation Act. They have done so by effectively excluding disabled students from

public school in the state; discriminating against students with disabilities; and failing to take

steps to ensure students with disabilities can be safely integrated in the public schools. As set

forth below, the Plaintiffs readily show a likelihood of success on the merits of these claims.

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132. Likewise, Section 504 of the Rehabilitation Act of 1973 provides

that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance … ."  29

U.S.C. § 794(a).  "Enforcement remedies, procedures and rights under Title II are the same as

under section 504." *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 930 (8th

Cir. 1994) (citing 42 U.S.C. § 12133). *Accord Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850,

856 (8th Cir. 2000).

The ADA and the Rehabilitation Act prohibit discrimination against a disabled person by

reason of the person's disability. *See* 42 U.S.C. § 12132. Together, the ADA and the

Rehabilitation Act require public entities, including public school districts and state school

systems, to afford students with disabilities an equal opportunity to participate in or benefit from

any aid, benefit, or service provided to others.  28 C.F.R §§ 35.130(b)(1), 34 C.F.R.

§104.4(b)(ii).  As explained by Judge Frank:

> Title II of the ADA, applicable to public entities, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Further, an implementing regulation referred to as the "integration mandate" states: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The preamble to these regulations describes "the most integrated setting" as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. Pt. 35, App. B, Subp. B., § 35.130.

*Murphy ex rel. Murphy v. Minn. Dep't of Human Servs.*, 260 F. Supp. 3d 1084, 1114 (D. Minn.

2018); *see also Steimel v. Wernert*, 823 F.3d 902, 909 (7thCir. 2016) ("In accordance with

Olmstead, the Department of Justice has released guidance directing that the integration mandate

[should] be read broadly").

     In other words, a public school system cannot explicitly or constructively exclude

students with disabilities from the classroom, nor can it provide different or separate aids,

benefits, or services to individuals with disabilities … unless such action is necessary to provide

qualified individuals with disabilities with aids, benefits, or services that are as effective as those

provided to others. 28 C.F.R. § 35.130(b)(1)(iv). Nor can a public entity otherwise limit a

qualified individual with a disability in the enjoyment of any right, privilege, advantage, or

opportunity enjoyed by others receiving the aid, benefit, or service. 28 C.F.R. §

35.130(b)(1)(vii).

17

To demonstrate a violation of the Rehabilitation Act or Title II, a plaintiff must demonstrate: "1) he is a qualified individual with a disability; 2) he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the entity; and 3) that such exclusion, denial of benefits, or other discrimination, was by reason of his disability." *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998); *see also Argenyi v. Creighton University*, 703 F.3d 441, 447 (8th Cir. 2013).

Here, the Plaintiffs have demonstrated likelihood of success on the merits of each of these elements.

### 1. The Plaintiffs have disabilities, are otherwise qualified to receive a public education, and have standing to bring this action.

"Disability" is defined by the ADA as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Through the ADA Amendments Act, Congress clarified that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4).

Here, each Individual Plaintiff has a disability – one that places them at high risk of contracting COVID-19 and/or heightened risk of complications if they contract COVID-19.  The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual."[26] Major life activities for purposes of the Act "include but are not limited to, caring for oneself, …, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working;" a major life activity "also includes the operation of a major bodily function, including but not limited to, functions of the immune

---

[26] 42 U.S.C. § 12102(1).

system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."[27] Conditions such as asthma, chronic lung disease, diabetes, sickle cell disease, and congenital heart disease by definition substantially limit a major bodily function. The Individual Plaintiffs readily meet this definition. Alexander Decl. ¶ 5 (asthma); Craig Decl. ¶ 3 (sickle cell anemia and compromised immune system); Croft Decl. ¶ 3 (asthma); Devereaux Decl. ¶¶ 3, 7 (congenital cytomegalovirus); Hadden Decl. ¶ 2 (heart disease, cerebral palsy, and autism); Preston Decl. ¶¶ 4-6 & 8-9 (heart defects & chronic kidney disease); Roise Decl. ¶ 2 (congenital hypoventilation syndrome); Sithonnorath Decl. ¶¶ 6-7 (Down syndrome); Stewart Decl. ¶¶ 3-4 (Williams Syndrome); Vercande Decl. ¶¶ 8-9 (cerebral palsy and brain injury). The Organizational Plaintiff has members who are individuals with disabilities that place them at high risk of experiencing severe health complications from COVID-19.  Compl. ¶ 10.

