IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - X
THE ARC OF IOWA, et al.,    :
                            :
      Plaintiffs,           :
                            :
vs.                         :        Case No. 4:21-cv-264
                            :
KIM REYNOLDS, In her        :        TRANSCRIPT OF HEARING ON MOTION
Official Capacity as        :        FOR TEMPORARY RESTRAINING ORDER
Governor of Iowa, et al.,   :
                            :
      Defendants.           :
- - - - - - - - - - - - - X


                            Courtroom 455, Fourth Floor
                            U.S. Courthouse
                            123 East Walnut Street
                            Des Moines, Iowa
                            Friday, September 10, 2021
                            9:59 a.m.


BEFORE:  THE HONORABLE ROBERT W. PRATT, Senior Judge


                    TONYA R. GERKE, CSR, RDR, CRR
                      United States Courthouse
                  123 East Walnut Street, Room 197
                      Des Moines, Iowa 50309

APPEARANCES:

For the Plaintiff:          JOHN ARAK FREEDMAN, ESQ.
Arnold & Porter LLP
601 Massachusetts Avenue Northwest
Washington, D.C.  20001

JIM T. DUFF, ESQ.
Duff Law Firm, P.L.C.
The Galleria
4090 Westown Parkway, Suite 102
West Des Moines, IA 50266

LEAH DENISE PATTON, ESQ.
ACLU of Iowa Foundation
505 Fifth Avenue, Suite 808
Des Moines, IA 50309

CATHERINE ELLIZABETH JOHNSON, ESQ
CYNTHIA ANN MILLER, ESQ.
Disability Rights Iowa
666 Walnut Street, Suite 1140
Des Moines, IA 50309

For State Defendants:    SAMUEL P. LANGHOLZ, ESQ.
Assistant Iowa Attorney General
1305 East Walnut Street
Des Moines, IA 50319

For the School District  KRISTY M. LATTA, ESQ.
Defendants:             Ahlers & Cooney, P.C.
(Except Iowa City CSD)   100 Court Avenue, Suite 600
Des Moines, IA 50309

1        P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              MR. MESSINA:  Your Honor, the case before the Court

4    this morning is 4:21-cv-264, the Arc of Iowa, et al. versus

5    Reynolds, et al.

6              Counsel, please enter your appearances for the record.

7              MR. DUFF:  Tom Duff for the plaintiffs.

8              MR. FREEDMAN:  John Freedman for the plaintiffs.

9              MS. PATTON:  Leah Patton for the plaintiffs.

10             MS. JOHNSON:  Catherine Johnson for the plaintiffs.

11             MS. MILLER:  Cynthia Miller for the plaintiffs.

12             MR. LANGHOLZ:  Sam Langholz for Governor Reynolds and

13    Director Lebo.

14             MS. LATTA:  Kristy Latta for all defendant school

15    districts excepting the Iowa City School District.

16             THE COURT:  Mr. Freedman, is it your burden?

17             MR. FREEDMAN:  It is, Your Honor, if I may approach.

18    Your Honor, I'm not sure what the local practice is removing the

19    mask for argument or not.

20             THE COURT:  That will be fine.

21             MR. FREEDMAN:  Good morning, Your Honor.  John

22    Freedman for the plaintiffs.  We're here on plaintiffs' motion

23    for a temporary restraining order.  The record we submitted we

24    believe is clear, and we think that it shows why interim

25    injunctive relief should be entered.  Unless the Court would

1   prefer a different order, I plan to start with irreparable harm,

2   then turn to likelihood of success on the merits, then talk

3   about burden on other parties, and then, finally, the public

4   interest.

5          THE COURT:  That's fine.

6          MR. FREEDMAN:  So with regard to irreparable harm, I

7   think there are three key points.  The first is that our

8   clients, these students and their families, face irreparable

9   harm because defendants' acts have caused them to face

10   heightened risk of danger to their health.  Each of these

11   children -- each of our clients has a disability that makes them

12   particularly vulnerable to severe medical consequences if they

13   contract COVID-19:  lung conditions, heart problems, Down

14   syndrome, cerebral palsy, immunocompromised conditions.

15   National and state officials, including the Centers for Disease

16   Control, American Academy of Pediatrics, the American Medical

17   Association, the Iowa Medical Association, and the Iowa chapter

18   of the Academy of Pediatrics, have all said unambiguously that

19   universal masking at schools makes children safer at schools,

20   and it makes schools safer for our plaintiffs and thousands of

21   other children in Iowa with disabilities.

22          THE COURT:  Mr. Freedman, do you want to offer the

23   declarations so we have a record?

24          MR. FREEDMAN:  I do.  I offer the declarations of our

25   two medical experts as well as our individual plaintiffs.

1          THE COURT:  Okay.  Mr. Langholz, do the defendants

2   have objections?

3          MR. LANGHOLZ:  The State defendants have no

4   objections, Your Honor.

5          THE COURT:  Are the school districts defendants here

6   as well?

7          MS. LATTA:  Yes, they are.

8          THE COURT:  Is there any objection?

9          MS. LATTA:  No, Your Honor.

10         THE COURT:  Go ahead, Mr. Freedman.  I'm sorry to have

11  interrupted you.

12         MR. FREEDMAN:  Thank you, Your Honor.  The guidance --

13  the unambiguous guidance from national and state authorities is

14  why school districts around the country have adopted universal

15  masking requirements.  The impact of the State defendants taking

16  a different approach is clear.  The numbers since Iowa schools

17  have reopened in the last few weeks speak for themselves.  22

18  percent of the new cases in the state last week were pediatric

19  cases.  22 percent.  In the short time since schools have

20  reopened, school districts have reported increasing numbers of

21  cases.  Cedar Rapids reports 66 students infected through

22  September 3rd.  That's a week ago.  Iowa City has reported 115

23  students infected and another 130 put in quarantine.  Des Moines

24  has reported 215 students and 66 staff infected.  That's as

25  of -- as of yesterday.

1      THE COURT:  Mr. Freedman, are these -- are these the

2  same figures that were in your earlier brief?

3      MR. FREEDMAN:  They're updated.

4      THE COURT:  Updated?

5      MR. FREEDMAN:  Yes, updated, Your Honor.  And we can

6  submit record evidence if that would be --

7      THE COURT:  Okay.  Well, I have read your brief.  I

8  suspect Mr. Langholz and Ms. Latta have as well.  So I had some

9  specific questions that I was going to go to the standard that I

10  think I'm bound by.  The -- I think the *Rounds versus Planned*

11  *Parenthood* from my circuit says that when you have a, quote,

12  democratically, small d, passed statute that the threshold

13  requirement -- I think the circuit uses the term, and I'm sure

14  Mr. Langholz will correct me if I'm wrong -- that the Court has

15  to be more deferential to the passing of a statute by another

16  branch of government as opposed to enjoining another kind of act

17  by non-governmental defendants, so I guess I'd like to know do

18  you accept that as the law of this circuit, *Rounds*, and what

19  deference all of these factors that you've set out for

20  irreparable harm, balance of the equities, et cetera -- what --

21  how should I handle *Rounds* in approaching the factual record

22  that you've made in the declarations?

23      MR. FREEDMAN:  Your Honor, I think that it goes to

24  the -- the issue of *Rounds* and putting aside the question of

25  whether or not *Rounds* is the governing standard or not, we

1  believe that we meet that standard.  I think the issue that goes

2  to his likelihood of success on the merits, we have identified

3  in our papers in our brief five separate violations of the

4  Americans with Disabilities Act, any one of which would override

5  any deference the Court owes to the State legislature.  We've

6  separately identified as a preemption ground under the American

7  Relief Plan Act which under the Supremacy Clause would overrule

8  any deference the Court owes to State legislative

9  determinations.

10         THE COURT:  Okay.  Thank you.

11         MR. FREEDMAN:  Just -- I want to -- just in terms of

12  the harm -- and this is -- because the numbers are evolving, I

13  just want to give the Court some sense of how serious these

14  numbers are, so the 215 cases that the Des Moines district had

15  reported as of yesterday, that's 215 cases in 11 school days.

16  That's more than 25 percent of the total number of cases that

17  the Des Moines district reported in a full year last year.  So

18  we're on a -- on a fast-spreading trajectory.  It's faster than

19  anything that any school district saw last year.

20         The Eighth Circuit has repeatedly held that danger to

21  a plaintiff's health is sufficient to establish irreparable

22  harm.  We cite in our brief the *Kai versus Ross* case, the *Harris

23  versus Blue Cross* case, and courts across the country have found

24  that exposing somebody to elevated risk of contracting COVID-19

25  constitutes irreparable harm.  That's the cases we cite at pages

1  13 and 14 of our brief.

