## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

THE ARC OF IOWA; CHARMAINE
ALEXANDER, individually and on behalf of
C.B., a minor; JONATHAN  CRAIG,
individually and on behalf of E.C. and J.C.,
minors; MICHELLE CROFT, individually and
on behalf of J.J.B., a minor; AMANDA
DEVEREAUX, individually and on behalf of
P.D., a minor; CARISSA FROYUM ROISE,
individually and on behalf of H.J.F.R., a minor;
LIDIJA GEEST, individually and on behalf of
K.G., a minor; MELISSA HADDEN,
individually and on behalf of V.M.H., a minor;
HEATHER LYNN PRESTON, individually
and on behalf of M.P. and S.P, minors; LISA
HARDISTY SITHONNORATH, individually
and on behalf of A.S., a minor; REBEKAH
STEWART, individually and on behalf of
E.M.S., a minor; and ERIN VERCANDE,
individually and on behalf of S.V., a minor,

       *Plaintiffs*,

    v.

KIM REYNOLDS, in her official capacity as
Governor of Iowa; ANN LEBO, in her official
capacity as Director of the Iowa Department of
Education; ANKENY COMMUNITY
SCHOOL DISTRICT; COUNCIL BLUFFS
COMMUNITY SCHOOL DISTRICT;
DAVENPORT COMMUNITY SCHOOL
DISTRICT; DECORAH  COMMUNITY
SCHOOL DISTRICT;  DENVER
COMMUNITY SCHOOL DISTRICT; DES
MOINES PUBLIC SCHOOLS; IOWA CITY
COMMUNITY SCHOOL DISTRICT;
JOHNSTON COMMUNITY SCHOOL
DISTRICT; LINN MAR COMMUNITY
SCHOOL DISTRICT; and WATERLOO
COMMUNITY SCHOOL DISTRICT,

       *Defendants*.

Case No. 4:21-cv-264

**REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION**

## INTRODUCTION

This Court's entry of the September 13 TRO enjoining enforcement of Section 280.31 has restored the *status quo ante* in the state.  Prior to the law, many school districts across Iowa had adopted universal masking policies, and since the TRO was entered, at least twenty-four school districts have reinstated universal masking.  The injunction has thus provided real relief for most of the Individual Plaintiffs and thousands of other families with children with disabilities.

The State Defendants wish to upend this, but the need for continued injunctive relief in the form of a preliminary injunction is real and urgent. COVID-19 continues to rage in Iowa. The latest data indicates that over the last week, there have been an average of almost 1,800 new cases per day, a rate 50% higher than when this action was first filed.  Srinivas Supp. Decl. ¶ 22. On September 22, more than 3,000 additional Iowa children were reported positive, more than a quarter of the state's new reported cases.  Srinivas Supp. Decl. ¶ 24.

A preliminary injunction is now necessary for the very reasons that prompted this Court to enter a temporary restraining order:  Absent relief, there is a likelihood of irreparable harm in the forms of an increased risk of severe illness or death, loss of educational opportunities, and violation of federal civil rights laws. Defendants do not dispute this.  Plaintiffs are also likely to succeed on the merits of their ADA and Rehabilitation Act claims; the State Defendants do not dispute four of the five claims. And the balance of the equities tips in Plaintiffs' favor. Further injunctive relief restoring the *status quo ante* will protect Plaintiffs and children with disabilities

across Iowa who are now in schools that have reinstated universal masking and permit other schools to consider their policies.[1]

The medical and public health community—from the Centers for Disease Prevention and Control ("CDC") to the Iowa Medical Association—stand united in their judgment: Masks are essential. Since the Court entered its TRO, newly released peer-reviewed studies confirm that universal masking is a critical tool to reduce spread of COVID-19 in schools: One study released on Friday that looked at over 1,000 schools in Arizona found that COVID-19 outbreaks were 3.5 times more likely in schools without universal masking. Srinivas Supp. Decl. ¶ 6. A second study that examined a nationwide sample found the rate of new pediatric COVID-19 cases in schools without universal masking was at least twice as high as schools with universal masking. Srinivas Supp. Decl. ¶ 8.

Against this backdrop, the resistance filed by the State Defendants is more notable for what it does not say than for what it does. Most notably, the State Defendants don't defend Section 280.31 or articulate any rationale for the law based in science or public health. For example, in light of evidence that the CDC, the American Academy of Pediatrics, the American Medical Association, the Iowa Medical Association, and the Iowa chapter of the American Academy of Pediatrics, all unequivocally support universal masking in K-12 schools, *see* Waddell Decl. ¶ 24, the State Defendants offer nothing—no declarations, evidence, or anything else—from a medical, public health, or education expert that challenges the evidence that universal masking is effective to reduce the spread of COVID-19 in schools.

---

[1] Following a preliminary injunction, other districts too may require masks. A number of school districts (including Defendant Denver School District) have expressed reservations about adopting universal masking in response to a "temporary" order, and others (including Defendant Waterloo School District) have reinstated universal masking only on a short-term basis. Roise Supp. Decl. ¶ 15; Craig Supp. Decl. ¶ 5.

And on the key legal issues, the State Defendants do not contest that Plaintiffs face irreparable harm in the heightened risk of exposure to COVID-19, loss of educational opportunities, and the violation of their civil rights under federal anti-discrimination laws. Similarly the State Defendants do not contest that enforcement of Section 280.31 is causing discrimination against children with disabilities in violation of the ADA and Rehabilitation Act in four of the five ways Plaintiffs identified: (1) by causing school districts to fail to make services, programs, and activities "readily accessible" by making them more dangerous for students with disabilities; (2) by effectively excluding students with disabilities from public education by creating a dangerous environment; (3) by offering segregated and lesser education services, including remote services, thus violating the integration mandate; and (4) by adopting a method of administration (namely threatening to disaccredit any school that adopts universal masking) that undermines the educational objective of public schools.  Injunctive relief is warranted under any of these uncontested grounds.

And on the sole ADA/Rehabilitation Act "success on merits" argument that the State Defendants contest——that universal masking is somehow not "reasonable" —State Defendants' argument ignores (i) that many schools in Iowa had adopted universal masking prior to Section 280.31, (ii) many have adopted masking requirements since the TRO issued; and (iii) schools in almost every other state in the country—including Illinois, Minnesota, Nebraska, Missouri, South Dakota, and North Dakota—have adopted universal masking.  It cannot be the case that such a widespread preventive public health measure deployed throughout the country and by Iowa school districts covering nearly 70% of students prior to the enactment of Section 280.31 is "unreasonable."  Preliminary injunctive relief is warranted to prevent the State Defendants from stopping school districts from granting this reasonable modification.

Finally, Plaintiffs' case finds further support from two decisions, issued on Friday, granting preliminary injunctions in nearly identical cases.  The one decision offered by the State Defendants denying a preliminary injunction expressly distinguishes this Court's TRO decision from the facts presented in that case.[2]

## DEVELOPMENTS SINCE THE TRO WAS ISSUED

1. In the last fourteen days, COVID-19 cases have increased in Iowa by 38%, and hospitalizations have increased by 9%.[3]  Srinivas Supp. Decl. ¶ 23.  Cases and hospitalizations are at an all-time high for 2021. Srinivas Supp. Decl. ¶ 21.

2. Cases in Iowa schools reflect this increase in COVID-19 case rates.  As of September 25, eleven Iowa school districts have recorded more positive cases thus far during the 2021-2022 school year than during the entire 2020-2021 school year.[4] Srinivas Supp. Decl. ¶ 26.  These eleven districts represent 33,525 students, or 6.6% of all Iowa public school students. *Id.*  In other words, more than one in twenty Iowa public school children lives in a district that has already exceeded the number of COVID-19 cases that it recorded during all of last year.