Additionally, each Individual Plaintiff, as well as the many members of the Arc of Iowa are enrolled in a public school and are qualified to receive the guarantee of a free public education.  Alexander Decl. ¶¶ 3, 16; Craig Decl. ¶ 6; Croft Decl. ¶ 5; Devereaux Decl. ¶ 6; Geest Decl. ¶ 2; Hadden Decl. ¶ 4; Preston Decl. ¶ 2; Roise Decl. ¶ 5; Sithonnorath Decl. ¶ 2; Stewart Decl. ¶ 7; Vercande Decl. ¶ 2. The Organizational Plaintiff is a membership organization that has members that are impacted by HF 847 and have associational standing. *Arkansas Medical Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 528 (8th Cir. 1993) (citing *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333 (1977)).

---

[27] 42 U.S.C. §§ 12102(2)(A)-(B).

Accordingly, the Individual Plaintiffs and the students represented by the Organizational

Plaintiff are all qualified individuals with disabilities who meet the essential eligibility

requirements for the services in question. 28 C.F.R. § 35.104.

> **2.    The Plaintiffs have been discriminated against by a public entity by virtue of disability, excluded from participation in or been denied the benefits of the services, programs, or activities of a public entity**

Plaintiffs are likely to succeed on the merits of their discrimination claims because the

Defendants' conduct in enforcing HF 847 violates the ADA and/or the Rehabilitation Act.

Under federal disability rights laws, discrimination occurs not just because of outright

exclusion, but also because of a host of other prohibited activities that lead to exclusion and

discrimination, including inaction.  Defendants' conduct violates these civil rights laws and

discriminates in at least five ways, any one of which suffices as grounds for injunctive relief.

*First,* the Defendants are failing to make services, programs, and activities "readily

accessible" to disabled individuals in violation of 28 C.F.R. § 35.150 by making school

programs and activities available exclusively under conditions that are demonstrably

dangerous to children with disabilities.  *See generally Argenyi v. Creighton University*, 703

F.3d 441, 451 (8th Cir. 2013) (quoting *Baughman v. Walt Disney World Co*., 685 F.3d 1131,

1135 (9th Cir. 2012) ("[T]the ADA and the Rehabilitation Act require [schools] to start by

considering how [their educational programs] are used by non-disabled . . . students and then

take reasonable steps to provide [disabled students] with a like experience.")).

For children whose parents have made the hard decision to attend in-person, their

educational experience is not equal to their general education peers.  Alexander Decl. ¶ 16;

Croft Decl. ¶ 14. Devereaux Decl. ¶¶  10, 16; Hadden Decl. ¶ 13; Preston Decl. ¶ 20-21;

Roise Decl. ¶ 14; Sithonnorath Decl. ¶ 21; Stewart Decl. ¶ 13.  The Defendants are subjecting

the Individual Plaintiffs who come to school to adverse conditions not required of other

students.  Students with disabilities that put them at risk of severe illness from COVID are

entering the school at their peril in a way that is demanded of no other student.  It is as if

they, and only they, must run a gauntlet in order to enter the school. Where there are simple

steps schools could take to ensure equal opportunities, all of which follow public health

guidelines, the Defendants' conduct is discriminatory. Universal masking is the best

protection from COVID infection in unvaccinated youth, and would allow students with

disabilities to fully participate in all educational programs, activities and extracurriculars.

   *Second,* by creating an unreasonably dangerous environment for children with

disabilities that put them at risk of severe illness from COVID-19, the Defendants are

effectively excluding Plaintiffs from participation in public education in violation of 42

U.S.C. § 12132;, 28 C.F.R. § 35.130, 29 U.S.C. § 794 (a), and 34 C.F.R. 104.4 (a) & b(1).  ,

As the Eighth Circuit has written, under Title II of the ADA "no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be denied

the benefits of the services, programs, or activities of a public entity." *Layton v. Elder*, 143

F.3d 469, 472 (8th Cir. 1998) (quoting 42 U.S.C. § 12132).  For some Plaintiffs with

disabilities, the risk of attending school without universal masking is so dire that the lack of

masking  effectively excludes them from the classroom. *Layton*, 143 F.3d at 472 (discussing

exclusion); *Heather K. v. City of Mallard, Iowa*, 946 F. Supp. 1373, 1383 n.13 (N.D. Iowa

1996) (noting that regulations promulgated under "" "the ADA forbid[s] public entities from .