2        The second -- and we have two other bases for

3  irreparable harm.  The second is the loss of educational

4  opportunities.  A number of our plaintiffs, the Craig family

5  and -- I'm going to mispronounce the name -- the Valencourt

6  [phonetic] family have removed their children from public

7  schools because of increased risk for attending schools where

8  masks were not required, and we cite in our brief various

9  circuit court decisions from around the country where the loss

10  of educational opportunities has been found to constitute

11  irreparable harm.

12        The third source of irreparable harm flows from

13  plaintiffs having their civil rights violated, being subject to

14  discrimination.  Here being subject to the illegal choice of

15  exposing their clients -- my clients to risk -- risk to their

16  health or exclusion and loss of education also establishes

17  irreparable harm with the cases we cite in our brief.

18        Now, defendants filed a partial response to this late

19  last night.  I want to address --

20        THE COURT:  Right.  Because I'm concerned about the

21  first thing I think they concede -- or maybe they don't.  I'm

22  assuming they concede jurisdiction, but the next thing they

23  claim is that standing is doubtful because even if I do what you

24  want, i.e., enjoin 847, it doesn't give your plaintiffs what

25  they want.

1          MR. FREEDMAN:  Right.

2          THE COURT:  Is that essentially the argument they

3   make?

4          MR. FREEDMAN:  That's on their papers, Your Honor.

5          THE COURT:  Yeah.

6          MR. FREEDMAN:  And I think our response to that is

7   it's wrong both, I think, in their articulation of the legal

8   standard as well as on the facts.  So I think that with regard

9   to the question of ascertainability, if we look at the key

10  Supreme Court cases on this, *Friends of the Earth*, for example,

11  a plaintiff who faces threat of future injury due to illegal

12  conduct from the defendants, anything that will abate that

13  conduct and prevent -- and prevent a violation of the law in the

14  future is a form of redress.  That's from the *Friends of --*

15  *Friends of the Earth* decision.  Anything also that -- and also

16  from that decision, anything that encourages defendants to

17  discontinue current violations and deters them from future

18  violations is also sufficient to establish redress.

19          It's also important and the Supreme Court emphasizes

20  this last term in a case called *Uzeugbunam -- Uzeugbunam*.  I'll

21  try my best to spell it for the court reporter; it's

22  U-z-u-e-g-b-u-n-a-m, *versus Preczewski*, P-r-e-c-z-e-w-s-k-i, 141

23  Supreme Court 792 at 801.  The Supreme Court in that decision

24  emphasized citing prior holdings that the ability to effectuate

25  a partial remedy satisfies the redressability requirement, so

1  even if the relief that we're seeking only partially provides a

2  partial remedy, that's sufficient to meet the redressability

3  hurdle.

4        THE COURT:  As I got your prayer for relief, you want

5  an injunction against the enforcement of 847 which if I

6  understand the mechanics here would restore to a school the

7  discretion whether to require a mask or not.  Is that

8  essentially what would happen?

9        MR. FREEDMAN:  That's correct, Your Honor.  That's our

10  current request to the Court.

11        But I think on the -- on the factual basis why that's

12  sufficient -- so I think if you look at our complaint, three

13  important things to keep in mind.  One is that plenty of school

14  districts, including my understanding is every school district

15  where we have a plaintiff -- individual plaintiff last year, had

16  a universal masking requirement.  We cite some of those in

17  paragraph 4 of our complaint on page 3, but they all at some

18  point last year had masking mandates, and several of them

19  publicly said that they were suspending them in light of passage

20  of HF 847.

21        The second thing is that plaintiffs' school districts

22  have indicated that if the law is -- if enforcement of the law

23  is suspended or enjoined, they would reestablish universal

24  masking.  We cite some of the school districts that have

25  publicly stated that in paragraph 53 of our complaint at pages

1   18 and 19.

2          And the third point that I think is important to

3   remember and not to lose sight of is that the defendants -- the

4   State defendants -- I should qualify -- the State defendants

5   have made clear that they intend to enforce HF 847.  That's --

6   we cite the statements to that effect at paragraphs 48 and 49 of

7   our complaint, pages 16 and 17, and those statements along with

8   the other evidence we cite in our complaint establishes that but

9   for the defendants' -- State defendants' efforts to enforce the

10  law, they would reintroduce universal masking, so we think

11  that's sufficient to establish -- establish a likelihood that --

12  of redressability which is all we're required to do.

13          THE COURT:  The partial relief case sounds like it's

14  very much in your favor then because what you're claiming is

15  that if I enjoin it, then it will revert to the school district

16  to give you the relief that you -- that they may or may not give

17  you.  I guess the State's point is that there's no guarantee

18  that if you get what you want, it helps your clients at all.

19          MR. FREEDMAN:  We think we've established facts that

20  it's likely that the defendant school districts would give us

21  the relief.  They had similar measures in effect last year.

22          THE COURT:  And that's the redressability element of

23  standing.

24          MR. FREEDMAN:  That's correct, Your Honor.

25          One other point that they -- that they made in last

1  night's filing I also want to address is the timing.  They say

2  we should have sued four months ago when the law was first

3  passed.

4          THE COURT:  Right.  And I want to know should that be

5  part of the analysis about your entitlement to this

6  extraordinary remedy, the fact that they claim that you've

7  delayed, and I guess they essentially argue what's the hurry?

8  That's the way I read their brief.

9          MR. FREEDMAN:  So here's what I'd say.  I don't think

10  it's relevant to -- considering the issue.

11          THE COURT:  Okay.

12          MR. FREEDMAN:  I think it's important to keep a couple

13  of things in mind.

14          THE COURT:  Okay.  Well, they contrasted what happened

15  in Western Tennessee -- they said that claim -- and it is

16  distinguishable.  I get that.  But the claim that -- claim that

17  Judge Lipman addressed had -- it was like 18 days after the

18  Governor's intervening by use of an executive way to get around

19  the Shelby County mandate, that that's the reason they were

20  entitled to the extraordinary remedy.  You, on the other hand,

21  have waited four months.  So how should I approach that?

22          MR. FREEDMAN:  So I do think that the question of

23  timing may go to an affirmative defense like laches or anything

24  like that.  I don't think it factors into the considerations the

25  Court is supposed to apply in considering a request for

1 emergency injunctive relief, and I think it's important to keep

2 in mind two important -- maybe three important things with

3 regard to timing.

4          First is that schools just started in Iowa.  A lot of

5 school districts have been in session for two or three weeks at

6 this point.  Relatedly, and I think the second point is, that

7 the injury and irreparable injury to our clients has only been

8 manifest since the schools reopened and are operating without

9 universal masking.

10          THE COURT:  They cite to a New York Times article -- I

11 think it was July 7th -- in the brief that you knew the variant

12 was out of control two months ago; you didn't do anything.  Your

13 point is we didn't know of the specific harms that were to visit

14 us until we all got together with unmasked individuals.  I guess

15 that's your claim.

16          MR. FREEDMAN:  I think that's right, Your Honor.  I

17 think, like, we look at -- you don't have a claim before your

18 injury is manifest.  It took reopening the schools and see how

19 spread impacts -- how spread is occurring for injury to be

20 manifest, and we look at that school district -- I cited

21 Des Moines earlier where we're already 11 days into the school

22 year at 25 percent of the total number of students that were

23 infected last year.  And Des Moines is not alone.  Cedar Rapids

24 is at 16 percent of their totals from last year.  Linn-Mar is at

25 30 percent of their total from last year, and that -- that's at

1  the end -- as of the end of last week.  We haven't gotten the

2  updated numbers.  Waterloo as of two weeks ago -- again, they

3  haven't updated the numbers since end of August.

4         THE COURT:  And you're going to supplement the record

5  this morning by a filing with that?

6         MR. FREEDMAN:  Yes, Your Honor.

7         THE COURT:  Okay.

8         MR. FREEDMAN:  Waterloo is at 55 percent of where --

9  the total numbers that they were at last year.  I mean, we're

10 seeing spread unlike anything that we've seen previously, and

11 the data I think substantiates our clients' concern, fear,

12 threat that they're actually going to be irreparably harmed.

13        I think the other important point is that it's only

14 been in the last few weeks that the State defendants have made

15 clear their intent to vigorously defend the law and to punish

16 school districts that take basic steps to comply with federal

17 law and to follow public health guidance.  We cite statements

18 from the Governor or statements from Director Lebo at paragraphs

19 48 and 49 of our complaint.  And they've made those statements

20 after they were advised by the federal government that the

21 federal government put them on notice of potential violations of

22 federal law.  Like, in response to that, they said we're going

23 to go ahead and stick with our --

24        THE COURT:  You're referring to Director Cardona's

25 letter.

1      MR. FREEDMAN:  That's correct, which is the

2  August 18th letter as well as the Office of Civil Rights letter

3  that came in on August 30th.