3. Twenty-seven school districts have recorded 50% or more positive cases thus far during the 2021-2022 school year than during the entire 2020-2021 school year. Srinivas Supp. Decl. ¶ 26. [5] These twenty-seven districts (including the eleven referenced above) represent 124,419 students, or 24.55% of all Iowa public school students. Srinivas Supp. Decl. ¶ 26. Stated

---

[2] The other order submitted by the State Defendants is just that – an order only -- that provides no reasoning.
[3] *Tracking Coronavirus in Iowa: Latest Map and Case Count*, N.Y. Times (Sept. 25, 2021), https://www.nytimes.com/interactive/2021/us/iowa-covid-cases.html.
[4] The following school districts have already exceeded their case counts from last year:  Alburnett (112%); Anamosa (1200%); Woodbine (100%); Waterloo (255%); Vinton-Shellsburg (110%); South Winneshiek (550%); South Hamilton (141%); Sioux City (116%); Muscatine (148%); Chariton (104%); Central City (350%).  Freedman Supp. Freedman Supp. Decl. ¶ 5 & Ex. E.
[5] In addition to the eleven districts identified above, the following districts are above 50%: College: (52%), Spencer (89%), Shenandoah (75%), Pella (86%), Mount Vernon (80%), Mid-Prairie (76%), Marshalltown (59%), Marion (75%), Lone Tree (73%), Linn-Mar (80%); Johnston (52%), Independence (50%), Greene (70%), Des Moines (76%), Dallas Center-Grimes: (53%), and Cedar Rapids (81%). Freedman Supp. Decl. ¶ 5 & Ex. E.

another way, around one in four Iowa public school children lives in a district that has already

recorded 50% or more of the total number of COVID cases that it recorded during all of last

year.  These and other school districts have reported significant rates of transmission:

- Van Buren County has reported an average of six positive cases reported per day, a 128% increase from the average two weeks ago.  Freedman Supp. Decl. ¶ 6 & Ex. F.  For the week of September 13, 2021, the Van Buren School District reported that district wide 18% of the students were absent.  Freedman Supp. Decl. ¶ 7 & Ex. G.  On or about September 21st, 10% of students district wide remained absent.  Freedman Supp. Decl. ¶ 7 & Ex. G.
- West Burlington School District's superintendent reported to the school board that over 3% of the students had tested positive for COVID-19 since the beginning of the school year.  Freedman Supp. Decl. ¶ 8 & Ex. H. The school nurse reported to the school board, "I have almost as many COVID positives in the elementary in the first two weeks of school than we had the entire school year last year. . . . At the junior-senior high level, from this date last year, I have triple the amount of cases at that level than last year.  The amount of illness that I've seen this year is unlike anything I've ever seen. . . . I don't know that I've ever sent home as many sick kids this year as I have in the past. Honestly, I'm just exhausted."  Freedman Supp. Decl. ¶ 8 & Ex. H.
- Greene County School District has reported at least 20 staff members have been out sick with COVID-19 since school started.  Freedman Supp. Decl. ¶ 9 & Ex. I.  The District has reported that this continues and more staff call in sick, then the school district might consider calling off classes in the coming weeks. Freedman Supp. Decl. ¶ 9 & Ex. I.

4. As stated above, the CDC and major medical associations, both national and Iowa

based, recommend universal masking in schools to address COVID-19 spread.  Waddell Decl. ¶

24.

5. Following this Court's order blocking enforcement of Section 280.31, twenty-four

school districts have adopted universal masking.  Srivinas Supp. Decl. ¶¶ 3(a)-3(x). These

measures have been adopted in eight of the ten school districts attended by Plaintiffs.[6]  While

most of these efforts cover all students, a number cover only K-6, Srinivas Supp. Decl. ¶¶ 3(b, d,

---

[6] Devereaux Supp. Decl. ¶ 2; Froyum Roise Supp. Decl. ¶ 3; Craig Supp. Decl. ¶ 2; Hadden Supp. Decl. ¶ 3; Croft Supp. Decl. ¶ 2; Stewart Supp. Decl. ¶ 2; Sithonnorath Supp. Decl. ¶ 2; Preston Supp. Decl. ¶ 2; Vercande Supp. Decl. ¶ 2; Geest Supp. Decl. ¶ 2; Alexander Supp. Decl. ¶ 2.

f, o, r, u, x),  and some are for only a limited duration, Craig Supp. Decl. ¶¶ 2-3 (Waterloo will

have universal masking for K-5 on a week-by-week basis); Stewart Supp. Decl. ¶ 2 (district will

have universal masking for K-6 until vaccines are available to children under 12); Vercande

Supp. Decl. ¶ 2 (same).  These policies also provide exemptions for medical conditions and some

include exemptions for religious beliefs.  Devereaux Supp. Decl. ¶ 2; Croft Supp. Decl. ¶ 2;

Stewart Supp. Decl. ¶ 2.

6. Plaintiffs are all students with disabilities that place them at risk of severe illness

should they contract COVID-19. Before this Court's injunction, Plaintiffs faced the difficult

decision whether to stay out of school or attend at risk to their health.  With masking in place,

parents are reporting, "With universal masking in place, I  . . . believe my child is much safer

returning to school.  My child is no longer having to take greater – and unnecessary risks – than

other students to get her education."   Sithonnorath Supp. Decl. ¶ 7. Parents report that they feel

safer sending their children to school in person and that their children no longer have to take

greater and unnecessary risks than other students to obtain an education; many also report that

their children feel safer and more comfortable attending school, and they appreciate that the

Defendant School Districts have taken measures to protect their children.  Devereaux Supp.

Decl. ¶¶ 4-5; Croft Supp. Decl. ¶¶ 3-5; Stewart Supp. Decl. ¶¶ 4-6; Sithonnorath Supp. Decl. ¶¶

4, 5, 7; Preston Supp. Decl. ¶¶ 4, 6, 8; Geest Supp. Decl. ¶¶ 6, 10; Alexander Supp. Decl. ¶¶ 4, 6.

## ARGUMENT

## I.     THIS COURT HAS JURISDICTION AND THE CONDUCT IS REDRESSABLE.

In issuing the TRO, this Court properly concluded that it had jurisdiction over this suit

and that the injury was redressable by Court action:

> The U.S. Supreme Court has made clear that the redressability standing
> requirement must be satisfied prior to entering federal court.  *See, e.g.,*

> *Allen v. Wright*, 468 U.S. 737 (1984).  The standard is not whether the
> proposed remedy is an absolute solution, but rather, whether it will "be
> 'likely,' as opposed to merely 'speculative,'" to redress plaintiff's injury.
> *Lujan*, 504 U.S. at 561; *see Uzegunam v. Preczewski*, 592 U.S. __, __,
> 792, 797 (2021) (emphasizing that the ability to effectuate a partial
> remedy satisfies the redressability requirement).  Here, Plaintiffs have
> standing to challenge section 280.31 in federal court because they allege a
> concrete and particularized injury that is redressable.  During the 2020-
> 2021 school year, numerous school districts around the state adopted,
> implemented, and enforced mask mandates for students, staff, and
> teachers.  If section 280.31 is not enforced, then those public school
> districts and others  in Iowa will have discretion to implement a mandatory
> mask policy on school grounds without violating Iowa law and risking the
> loss of accreditation.  Therefore it is not "merely speculative" that
> enjoining enforcement of section 280.31 will redress Plaintiffs' alleged
> injuries.  Accordingly, Plaintiffs have standing to bring this action before
> this Court.

ECF 32 at 16-17.  Subsequent developments have confirmed that the Court's assessment was

correct.  After the TRO was entered, redress has shown not only to be "likely," it has proven to

be certain: Numerous school districts across the state have adopted universal masking.  This

includes eight of the ten Defendant School Districts (Des Moines, Iowa City, Linn-Marr,

Davenport, Waterloo, Decorah, Ankeny, and Johnston) as well as sixteen other school districts

(Cedar Rapids, Ames, Urbandale, West Burlington, West Des Moines, Grinnell-Newburg,

Muscatine, Cedar Falls, Burlington, Fort Dodge, Fairfield, Marshalltown, Mount Vernon, Boone,

Van Buren, and College Community).  Srinivas Supp. Decl.¶¶ 3(a)-3(x).  Collectively, the

universal masking policies in these school districts include the largest school districts in the state

and protect over 30% of Iowa children in K-12 public schools.  Srinivas Supp. Decl.¶ 4.

And the reintroduction of universal masking has helped address the injury of many of the

Plaintiffs, who have confirmed that with universal masking in place, their children now have

safer access to their education.  In other words, in districts that have adopted universal masking,

children with disabilities that put them at greater risk of COVID-19 are no longer faced with a

discriminatory policy that forces them to go to school at their peril.  Alexander Supp. Decl. ¶¶ 5-6; Croft Supp. Decl. ¶¶ 3, 5. Devereaux Supp. Decl. ¶ 5; Geest Supp. Decl. ¶ 10; Hadden Supp. Decl. ¶¶ 3-4; Preston Supp. Decl. ¶¶ 6-8; Sithonnorath Supp. Decl. ¶ 7; Stewart Supp. Decl. ¶¶ 4-6.

This is more than sufficient to establish redressability, traceability, and standing under Article III. As the Western District of Tennessee said when rejecting a standing challenge in a very similar case: "'[T]he allegation that a defendant's conduct was a motivating factor in the third party's injurious actions satisfies the requisite standard.'" *G.S. by and through Schwaigert v. Lee*, No. 21-cv-02552-SHL, 2021 WL 4268285 at *6 (W.D. Tenn. Sept. 17, 2021) (attached as Freedman Decl. Ex. J) (quoting *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 714 (6th Cir. 2015). *See also S.B. v. Lee*, No. 21-cv-00317, slip op. at 18 (E.D. Tenn. Sept. 24, 2021) (finding in a nearly identical case that "[u]nder a broad view, or really any view, [a school district's] failure to prospectively adopt a mask mandate—the alleged reasonable accommodation—is an injury, a concrete, actual, and ongoing injury, for which [a Governor's] executive order [banning universal masking] is a traceable cause"). Here, the ban on mask mandates was not just a motivating factor in school districts' decisions not to require mask mandates, it was the deciding factor.