. . exclude[ing] from participation").

   *Third,* the Defendants are violating the requirement to provide reasonable

modifications in order to provide equal access to programs, services, and activities.  As the

Eighth Circuit has recognized, a public entity is required to "make reasonable modifications

in policies . . . when the modifications are necessary to avoid discrimination on the basis of disability . . . '" *DeBord v. Board of Educ. Of Ferguson-Florissant*, 126 F.3d 1102, 1105 (8th Cir. 1997) (quoting 28 C.F.R. § 35.130(b)(7)). The ADA further requires that if reasonable modifications to policies, practices, or procedures would permit a child with disabilities to safely attend their school, the school district must make those modifications unless doing so would fundamentally alter the nature of the service, program, or activity being provided. 28 C.F.R. § 35.130(b)(7). HF 847 prohibits school districts from making the modification of universal masking, which would allow students with disabilities to safely attend school.

*Fourth*, the Defendant's method of administration has imposed a policy that has the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities in violation of 28 C.F.R. § 35.130(b)(3) and 34 C.F.R. § 104.4 (b)(4), because the objectives of public school programs are to provide safe, healthy environments for students to learn, and participate in all school activities with other children. By refusing to follow public health guidelines, and by relegating students with disabilities to remote learning (or no learning at all), the Defendants have undermined the purpose of public education with respect to students with disabilities in violation of both the ADA and the Rehabilitation Act. 28 C.F.R. § 35.130(b)(3); 34 C.F.R. § 104.4 (b)(4). In addition, the Department of Education's threat to strip accreditation from schools impacts a district's ability to provide education services,[28] and is a prohibited criteria or method of administration that has "the effect of subjecting qualified individuals with

---

[28] Ian Richardson, *Can Iowa Schools Defy the State's COVID Mask Ban Like Florida and Texas Schools Are?* Des Moines Reg. (Aug. 16, 2021), https://www.desmoinesregister.com/story/news/politics/2021/08/16/what-backlash-could-schools-face-if-they-defy-iowas-mask-mandate-ban-kim-reynolds-cdc-covid/5512069001/.

disabilities to discrimination on the basis of disability" or has "the purpose or effect of defeating or substantially impairing accomplishment on the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i), (ii).

*Fifth*, the Defendants are failing to permit public entities to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. By telling students with disabilities who fear for their health in attending school in person to use remote learning, the Defendants are not only relegating these students to a lesser service, they are also unnecessarily segregating them from their peers, and separating them from the community, in violation of 28 C.F.R. § 35.130(d) and 34 C.F.R. § 104.34(a). *See generally Olmstead v. L.C.*, 527 U.S. 581, 592 (1999) (noting that the "most integrated setting" means "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible" (citing 28 C.F.R. pt. 35 App. A, p. 450 (1998)); *see also Jennsen v. Minn. Dep't. of Social Servs.*, 138 F.Supp.3d 1068, 1070 (D. Minn. 2015) (the ADA, as interpreted by the Supreme Court in *Olmstead*, "gave individuals throughout the country hope to believe that they could one day be truly integrated into society and given the same dignity and respect afforded to all persons").

Defendants are "public entities" as defined under federal law, 42 U.S.C. §12131(1)(B), and they receive federal financial assistance.  Defendants are therefore subject to the requirements of the ADA and Rehabilitation Act. *See* 29 U.S.C. § 794(b)(2)(B) (any "local educational agency" eligible to receive federal grants under the Elementary and Secondary Education Act ("ESEA") (20 U.S.C. § 7801) is a covered entity under the Rehabilitation Act).  Governor Reynolds and Director Lebo, acting in their official capacities, are subject to

suit under the Rehabilitation Act and the ADA where they have taken affirmative steps to implement and enforce HF 847.

Without HF 847, the Individual Plaintiffs and individuals represented by the Organizational Plaintiffs would have the option of attending public schools that follow public health guidelines, or have the option of requesting the reasonable modification of universal masking, in order to attend their schools in person.[29]

### B.     HF 847 is Preempted by Federal Law

The Supremacy Clause of the United States Constitution renders federal law the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. Under the doctrine of federal preemption, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138 (1988) (citing *Free v. Bland*, 369 U.S. 663, 666 (1962)). State law is preempted when, among other things, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*, 461 U.S. 190, 204 (1983).