4      THE COURT:  Is that in the record?

5      MR. FREEDMAN:  It's in the complaint.

6      THE COURT:  All right.  Thank you.

7      MR. FREEDMAN:  The -- on the likelihood -- just

8  turning to the likelihood of success on the merits, I alluded to

9  a lot of what I was planning to say.  A lot of it is covered in

10 our brief.  I just want to emphasize a couple points.  With

11 regard to our claims under Title II of the Americans with

12 Disabilities Act and the Rehabilitation Act, we don't think

13 there's any dispute that our plaintiffs have disabilities, and

14 they're all being discriminated against because of their

15 disabilities.

16     The violations -- the violations -- we identify five

17 separate violations or particular elements of the statute or

18 regulations in our brief.  They all flow from the legal

19 requirement that no person with a disability can be excluded

20 from participation in or be denied the benefits of the services,

21 programs, or activities of a public entity, or be subjected to

22 discrimination by any such entity.  I can walk through the five

23 separate violations -- they're outlined in our brief -- if it

24 would be helpful for Your Honor to do that.

25     THE COURT:  I don't think it's necessary unless you

1  do.  I've read your brief.

2          MR. FREEDMAN:  And I don't think that they respond or

3  engaged on that in last night's filing, so I think we can let

4  the brief speak for itself.

5          We've separately pointed to a second -- second set of

6  federal violations under our preemption claim.  When Congress

7  passed the American Rescue Plan, it provided Iowa schools with

8  hundreds of millions of dollars in emergency relief so that they

9  could adopt and implement policies in line with guidance for the

10  Centers for Disease Control.  CDC guidance -- I mentioned this

11  before -- specifically recommends that each school district

12  implement mask mandates.  The defendants' threat to enforce

13  HF 847 to punish schools who adopt and implement CDC guidance is

14  directly contrary and frustrates Congress's purpose in providing

15  this money.  That was the main message of Secretary Cardona's

16  August 18th letter.  We don't think that the preemption case is

17  closed.  It's clearly contrary and frustrates Congress's

18  purpose.  Separate basis -- it's a separate basis for why we

19  think we will prevail on the merits.

20          And just turning quickly to the -- to the last two

21  factors, the interests of other parties and the public interest,

22  as we note in our brief, when the Government -- when a

23  Governmental entity is the defendant, those factors effectively

24  merge.  There's no discernible cost or administrative burden to

25  the defendants from enjoining enforcement of HF 847.  Defendants

1   certainly -- the State defendants certainly didn't cite any in

2   their brief last night.

3           And with regard to the public interest, it's always in

4   the public -- in the public's interest to enforce a nation's

5   anti-discrimination laws, and it's also in the public interest

6   to protect children with disabilities and indeed all children to

7   reduce their risk of contracting COVID-19.  Again, they did not

8   engage on this last night, so I think we win on all four

9   factors.  We think that interim injunctive relief is warranted

10  and should be entered, and I'm happy to entertain any other

11  questions Your Honor has.

12          THE COURT:  Mr. Freedman, how do you respond to their

13  claim in their brief last evening that said that an order

14  enjoining -- well, let me put it this way.  Two questions.

15  First of all, what exact relief are you requesting?  I went --

16  when I read that part of their brief, I went to your prayer.  It

17  looked to me -- you had three -- three clauses.  You want an

18  injunction based upon each of the substantive claims -- ADA,

19  Rehabilitation Act of '73, and the American Rescue Plan of

20  2021 -- and it's a broad claim for enjoin 847.  So when they

21  claim in their brief it will cause -- an order enjoining would

22  cause confusion, what's your response to that?

23          MR. FREEDMAN:  Your Honor, I think we are seeking --

24  to be clear, we are seeking enjoining the State defendants from

25  attempting to enforce HF 847.  I think that's relatively clear.

1  I think that that would permit the defendant school districts

2  and, frankly, school districts around the state to make their

3  own judgment as to whether they think universal masking should

4  be introduced.  Many, many school districts including -- it's my

5  understanding all defendant school districts had universal

6  masking last year.  It would essentially restore things to the

7  status quo before passage of the law.  I don't think that's

8  confusing.  The attorney for the school districts can speak to

9  whether they think that would be confusing, but people wore --

10 students wore masks all last year.  Students all over the

11 country are wearing masks.  School districts in Minnesota, in

12 Illinois, in Missouri, in Nebraska -- school districts in those

13 states have adopted universal masking.  It's not rocket science,

14 Your Honor.

15          THE COURT:  Mr. Freedman, the other argument they

16 make -- one of the other arguments they make is that there's

17 nothing that prevents school districts and, I guess, everybody

18 from complying with 847 by saying we're enforcing the Americans

19 with Disabilities Act, therefore, it takes a back seat -- I'm

20 paraphrasing, and I'm sure counsel will correct me but -- or

21 maybe you can put this in better context than I just did.  But

22 the way I get their argument is that a school district can still

23 comply with federal law by permitting a mask mandate, and I

24 guess the school district would -- I'm trying to envision how

25 they'd do that.  I assume they'd say you can mask because we

1  want to comply with the ADA, but you don't have to.  I mean, I'm

2  confused by their argument.

3      MR. FREEDMAN:  Yeah.  I found that to be something of

4  a head scratcher when I read that this morning, Your Honor.  As

5  I understand the argument -- as I read or interpret it, there's

6  savings language at the end of the statute that says the

7  universal masking -- there's a carve-out for any other provision

8  of the law, which the State is now taking the position that the

9  violations that we're talking about would be considered other

10 provisions of the law.

11      I think -- you know, I've got two sort of factual

12 questions about that for the State if that's their position.

13 The first is that the State defendants have taken the

14 position -- and this is the language we cite at paragraphs 48

15 and 49 of our complaint at pages 16 and 17 -- that they intend

16 to enforce HF 847 vigorously.  That includes statements

17 attributed to a Department of Education spokesperson that risks

18 to school districts if they impose mask mandates include various

19 sanctions including loss of accreditation.

20      The second thing that I think it's important to keep

21 in mind is that those statements that we cited, including

22 statements from the Governor, are statements after the U.S.

23 Department of Education twice put the State on notice that

24 enforcement of HF 847 would violate the same federal laws that

25 we're citing in our complaint.  That's the Secretary Cardona

1  letter on August 18th and the Office of Civil Rights letter on

2  August 30th.  So I don't understand how they can be taking the

3  position publicly that they don't think there's any -- any

4  problem with federal law and the position that they articulate

5  in the brief that this is all much to do about nothing because

6  school districts can go ahead -- their position is school

7  districts can go ahead.

8          We think clearly for the Court on this and just making

9  clear that if HF 847 is enjoined would make it perfectly clear

10 to the school districts that they can go back to the way things

11 were before the statute was passed.  That's usually what the

12 purpose of an injunction is.

13         THE COURT:  Mr. Freedman, are you familiar with the

14 concept called judicial estoppel?

15         MR. FREEDMAN:  I am, Your Honor.

16         THE COURT:  So the defendant claims on the one hand

17 that we're going to vigorously enforce the law, and then they

18 come here and say, But wait a minute; we want -- we -- you can

19 have a mask mandate and say we're complying with federal law.

20 Is that essentially judicial estoppel?

21         MR. FREEDMAN:  Your Honor, I'm not sure if it meets

22 the technical finding.

23         THE COURT:  I'm not either.

24         MR. FREEDMAN:  I'm not sure it's sufficiently binding

25 on the Governor.  If the Governor comes out today and says,

1  Never mind; the school districts should do what they want; we

2  now see the light, that would be something I think the Court can

3  take notice of.  Given the pattern and the recalcitrance that

4  we've seen in the public statements to date, I don't think it's

5  sufficient to overcome a paragraph in a brief.

6          THE COURT:  Right.  The savings language we talked

7  about says, quote, The facial covering is required by any other

8  provision of law.  So I assume if a student came to school with

9  a mask, would the student be able to say, Well, never mind your

10  mandate; I'm relying on federal law?

11          MR. FREEDMAN:  Well, I think it's not a question of

12  individual masking.  I think the risk presented to our clients

13  and thousands of other children with disabilities here is the

14  risk that others are not masking.  That's really the -- I mean,

15  the -- the CDC is clear that these are recommendations that are

16  designed to reduce risk, and for our clients it's important to

17  reduce risk to the minimum extent possible.  Nothing is going to

18  eliminate risk.  Getting vaccines wouldn't 100 percent eliminate

19  the risk.  Masking -- masking reduces the risk.  Vaccines reduce

20  risk.  What we believe the ADA and the Rehabilitation Act

21  require is to allow our clients and students with disabilities

22  to be able to participate as full participants in school.  The

23  school can take the very easy step -- districts can take the

24  very easy step of telling everybody to wear masks, universal

25  masking.  They did it last year.  They did it last year before

1  the law.  States around the country, including every neighboring

2  state, have school districts that require this.