Nevertheless, the State Defendants in their resistance suggest redressability is not satisfied because only an "injunction requiring everyone in their children's schools to wear a mask" would provide Plaintiffs' relief. ECF 42 at 8.  That is incorrect.  It is black letter law that:

> a plaintiff who is injured or faces the threat of future injury due to illegal conduct at the time of the suit, a sanction that effectively abates that conduct and prevents is recurrence provides a form of redress . . . To the extent that they encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen

> plaintiffs who are injured or threatened with injury as a consequence of
> ongoing unlawful conduct.

*Friends of the Earth v. Laidlaw*, 528 U.S. 167, 185-86 (2000). Enjoining enforcement of Section 280.31 clearly abates the harm. Indeed, as noted above, promptly after entry of the TRO, twenty-four school districts reinstated universal masking.  Srinivas Supp. Decl. ¶ 3. That the reinstatement is directly due to the injunction is evident from the statement from Defendant Iowa City Community School Boards:

> The District believes that absent the Court's Temporary Restraining Order of September 13, 2021, restraining enforcement of §280.31, that Code section did not permit the District to require masks, or required the District to do so at the peril of the District and Administrators, e.g. potential loss of accreditation and licensure.  The law, in other words, stands as an obstacle to Plaintiffs' securing relief.

Freedman Supp. Decl. ¶ 2 & Ex. A. *See also supra* page 6 (citing plaintiff declarations attesting to benefit of masking in their schools).  This clearly satisfies the Supreme Court's rule from *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), explaining that standing and redressability are present if plaintiffs' "theory of standing … does not rest on mere speculation about the decisions of third parties" but "it relies instead on the predictable effect of Government action on the decisions of third parties."  *Id.* at 2566.

The State Defendants alternatively contend that standing cannot be established because enjoining Section 280.31 is not necessary in that it does not prohibit masking requirements if required by "any other provision of law" and that "a school already has it within its power to comply with any requirement of federal law." ECF 42 at 6.  As discussed at oral argument, because the State Defendants deny that the ADA and the Rehabilitation Act require that school districts be permitted to adopt universal masking as a reasonable modification, their argument

that the "savings" clause moots this suit is illusory.[7] *See also* 9/10/21 Tr. at 29, 32. Rather, this dispute confirms that there is a "case or controversy" sufficient for this Court to exercise jurisdiction.

## II.     DEFENDANTS DO NOT CONTEST THAT PLAINTIFFS HAVE SHOWN IRREPARABLE HARM.

In their motion for a TRO and preliminary injunction, Plaintiffs cited three discrete irreparable harms posed by enforcement of Section 280.31: 1) the heightened risk of severe illness because of exposure to a deadly viral contagion, 2) loss of educational opportunities, and 3) the violation of their civil rights under federal anti-discrimination laws. ECF 4-1 at 13-16. In granting the TRO, this Court found that Plaintiffs had demonstrated all three types of irreparable harm. ECF 32 at 19-22. In their resistance, the State Defendants do not contest that Plaintiffs have established irreparable harm. *See* ECF 42. In other words, State Defendants do not dispute that their enforcement of Section 280.31 increases the risk children with disabilities will suffer more severe illness, will lose educational opportunities, and will have their civil rights violated. Injunctive relief is clearly warranted.

## III.    PLAINTIFFS HAVE DEMONSTRATED LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.  Plaintiffs Have Shown Likelihood of Success on the Merits on ADA and Rehabilitation Act Violations.

#### 1.  State Defendants Have Waived Any Objection to Multiple Bases for the Court's TRO.

In seeking injunctive relief, Plaintiffs noted that the Defendants had violated the ADA and Rehabilitation Act in five distinct ways. ECF 4-1 at 20-24. In entering the TRO, the Court found that Plaintiffs had demonstrated likelihood of success on the merits on four independent

---

[7] The State Defendants do not dispute that if school boards proceed to adopt mask requirements absent an injunction, they will do so at their peril.

grounds.  ECF 32 at 24-27. In their resistance, the State Defendants do not challenge that

Plaintiffs have disabilities, are enrolled in public schools, and are qualified to receive the

guarantee of a free public education.  *Compare* ECF 4-1 at 18-20 *with* ECF 42. And in their

resistance, the State Defendants do not dispute that the Court determined that enforcement of

Section 280.31 causes Plaintiffs to be discriminated against in violation of Title II of the ADA

and the Rehabilitation Act on multiple, independent grounds Plaintiffs identified.  As Plaintiffs

established, enforcement of Section 280.31:

- causes school districts to fail to make services, programs, and activities "readily

  accessible" under 28 C.F.R. § 35.150.  *Compare*  ECF 4-1 at 20-21 and ECF 32 at 25-26

  (discussing *Argenyi v. Creighton University*, 703 F.3d 441, 451 (8th Cir. 2013) ("[T]he

  ADA and the Rehabilitation Act require [schools] to start considering how [their

  educational programs] are used by non-disabled . . . students and then take reasonable

  steps to provide [disabled students] with a like experience") *with* ECF 42 (no discussion

  of 28 C.F.R § 35.150 or *Argenyi*);

- excludes Plaintiffs and students with disabilities from participation and obtaining the

  benefits of public schools in violation of 28 C.F.R. § 35.130(a).  *Compare* ECF 4-1 at 21

  and ECF 32 at 24-25 (discussing 28 C.F.R. § 35.130(a*)* and *Layton v. Elder*, 143 F.3d

  469, 472 (8th Cir. 1998) ("no qualified individual with a disability shall, by reason of

  such disability, be excluded from participation in or be denied the benefits of the services,

  programs, or activities of a public entity") (quoting 42 U.S.C. § 12132) *with* ECF 42 (no

  discussion of 28 C.F.R. § 35.130(a) or *Layton*);

- means the State Defendants have adopted a method of administration (threatening school

  district's accreditation) that has the effect of defeating or substantially impairing the

objectives of the program (education) with respect to children with disabilities, in violation of 28 C.F.R. § 35.130(b)(3). *Compare* ECF 4-1 at 22-23 (discussing that threatening to strip accreditation has "the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" and "the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities") *with* ECF 42 (no discussion of 28 C.F.R. § 35.130(b)(3)); and

- prevents school districts from providing education in the most integrated, non-segregated manner in violation of 28 C.F.R. § 35.130(d). *Compare* ECF 4-1 at 23-24 and ECF 32 at 26-27 (discussing *Olmstead v. L.C.*, 527 U.S. 581, 592 (1999) (the "most integrated setting" means "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible") *with* ECF 42 (no discussion of 28 C.F.R. § 35.130(d) or *Olmstead*).

Any one of these uncontested violations establishes a violation of federal law sufficient to establish likelihood of success on the merits. Plaintiffs urge the Court to enter findings in its preliminary injunction decision on each of these four uncontested points.

2. **Universal masking is a reasonable modification within the meaning of the ADA and the Rehabilitation Act.**

The one claim of the five Plaintiffs raised that the State Defendants contest on the merits is whether allowing schools to adopt universal masking is a reasonable accommodation. In entering the TRO, this Court found:

> Defendants appear to be violating the ADA's requirement that schools
> must provide "reasonable modifications" to disabled students in order to
> provide them with equal access to school programs, services, and
> activities. *See DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist.*,
> 126 F.3d 1102, 1105 (8th Cir. 1997) ("Title II regulations require a public

> entity to 'make reasonable modifications in policies . . . when the
> modifications are necessary to avoid discrimination on the basis of
> disability, unless the public entity can demonstrate that making the
> modifications would fundamentally alter the nature of the service.'"
> (quoting 28 C.F.R. § 35.130(b)(7))). A universal masking requirement
> instituted by a school is a reasonable modification that would enable
> disabled students to have equal access to the necessary in-person school
> programs, services, and activities. Allowing schools to make the
> reasonable modification of universal masking to protect disabled children
> also would not fundamentally alter the nature of the services that public
> schools provide.

ECF 32 at 26.  In their most recent filings, the State Defendants claim that *permitting* schools to

make decisions as to whether to require masks "would be an undue burden," "fundamentally

alter the nature of the educational program established by the State," or "void the Legislature's

policy decision" to take a controversial issue from the local schools.  ECF 42 at 12. And they

contend that masking "can have negative educational and social consequences."  ECF 42 at 13.

These arguments are out of step with the law, science, and experience.