---

[29] The Defendants cannot avoid their obligations under the ADA even if compliance may violate state law. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." State law must give way to the extent it "conflicts with federal law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 378 (2000). Such conflicts exist not only where "it is impossible . . . to comply with both state and federal law," but also "where under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 372-73 (citation and internal quotation marks omitted).  Simply put, a defendant "is duty bound not to enforce a [state] statutory provision if doing so would either cause or perpetuate unlawful discrimination" under federal law. *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*, 620 F.3d 62, 67-70 (1st Cir. 2010). To the extent HF 847 or any other Iowa law, regulation, or directive impedes any School Board's ability to comply with its ADA obligations, state law must "give way." *N. Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 45 (1971).

HF 847 conflicts with federal law because it frustrates Congress' purpose to ensure that local school districts have the authority to adopt public health policies, including mask requirements, to protect students and educators as they develop plans for safe return to in-person instruction. Under Section 2001(i) of the American Rescue Plan Act of 2021 (ARPA), local school districts in Iowa have been allocated over $[770] million dollars in Elementary and Secondary School Emergency Relief (ESSER) funding so that they can adopt plans for a safe return to in-person instruction. Pub. L. No. 117-2, § 2001(i), 135 Stat. 4, 23 (2021). Section 2001(e)(2)(Q) of the ARP Act expressly gives local school districts the authority to use these ARPA ESSER funds for "[d]eveloping strategies and implementing public health protocols including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff." *Id.* § 2001(e)(2)(Q), 135 Stat. 21. As discussed above, the CDC's guidance specifically recommends universal indoor masking in all K-12 schools.

Furthermore, interim final requirements adopted by the U.S. Department of Education specifically require each local school district to adopt a plan for safe return to in-person instruction that describes "the extent to which it has adopted policies, and a description of any such policies, on each of the following safety recommendations established by the CDC …", including specifically "[u]niversal and correct wearing of masks." *See* Am. Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 Fed. Reg. 21,195, 21,200-01 (April 22, 2021). While the requirement "does not mandate that [a local educational agency] adopt the CDC guidance" it does "requires that [each district] describe in its plan the extent to which it has adopted the key prevention and mitigation strategies identified in the guidance,"

which include both "[u]niversal and correct wearing of masks," and notably "appropriate

accommodations for children with disabilities with respect to health and safety policies,"

among others. *Id*. at 21,200. The interim requirements further provide that a local educational

agency must ensure the interventions it implements will respond to the needs of all students,

"and particularly those students disproportionately impacted by the COVID-19 pandemic,

including . . . children with disabilities." *Id.* at 21,201. The school districts of Iowa cannot

satisfy this requirement given HF 847.

On August 18, the Department of Education sent Defendants Reynolds and Lebo a

letter warning that HF 847 is squarely at odds with the purpose of ARPA and stands as an

obstacle to the accomplishment and execution of ARPA's full purposes and objectives.

Rather than affording discretion to local school boards to develop and implement safety

protocols as envisioned by ARPA, HF 847 *prohibits* local school districts, including the

Defendant School Boards, from implementing precisely the type of safe return-to-school

policies encouraged by ARPA. As explained by U.S. Education Secretary Cardona, HF 847

"restrict[s] the development of local health and safety policies and is at odds with the school

district planning process embodied in the U.S. Department of Education's (Department's)

interim final requirements."[30]

HF 847 impermissibly conflicts with and is preempted by the American Rescue Plan Act

and the implementing final requirements of the U.S. Department of Education. In particular, it

bars school districts from complying with the American Rescue Plan Act requirement as

implemented by the Department of Education that school districts adopt plans for a safe return to

---

[30] Letter from Miguel A. Cardona, Sec. of Educ., to Kim Reynolds, Governor & Ann Lebo, Education Director (Aug. 18, 2021), https://oese.ed.gov/offices/american-rescue-plan/american-rescue-plan-elementary-and-secondary-school-emergency-relief/21-006972-letter-from-secretary-cardona-iowa-final-signed/.

in-person instruction consistent with CDC guidance, including mask requirements. Accordingly, HF 847 should be declared null and void.