3         THE COURT:  Mr. Freedman, I saw nothing in the brief

4  of the State about the Supremacy Clause, and obviously I don't

5  have those kinds of cases every day involving the Supremacy

6  Clause, but I -- I did -- you cited -- in your opening brief,

7  you cited two cases about the Supremacy Clause.  One was *Pacific*

8  *Gas and Electric* from 1983 term and then *Hines versus*

9  *Davidowitz*, and I -- I'm going to ask Mr. Langholz this as well,

10 but in *Hines versus Davidowitz* that you cited, it says, This

11 Court, in considering the validity of state laws in the light of

12 treatises or federal laws touching on this same subject, has

13 made use of the following expressions:  conflicting; contrary

14 to; occupying the field; repugnance; difference;

15 irreconcilability; inconsistency; violation; curtailment; and

16 interference.  But none of these expressions provides an

17 infallible constitutional test or exclusive constitutional

18 yardstick.  In the final analysis, there can be no one crystal

19 clear distinctly marked formula.

20        So when I look at Article VI, Clause 2, of the

21 Constitution, how should I -- if we let 847 go forward with no

22 injunctive relief, is that in opposition to the three acts of

23 Congress?  Is that repugnant to the three acts of Congress?

24 What's my analysis?

25        MR. FREEDMAN:  So, Your Honor, I think we're just

1  talking about one act of Congress which is the American Rescue

2  Plan Act.

3          THE COURT:  All right.

4          MR. FREEDMAN:  I think, though, the answer is it's all

5  of the above.  It's everything you just cited.  It's contrary

6  to, inconsistent with, repugnant to.

7          Congress was very clear when it gave this money that

8  schools were expected to address compliance with CDC

9  recommendations.  HF 847 says, in effect, we don't care what the

10 CDC says -- in fact, the Governor has made statements to that

11 effect:  No school can adopt this; we don't care what the CDC

12 has said.  So that's -- given Congress's express invocation of

13 the CDC guidance, the conflict, the inconsistency is clear.  We

14 think that that's -- that's -- you know, it's as clear a

15 violation of the Supremacy Clause as we can have other than

16 writing into the statute or making the statute language like we

17 are expressly directing you to disregard anything the CDC says.

18 That's the only thing I can think of that would be a clearer

19 violation.

20         THE COURT:  I have the sense that you don't feel as

21 strongly about your third claim as you do about the first two.

22 Is my impression wrong?

23         MR. FREEDMAN:  Well, I think that -- here's what I

24 would say.  I think that our clients -- the first two claims are

25 really directed at our clients and protection of our clients,

1   and they directly intend to invoke our civil rights of our

2   clients as recognized in federal law.  I think the third claim

3   is a broader claim that could be asserted on behalf of our

4   clients but also all children in this state.  All children

5   deserve to be kept safe.  I do -- I do feel strongly about -- I

6   think we all -- we feel strongly about all three claims.  I

7   think the -- you know, the heart of our case for our clients, as

8   I think Your Honor correctly identifies, is probably more

9   focused on the first two claims.

10         THE COURT:  Okay.  Lastly, the State's brief says, in

11  essence, put this off; we want to file a motion to dismiss, and

12  the Court could benefit by more robust briefing.  I know the

13  latter is true.  I can always learn more.  But I wanted to know,

14  I guess, in contrast to the State, your claim is you're entitled

15  to the extraordinary remedy of injunctive relief because this is

16  indeed an emergency; there is irreparable harm.  Is that it?

17         MR. FREEDMAN:  That's correct, Your Honor.  I mean, we

18  look at the trends in the schools, you know, in the short time

19  that they've been open.  I mean, the Des Moines numbers are --

20  are off the charts, and a number of other districts are off the

21  charts.

22         THE COURT:  Okay.  Thank you, Mr. Freedman.

23         MR. FREEDMAN:  Thank you, Your Honor.

24         THE COURT:  Good morning, Mr. Langholz.

25         MR. LANGHOLZ:  Good morning, Your Honor.  My name is

1 Sam Langholz, and it's my privilege to represent Governor

2 Reynolds and Director Lebo here today, and, first of all, Your

3 Honor, we appreciate the opportunity to have this hearing.  We

4 recognize that in a temporary restraining order you could have

5 made the decision that it was appropriate to issue that

6 immediately.

7 　　　　　THE COURT:  Well, you know, I talked to Ms. Austen

8 last week -- I think the day after she filed it -- and, you

9 know, I always quote Judge Vietor, my predecessor, when I

10 started said only if there is a nuclear explosion should you

11 give injunctive relief without a hearing because you can always

12 learn more, and so I appreciate you saying that, but I have

13 learned something here in the time I've been here, and your

14 brief and Mr. Freedman and Ms. Austen's brief as well has been

15 very helpful to me because when you -- as you know from your

16 previous work, Mr. Langholz, when you guess, which is

17 essentially what you're doing at this early stage, you hope that

18 you -- just pray that you don't make a mistake because people's

19 rights are very valuable.  So I appreciate you saying that.

20 　　　　　So anyway, go ahead.

21 　　　　　MR. LANGHOLZ:  And given that and given the weighty

22 issues that plaintiffs present here, the State takes the

23 position that this is not appropriate for a temporary

24 restraining order, that the Court would benefit, as you noted,

25 from further briefing and development of a record and a

1  preliminary injunction and that really when you're looking at

2  whether a TRO should be granted, we're looking at the harm just

3  in this interim time period between when you would otherwise

4  have the opportunity to rule on a temporary injunction.

5          You know, stepping back just a bit, I think it's

6  helpful to remember that this is now the third year that Iowa's

7  students have been affected by the COVID-19 pandemic.  The

8  federal government, the state government, school districts, and

9  parents have all been faced with challenging decisions trying to

10  navigate that, and we're here today now talking about one

11  provision of House File 847, you know, section 280.31, that is,

12  you know, the latest attempt to resolve some of those issues for

13  the benefit of Iowa students, and there's certainly, like all

14  the decisions through the last three years, strong opinions on

15  all of those sides, but it's not a basis for granting the

16  temporary restraining order.

17          I want to kind of address a preliminary issue that

18  struck me as I was listening to the discussion and the specific

19  request here, and there's -- there was talk of enjoining

20  enforcement of House File 847, and although that's the short

21  term that's sort of been used throughout the plaintiffs' briefs,

22  that's a large bill.  So an injunction enjoining House File 847

23  would -- regardless of any other basis would be overly broad and

24  significant.  My understanding from plaintiffs' briefing and

25  discussion is that they're concerned about one section of that

1   bill which is now, you know, Iowa Code section 280.31.

2           THE COURT:  Right.  And I noted that as well.  Because

3   as you just pointed out, 65(d)(1)(C) says -- and it's entitled

4   Contents and Scope of Every Injunction and Restraining Order.

5   It says, (C), Describe in reasonable detail -- and not by

6   referring to the complaint or other document -- the act or acts

7   restrained or required.  So your point is that as you understand

8   the request, they're requesting only that the ban of a local

9   school district's being able to impose a mask mandate be

10  enjoined.

11          MR. LANGHOLZ:  Correct.  That's correct.

12          THE COURT:  And if that's not the case -- excuse me

13  for interrupting.  And if that's not the case, Mr. Freedman is

14  going to tell me in rebuttal that I got it wrong.

15          MR. LANGHOLZ:  That's correct.  And the State cites,

16  you know, at the beginning of our introduction on page 2, you

17  know, what we believe is a proper citation, you know, of that

18  act and what section, you know, ultimately is codified at

19  section 280.31.  And we understand -- you know, and it sounded

20  like there was no change in that position today that the request

21  is to enjoin Governor Reynolds and Director Lebo from enforcing

22  that provision, and this request, you know, whether at a TRO or

23  preliminary injunction, is neither necessary nor sufficient to

24  remedy the alleged harms of plaintiffs.

25          As Your Honor just discussed with counsel, section

1    280.31 contains an explicit exception that allows mandates of

2    face coverings when required by any other provision of law.

3    That includes federal law.  There was, in fact, a discussion,

4    you know, about this provision during the debates on the House

5    floor.  You know, the legislators expressed some confusion about

6    what -- you know, how broad that could be; it wasn't fully

7    acknowledged, you know, kind of an acknowledgment.  In fact, one

8    of the opponents, Representative Bohannan, was raising

9    perhaps -- this was a concern perhaps because how do we know

10   what sort of exceptions could come in there, but nonetheless,

11   you know, that's the law that was passed.