In the Eighth Circuit, "[t]here is no precise reasonableness test, but a [modification] is

unreasonable if it either imposes undue financial or administrative burdens, or requires a

fundamental alteration in the nature of the program." *DeBord v. Board of Educ*., 126 F.3d 1102,

1106 (8th Cir. 1997). *See also Davis v. Francis Howell Sch. Dist*., 138 F.3d 754, 757 (8th Cir.

1998) (finding a modification to be unreasonable if it "would impose undue financial and

administrative burdens on the district."). After a plaintiff establishes a modification is

reasonable, the burden shifts to the defendant to demonstrate a fundamental alteration or undue

burden. *See, e.g*., *Hahn ex rel. Barta v. Linn Cnty.*, 130 F. Supp. 2d 1036, 1051-52 (N.D. Iowa

2001) (quoting 28 C.F.R. § 35.164); *Murphy by Murphy v. Harpstead*, 421 F. Supp. 3d 695, 717

(D. Minn. 2019).

The evidence submitted by Plaintiffs establishes that universal masking is a reasonable modification. How reasonable? It is in line with the recommendations of the CDC, the AAP, the AMA, and the Iowa Medical Association. Waddell Decl. ¶ 24.  It is consistent with the practice of one third of the school districts in the state as of August 2020,[8] districts that comprised nearly 70% of the student population in the state.[9] Today, school districts across the country have adopted universal masking requirements, including schools in Illinois, Minnesota, Missouri, Nebraska, North Dakota, and South Dakota. As have a growing number of districts in Iowa, including eight of ten Defendant school districts and at least an additional sixteen districts following this Court's TRO.  Srinivas Supp. Decl. ¶¶ 2 & 3.

It cannot be the case that a preventive public health measure so widespread in use and recommended by the CDC can be a "fundamental alteration," or an "undue financial or administrative burden." *See also S.B. v. Lee*, No. 21-cv-00317, slip op. at 40 ("The Court strains to understand how a mask mandate would impose an undue burden on the Knox County Board of Education when it voluntarily adopted one for the entirety of the previous school year."). And Defendants have submitted no evidence that it is.

This modification is all the more "reasonable" when cases of COVID-19 among Iowan children are soaring[10]—a fact Defendants do not dispute. Srinivas Supp. Decl. ¶¶ 24, 26. According to the CDC and IDPH, masks are one of the most effective measures to combat

---

[8] Isabella Murray, *Which Iowa Schools Require Masks, Which Don't*, Iowa Starting Line (Aug. 17, 2020), https://iowastartingline.com/2020/08/17/which-iowa-schools-require-masks-which-dont/.
[9] *Id.*
[10] Tim Webber, *Iowa sets new 2021 high for COVID hospitalizations — with new reported cases not far behind*, Des Moines Reg. (Sept. 22, 2021), https://www.desmoinesregister.com/story/news/health/2021/09/22/covid-19-iowa-state-reaches2021-high-hospitalizations-delta-variant-cases-deaths/5804666001/ ("Among the hospitalized patients are 18 children, an age group that again accounted for the largest number of new reported cases over the previous week. More than 3,000 additional children were reported positive for COVID-19 in Wednesday's data update — more than a quarter of the state's 12,163 new reported cases.").

transmission of the deadly virus.  Waddell Decl. ¶¶ 25, 26; Srinivas Decl. ¶ 23; Srinivas Supp. Decl. ¶¶ 6-8, 13.  This is especially true for unvaccinated people, a cohort that includes children under the age of 12 who have not yet been approved for vaccinations. *See, e.g*., *S.B. v. Lee*, No. 21-cv-00317, slip op. at 33 (stating in an analogous case that "among the unvaccinated, [COVID-19] is untamable without communitywide masking inside schools" and noting the risk to the disabled students from the "extreme contagiousness of the Delta variant"). Indeed, a study newly released by the CDC's Morbidity and Mortality Weekly Report on September 24 concluded that "increases in pediatric COVID-19 case rates during the start of the 2021–22 school year were smaller in U.S. counties with school mask requirements than in those without school mask requirements" – and noted that transmission rates in schools with universal masking were less than half that of schools without.[11] Srinivas Supp. Decl. ¶ 8. In a second study, also released on September 24, based on data from "the two largest Arizona counties, with variable K–12 school masking policies at the onset of the 2021–22 academic year, the odds of a school-associated COVID-19 outbreak were 3.5 times higher in schools with no mask requirement than in those with a mask requirement implemented at the time school started."[12] Srinivas Supp. Decl. ¶ 6.

As the court in the Western District of Tennessee observed when finding masks to be a reasonable modification under Title II of the ADA in a case nearly identical to this one, "the use of masks is overwhelmingly supported as a means of preventing COVID-19 transmission." *G.S.*

---

[11] Samantha E. Budzyn et al., *Pediatric COVID-19 Cases in Counties With and Without School Mask Requirements — United States, July 1–September 4, 2021,* MMWR (Sept. 24, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7039e3.htm?s_cid=mm7039e3_w
[12] Megan Jehn, *Association Between K–12 School Mask Policies and School-Associated COVID-19 Outbreaks — Maricopa and Pima Counties, Arizona, July–August 2021,* MMWR (Sept. 24, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7039e1.htm?s_cid=mm7039e1_w.

*by and through Schwaigert v. Lee*, No. 21-cv-02552-SHL, 2021 WL 4268285 at *6 (W.D. Tenn.

Sept. 17, 2021).

    The State Defendants' arguments in resistance are without merit.

    First, the State Defendants assert that a mandate would purportedly "impose

administrative and potential financial and legal burdens." ECF 42 at 13. The State Defendants

offer no support for this—no declarations or other evidence from state public health, education,

or medical officials, or anyone else—indeed, they dedicate no more than one sentence to the

topic. The rush of schools to adopt universal masking since entry of the TRO speaks to the

shortcoming of this assertion. So does the fact that the majority of schools had universal

masking prior to Section 280.31.

    Second, the State Defendants contend "[a] universal mask mandate is also not a

reasonable modification because it requires infringing on the rights of third parties." ECF 42 at

13. But courts have long recognized schools' broad discretion to implement health regulations

that intrude on third parties' rights in more invasive ways than universal masking allegedly does.

*See, e.g., Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *Boone v. Boozman*, 217 F. Supp. 2d

938, 954 (E.D. Ark. 2002) (upholding Arkansas's school immunization requirements and stating

"[i]t is well established that the State may enact reasonable regulations to protect the public

health and the public safety, and it cannot be questioned that compulsory immunization is a

permissible exercise of the State's police power"); Iowa Code § 139A.8(2)(b)-(e) (requiring

proof of immunization against diptheria, pertussis, poliomyelitis, tetanus, rubeola, rubella, and

varicella prior to enrollment in any licenses child care center, elementary, or secondary school;

proof of immunization against hepatitis type B prior to enrollment in kindergarten; and proof of

immunization against meningococcal disease prior to enrollment in seventh or twelfth grade in

Iowa); Iowa Admin. Code r. 641-7.6 (agency regulations requiring proof of immunization for students enrolled in elementary, secondary, and other types of schools); *see also B.W.A. v. Farmington R–7 Sch. Dist.*, 554 F.3d 734, 741 (8th Cir. 2009) (upholding dress code). Face masks are minimal burdens compared to forced exclusion, vaccinations, and even rigid dress codes that suppress core political speech under the First Amendment.[13]

Third, the State Defendants contend that masks "can have negative educational and social consequences." ECF 42 at 13. For the broad point, they point exclusively to a WHO Interim Report from 2020 – but with a parenthetical that states that the benefits of masking should be weighed against potential harms, include feasibility, discomfort and social and communications concerns. ECF 42 at 13. As the declarations of Dr. Srinivas and Dr. Lewkowitz make clear, this assessment has been superseded. As Dr. Srinivas notes, subsequent public health determinations since the WHO report, including guidance from the CDC, recommends adoption of universal masking in schools. Srinivas Supp. Decl. ¶¶ 17-20. And as Dr. Lewkowitz notes, "concern regarding the impact of masks on children's cognitive development do not justify a prohibition on masking in schools as necessary to reduce the transmission of COVID-19 among school children, in accordance with guidance issued by the CDC and American Academy of Pediatrics." Lewkowtiz Decl. ¶ 9. In particular, "masks are not likely to hinder speech and language

---

[13] The State Defendants rely on three cases to support their conclusory statement that universal masking is not a reasonable modification. ECF No. 42 at 12. All are inapposite. In two of the cases, the courts found defendants produced compelling evidence as to unreasonableness. *See Davis v. Francis Howell Sch. District*, 138 F.3d 754, 755 (8th Cir. 1998) (denying parents request that school nurse administer daily to their son a dose of a central nervous system stimulant twice the recommended maximum, raising safety and liability issues for the district); *Timothy H. v. Cedar Rapids Community. School District*, 178 F.3d 968, 973 (8th Cir. 1999) (holding request to establish special free bus route to be an unreasonable modification where "evidence establishes that the school district would be required to spend approximately $24,000 per year to establish a special bus route to enable [the student] to attend Kennedy High School, despite the undisputed fact that [the student]'s neighborhood high school has a special education program that meets her needs."). And in *Pottgen v. Missouri. State High Sch. Activities Association*, the Eighth Circuit determined that the student was not a "qualified individual" under the ADA and was not eligible for a reasonable modification.

development in young school age children." Lewkowtiz Decl. ¶ 10. Further, "research strongly suggests that masks worn by others will not have any long-term detrimental consequences for young children's ability to perceive identity, emotional, and visual-speech cues in a social partner's/interlocutor's face." Lewkowtiz Decl. ¶ 20.