### III.   THE BALANCE OF EQUITIES WEIGHS HEAVILY IN THE PLAINTIFFS' FAVOR AND THE INJUNCTION SERVES THE PUBLIC INTEREST.

The balance of equities tips decisively in favor of the Plaintiffs and an injunction is undoubtedly in the public interest. When the Defendants are governmental actors, the third and fourth factors merge and are properly considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Congress has mandated that the public interest requires equal treatment for persons with disabilities, thereby maximizing their integration and independence. An injunction here supports that public interest, toward the ends which the federal law requires. *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) (the "public interest strongly favors" enforcement of Title II of the ADA); *Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1261-1263 (N.D. Iowa 1995) ("the public interest is served by enforcement of anti-discrimination provisions of Title II of the ADA"). It is against the public interest to allow a state to continue to violate federal law, because the Supremacy Clause requires that federal law be paramount.

Moreover, allowing schools to require masks will benefit all children and their communities by providing the protection against the spread of COVID-19.

With little administrative burden and no discernible costs associated with the requested modification, the balance of the hardships is greatly in favor of the Plaintiffs and the Motion for Preliminary Injunction should be granted.

### CONCLUSION

The Plaintiffs, on behalf of their children with disabilities, respectfully request that this Court immediately enjoin enforcement of HF 847 and allow the school districts to ensure that

each child receives a free and appropriate education in the least restrictive and the most

integrated environment—without jeopardizing their lives or safety.

Date:  September 3, 2021

**AMERICAN CIVIL LIBERTIES UNION OF IOWA**

/s/ Rita Bettis Austen
Rita Bettis Austen, AT0011558
**ACLU of Iowa Foundation Inc.**
505 Fifth Avenue, Suite 901
Des Moines, IA 50309-2316
Telephone: 515-243-3988
Facsimile: 515-243-8506
rita.bettis@aclu-ia.org

/s/ Shefali Aurora
Shefali Aurora, AT0012874
**ACLU of Iowa Foundation Inc.**
505 Fifth Avenue, Suite 901
Des Moines, IA 50309-2316
Telephone: 515-243-3988
Facsimile: 515-243-8506
shefali.aurora@aclu-ia.org

/s/Leah Patton
Leah Patton, AT0006022
**ACLU of Iowa Foundation Inc.**
505 Fifth Avenue, Suite 901
Des Moines, IA 50309-2316
Telephone: 515-243-3988
Facsimile: 515-243-8506
leah.patton@aclu-ia.org


**DISABILITY RIGHTS IOWA**

Cynthia A. Miller (AT0005382)
666 Walnut Street, Suite 1440
Des Moines, IA 50309
T: (515) 278-2502
E: cmiller@driowa.org

Catherine Johnson*  (AT0004006)
666 Walnut Street, Suite 1440

Des Moines, IA 50309
T: (515) 278-2502
E: cjohnson@driowa.org

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Louise Melling*
125 Broad St.
New York, NY 10004
T: (212) 549-2637
E: lmelling@aclu.org

Susan Mizner*
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0781
E: smizner@aclu.org

**ARNOLD & PORTER KAYE SCHOLER LLP**

John A. Freedman*
Tara L. Williamson*
601 Massachusetts Ave, NW
Washington, DC 20001
T: 202.942.5316
E: john.freedman@arnoldporter.com

*Motion to proceed *pro hac vice* forthcoming

**THE ARC**

Shira Wakschlag*
The Arc of the United States
1825 K Street, NW, Suite 1200
Washington, DC 20006
Telephone: 202-534-3708
Facsimile: 202-534-3731
wakschlag@thearc.org
*pro hac vice admission pending

**TOM DUFF LAW FIRM**

/s/ THOMAS J. DUFF

THOMAS J. DUFF

/s/ JIM DUFF

JIM T. DUFF

DUFF LAW FIRM, PLC

The Galleria

4090 Westown Pkwy, Suite 102

West Des Moines, Iowa 50266

Telephone: (515) 224-4999

Fax: (515) 327-5401

Email : tom@tdufflaw.com

jim@tdufflaw.com

wendy@tdufflaw.com

*Attorneys for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

The foregoing paper will also be served along with the Complaint and Summons to all Defendants.

Date: September 3, 2021

/s/Rita Bettis Austen
Rita Bettis Austen