12              THE COURT:  Did that include a discussion of the State

13   prohibition against discrimination regarding the disabled, or

14   was that just -- was the discussion of the legislature just

15   limited to the federal law?

16              MR. LANGHOLZ:  It was -- it was a discussion of this

17   provision --

18              THE COURT:  Okay.

19              MR. LANGHOLZ:  -- recognizing that there's an

20   exception for other provisions of law and raising questions.

21   You know, that could be, you know, any number of things, you

22   know, legislators that were complaining, you know, that they had

23   only had a short period of time to -- to consider and hadn't

24   fully thought through all of the provisions of law that might be

25   implicated in that regard.

1          THE COURT:  So does the CDC order requiring masks on

2    school buses fall within that exception?

3          MR. LANGHOLZ:  The State has given guidance, I

4    believe -- and I think that's outside the scope of any claim

5    here but has -- has given guidance that that is a -- a mandate

6    that's required that this statute does not prohibit --

7          THE COURT:  Okay.

8          MR. LANGHOLZ:  And as the Court points out as well, I

9    mean -- you know, as a matter of law, you know, leaving aside

10   this injunction, you know, with the Supremacy Clause, regardless

11   of whether or not there's a savings clause in the statute, I --

12   governmental entities, private citizens are required to follow

13   federal law as a matter of the Supremacy Clause regardless of

14   whether the statute acknowledged it.  But when we're talking

15   about an injunction and whether it's necessary to take that

16   extraordinary relief or the even more extraordinary relief of a

17   temporary restraining order while we're sorting things out, the

18   fact that there's a savings clause and that that allows mask

19   requirements without an injunction, if it is required by -- by

20   federal law, you know, is significant for the question before

21   the Court here today.

22          And I want to -- the Court and plaintiffs expressed

23   some confusion about, you know, what the State's position is is

24   contradictory to some of the public statements, and I want to be

25   absolutely clear that the State defendants do not agree that

1  federal law -- the federal -- you know, any federal law that

2  we're aware of or the three federal claims that have been

3  brought here mandate as a matter of law that a universal mask

4  mandate in the entire school district that these 10

5  plaintiffs -- or perhaps if their argument is taken to its full

6  implications, you know, all Iowa schools -- that as a matter of

7  federal law, every school district must implement a universal

8  mask mandate for all students.

9          THE COURT:  I don't think that's their claim.  That's

10  not their claim.  Isn't their claim that we want discretion

11  restored to local schools, and absent that, there's violations

12  of federal law?  Isn't that their claim?

13          MR. LANGHOLZ:  That may be -- you are correct that

14  they don't state what I just said.

15          THE COURT:  Right.

16          MR. LANGHOLZ:  And I'm unclear at this juncture from

17  the briefing exactly what they claim.  I mean, all of the

18  declarations, you know, of these individuals are claiming they

19  will only feel safe with a universal mask mandate.  That's the

20  harm they're asking about.  You know, when outlined about the

21  harm, you know, it's the heightened risk to health or

22  alternatively being pulled out of school and having, you know,

23  harms from the education and the Hobson's choice, you know, that

24  they argue.  That presents -- if that's the harm -- you know,

25  and it's more nuanced -- you know, and it's a more nuanced

1   federal position -- then I think we have the serious

2   redressability problems that --

3           THE COURT:  Okay.  Well, I want to talk about

4   redressability in a minute because on ECF 17, which is their

5   brief, they've got -- and I'm at page 24.  Here's what the

6   plaintiffs tell me about this, because you just got into the

7   part about let me be clear; there was no contradictory position

8   of the State.  Because here's what the defense -- in footnote 29

9   the plaintiffs write, The Defendants cannot avoid their

10   obligations under the ADA even if compliance may violate state

11   law.  Under the Supremacy Clause, U.S. Constitution Article VI,

12   Clause 2, The laws of the United States, quote, shall be the

13   supreme Law of the Land, and Judges in every State shall be

14   bound thereby, any Thing in the Constitution or Laws of any

15   State or to the Contrary notwithstanding.  State law must give

16   way to the extent it conflicts with federal law.

17           So they're telling me you don't have a choice.  You,

18   the district court -- you don't have a choice; you have to

19   enjoin this because they can't enforce 847 because if they

20   enforce 847, it violates the Constitution.

21           MR. LANGHOLZ:  That appears to be their argument, Your

22   Honor.

23           THE COURT:  Yeah.

24           MR. LANGHOLZ:  And I don't disagree with any of the

25   legal propositions cited there about the Supremacy Clause and

1   the nature of the federal law, but there's nothing to give way

2   here because this statute already allows schools to enforce a

3   mask mandate if it is required by federal law.  Again, there's a

4   dispute about whether it's required by federal law or whether

5   discretion is required by federal law in some way, but the --

6   you know, the -- I think it may help, again, to kind of look

7   specifically -- you know, move a bit to the discrimination

8   claims because as we start to look at that -- as we start to

9   look at the discrimination --

10          THE COURT:  Mr. Langholz, let me interrupt there.  I

11  apologize.  I have the advantage of a transcript.  Because what

12  you just said was -- when you mentioned discretion:  Again,

13  there's a dispute about whether it's required by federal law or

14  whether discretion is required by federal law, and so that's two

15  different claims, isn't it?

16          MR. LANGHOLZ:  Yes.

17          THE COURT:  I mean, I don't think one -- and

18  Mr. Freedman is going to correct me or Mr. Duff will.  I don't

19  think they're claiming the first part of your statement is their

20  claim, but I do believe that the second part of your statement

21  is their claim.  You say, Again, there's a dispute about whether

22  it's required by federal law or whether discretion is required

23  by federal law in some way.  That's the way I get their claim.

24          MR. LANGHOLZ:  And I will be interested as well in

25  plaintiffs' response to that.

1          THE COURT:  Okay.

2          MR. LANGHOLZ:  As we looked at their complaint, their

3    application, the requested relief, I'm unclear how expansive --

4          THE COURT:  Okay.  And does that get back to your

5    redressability where you were at when I interrupted you?

6          MR. LANGHOLZ:  It does.  You know, and I can address

7    that -- that point briefly here too.  Again, it -- the request

8    they're asking for doesn't give them a mask mandate; it only

9    does the same thing that the statute already does, saying that

10   the school districts can comply with federal law.

11         Now, plaintiffs point to the school districts'

12   practices last year, to some statements of individual school

13   board members or superintendents about, you know, possible

14   intentions.  To my knowledge, there's nothing in the record and

15   I'm not aware of any school boards that have taken a vote that

16   have put in, you know, a mask mandate that is conditioned on

17   this -- you know, this statute being struck down in some manner,

18   you know, which is what the situation was before the Court in

19   Tennessee and why the Court there was able to avoid, you know,

20   redressability problems.

21         But there's changed circumstances now.  Certainly, you

22   know, plaintiffs have pointed out, you know, some of those, you

23   know, on the side of the Delta variant and such, but the subject

24   of masks in schools has been the topic of significant debate

25   throughout these school districts, you know, before you here

1  today.  Across the whole state, there are school board elections

2  coming up.  It's been the subject of, you know, campaigns and

3  discussions there.  I think, you know, there's not a basis to

4  conclude certainly at the level of facts that might be

5  necessary, even if facts can get us there without an absolute

6  government action, that, you know, Article III standing has been

7  met for this, you know, requested relief when it's uncertain and

8  speculative.

9         It's also speculative, you know, at this juncture in

10  the record here whether there's going to be any actual harm --

11  irreparable harm between now and when a preliminary injunction

12  could be ruled, and there's other processes to address these

13  concerns.  That's the normal IEP, IDEA special education

14  process, and, in fact, plaintiffs talk about that process in

15  their applications, and that demonstrates why this statute is

16  not what's causing their harm.

17         If you look at the declaration that's docket 3-11,

18  Ms. Preston's declaration, you know, paragraph 18, she talks

19  about how her child had a -- you know, new reasonable

20  precautions put into her plan to try to address the safety

21  issues and then complains after the first day of school at the

22  Des Moines Public School -- or the first week of school at the

23  Des Moines Public Schools that the plan they put in place was

24  not being followed.  You know, the remedy to that problem is to

25  go through the complaint process with Des Moines Public Schools,

1   with the AEAs, with the state agency.  There's nothing in the

2   declarations or the pleadings that are before you that this

3   remedy that is available in a way to go through the process --

4   the fact-specific process to decide for this individual student

5   what's necessary to keep them safe and comply with federal law,

6   you know, has been complied with.

7           THE COURT:  So she -- he or she then has an

8   administrative remedy that -- and who would be the arbiter of

9   that?  Who would be the decider of that?