Not only is there no current peer-reviewed evidence to suggest that masks harm the educational attainment of students with disabilities, but there is *significant* evidence finding that online-only learning environments—which Governor Reynolds has suggested as an alternative for students with disabilities seeking to protect their health—is harmful to students with disabilities. *See generally* Basham Decl.[14] What Plaintiffs ask is that Section 280.31 be enjoined, so that school districts can weigh these factors, and their obligations under the ADA and the Rehabilitation Act.

Fourth, the State Defendants suggest that Plaintiffs could seek other modifications. ECF 42 at 15. As the district court in the Eastern District of Tennessee recognized, however, *no* modifications are as vital to disabled students as masking. *See S.B. v. Lee*, No. 21-cv-00317, slip op. at 29 (rejecting an argument that a district could pursue other accommodations without masking because mask-wearing is "*the* most important of the CDC's guidelines"). The core issue is what do the ADA and Section 504 require the Defendants do for Plaintiffs – students with disabilities that put them at severe risk should they contract COVID-19 – so that they may

---

[14] Online-only learning disadvantages students with disabilities for a number of reasons: (1) few online learning management systems are specifically designed to support the intensive needs of students with disabilities; (2) online learning environments are far more complex to navigate for students with disabilities and those who support them resulting in an inability to provide meaningful, intensive supports; (3) students with disabilities often lack the necessary skills to independently demonstrate success in online-only settings; (4) online education require far more parent participation than face-to-face instruction, but many parents do not have the time or necessary expertise to successfully support students with disabilities in these settings; and (5) educators are rarely trained in the necessary skill set to use online learning tools effectively. *Id*. at ¶¶ 17-22. Thus, "full-time online education should never be considered as the only placement option for students with disabilities, as this would not be expected to provide these students with the same level of educational goal attainment that they would receive via well-designed face-to-face instruction." *Id*. at ¶ 23.

engage in education, in an integrated setting, without discrimination, including the heightened

risk of hospitalization as a price of attending school. School districts must have the liberty to

consider the options, freed of the State Defendants' threat to cut school accreditation, to which

the public school's total ability "to exist" as well as receive any funding is totally dependent.[15]

     Finally, the State Defendants make the important point that there are students with

disabilities who will need an accommodation from a mask mandate. ECF 42 at 15. It is a view

Plaintiffs share. And last and this year alike, children with disabilities have been granted

accommodations when a request has been made.[16] This is confirmed by the parent declarations

the State Defendants have submitted, which note that the children with disabilities have each

been granted an accommodation when requested.[17]

     The proposition is simple: The ADA and Section 504 require that schools be able to

require masking, in times of high transmission, to enable students with disabilities that increase

their risk of severe illness from COVID to get equal access to education. The ADA and Section

504 also provide exceptions to those students with disabilities who, for medical reasons, cannot

---

[15] *See* Ian Richardson, *Can Iowa Schools Defy the State's COVID Mask Ban Like Florida and Texas Schools Are?*, Des Moines Reg. (Aug. 16, 2021), https://www.desmoinesregister.com/story/news/politics/2021/08/16/what-backlashcould-schools-face-if-they-defy-iowas-mask-mandate-ban-kim-reynolds-cdc-covid/5512069001/ (in which the Department of Education warned that "school districts that choose not to follow the ban could receive citations" and "be referred to the State Board of Education" which has the power to de-accredit schools). *See generally* .Iowa Code ch. 28 (setting out uniform school requirements of all accredited public and private schools, to which Iowa Code §280.31); Iowa Code § 256.11(10)(setting out the accreditation process); Iowa Code § 256.11(11)(setting out the de-accreditation process); Iowa Code § 256.11(12) (providing that upon deaccreditation, "the deaccredited school district ceases to exist" and providing for division of assets and property of the former school district, including revenues based on student enrollment in the former school district).

[16] See, e.g., Sarah Beckman, *Some central Iowa schools implement medical, religious exemptions for mask mandates,* WeAreIowa (Sept. 22, 2021), https://www.weareiowa.com/article/news/health/coronavirus/iowa-covid-masks-medical-religious-exemptions-forms-what-are-they-school-districts-reasonable-accommodation/524-d3a8381e-265b-4b07-95ca-a62e90cb2f74?utm_campaign=snd-autopilot&utm_medium=social&utm_source=undefined_weareiowa5news.

[17] *See* ECF 39-3 ¶ 5 ("I requested and received an exemption"), ¶ 8 ("I requested and received an exemption"), ¶ 11 ("I have requested an exemption"); ECF 39-4 ¶ 14 ("I would strongly consider seeking an exemption"); ECF 45-1 ¶ 8 ("Working with L.B.'s IEP team, we agreed that not wearing a mask or other facial covering would be a reasonable accommodation for her") & ¶ 15 ("Consistent with the approach last year . . . L.B. will not be wearing a mask while at school").

wear a mask.[18] The presence of such students with disabilities who cannot mask does not negate the need for universal masking in others; it amplifies it. *See* Vercande Decl. ¶ 12 (stating that due to S.V.'s brain injury, cerebral palsy, and history of strokes, he is unable to adhere to mitigation strategies such as wearing a mask, social distancing, or handwashing independently, "so it is even more important that others wear a mask and follow CDC guidelines around him."); Sithonnorath Decl. ¶ 11 (stating that due to A.S.'s disabilities related to down syndrome, she is unable to mask, social distance, or independently wash her hands, necessitating that others around her wear a mask and follow CDC guidelines.); Sealed Appx. of Exs., ECF 11, at 51-52, 60 (pediatrician recommendation for S.V. consistent with Vercande declaration). Where some students cannot wear masks for medical reasons, they must rely on the conscientious observance of public health protocols from others in order to stay safe. Instead of pitting disabled students against each other, this Court should grant relief that accommodates all of them.

3. **The ADA and the Rehabilitation Act provide for disparate impact and reasonable modification claims.**

The State Defendants contend that facially neutral government policies are immune from review by the court under the ADA and Section 504 of the Rehabilitation Act. ECF 42 at 9-11. It amounts to an argument that the ADA and the Rehabilitation Act do not provide for disparate impact and for failure to make reasonable accommodations. Defendants cite no case for this proposition. To the contrary, the most recent of the Eighth Circuit cases upon which the State Defendants rely expressly addresses the merits of a disparate impact case. *See Timothy H. v. Cedar Rapids Cmty. Sch. Dist.*, 178 F.3d 968, 971-72 (8th Cir. 1997) ("To the extent [a disabled

---

[18] Unlike the State Defendants, who hypothesize a severe "one size fits all" masking policy, Plaintiffs' proposed relief relies lets districts make evidence-based decisions for their community and comply with the ADA and Section 504. And under Plaintiffs' proposed relief, districts could voluntarily impose a mandate and voluntarily lift it when warranted, based on their tailored assessment of local conditions and compliance with the ADA and Section 504.

child's] parents seek to prove unlawful discrimination based not on disparate treatment, but on the effect the school district's transportation policy has on mobility-impaired students, we do not find a basis for concluding that the school district's policy has a discriminatory impact upon the disabled."). And, as the State Defendants concede, there is no case in this Circuit barring the court from reaching Plaintiffs' reasonable accommodation claim. ECF 42 at 11. There is no reason for this Court to adopt the radical approach suggested by the State Defendants. In *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581 (1999), the Court rejected the notion that Title II of the ADA "requires uneven treatment of similarly situated individuals" and concluded that "Congress had a more comprehensive view of the concept of discrimination advanced in the ADA." *Id.* at 598; *see also id. at 611* (Kennedy, J., concurring) (noting that court found discrimination under Title II of the ADA even though there was "no allegation that Georgia officials acted on the basis of animus").

### 4. There is no Administrative Exhaustion Requirement to Bring Claims Under Title II of the ADA or Section 504 of the Rehabilitation Act.