10          MR. LANGHOLZ:  Well, ultimately it would come back to

11  this court, Your Honor.  It's, you know, a process -- or it

12  could come back to this court.  It's a process that starts at

13  the school level that can go to the AEA.  Eventually there's an

14  administrative law judge proceeding, and that can be appealed

15  either to the Iowa District Court or to the federal court.  Most

16  often it comes to this court.

17          THE COURT:  Right.  And I think Judge Lipman addressed

18  that in the Western Tennessee case if I recall, and she said

19  exhaustion wasn't required.

20          MR. LANGHOLZ:  That's correct.  You know, and I would

21  point out as well, again, that was a temporary restraining order

22  and with limited briefing from the State of Tennessee.  They

23  actually just in the last couple days, you know, have held a

24  preliminary injunction hearing that's still pending.  There's

25  been additional briefing filed by the State of Tennessee that

1   more robustly outlines, you know, those exhaustion arguments.

2   You know, the State of Iowa will certainly intend to be more

3   robustly explaining, you know, those as well.

4          I'd also briefly direct the Court to docket 3-12,

5   another declaration, a similar issue, again, where Ms. Geest

6   talks about, you know, asking for an accommodation that -- and

7   this is paragraphs 9 through 12 -- asking for an accommodation

8   that the child's teacher whenever there would be one-on-one

9   interaction would mask, you know, as a part of their reasonable

10  accommodation and, again, after the first week of school

11  complained -- or was complaining in this declaration -- although

12  there's no suggestion she complained through the proper channels

13  and started those administrative processes -- that the teacher

14  wasn't following those reasonable accommodations.  Those are the

15  processes.

16         And also, again, going back to the question about

17  what's the State's position and what do you mean when you say

18  you can comply with federal law, you know, although the question

19  is not before us right here, I would be hard-pressed to say

20  that, you know, it is -- that federal law might not require, you

21  know, one-on-one interaction between a teacher and, you know, a

22  medically fragile student to have to have a mask and that that

23  would be a situation where the school district could say, Yes,

24  teacher, you know, you need to do this when you're around them

25  because that's a reasonable accommodation required by federal

1  law, and, again, it would be possible right now with the

2  existing law because that's permitted under section 280.31

3  without an injunction, and it's unclear, again, why that isn't

4  happening or why the processes for -- for doing that --

5          One last also point to docket 3-5, paragraph 10, which

6  is another situation like this talking about a plan put

7  together, you know, for masking in close contact and small

8  groups, you know, a voluntary masking, try and have that done.

9  Again, the complaint there was that voluntary is not good

10  enough.  Now, I can't tell you from the factual record here

11  whether there would be a basis to conclude that mandatory

12  masking for those small group contacts would be appropriate, but

13  it's possible through the normal process that that's the

14  determination that could be made, that for that student and the

15  situation of that classroom and the interactions they're going

16  to have that federal law requires it.  And, again, it's not --

17  there's no injunction required to sort those problems out.

18          And that's really why this lawsuit's not appropriate.

19  These are fact-specific situations.  There's a process set up to

20  resolve those without enjoining the statute, without -- without

21  even the more nuanced version of, you know, their claim that

22  Your Honor suggested that there needs to be discretion.  There

23  is discretion where federal law authorizes and mandates that

24  discretion already under the statute.  But the State's position

25  and what the public comments, you know, appear to be discussing,

1  you know, is the idea that, you know, one of these public

2  schools could say, Well, because I have one medically fragile

3  student, you know, in this building, I am now required by

4  federal law to -- to implement a districtwide universal mask

5  mandate.  If a school were to do that, I suspect that the State

6  of Iowa would be very concerned that that's, you know, not

7  actually required by federal law and that they're violating Iowa

8  law by doing that.

9          You know, these are significant merits issues.  You

10  know, there's disability issues on both sides.  You know, the

11  federal Department of Education Q and A documents on their

12  website, you know, talk about how there have to be -- for

13  schools that do do mandatory mask mandates, there have to be

14  exceptions for disabled students on the other side, you know,

15  autistic students who may have issues with -- you know, with

16  wearing masks or those with sensory issues or deaf and, you

17  know, situations where masks are, you know, problematic.  These

18  are tough choices for the schools.  They're fact-specific

19  choices.  The legislature made a decision to help remove some of

20  these challenges by making clear, you know, what -- that on a --

21  which side of that equation they should start from and start

22  making exceptions to accommodate disabled students and the

23  requirements of federal law with respect to them, but that's not

24  a basis to enjoin the lawsuit.

25          As we've talked about, you know, ultimately as we

1  start to go into the merits and the things I think we should be

2  talking about, when we think about the likelihood of success and

3  eventually a preliminary injunction -- I mean, as we go

4  fact-specific, the questions are, you know, what is the

5  accommodation that would be necessary for these students?  You

6  know, are there accommodations short of universal mask mandates,

7  which repeatedly throughout the declarations and complaints

8  appear to be what plaintiffs are asserting are the only, you

9  know, possible solution?  But are there PPE that -- you know,

10  whether it's masks or other things that can be done for the

11  students who need to protect themselves?  You know, how has this

12  been handled, you know, with other sorts of significant --

13  protections from significant illnesses in the past?  You know,

14  are there distancing options?  You know, a host of fact-specific

15  things that through the normal process that can be followed, you

16  know, are an appropriate way to address these issues.

17         THE COURT:  Mr. Langholz, can I interrupt for just a

18  minute?

19         MR. LANGHOLZ:  Absolutely.

20         THE COURT:  One of the things I asked Mr. Freedman

21  about -- and it's in your brief and I want to know -- you know,

22  the public interest is always one of the important factors in

23  equitable relief, particularly emergency equitable relief, so

24  you've said in your brief -- and I think you cite The New York

25  Times article of July 7th about the Delta variant is here.  I

1   may have the dates of that wrong.  And you tell me that they

2   delayed four months; this was passed and effective May 20th.  So

3   I asked Mr. Freedman this as well.  In considering the public

4   interest and the balance of the harms, should I take into

5   account the fact that there's been four months and nothing

6   happened until last Thursday when they filed the lawsuit?

7           And, secondly, Mr. Freedman's response to that is,

8   Hey, nobody was in school then; we didn't know -- you know,

9   while we knew there was a pandemic, we didn't know the extent of

10  it until school which has only been recently convened two or

11  three weeks ago, and then he recites for me the record cases

12  that have come.  So that's a long question, but should I take it

13  into account, the four-month delay in their filing?

14          MR. LANGHOLZ:  The short answer is yes.  The U.S.

15  Supreme Court says that you should in the *Benisek* case that we

16  cite.  That says that the timing in coming forward -- certainly

17  that was a case where the timing was significantly more delayed

18  than even four months, but timing is an appropriate

19  consideration as is -- you know, you asked about the *Rounds*

20  standard and an injunction of, you know, a statute.  That's also

21  an appropriate consideration.

22          Although we did not cite it in our brief, I'd also

23  point the Court to *New Motor Vehicle Board v. Orrin Fox*, which

24  is 434 U.S. 1345, and there the U.S. Supreme Court talks about

25  the irreparable harm to a State anytime that a statute is

1   enjoined.  And that's particularly heightened here when we're

2   talking about a TRO rather than a preliminary injunction and

3   we're talking about a statute that already says you can follow

4   federal law.

5           THE COURT:  Right.  Well, it bothers me when you've

6   got the numbers that both I think you agree on.  I think

7   Mr. Freedman or Mr. Duff's brief tell me that there are 415,000

8   students in the Iowa public schools, 62,000 of which the

9   Department of Education says have some kind of disability, so

10  when you say -- I don't know.  Mr. Freedman I think used the

11  term in his brief calamitous consequences and the idea of

12  calamitous consequences to the plaintiffs.  I assume that your

13  request, as I get it, you want to put off a decision; you want

14  more time to file a motion and further briefing, that an order

15  now is going to create -- is going to impair the public

16  interest.  Is that --

17          MR. LANGHOLZ:  That's correct.  Yes, especially -- I

18  mean, whether it's a TRO or a preliminary injunction, either of

19  those, the State would believe it would impair the public

20  interest and put this exceedingly controversial issue back on

21  the plates of all of the school boards around the state.  That

22  could have been one of the conceivable rational bases for the

23  statute in the first place to, you know -- given everything

24  that's going on --

25          THE COURT:  What do you see -- I mean, is there going

1  to be a substantial -- is this going to boil down to just a

2  straight-out legal question?  Because it doesn't seem to me like

3  there's a great deal of difference about the affidavits of

4  Dr. Waddell and Dr. Srinivas.  I apologize for not getting that

5  pronunciation correct.  So if I did that going forward, do you

6  anticipate a lot of discovery?  Have you talked to counsel about

7  the way they've framed their lawsuit and what's necessary to get

8  the thing at issue if you want it put off?