The State Defendants contend that Plaintiffs failed to exhaust their administrative remedies under the Individuals with Disabilities Education Act ("IDEA"). ECF. No. 42. at 15-18. In entering the TRO, this Court held:

> [W]hen "the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required. [*Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 754 (2017).] Courts must look to the "gravamen" of the plaintiff's complaint in determining whether the relief sought falls under the IDEA, and therefore requires administrative exhaustion. *Id.* at 755. In making this determination, courts must ask first whether "the plaintiff [could] have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school." *Id.* at 756. Second, courts must ask "could an *adult* at the school . . . have pressed essentially the same grievance?" *Id.* When the answer is "yes" to both questions, then the claim is not one for the denial of a FAPE under the IDEA and there is no exhaustion requirement. *Id.*

> Here, Plaintiffs could bring their claims for the alleged
> discriminatory conduct occurring at another public facility, like a library.
> An adult, such as a teacher or a staff member at a public school, could also
> bring the claims alleged by Plaintiffs. Thus, the gravamen of Plaintiffs'
> Complaint is not for the denial of a FAPE, and the IDEA's exhaustion
> requirement is therefore not applicable here.

ECF 32 at 17.

As this Court recognized, the Supreme Court's statement of the law is clear. The IDEA's

exhaustion provisions apply to "special education and related services." *Fry v. Napoleon Cmty.*

*Schs.*, 137 S. Ct. 743, 748-49 (2017). Plaintiffs here do not seek special education services; they

seek equal access to public facilities and benefits. While "the IDEA guarantees individually

tailored educational services," Title II and Section 504 "promise non-discriminatory access to

public institutions." *Fry*, 137 S. Ct. at 756.

The Eighth Circuit embraces this two-question inquiry set forth in *Fry* and applied by this

Court in determining the gravamen of complaints in this type of case. *See, e.g.*, *E.D. by and*

*through Dougherty v. Palmyra R-l Sch. Dist*, 911 F.3d 938, 941 (8th Cir. 2019) (applying and

analyzing under this two-pronged inquiry); *Nelson v. Charles City Cmty. Sch. Dist.*, 900 F.3d

587, 592 (8th Cir. 2018) (same).[19] Federal district courts in Iowa courts do too. *See, e.g.*, *K.G. by*

*and through Gosch v. Sgt. Bluff-Luton Cmty. Sch. Dist.*, 244 F. Supp. 3d 904, 917-18 (N.D. Iowa

2017) (finding that the "conclusion that the 'gravamen' of the [plaintiffs'] claims is not relief for

denial of a FAPE is bolstered by" the first question in *Fry* because "[p]lainly, the plaintiff could

---

[19] The State Defendants cite *Nelson* for the proposition that "it's improper to approach this question at a 'higher level of generality.'" ECF 42 at 18. There the issue was simply whether those plaintiffs could characterize their claim for "mishandling of an application to open enroll in online educational programming in a neighboring school district" as "the broken promise of non-discriminatory access." 900 F.3d at 592. That leap up – from the specific claim at issue in the case to a high level or generality – is not present here.

have brought essentially the same claims for excessive and unreasonable use of force and discrimination, if the alleged conduct had occurred at a different public facility").

In the instant case, the answer to both questions is unequivocally yes. Plaintiffs would experience the same risks to their health in other public facilities. And adults with disabilities that make them vulnerable to severe complications from COVID, including teachers, staff, and parents, are similarly endangered by bans on mask mandates in schools, and could also choose to sue for the school, or other public entities, to require masking. COVID-19 does not infect only students. It is not spread only in schools. As a result, "exhaustion is not necessary" because "the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee." *J.M. v. Francis Howell Sch. Dist.*, 850 F.3d 944, 948 (8th Cir. 2017) (quoting *Fry*, 137 S. Ct. at 748). The gravamen is nondiscriminatory access.

In recent rulings, federal district courts addressing the very issue presented here have rejected the exhaustion argument presented by the State Defendants here. The Eastern District of Tennessee, for example, rejected the exact IDEA argument advanced by the State Defendants here because "[t]he crux of Plaintiffs' allegations is safe access to public, brick-and-mortar government buildings and not the denial of a FAPE." *See also S.B. v. Lee*, No. 21-cv-00317, slip op. at 12. Ditto for the Middle District of Tennessee, which held it "need not spill significant ink in addressing" this IDEA exhaustion argument because the harm to plaintiffs clearly stemmed from "education harm" and not "the denial of FAPE." *R.K. v. Lee*, 21-cv-0072, slip. op. at 14 (M.D. Tenn. Sept. 24, 2021).  And in another similar case, the Western District of Tennessee also rejected this exhaustion argument, finding:

> [I]f one takes a step back and analyzes why Plaintiffs' education was interrupted, it is due to Plaintiffs' inability to access their educational environment. While these named Plaintiffs have varied educational needs – requiring significant variation in educational services – their claim does not rest on what services do or do not suffice. Instead, the

> Amended Complaint alleges that Plaintiffs are school-aged children with disabilities . . . who share a common, heightened vulnerability to the effects of COVID-19 if exposed. They cannot even walk into or within the building in a manner that is equal to their non-disabled counterparts. Much like in *Fry*, where a student with a therapy dog sought the dog's assistance in her classroom, and whose claim was not found to require exhaustion under the IDEA, Plaintiffs' health risks are not related to an education that is substandard or not 'appropriate'.

*G.S. by and through Schwaigert v. Lee*, No. 21-cv-02552-SHL, 2021 WL 4268285 at *10 (W.D. Tenn. Sept. 17, 2021).

Plaintiffs here are in the same exact situation, "as school-aged children with disabilities" with a heightened vulnerability to COVID-19. They too cannot "walk into or within the building in a manner that is equal to their non-disabled counterparts."  The claims here are purely and simply disability discrimination claims under Title II of the ADA and Section 504 of the Rehabilitation Act.  No administrative exhaustion is required.

The State Defendants curiously rely on *Hayes v. DeSantis*, arguing it shows that Plaintiffs have failed to exhaust their administrative remedies. ECF 47 (citing Case No. 1:21-CV-22863, 2021 WL 4236698 (S.D. Fla. Sept. 15, 2021)). But the *Hayes* court clearly and correctly distinguished that case from this one:

> [*ARC of Iowa v. Reynolds*] is distinguishable from this case for two reasons. First, in *Reynolds*, the Court concluded that the "gravamen of Plaintiffs' Complaint is not for the denial of a FAPE." Whereas, here, the Complaint clearly alleges a denial of FAPE for the reasons stated above. Second, the executive order in *Reynolds* banned mask mandates in public schools generally. Whereas, in this case, Executive Order 21-175 is limited solely to children, and does not extend to adults such as teachers or school staff.

*Id*. at 17 n.4.

The State Defendants thus have no support for their argument that Plaintiffs have failed to exhaust.

**B.  Plaintiffs Have Shown Likelihood of Success on the ARPA Claims.**

The State Defendants assert the Plaintiffs' ARPA claims should fail for two reasons. First, the State Defendants contend that neither ARPA nor Department of Education "guidance" "require that schools have the authority to impose universal mask mandates." ECF 42 at 19. But the State Defendants ignore the language of the statute and the Department of Education's regulation: In granting Iowa schools over $770 million, Congress and the Department of Education directed that local school districts were to utilize these funds to "implement[] public health protocols, including, *to the greatest extent practicable*, policies in line with guidance from the Centers for Disease Control and Prevention." Pub. L. No. 117-2 § 2001(e)(2)(Q) (emphasis added); *see also* Am. Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 Fed. Reg. 21,195, 21198, 21201 (Apr. 22, 2021) (U.S. Department of Education interim final rule requiring every local school district that receives funds "must" report how they "will implement prevention and mitigation strategies that are, to the greatest extent practicable, consistent with the most recent CDC guidance"). The CDC's guidance unambiguously says schools should adopt "universal indoor masking by all students (age 2 and older), staff, teachers and visitors to K-12 schools." Section 280.31 bars Iowa schools from "implementing" CDC guidance "to the greatest extent practicable," as required by the statute and Department of Education regulations. "It has long been settled that state laws that conflict with federal law are without effect." *Mutual Pharmaceutical Co., Inc. v. Bartlett*, 133 S.Ct. 2466, 2473 (2013) (citing *McCulloch v. Maryland*, 4 Wheat. 150 (1819)).

Second, citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) and *South Dakota v. Dole*, 483 U.S. 203, 208 (1987), the State Defendants contend that this direction from Congress cannot preempt Section 280.31 because it is somehow "ambiguous." ECF 42 at 21-22. But there is nothing ambiguous about the CDC's mask guidance or about the ARPA's

requirement of implementing CDC guidance "to the greatest extent practicable."  And Section

280.31 unambiguously prohibits Iowa schools from "implement[ing]" CDC guidance "to the

greatest extent practicable."  The very resistance of the State Defendants to the injunction sought

in this case makes that clear.  *See, e.g.,* ECF 1 at ¶ 48; ECF 42 at 21, 22.  Since the earliest days

of this country, "any state law . . . which interferes with or is contrary to federal law, must yield."