9        MR. LANGHOLZ:  Unfortunately, Your Honor, we have not

10  really yet, given the short time frame from the filing and

11  preparing for this hearing --

12        THE COURT:  Okay.

13        MR. LANGHOLZ:  -- and other emergency matters --

14        THE COURT:  That's fine.

15        MR. LANGHOLZ:  -- but we stand ready to do that.  You

16  know, I can't represent for certain, you know, that we wouldn't

17  have any evidence, you know, to present.  We certainly may, but

18  I think your perception is accurate that this is largely a legal

19  question which also goes, you know, I think, as my answer to

20  your question about what do we say, you know, about the

21  statistics, the potential calamity, you know, coming -- and

22  those are certainly valid policy public concerns that are a

23  subject of debate, you know, right now throughout the state of

24  Iowa, throughout state government.  They were a part of the

25  debate in the legislature when the statute was passed about what

1    would happen, but it does not appear that any of those

2    evidentiary issues connect up to the legal claims that are being

3    brought here certainly in such a sufficient way, you know, for

4    the narrow question here about likelihood of success on a TRO

5    but likely on the claim at all.

6          THE COURT:  I have to tell you that your brief has

7    been helpful because it's brought to bear on many of the

8    *Dataphase* and *Rounds* factors.  You know, the argument about, you

9    know, we can still comply without violating the statute, what

10   I'll call the savings clause, I hadn't realized before when you

11   argued that facial covering is required by any other provision

12   of law that perhaps that's a, I guess, defense is what you

13   argued, so I hadn't seen that before your brief.

14         So anything else, Mr. Langholz?

15         MR. LANGHOLZ:  Just briefly, Your Honor.  I want to

16   make sure that I responded to every, you know, question that had

17   been raised last time.

18         There was some discussion about, you know, the

19   accuracy of the standing and redressability and whether the

20   recent U.S. Supreme Court case that I'm also not going to

21   attempt to present -- to pronounce has a contrary assertion, and

22   I want to be clear.  It's not contrary.  In fact, you know, the

23   majority opinion cites the case that we, you know, cited for the

24   proposition that you need standing for every form of relief, and

25   it needs to be redressing.  It was a critical part of their

1   analysis for why nominal damages, you know, was appropriate, and

2   so it's not contrary in any way; it was just recently reaffirmed

3   that that's an appropriate consideration.

4          So at bottom, this is upsetting the status quo.  You

5   know, we will also be arguing that, you know, a preliminary

6   injunction isn't appropriate, but regardless if this Court

7   ultimately disagrees for the drastic extraordinary remedy of

8   enjoining a duly enacted statute of the State of Iowa, the Court

9   should decline to grant a temporary restraining order and wait

10  until after a preliminary injunction.

11         THE COURT:  Mr. Langholz, unless I missed it, I didn't

12  see any response to the claim of the plaintiffs that 847 -- this

13  section of 847 violates the Supremacy Clause.  Did you argue

14  that and I missed it or --

15         MR. LANGHOLZ:  Well, we did not in the expedited

16  briefing here get into the significant merits of the substantive

17  claims.  The Supremacy Clause kind of flows throughout all three

18  of these claims.  I think specifically they highlighted

19  specifically with respect to the ARP Act, and it similarly --

20  you know, if that is, in fact, a federal requirement -- and the

21  State disputes that there is -- that the plaintiffs are correct

22  that there's anything in that statute that can -- is clear

23  enough to be a mandate that school districts either must have

24  universal mask mandates or must have discretion to implement

25  universal mask mandates, you know, again, an injunction wouldn't

1  be necessary because districts could comply with that as well.

2         But we've closely parsed from when we first received,

3  you know, the Secretary's letter, you know, explaining --

4  directing to the Act, the letter itself, as it's a hyperlink in

5  the complaint.  It doesn't actually say that mask mandates are

6  required or that school districts are required to be able to

7  implement universal mask mandates.  It's an interesting chain of

8  legal reasoning.  You know, it appears to be very carefully

9  lawyered, but it's a novel claim both from that letter and

10  from -- you know, as asserted here that somehow a -- an

11  appropriation and language authorizing the use of that money

12  linked somehow now to a regulation that a school comes up with a

13  plan to come back to return to learning and guidance from the

14  CDC that, you know, masking is appropriate.  That that chain of

15  links turns into a clear federal mandate that all schools either

16  must have discretion or must actually implement, you know, mask

17  mandates was a novel and unprecedented claim that the State of

18  Iowa would resist as well.  But if it's correct and if schools

19  concluded that it was correct, they would have authority under

20  the statute already without an injunction from the Court.

21         THE COURT:  When you're an older person like I am,

22  Mr. Langholz, *Cooper versus Aaron* was the Little Rock case that

23  all nine justices signed, and they talked about the supremacy of

24  federal law, and so I went and read *Cooper* yesterday.  If the

25  design of the Constitution is that federal law is supreme, I

1  don't see a way that this statute can be enforced.  Do you?

2          MR. LANGHOLZ:  Well, it would be -- it presupposes

3  that there is a federal mask requirement, and if a federal mask

4  requirement exists, then, you know, a school district would be

5  allowed, you know, and, in fact, would be required to implement

6  it.  It would -- perhaps in that situation if plaintiffs are

7  correct that there's not just a -- if it is correct -- and I

8  don't want to put words in plaintiffs' mouth that this is their

9  assertion, but if it's correct that federal law requires all

10  school districts to implement a mandatory mask mandate, school

11  districts could do so under the terms of this law.  Effectively

12  it would be a nullity at that point, you know, if it didn't have

13  a savings clause, as we're calling it, you know, in it, correct,

14  the Supremacy Clause would supersede it and prevent enforcement,

15  but we do have a savings clause, so an injunction is not

16  necessary at least, again, on the -- I can conceive perhaps of a

17  way -- you know, different sorts of injunctions than what's

18  being requested by plaintiffs here that might be more

19  appropriate, you know, depending on the nuance of the claim, but

20  a strictly just don't enforce the statute is an unnecessary

21  injunction.

22          THE COURT:  Thanks very much.

23          MR. LANGHOLZ:  Thank you, Your Honor.

24          THE COURT:  Ms. Latta, do the school boards have any

25  input that they -- that your clients want to make at this point

1  or -- no?

2          MS. LATTA:  No, Your Honor.  Yes.  We're not taking a

3  position with respect to this portion of the proceedings at

4  least on behalf of the nine districts that I represent.

5          THE COURT:  Right.  But as to the chaos, confusion,

6  calamitous impact, nothing?

7          MS. LATTA:  No position.

8          THE COURT:  All right.  All right.  Okay.

9          Mr. Freedman, do you want any rebuttal?

10          MR. FREEDMAN:  Yes, Your Honor, just briefly --

11          THE COURT:  Yes.

12          MR. FREEDMAN:  -- if I may.  So I want to just address

13  a few points Mr. Langholz raised.  The first is on the citation

14  to HF 847, that's a fair point.  I think we're looking

15  specifically to enjoin enforcement of section 280.31.  I

16  believe -- just so we're clear, I believe the specific language

17  we're talking about was a last-minute addition to the overall

18  education bill which is HF 847.  I believe it was -- the bill

19  was HR 2147.  We'll confirm that with Mr. Langholz, but it was

20  the -- the bill passed on -- the amendment to the overall House

21  File, it was passed on May 20th, 2021.  But I -- the statutory

22  citation in defendants' brief is certainly correct and is what

23  we're seeking to enjoin enforcement of.

24          THE COURT:  Okay.

25          MR. FREEDMAN:  I think the second point I want to

1  address is you had a colloquy with Mr. Langholz about the

2  State's position -- State defendants' position regarding whether

3  we're seeking to impose a universal statewide mask mandate or

4  give school districts the discretion to implement them based on

5  their judgment, their application of public health guidance, and

6  in accordance with their local public health authorities

7  applying CDC guidance.  Your Honor is correct.  We're asserting

8  the latter in this litigation.  We think that that's

9  consistent -- and to preview an argument we'll come back to, we

10  think that's consistent with what Congress intended in the

11  American Rescue Plan Act, that local school districts are

12  empowered to follow the CDC guidance in the language of the Plan

13  Act to the maximum extent practical.  I believe that's the

14  statutory language.

15         We think that exercising that judgment last year in

16  the absence of this prohibition, many school districts --

17  probably even most school districts across the state -- made the

18  judgment that universal masking was appropriate as a public

19  health measure to protect their -- to protect the student

20  population.  I don't know whether the disability community was

21  also advocating it at that time, but it certainly benefited and

22  protected the community of students with disabilities.  But just

23  so we're clear, we are just saying the purpose of this

24  injunction is to restore back the status quo before this bill

25  passed, which is what the purpose of an injunction serves, to

1   empower school districts to be able to take -- impose or adopt

2   universal masking, if that's the decision that they make.