*Free v. Bland*, 369 U.S. 666 (1962) (quoting *Gibbons v. Ogden*, 9 Wheat 1, 210-211 (1824)

(opinion of Marshall, C.J.)). Congress has decreed that Iowa school districts must be free to

"implement" CDC guidance "to the greatest extent practicable."  Because Section 280.31

prohibits schools from doing so, it is preempted.

## III.   INJUNCTIVE RELIEF IS SERVING THE PUBLIC INTEREST AND OUTWEIGHS ANY BURDENS.

In entering the TRO, this Court found that enjoining enforcement of Section 280.31 was

in the public interest and was not outweighed by any burdens:

> "[Courts] are mindful of the general principle that courts will not second-guess the public health and safety decisions of state legislatures acting within their traditional police powers." *Sak v. City of Aurelia*, 832 F. Supp. 2d 1026, 1047 (N.D. Iowa 2011) (quoting *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996)). But when Congress passes antidiscrimination laws like "the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to [e]nsure that the mandate of federal law is achieved." *Id.* (quoting *Crowder*, 81 F.3d at 1485); *see also Heather K. by Anita K. v. City of Mallard*, 887 F. Supp. 1249, 1266 (N.D. Iowa 1995) ("The public interest in eliminating [discrimination on the basis of disability] gave rise to the ADA."). In other words, the national public interest in enforcing the ADA wins out over the state's interest in enforcing Iowa Code section 280.31 in this case.

> It is also in the public's interest to inhibit the spread of COVID-19 and the devastation it is wreaking in Iowa, both among school-aged children and their families, particularly for the safety of disabled children. Moreover, there is little harm to Defendants in enjoining section 280.31 and permitting the individual public school districts to return to the way in which they were operating prior to its passage by leaving a universal mask mandate to their discretion. It is no great burden for individual school

> boards to make these types of decisions for the children within their
> districts. *See* ECF Nos. 28-5; 28-6.

ECF 32 at 28.  These findings were sound, and the few points the State Defendants offer in their

resistance do not warrant any reconsideration.

Notably, the State Defendants do not establish or contend that there is any administrative

burden or cost to the State Defendants from complying with the injunction.  The State

Defendants have submitted no declarations or evidence that the injunction is causing any

administrative burden or cost.  Nor have the school districts, Defendant or otherwise, come to the

Court with an argument that the injunction is causing any administrative burden or cost.  Indeed,

the only school district to address the injunction supports its continuation. Freedman Supp. Decl.

¶ 2 & Ex. A.

Rather than submitting evidence of administrative burden or cost, the State Defendants

argue that anytime a State is "enjoined by a court from effectuating statutes enacted by

representatives of its people, it suffers a form of irreparable injury." ECF 42 at 25 (quoting *New

Motor Vehicle Bd. V. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)). This ignores basic principles

of federalism.  *See, e.g., Cooper v. Aaron*, 358 U.S. 1, 17 (1958) (the "rights of children not to be

discriminated against in school admission . . . can neither be nullified openly and directly by

state legislators or state executives or judicial officers, nor nullified indirectly by them through

evasive schemes. . . ."); *McCulloch v. Maryland*, 17 U.S. 316, 427-28 (1819) (does "[t]he

sovereignty of a state. . ..  extend to those means which are employed by congress to carry into

execution powers conferred on that body by the people of the United States? We think it

demonstrable, that it does not. Those powers are not given by the people of a single state. They

are given by the people of the United States, to a government whose laws, made in pursuance of

the constitution, are declared to be supreme").  And it is inconsistent with basic notions of

democracy upon which our constitutional system rests. *See also S.B. v. Lee*, No. 21-cv-00317, slip op. at 54 (noting in a similar case when "an elected official's actions [designed to] frustrate a public entity seeking to prospectively comply with the ADA," the official conflicts with "the guarantees of a democratic process").

In any event, even if the State Defendants had an interest in enforcing their state law, in a case where the Court has concluded that the law is likely invalid and is causing irreparable harm to Plaintiffs, the balance of the equities obviously supports the injunction. Indeed, it is always the case that a TRO or preliminary injunction against enforcement of a state or federal law "burdens" the government interest in enforcing the law, but courts issue such relief frequently.

The State Defendants also suggest that the injunction imposes a burden on parents who object to schools adopting universal masking, ECF 42 at 25, and have submitted five declarations from parents who express such objections. ECF 42-1, 42-2, 42-3, 45-1,45-2. These declarations reflect that, when these parents requested relief last year, their school districts were able to grant them accommodation from universal masking. Granau Dec. ¶ 5 ("This past school year, I requested and received an exemption [from Urbandale school district] from B.G. being required from wearing a mask, due to his autism."); Boone Dec. ¶ 8 ("This past school year, L.B. attended [Ankeny] school without a mask. Working with L.B.'s IEP team, we agreed that not wearing a mask would be a reasonable accommodation for her.")[20] None of these declarations indicates that their requests for accommodation have been denied either last year or this year, *id.*; accordingly,

---

[20] *Cf.* Doy Dec. (not indicating whether Mr. Doy sought a medical exemption from Muscatine school district for his son as an accommodation); Givens Dec. (not indicating whether Ms. Givens sought a medical exemption from Ankeny school district for her son as an accommodation); Parker Dec. (not indicating whether Ms. Parker sought a medical exemption from Ankeny school district for her daughter as an accommodation). Ankeny has also announced that all exemptions to masking last year will be honored this year. *See* Melody Mercado, *The issue of mask mandates in schools is roiling the metro*, Des Moines Reg. (Sept. 23, 2021), https://www.desmoinesregister.com/story/news/education/2021/09/23/ankeny-iowa-school-board-meeting-epicenter-of-covid-mask-mandate-debates-kim-reynolds/5797687001/.

these families stand in stark contrast to Plaintiffs and thousands of other families across the state

with children with disabilities that put them at risk of severe illness if they contract COVID-19

who cannot be accommodated if Section 280.31 is enforced.

The State Defendants also contend that the TRO "upset the status quo rather than

maintain[ed] it" and has created "unnecessary confusion and conflict."  ECF 42 at 24.  The State

Defendants provide no declarations or evidence from school districts in support of their

contention.  More important, they provide no support for the proposition that "upset" can

override the risk of severe illness or death, loss of educational opportunities, or violations of civil

rights.

Finally, the State Defendants argue in their resistance that this suit and request for

injunctive relief are untimely.  ECF 42 at 23.  The State Defendants nowhere explain in their

motion what the timeliness of injunctive relief has to do with either the public interest or burdens

on the parties.  As the Eighth Circuit has held, contesting the timeliness of a request for equitable

relief – laches – "is an affirmative defense and the burden of persuasion generally rests with the

Defendant."  *Whitfield v. Anheuser-Busch, Inc.*, 820 F.2d 243, 244-45 (8th Cir. 1987).  To

establish that defense, a defendant must make a showing that the Plaintiff is "guilty of

unreasonable and inexcusable delay that has resulted in prejudice to the defendant."  *Midwestern

Machinery v. Northwest Airlines*, 392 F.3d 265, 277 (8th Cir. 2004) (quoting *Goodman v.

McDonnell Douglas, Corp.*, 606 F.2d 800, 804 (8th Cir. 1979)).  The State Defendants cannot

possibly meet this burden.  As was discussed at oral argument on the motion to dismiss,

Plaintiffs filed suit only after it was clear that (i) the State Defendants intended to vigorously

enforce Section 280.31 in response to correspondence from the U.S. Secretary of Education and

the Department of Education Office of Civil Rights, and, (ii) irreparable injury to the Individual

Plaintiffs was only manifest after schools reopened without universal masking.  9/10/21 Tr. 12-15.

In sum, the State Defendants have offered no evidence or reason for this Court to revisit its findings that enjoining Section 280.31 is in the public interest and not outweighed by any burden.

## IV.  RULE 65(c) DOES NOT REQUIRE POSTING A BOND UNDER THE CIRCUMSTANCES OF THIS CASE.

In a footnote, the State Defendants contend that if a preliminary injunction is entered, Plaintiffs should be required to post a $25,000 bond.  ECF 42 at 25 n.6.  To the contrary, under Federal Rule of Civil Procedure 65(c), no bond should be required in this case, for two reasons: (1) Bond should be waived given the civil rights at issue in this matter and the important public interests at stake in this litigation;  and (2) the basis of the State Defendants' bond request is to cover primarily attorney fees,[21] which (a) numerous courts have held are not recoverable as a "cost" within the meaning of Rule 65(c), and (b) under the governing civil rights statutes, Plaintiffs would not have any probable liability to pay. However, if the court determines that bond is required, it should be nominal.