3           Mr. Langholz suggested that our record is unclear on

4   sort of what -- what -- whether that would be necessary to

5   provide relief to our clients.  I don't want to revisit the

6   discussion of redressability.  I think that we've provided

7   sufficient facts to show that we meet the redressability

8   standard.  I do want to say -- I mean, it may be the case that

9   no school boards have taken a vote to implement this --

10  implement universal masking, but I think that's readily

11  explainable by a couple of things.

12          One is the defendants have stated that they consider

13  any such measures to be illegal under State law.  They've

14  also -- Director Lebo's department has taken public positions

15  that school boards who engage in enacting universal masking will

16  be sanctioned including up to loss of accreditation.  We look at

17  particular Iowa communities that have as public health measures

18  adopted universal masking and see that school districts in those

19  communities have said, We can't follow our local law because of

20  the State law.  Iowa City has -- the mayor has adopted a

21  universal masking, and the superintendent of the school district

22  has said, We can't follow that because of the State law.  So we

23  think that's sufficient to establish redressability along with

24  the fact that the school districts where all of our clients

25  reside had made that decision last year.

1          A lot of Mr. Langholz's -- turn to another point.  A

2    lot of Mr. Langholz's argument was directed towards questions of

3    exhaustion of remedies.  We are not bringing -- to be clear, we

4    are not bringing a claim in this lawsuit that requires us to

5    exhaust administrative remedies.  Mr. Langholz is suggesting

6    that maybe if we brought a claim under IDEA and that our

7    students were seeking enforcement of their Individualized

8    Education Plans, IEPs, there are exhaustion requirements there.

9    We are not bringing those claims there.  We considered them, and

10   we decided we don't need to do that to get our plaintiffs

11   relief.  Our claims here are under the Americans with

12   Disabilities Act which has no exhaustion requirement and under

13   the Rehabilitation Act which has no exhaustion requirement, so a

14   lot of the argument and a lot of what we just heard is just

15   simply a red herring.  It's not relevant to the claims we're

16   bringing.

17          On the -- on the question of timing, you know, I --

18   where I practice, one of our -- one of our D.C. judges, my

19   regular court -- he's a retired judge now, but he was very fond

20   of saying the federal government, the Department of Justice,

21   whenever they came in to defend a suit always claimed that the

22   plaintiff was both too early and too late, and I think that's

23   what we're hearing now:  too early to know whether it's really

24   going to cause harm; too late because the law was passed months

25   ago.  And you can't have it both ways.  I mean, if we look at it

1  another way, we brought suit promptly when it was clear from the

2  defendants' statements that they intended to vigorously enforce

3  the law, including statements from Director Lebo's department

4  about the consequences for school districts if they passed -- if

5  they enacted or reintroduced universal masking.  That's only

6  been clear since the school has resumed.  It's a matter of days,

7  not months.

8          It's also, I think, clear that our students are -- or

9  our plaintiffs are in districts where we're seeing spread unlike

10  anything that we saw last year.  So whether that would have been

11  apparent in May I think is not really relevant.  It's apparent

12  now.  We have injury now.  That's sufficient to grant relief.

13          On the -- on the colloquy at the end of Mr. Langholz's

14  argument about the -- about the preemption plan, there was some

15  suggestion that this was a novel or creative or crazy preemption

16  theory.  It's not.  Appropriations bills have substantive riders

17  all the time that make policy changes, implement policy changes.

18  That's something Congress is very fond of doing because it's

19  frequently easier to get something enacted as part of an

20  appropriation or otherwise.  It doesn't change things, the fact

21  that Congress directed that school districts in taking this

22  money were supposed to follow recommendations and guidance from

23  the CDC to the maximum extent practical.

24          HF 847 prevents, frustrates, directs Iowa school

25  districts that they can't follow that Congressional direction,

1   takes that discretion away from them, takes away any ability of

2   school districts to assess and make decisions for their

3   districts whether they want to -- whether they -- what they want

4   to do.  We know that last year the school districts where our

5   plaintiffs reside and many other school districts across the

6   state in assessing and making -- in assessing that guidance

7   concluded that they wanted universal masking.

8           Just two other sort of short points.  One is that I

9   think if the defendants' position -- if the defendants' position

10   is that the statute actually allows districts to comply with

11   federal law and adopt universal masking in order to comply with

12   federal law, there's really no harm -- no harm that they've

13   cited in granting the TRO.  There's simply -- if that's their

14   position, that's really -- entering the TRO is preserving the

15   status quo.  We have grave concerns based on the public

16   statements that the defendants -- State defendants have made

17   that they don't really -- that's not really their position in

18   which case we think a TRO would bring great clarity to the

19   situation and make it far easier for school districts to comply

20   with federal law, but if it's really the State's position and if

21   it's really Governor Reynolds' position that state [sic]

22   districts can adopt universal mask mandates if they conclude

23   that's what they're entitled to under federal law, there's no

24   harm to the State from entering the TRO.

25           And the final point I want to make, Your Honor, is

1  that we recognize that entry of a TRO and entry of emergency

2  injunctive relief is an extraordinary remedy, but we think these

3  circumstances warrant it.  When you look at the harm that our

4  plaintiffs face, the harm that thousands of other children with

5  disabilities in the state of Iowa face, the harm that could be

6  reduced, mitigated, potentially prevented if school districts

7  are allowed to make and in their judgment adopt universal

8  masking clearly weighs in favor of an injunction.  We think

9  similarly the violations of federal law here are clear and

10  warrant an injunction.  We think the public interest

11  currently -- certainly warrants an injunction, and we don't

12  think we've heard any burden from the State defendants that

13  would offset any of those.  So we recognize this is a big ask,

14  but we do think that circumstances warrant it, and we ask Your

15  Honor to enter an injunction.

16          THE COURT:  Mr. Freedman, the last thing I asked

17  Mr. Langholz, if I get in Count 1 and Count 2 the analysis about

18  are they disabled, were they discriminated against, did they

19  accommodate their disability -- okay.  If I get through that

20  analysis and the analysis on the Count 2 that the 280 -- 280.31

21  violates those two, then on a straightforward analysis, the last

22  question I ask you, am I being too simplistic to think that the

23  Supremacy Clause means that if Congress -- or if the State

24  passed a law saying you can discriminate -- I'm trying to think.

25  Is it -- what's the right analysis to look at the Supremacy

1   Clause here?  This can't -- this -- 280.31 cannot stand because

2   of the ADA and the Vocational -- and the Vocational [sic] Act of

3   '73.  Is that as simple as it is?

4          MR. FREEDMAN:  So here's what I'd say.  We have been

5   looking at the Supremacy Clause issue as related to the direct

6   language in the Congressional language in the American Rescue

7   Plan Act.  I don't think -- the question of whether it's

8   preempted under the -- under the Americans with Disabilities Act

9   I will tell Your Honor is far more complicated than I was

10  hoping.

11         THE COURT:  Okay.

12         MR. FREEDMAN:  We looked at that.  The issue, I think,

13  is that courts construing the question of preemption of the

14  Americans with Disabilities Act recognize that a lot of states

15  at the time the ADA was passed had State pronouncements and did

16  not intend to preempt -- Congress did not intend to preempt

17  those protections, so, you know, I can't cite -- I don't know

18  whether I can think of an Eighth Circuit case specifically

19  holding that, but in all candor, Your Honor, I think our

20  stronger claim on preemption is under the American Rescue Plan

21  Act.

22         THE COURT:  Okay.  Candor is always appreciated.

23         MR. FREEDMAN:  Unless Your Honor has any other

24  questions --

25         THE COURT:  No.  We'll consider the matter submitted.

1  Thank you very much.

2          We'll be in recess.

3          MR. FREEDMAN:  Thank you, Your Honor.

4          MR. LANGHOLZ:  Thank you, Your Honor.

5          (Proceedings concluded at 11:24 a.m.)

6

7

8                    C E R T I F I C A T E

9          I, Tonya R. Gerke, a Certified Shorthand Reporter of

10 the State of Iowa and Federal Official Realtime Court Reporter

11 in and for the United States District Court for the Southern

12 District of Iowa, do hereby certify, pursuant to Title 28 U.S.C.

13 Section 753, that the foregoing is a true and correct transcript

14 of the stenographically reported proceedings held in the

15 above-entitled matter and that the transcript page format is in

16 conformance with the regulations of the Judicial Conference of

17 the United States.

18         Dated at Des Moines, Iowa, September 16, 2021.

19

20

21                    /s/ Tonya R. Gerke
                      Tonya R. Gerke  CSR, RDR, CRR
22                    Federal Official Court Reporter

23

24

25