Rule 65(c) provides that a preliminary injunction bond can be set "in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined."  The Eighth Circuit has held that a district court's decisions both to waive the posting of a bond and in setting a nominal amount of a bond are within the District Court's discretion—and it is particularly appropriate to waive bond in civil rights cases.  *See, e.g.,*

---

[21] In a subsequent September 4, 2021 filing, the State Defendants have indicated that the requested bond amount is based on State Defendant Counsel's rate of $70.01 per hour, and for 240 hours of time, of which 160 involves petition and merits briefing at the Supreme Court, ECF 46-1 ¶¶ 3-4.  The costs cited include appellate docketing fees in the Eighth Circuit and Supreme Court and printing costs for an appellate brief, petition for certiorari and merits briefing.

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir.

2016) (affirming decision not to require bond "because of the important public interest" in

seeking the injunction) (collecting cases); *Bukaka, Inc. v. Cnty. of Benton,* 852 F. Supp. 807, 813

(D. Minn. 1993) (bond requirement of Rule 65(c) waived because of important First Amendment

issues raised by plaintiff against county defendant and bond requirement could prevent judicial

review of ordinance's constitutionality); *Interbake Foods, LLC v. Tomasiello*, 461 F. Supp. 2d

943, 979-80 (N.D. Iowa 2006) (setting bond at $1.00 because that amount was sufficient to

"adequately protect the defendants from any damages").[22]

      Here, the State Defendants have not offered declarations or evidence that they will incur

any "damages" if Section 280.31 is found to be improperly enjoined, and the "costs" they have

identified (ECF 46-1 ¶¶ 1, 2) are nominal, and can be assessed in the ordinary course of appellate

proceedings under Federal Rule of Appellate Procedure 39 without requiring a bond.  Moreover,

there is no reason to think that the State Defendants will incur any "damages" or anything other

than nominal "costs" from defending this litigation.  It is clear from the footnote and the State

Defendants subsequent filing that they consider the primary need for relief to be a potential

recovery of attorneys' fees. ECF 46 ¶ 6 & ECF 46-1 ¶¶ 3-4.  But it is well recognized under the

law that "attorneys' fees" are neither "costs" nor "damages" as those terms are defined in the

Federal Rules of Civil Procedure, and accordingly "it has long been established that a prevailing

party may not generally collect as damages against an injunction bond attorneys' fees expended

in litigating the litigation."  *See, e.g., Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 560 (2d

Cir. 2011) (citing *Tullock v. Mulvane*, 184 U.S. 497, 509-514 (1902)); *Fireman's Fund Ins. Co.*

---

[22] The case the State Defendants cite in their footnote, *Rathmann Group v. Tanenbaum*, held that the district court abused its discretion in setting bond *not* on account of deciding to waive or setting the amount of bond, but in failing to consider the adverse party's request for additional security at all. 889 F.2d 787, 789 (8th Cir. 1989).

*v. S.E.K. Constr. Co.*, 436 F.2d 1345, 1352 (10th Cir. 1971) ("Under [Rule 65(c)] attorneys' fees are . . . not recoverable").

And contrary to the State Defendants' claims, the ADA and Rehabilitation Act permit a *plaintiff* to recover attorneys' fees if they prevail in litigation; these statutes do not require an unsuccessful plaintiff to pay a defendants' fees absent evidence, not present here, indicating plaintiffs' actions were frivolous, unreasonable, or groundless. *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978) (examining Title VII's fee-shifting provision); *Tarter v. Raybuck*, 742 F.2d 977, 987 (6th Cir. 1984) (applying *Christiansburg* to ADA claims in light of the substantially similar fee-shifting provisions of the ADA and Title VII); *Bruce v. Gainesville*, 177 F.3d 949, 951 (11th Cir. 1999) (same); *No Barriers, Inc., v. Brinker Chili's Texas, Inc.*, 262 F.3d 496, 498 (5th Cir. 2001) (same); *Parker v. Sony Pictures Entertainment, Inc.,* 260 F.3d 100, 110 (2d Cir. 2001) (same); *Bercovitch v. Baldwin School, Inc.*, 191 F.3d 8, 11 (1st Cir. 1999) (applying *Christiansburg* to ADA and Rehabilitation Act claims).  Accordingly, the State Defendants' claim for defense attorneys' fees, in addition to being outside the scope of Rule 65(c), is in error.

For all these reasons, this Court routinely waives any bond requirement in granting preliminary injunctive relief in civil rights cases brought against the state; there are no known recent such cases in which this Court required a Rule 65(c) bond. *See, e.g., Johnson v. Bayens*, 20-cv-00306, ECF 16 (S.D. Iowa Dec. 10, 2020) (granting preliminary injunction of ban on protesters from State Capitol, requiring no bond); *Animal Legal Defense Fund v. Reynolds*, 19-cv-124, 2019 WL 8301668 (S.D. Iowa Dec. 2, 2019) (preliminarily enjoining Iowa's second "ag-gag" law, and requiring no bond); *Business Leaders in Christ v. Univ. of Iowa*, 17-cv-080, 2018

WL 3688981 (S.D. Iowa Jan. 23, 2018) (enjoining University's selective enforcement of an otherwise reasonable and viewpoint neutral policy, and requiring no bond).[23]

The Court should do the same here; bond should be waived, or the amount of any bond set by the Court should be nominal.

## CONCLUSION

Plaintiffs, on behalf of their children with disabilities, respectfully request that this Court enter a preliminary injunction enjoining enforcement of Section 280.31 and allow the school districts to ensure that each child receives a free and appropriate education in the least restrictive and the most integrated environment—without jeopardizing their lives or safety.

Date:  September 26, 2021

---

[23] The State has recently started seeking bond in civil rights cases *state* court, but there too, their request to force litigants in civil and constitutional rights cases to cover the cost of the salaries of Assistant Attorneys General has been rejected. *Planned Parenthood of the Heartland, Inc. et al. v. Reynolds et al.,* No. EQCV081855, at *16 (Johnson Co. Dist. Ct. Jun. 30, 2020) ("Respondents offer no authority for the proposition that a salaried State of Iowa attorney could make a claim for hourly attorney fees for this type of case; thus, the Court does not believe the bond needs to be increased to make provision for payment of attorney fees, if Petitioners are not successful in their claims.").

Respectfully submitted:

**AMERICAN CIVIL LIBERTIES UNION OF IOWA**

/s/ Rita Bettis Austen
Rita Bettis Austen, AT0011558
**ACLU of Iowa Foundation Inc.**
505 Fifth Avenue, Suite 901
Des Moines, IA 50309-2316
Telephone: 515-243-3988
Facsimile: 515-243-8506
rita.bettis@aclu-ia.org

/s/ Shefali Aurora
Shefali Aurora, AT0012874
**ACLU of Iowa Foundation Inc.**
505 Fifth Avenue, Suite 901
Des Moines, IA 50309-2316
Telephone: 515-243-3988
Facsimile: 515-243-8506
shefali.aurora@aclu-ia.org

/s/Leah Patton
Leah Patton, AT0006022
**ACLU of Iowa Foundation Inc.**
505 Fifth Avenue, Suite 901
Des Moines, IA 50309-2316
Telephone: 515-243-3988
Facsimile: 515-243-8506
leah.patton@aclu-ia.org

**DISABILITY RIGHTS IOWA**

Cynthia A. Miller (AT0005382)
666 Walnut Street, Suite 1440
Des Moines, IA 50309
T: (515) 278-2502
E: cmiller@driowa.org

Catherine Johnson*  (AT0004006)
666 Walnut Street, Suite 1440
Des Moines, IA 50309
T: (515) 278-2502
E: cjohnson@driowa.org

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Louise Melling*
125 Broad St.
New York, NY 10004
T: (212) 549-2637
E: lmelling@aclu.org

Susan Mizner*
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0781
E: smizner@aclu.org

*Motion to proceed *pro hac vice* forthcoming

**ARNOLD & PORTER KAYE SCHOLER LLP**

John A. Freedman
Tara L. Williamson*
601 Massachusetts Ave, NW
Washington, DC 20001
T: 202.942.5316
E: john.freedman@arnoldporter.com

*Motion to proceed *pro hac vice* forthcoming

**THE ARC**

Shira Wakschlag*
The Arc of the United States
1825 K Street, NW, Suite 1200
Washington, DC 20006
Telephone: 202-534-3708
Facsimile: 202-534-3731
wakschlag@thearc.org

*pro hac vice admission pending

**TOM DUFF LAW FIRM**

/s/ THOMAS J. DUFF_____
THOMAS J. DUFF
/s/ JIM DUFF_____
JIM T. DUFF

35

DUFF LAW FIRM, PLC
The Galleria
4090 Westown Pkwy, Suite 102
West Des Moines, Iowa 50266
Telephone: (515) 224-4999
Fax: (515) 327-5401
Email : tom@tdufflaw.com
jim@tdufflaw.com
wendy@tdufflaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk

of Court by using the CM/ECF system.

Date: 9/26/2021

/s/Rita Bettis Austen
Rita Bettis Austen