# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRT OF IOWA

THE ARC OF IOWA; CHARMAINE
ALEXANDER, individually and on behalf of
C.B., a minor; JONATHAN  CRAIG,
individually and on behalf of E.C. and J.C.,
minors; MICHELLE CROFT, individually and
on behalf of J.J.B., a minor; AMANDA
DEVEREAUX, individually and on behalf of
P.D., a minor; CARISSA FROYUM ROISE,
individually and on behalf of H.J.F.R., a minor;
LIDIJA GEEST, individually and on behalf of
K.G., a minor; MELISSA HADDEN,
individually and on behalf of V.M.H., a minor;
HEATHER LYNN PRESTON, individually
and on behalf of M.P. and S.P, minors; LISA
HARDISTY SITHONNORATH, individually
and on behalf of A.S., a minor; REBEKAH
STEWART, individually and on behalf of
E.M.S., a minor; and ERIN VERCANDE,
individually and on behalf of S.V., a minor,

        *Plaintiffs*,

   v.

KIM REYNOLDS, in her official capacity as
Governor of Iowa; ANN LEBO, in her official
capacity as Director of the Iowa Department of
Education; ANKENY COMMUNITY
SCHOOL DISTRICT; COUNCIL BLUFFS
COMMUNITY SCHOOL DISTRICT;
DAVENPORT COMMUNITY SCHOOL
DISTRICT; DECORAH  COMMUNITY
SCHOOL DISTRICT;  DENVER
COMMUNITY SCHOOL DISTRICT; DES
MOINES PUBLIC SCHOOLS; IOWA CITY
COMMUNITY SCHOOL DISTRICT;
JOHNSTON COMMUNITY SCHOOL
DISTRICT; LINN MAR COMMUNITY
SCHOOL DISTRICT; and WATERLOO
COMMUNITY SCHOOL DISTRICT,

        *Defendants*.

Case No. 4:21-cv-264

**PLAINTIFFS' APPENDIX IN
SUPPORT OF THE PARTIALLY
UNRESISTED MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

A. Declaration of Dr. Lisa Menzies ...................................................................3

B. Declaration of Dr. Stephen Mooradian ........................................................9

C. Declaration of Froyum Roise ....................................................................16

D. Declaration of Dr. Joel Waddell in Support of Plaintiffs' Motion for TRO/PI ..........20

E. Declaration of Dr. Megan Srinivas in Support of Pl. Mot. for TRO/PI.....................39

F. Letter of C. Joseph Holland (Sept. 10, 2021) .............................................56

G. Article of Nick Coltrain, *Des Moines Register* (Aug. 26, 2021) ................................58

H. Article of Tim Weber, *Des Moines Register* (Sept. 2, 2021)........................................63

I. Article of Ian Richardson, *Des Moines Register* (Aug. 16, 2021).............................67

J. Statement of Governor Reynolds (Aug. 30, 2021) .....................................72

K. Declaration of Michelle Croft (July 1, 2022)..............................................74

L. Defendant-Appellant Br. (Oct. 19, 2021), Dkt. 508885 (Excerpt) ............................77

M. Defendant Br. (Sept. 21, 2021) (Excerpt) ...................................................96

N. Plaintiffs' Declarations in Support of Motion for TRO/PI .......................................123

O. Tr. of TRO Hearing (Sept. 17, 2021) (Excerpt) .......................................170

# Exhibit A

## DECLARATION OF DR. LISA MENZIES

COMES NOW, Doctor Lisa Menzies and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Dr. Lisa Menzies, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2. I am a pediatric physician at Unity Point Health Blank Children's Pediatric Clinic. My CV is attached to this declaration.

3. E.C., who is six years old, is one of my pediatric patients.

4. E.C. has the following diagnoses: Down's Syndrome, hypothyroidism, Lennox-Gastaut Syndrome, cardiac defects, chronic lung disease, high risk of aspiration, and high risk for pneumonia.

5. These conditions put E.C. at high risk for severe complications if she were to become infected with COVID-19, even though E.C. has been fully vaccinated and boosted.

6. Due to her intellectual challenges, E.C. is unable to fully tolerate mask wearing.

7. For these reasons, E.C. has not been attending school in-person for some time. She has been receiving home-bound schooling.

8. Home-bound schooling has its downsides. Where home-bound schooling has been the safest way to care for E.C. due to the lack of a mask mandate, she is not able to obtain the same level of special education services as she would get if she were attending school in person.

9. It is E.C.'s right to get the best special education she can get. Therefore, a return to in-person learning in the fall of 2022 is preferable to continued home-bound schooling. However, this must be done safely, considering E.C.'s significant medical conditions that

make her highly susceptible to severe complications if she were to become infected with COVID-19.

10. I recommend that E.C. return to in-person learning in the fall of 2022. I base this recommendation on several considerations. E.C.'s ability to maintain focus on a computer screen, which is required for online or remote learning, is hampered because of her disabilities. Homebound services do not have the breadth or depth of education that E.C. would get from in-person learning, do not provide E.C. with the social interaction she would have with her peers in an in-person learning setting, and lack the required therapies that E.C. would get in an in-person setting.

11. However, certain measures must be undertaken for E.C. to safely return to in-person learning in the fall. These measures would also medically benefit all children in special education who have medical challenges.

12. In terms of recommendations for a safe return to in-person learning, I recommend, among other precautions, that masking may be necessary, depending on conditions in the fall or if conditions are like they are now, by E.C.'s teachers and aides and by all others in the classroom who can wear masks.

13. There is good evidence that wearing masks can stop or lessen the spread of COVID-19 infection in the classroom.

14. Masks are still necessary even with the availability of current vaccines and treatments. Currently, the vaccination of E.C.'s school aged peers is low compared to the vaccination rate of the adult population, which affects the lowered immunity level of this age group. Therefore, even if E.C. is vaccinated, the low vaccination rate and the lowered immunity level of her peers means that masking is still necessary for others in close contact with

E.C. There would need to be an uptick in vaccination of E.C.'s school aged peers as well as a corresponding increase in immunity before masks would not be necessary for those in close contact with E.C.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this 30 day of June 2022, at Des Moines, Iowa.

Dr. Lisa Menzies

# Lisa J Menzies MD

4245 Foster Drive, Des Moines, IA 50312

(515)-208-7904

lisamenzies@msn.com

## EDUCATION

- Rush Presbyterian-St Luke's Medical Center, Chicago, IL 1993-94, Chief Resident
- Rush Presbyterian-St Luke's Medical Center, Chicago, IL 1990-93, Resident, Pediatrics
- Rush Medical College, Chicago, IL 1986-1990, MD
- University of Illinois Urbana-Champaign, Urbana, IL 1982-86, BS- Biological Sciences

## WORK EXPERIENCE

- Rush Presbyterian-St. Luke's Medical Center, Chicago, IL 1993-94, Junior Attending
- UnityPoint Health, Blank Children's Pediatric Clinic 1994-present

## CERTIFICATION

- American Board of Pediatrics 1994- present

## LICENSURE

- Iowa

## HONORS AND AWARDS

- Outstanding Senior Resident, Rush Presbyterian-St Luke's Pediatric Residency 1993
- Teacher of the Year Award, Blank Children's Hospital 1996
- Charlotte Fisk Award, Blank Children's Hospital 2002
- Eyes of the Child Award, Blank Children's Hospital 2006
- Continuity Care Partner Award, Blank Children's Pediatric Clinic
- Heroes of the Heartland Award, American Red Cross, 2017
- Excellence in Patient Experience Award, National Medical Home Initiative, 2019

## RESEARCH EXPERIENCE

- WeeseMayer, DE, Silvestri JM, Menzies LJ CCHS: Diagnosis, Management and Outcome in 32 Children J. Pediatrics 120 381-387

## ACCREDITATIONS

- American Board of Pediatrics
- American Academy of Pediatrics
- Iowa Medical Society

## VOLUNTEER EXPERIENCE

- Garfield Free Clinic, Chicago, IL 1993-94
  - Provided free medical care to impoverished community- twice monthly
- Issa Trust Foundation, Ocho Rios 2004-6 and Negril Jamaica 2007
  - Set up and staffed free pediatric clinic services in small communities near the towns. I was the medical team leader responsible for several physicians and multiple nurses for each week.
- Outreach Africa, Des Moines, IA/Singida, Tanzania 2008-2014
  - Medical team leader for multiple missions responsible for the planning of the missions varying from 14-23 days and responsible for 30-80 team members, procurement of medications and planning of protocols and clinic set up. Worked closely with the physicians, nurses and pharmacists pre-planning. Worked with local governmental and side by side with hospital personnel to ensure a respectful and beneficial relationship in the Singida Regional Hospital and medical clinics near Singida and Manyoni, Tanzania. Both when I was the team leader and when I was a team member I worked as a pediatrician seeing patients in hospital and clinic settings.
  - My favorite trip was when we went out to more remote villages and taught, hand sanitation, and "Breath Baby Breathe" to the local women who attended to the births in the villages, before we began the clinics.
  - During every trip we taught about prevention of infestation with helminths and gave prophylactic medications.

## ADDITIONAL LANGUAGES

- Clinical Spanish

## REFERENCES

- Dr Holley Bzdega
- Dr. Stephen Elliott
- Dr. Ed Bell

2

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

THE ARC OF IOWA et al.,

      *Plaintiffs,*

v.

KIM REYNOLDS et al.,

      *Defendants.*

Case No. 4:21-cv-264

**DECLARATION OF STEPHEN J. MOORADIAN, M.D.**

---

I, Dr. Stephen J. Mooradian, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am a pediatric cardiologist and owner at Pediatric Cardiology, P.C. in Des Moines, Iowa.

2. I am certified by the American Board of Pediatrics in pediatric cardiology. I practice general pediatric cardiology and I have a special training in fetal echocardiography, as well as transthoracic and transesophageal echocardiography. I have over 28 years of experience in the medical field. My CV is attached as Ex. A.

3. I have treated M.P. since July 2, 2015.

4. M.P. is diagnosed with Heterotaxy, an extremely rare condition where many organs in the body can be formed abnormally, in the wrong position, or are even missing.

5. M.P. has several medical complications resulting from Heterotaxy, including a complex cardiac anatomy. He has an unbalanced complete atrioventricular septal defect, D-transposition of the great arteries, and right atrial isomerism (bilateral right sidedness). He also has a lung abnormality resulting in two right lungs.

6. Under my care M.P. had Fontan surgery to address his cardiac anomaly. In the normal heart each ventricle does a separate job. The right ventricle pumps blood to the lungs. The left ventricle pumps blood to the body. In a single ventricle heart, there is only one ventricle

large enough to do the normal job of pumping blood. Fontan surgery is used to change the circulation and allows the single ventricle to pump blood without overworking it. It is a palliative surgery for patients with univentricular heart of many different varieties. When a heart only has one good ventricle, the Fontan surgery is the typical surgical approach. The Fontan surgery is not a cure; rather, it is a way to route the blood flow to allow the circulation to be as effective as possible.

7. As a Fontan patient, M.P.'s heart and lungs are under chronic stress. His liver is also under stress. Since his blood flow can be sluggish, he is at increased risk of blood clots.

8. Based on my experience and consistent with CDC guidance, because of these heart and lung conditions M.P is at high risk for severe complications from COVID-19, even though he is fully vaccinated.

9. For all my Fontan patients, I recommend vaccination along with other mitigation strategies such as masking.

10. Evidence is clear that masks are most effective when worn by all surrounding the patient. If those around a patient are masked, they can decrease risk of the patient contracting the virus.

11. I would recommend all those who are around M.P. at school, including other students and staff, wear a mask to protect his health.

12. Many people who are infected with COVID-19 will recover without need for hospitalization. However, patients with chronic heart conditions such as M.P. are at more risk of severe complications, both in the short term and long term.

13. This is confirmed by M.P.'s own experience. M.P. contracted COVID-19 last fall and as a result, he was hospitalized for approximately five days. His oxygenation was extremely low, and he required treatment in a hospital to recover.

14. He first went to the ER where he tested positive and was initially sent home. His parents were told to return if his oxygenation dropped. His oxygenation dropped, and he was hospitalized. In the hospital he received Remdesivir, along with steroids and other fluids through the IV.

15. M.P.'s standard oxygenation level is at best 88-91%, most people need to be hospitalized at 90%. His oxygenation dropped into the 70% range, and he was hospitalized.

16. The medication and constant medical supervision at hospital were critical to making sure he recovered and did not have to be put on a ventilator.

17. Currently we do not have a complete understanding of the long-term consequences of COVID-19, but there is a group of patients who develop "Long Covid" which seems to include lung dysfunction and hypercoagulable state, both of which would be especially dangerous for a Fontan patient such as M.P.

18. It is my medical opinion that M.P. still requires masking by those around him in school in order to best protect him from further COVID-19 infections.

19. Despite having had COVID-19 M.P. remains at high risk for complications from COVID-19 because having COVID-19 once does not prevent one from the possibility of reinfection from a different variant. Reinfections are not unusual with COVID-19. In fact, a recent study found the risk of reinfection increased substantially with the emergence of omicron in November. [1]

---

[1] Juliet R. C. Pulliam, Cari van Schalkwyk. Nevashan Govender, Anne von Gottberg, Cheryl Cohen. Michelle J. Groome, Jonathan Dushoff, Koleka Mlisana, *Harry Moultrie, Increased risk of SARS-CoV-2 reinfection associated*

20. Additionally, though he is vaccinated he continues to be at high risk for severe complications because vaccinations do not provide complete immunity and with each new variant there are additional risks.

21. I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this $\underline{3\mathcal{O}}$ day of June 2022, at Des Moines, Iowa.

_Mooradian_ M.D.

Dr. Stephen J. Mooradian

---

*with emergence of Omicron in South Africa* 376 Science 6593 (Mar. 15, 2022), *available at* https://www.science.org/doi/abs/10.1126/science.abn4947.

June 2022

Curriculum Vitae
# Stephen J. Mooradian, MD

**Personal Data:**

| | |
|---|---|
| Current Position: | Pediatric Cardiologist |
| | Pediatric Cardiology, P.C. |

| | |
|---|---|
| Office address: | 330 Laurel Street, Suite 2200 |
| | Des Moines, Iowa 50314 |
| | Tel. (515) 288-1097 |
| | Fax. (515) 288-2847 |
| | E-mail: stephenm@pedscard.com |

| | |
|---|---|
| Date of Birth: | 24 November 1967 |
| Citizenship: | United States of America |

**Medical Licensure:**

| | |
|---|---|
| 1997-2006 | State of Michigan, No. 4301063710 |
| 2007-Present | State of Iowa, No. 33317 |

**Certification:**

| | |
|---|---|
| 1997-2011 | American Board of Pediatrics, General Pediatrics |
| 2000-Present | American Board of Pediatrics, Pediatric Cardiology |

**Society Memberships:**

| | |
|---|---|
| 2000-Present | Polk County Medical Society |
| 2000-Present | Iowa Medical Society |
| 2000-Present | American Society of Echocardiography |
| 2002-Present | Fellow, American College of Cardiology |

**Education:**

| | |
|---|---|
| 1985-1989 | Harvard College, AB in Medical Anthropology, *cum laude* |
| 1990-1994 | Columbia College of Physicians and Surgeons, MD |

**Post-Graduate Training:**

| | |
|---|---|
| 1994-1997 | Pediatric Residency: C.S. Mott Children's Hospital, University of Michigan |
| 1997-2000 | Pediatric Cardiology Fellowship: University of Michigan Congenital Heart Center |

**Leadership Activities:**
2015-2016          Vice-chair, Department of Pediatrics, Mercy Medical Center
2016-2017          Chair, Department of Pediatrics, Mercy Medical Center

**Honors and Awards:**
1987-1989          Harvard College Scholarship for Academic Excellence
1988-1989          White Scholarship for Academic Achievement at Harvard University
1991               Rudin Scholarship; Columbia Center for the Study of Medicine and Society
1994               Marie Nercessian award for dedication to the care of sick people
1994               Rebecca A. Schwartz Prize for outstanding work in Pediatric Cardiology
2008               Teaching / Academic Excellence Award, Blank Children's Hospital
2017               Pediatric Recognition Award, Blank Children's Hospital

**Publications:**
2000               Mooradian S, Goldberg C, Crowley D, Ludomirsky, A. Evaluation of a Noninvasive
                   Index of Global Ventricular Function to Predict Rejection Following Pediatric
                   Cardiac Transplantation. *The American Journal of Cardiology*; 86: 358-360.

**Research Presentations:**
                   A Non-Invasive Index for Global Ventricular Function: A Predictor for Rejection
                   after Pediatric Cardiac Transplantation?
1998               Oral Presentation, Midwest Pediatric Cardiology Society annual meeting
1998               Poster Presentation, Michigan Chapter of ACC annual meeting
1999               Oral Presentation, American Society of Echocardiography annual meeting

**Teaching Activities:**
2000-Present       Numerous lectures on pediatric cardiology topics
                   - Des Moines University, 4-8 lectures per year
                   - Mercy Medical Center
                   - Blank Children's Hospital

# Exhibit C

## <u>DECLARATION OF CARISSA FROYUM ROISE</u>

COMES NOW, Carissa Froyum Roise and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.  My name is Carissa Froyum Roise, and I am over 18 years old and have personal knowledge of the facts as stated herein.

2.  The attached letter is a true and correct copy of my son H.J.F.R.'s medical record from his treating physician, Dr. Tim Starner.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this 1st day of July 2022, at Denver, Iowa.

Carissa Froy—Roise
Carissa Froyum Roise, Plaintiff

Patient:████████████ | DOB:████████ | Printed from MyChart on Tuesday June 21, 2022 at 5:02:02 AM | This instance of MyChart connects to information in the records of UW Health (Wisconsin), Access Community Health Centers (Madison), and Quartz Health Solutions.

# Letter Details  (Hans)

 **UW**Health

**AMERICAN FAMILY CHILDRENS HOSPITAL PULMONARY**
1675 HIGHLAND AVE
MADISON WI 53792
608-263-6420

June 20, 2022

████████████████████
████████████
██████████
Denver IA 50622

To Whom It May Concern:

████████████ (████████) is an established patient of mine at American Family Childrens Hospital Pulmonary.  ████ has the following diagnoses:  Congenital Central Hypoventilation Syndrome (CCHS), autonomic dysfunction, chronic respiratory failure with hypoxia and hypercapnia, and dependence on bilevel positive airway pressure ventilation due to central sleep apnea.

Because ████ has CCHS, he is at an elevated risk of needing additional ventilatory support if he should contract COVID-19.  COVID-19 is different from influenza and RSV as it has a higher risk for lingering/sustained effects.

As such, he benefits from wearing a face mask to reduce the risk of contracting COVID-19.  He should follow the CDC guidelines on masking.  He is free to always wear a mask if he prefers, as that does not constitute any harm for him.

Per current CDC guidelines, when his county is in the medium transmission category, he should wear a mask when indoors with other non-household contacts.  When his county is in the high transmission category, we recommend that all people should wear a mask when indoors with other people to reduce ████ exposure to COVID-19 spread by others.

If you have any questions, please contact our office at 608-263-6420.

Sincerely,



Timothy D Starner, MD
Electronically signed by Timothy D Starner, MD on 6/20/2022 at 12:53 PM
Dept of Pediatrics Pulmonary and Sleep Medicine Division
American Family Children's Hospital; University of Wisconsin - Madison
Phone: 608-263-6420 Option 2

PLAINTIFFS' APPENDIX 018



FAX: 608-890-6395
NPI: 1972592004

Patient Name: ▓▓▓▓▓▓ (DOB: ▓▓▓▓) MRN: ▓▓▓▓▓      Page 1 of 1

*This letter was initially viewed by ▓▓▓▓▓▓ at 6/21/2022 5:01 AM.*

UW Health Privacy Practices & Policies

MyChart® licensed from Epic Systems Corporation © 1999 - 2022

# Exhibit D

<u>Declaration of Dr. Joel Waddell</u>

I, Dr. Joel Waddell, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

**<u>Background</u>**

1. I am currently a practicing pediatric infectious diseases physician at the Blank Children's Hospital in Des Moines, Iowa. At the Blank Children's Hospital, I currently serve as the Pediatric Residency Associate Program Director and as the Pediatric Residency Curriculum Committee Chair.  All statements within this declaration represent my thoughts, and these statements do not necessarily represent the positions of Blank Children's Hospital, Iowa Methodist Medical Center, or UnityPoint Health.

2. I received my Bachelor of Science from East Tennessee State University in 2009 and my D.O. from Des Moines University in 2013. I completed my residency in General Pediatrics at Kansas University in 2016 and fellowship in Pediatric Infectious Diseases at the University of Missouri–Kansas City in 2019.  I received three years of additional training in Pediatric Clinical Pharmacology at the University of Missouri–Kansas City.  I am currently a member of the Society for Pediatric Research, the Pediatric Infectious Diseases Society, the Infectious Diseases Society of America, the Society for Healthcare Epidemiology of America, and the American Academy of Pediatrics.

3. Since completing my residency and fellowship training, I have practiced at the Blank Children's Hospital in Des Moines providing both inpatient and outpatient consultations in pediatric infectious diseases.  In addition to serving as the Pediatric Residency Associate Program Director and as the Pediatric Residency Curriculum Committee Chair, I am also a member of the Pediatric Residency Scholarship Oversight Committee and the Pediatric Death Review Committee. Before beginning at the Blank Children's Hospital, I also served on various committees during my time as a resident and as a fellow. I served for two years (2017-2019) as a member of the Pediatric Infectious Diseases Society Research Affairs Committee, for two years (2017-2019) as a member of the Musculoskeletal Infection Hospital Care Committee at Children's Mercy Hospital, for two years (2014-2016) as a member of the Pediatric Hospital Ethics Committee at the Kansas University Medical Center, for three years (2013-2016) as a member of the Pediatric Medical Education Committee at the Kansas University Pediatric Residency program, and for two years (2009-

1

32  2011) as the Research Committee Chair of the Student Osteopathic Medical Association at
33  Des Moines University.

34  4.  My academic and medical policy work includes forty scientific presentations and invited
35      lectures, two co-authored hospital policies and handbooks, and two co-authored
36      publications on subjects relevant to pediatric infectious diseases. I have also appeared in
37      nine television, newspaper, and radio interviews where I provided insight into the impact
38      of COVID-19 on children.  I spoke at the state of Iowa's annual school nursing conference
39      discussing COVID-19 clinical presentations, treatment options, and various modalities to
40      prevent COVID-19 infections in schools.  I have provided five didactic lectures regarding
41      COVID-19 in children at three different medical centers in Iowa.  Additionally, I will be
42      the keynote speaker at the 2021 Iowa Physiology Society annual meeting in December
43      2021.

44  5.  I received the Most Outstanding Faculty Teaching Award at the Blank Children's Hospital
45      Pediatrics Residency Program in 2021, the Teaching & Academic Excellence Award at the
46      Blank Children's Hospital Pediatric Education Department in 2019, the Most Outstanding
47      Fellow Teaching Award at Children's Mercy Hospital, the Most Outstanding Pediatric
48      Resident Award at the Kansas University Pediatric Residency program in 2016, and the
49      Resident Researcher of the Year Award at the Kansas University Pediatric Residency
50      program in 2015.

51  6.  My CV is attached as Exhibit A.

52  7.  I am familiar with the state law prohibiting mask mandates in schools. In my expert
53      opinion, this law will hurt the children of this state and their families by denying schools
54      the ability to fashion policies for their districts that attend to the health needs of their
55      students. If students face the prospect of going to school in areas of substantial or high risk
56      of COVID-19 transmission, with no requirements of masks, they are forced either to attend
57      school at risk to their health and that of their families or to stay out of school, also a risk to
58      their physical psychological, emotional, and developmental well-being. I am particularly
59      concerned for those students with disabilities that increase the risk of severe illness should
60      they contract COVID-19. Given the dominance of the Delta variant in Iowa and across the
61      United States, it is even more likely that entire classrooms, including those with students

2

62    with disabilities, could be infected with COVID-19 in the absence of vaccines or mask
63    mandates.

64    8.  I am not being compensated for my time reviewing materials and preparing this report.

65

66    **I.      Increased COVID-19 Transmission and Prevalence of the Delta Variant in Iowa**

67    9.  The beginning of this school year coincides with a dramatic increase in COVID-19
68        transmission. As of August 31, all but three of Iowa's ninety-nine counties were
69        experiencing "high" levels of community COVID-19 transmission, with "high" being the
70        most severe CDC transmission designation.[1] Between June 27 and August 31, the average
71        daily cases per 100,000 residents in Iowa has risen sixteen-fold from two per 100,000 to
72        thirty-three per 100,000.[2] Furthermore, the test positivity rate, an indicator of increasing
73        COVID-19 community spread,[3] has risen seven-fold from about 2% to over 14% during
74        this same time period.[4] Iowa is also experiencing a faster rate of increase in new COVID-
75        19 cases than the United States as a whole; for the fourteen-day period ending on August
76        31, Iowa recorded a 46% increase in daily average COVID-19 cases per 100,000 residents,
77        compared to a 18% increase in this same rate for the United States as a whole.[5]

78    10. Iowa's hospitals show the strain of the COVID-19 pandemic. As of August 31, the State
79        of Iowa reported 498 COVID-19 hospitalizations, a number not seen since the 2020-2021
80        winter COVID-19 surge.[6] August also saw an all-time low availability of ICU beds
81        available in Iowa. On September 2, the state of Iowa Regional Medical Coordination
82        Center Dashboard reported only 297 available ICU beds in the state of Iowa, fewer
83        available beds than at any point during the 2020-2021 winter COVID-19 surge.[7]

---

[1] *COVID-19 Integrated County View*, Ctrs. for Disease Control & Prevention (Aug. 31, 2021 update),
https://covid.cdc.gov/covid-data-tracker/#county-view (last visited Sept. 2, 2021).
[2] Mayo Found. for Medical Educ. & Res., *Iowa coronavirus map: What do the trends mean for you?*, Mayo Clinic,
https://www.mayoclinic.org/coronavirus-covid-19/map/iowa (last visited Sept. 2, 2021).
[3] *See, e.g.*, *Positivity Rate Explained*, Barry-Eaton Dist. Health Dep't. (Oct. 2020),
https://www.barryeatonhealth.org/sites/default/files/Positivity%20Rate%20Explained.pdf (last visited Sept. 2,
2021).
[4] Mayo Found. for Medical Educ. & Res., *supra* note 2.
[5] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (Sept. 2, 2021 update),
https://www.nytimes.com/interactive/2021/us/covid-cases.html (last visited Sept. 2, 2021).
[6] *Hospitalization Analysis*, Iowa Dep't of Pub. Health, https://coronavirus.iowa.gov/pages/hospitalization-analysis
(last visited Sept. 2, 2021).
[7] *Hospital Data Summary, Regional Medical Coordination Center Dashboard*, Iowa Dep't of Pub. Health,
https://coronavirus.iowa.gov/pages/rmcc-data (last visited Sept. 2, 2021).

PLAINTIFFS' APPENDIX 023

84    11. The COVID-19 Delta variant is estimated to account for 99.7% of COVID-19 infections

85        in HHS Region 7, which includes Iowa, as of August 31.[8] This is relevant to the overall

86        COVID-19 transmission landscape given that the Center for Disease Control and

87        Prevention (CDC) estimates that the Delta variant is at least twice as transmissible as

88        previous variants and that it could likely lead to more severe illness in adults.[9]

89

90          **II.    The Impact of the Delta Variant for Children**

91    12. Pediatric COVID-19 cases comprise an increasing share of overall COVID-19 cases in the

92        United States. While Iowa stopped updating its pediatric COVID-19 testing data on July

93        15,[10] the most recent available data from Iowa suggest a similar trend statewide as well.

94        On August 16, 2021, the number of children hospitalized due to COVID-19 in the United

95        States reached an all-time high exceeding 1,900.[11] Pediatric hospitalizations now account

96        for 2.3% of all COVID-19-related hospitalizations, compared to less than 1% in May of

97        2020.[12] Similarly, pediatric COVID-19 cases represented fewer than 5% of all cases in

98        May of 2020, but now account for over 14% of total cases.[13]

99    13. In Iowa, the most recent data indicate similar trends. According to the last full week of

100      pediatric data reporting in Iowa, ending on July 8, there were nearly 50,000 cumulative

101      childhood COVID-19 cases reported in the state.[14] Even with the gap in data reporting,

102      Iowa still exceeds the national average in terms of cumulative COVID-19 cases per

103      100,000 children.[15] Since Iowa last reported pediatric COVID-19 data, the weekly number

104      of new pediatric COVID-19 cases has increased ten-fold from fewer than 20,000 to over

---

[8] *COVID Data Tracker: Variant Proportions*, Ctrs. for Disease Control & Prevention (Aug. 28, 2021 update), https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last visited Sept. 2, 2021).

[9] *Delta Variant: What We Know About the Science*, Ctrs. for Disease Control & Prevention (May 7, 2021 update), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (last visited Sept. 2, 2021).

[10] *Children and COVID-19: State Data Report: Version: 8/26/21*, Am. Acad. Pediatrics (Aug. 26, 2021 update), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/ (last visited Sept. 2, 2021).

[11] Carolyn Crist, *U.S. Reports Record COVID Hospitalizations of Children*, WebMD (Aug. 16, 2021), https://www.webmd.com/lung/news/20210816/u-s-reports-record-covid-hospitalizations-of-children (last visited Sept. 2, 2021).

[12] *Children and COVID-19: State Data Report*, *supra* note 11, at 16, 20.

[13] *Id.* at 12, 15.

[14] *Id.* at 25.

[15] *Id.*

105    203,962 as of August 26.[16] It is clear from the available data that COVID-19 currently
106    presents as acute threat to children in Iowa.

107

108    **III.    The Availability of Vaccines for Children and Overall Vaccination Rates in Iowa**

109    14. Children in Iowa are vulnerable to the Delta variant given the unavailability of vaccines
110       from children under the age of twelve and the low vaccination rate for children twelve to
111       nineteen years old. None of the three available COVID-19 vaccines have been approved,
112       for emergency use or otherwise, for children under the age of twelve.[17] As of September 2,
113       only about 30% of children aged twelve to fifteen were fully vaccinated, only about 39%
114       of children aged sixteen and seventeen were fully vaccinated, and only about 40% of
115       adolescents aged eighteen and nineteen were fully vaccinated in Iowa.[18] Nationally, 64%
116       of adults above the age of eighteen were fully vaccinated as of September 2, underscoring
117       the particularly low vaccine coverage for Iowa minors.[19]

118    15. In addition, as with adults, some children with cancer, immunodeficiencies, and those
119       receiving immunosuppressive medications cannot mount an appropriate immune response
120       to COVID-19 vaccines. Therefore, they are less protected from COVID-19 vaccination.

121    16. According to the CDC, unvaccinated people are much more likely to contract, transmit,
122       and experience severe symptomatic illness from the Delta variant than their vaccinated
123       counterparts.[20] In light of the data on pediatric vaccination rates and the unavailability of
124       vaccines to the youngest school-aged children, children account for a disproportionate
125       share of Americans to whom the Delta variant poses the greatest risk.

126

---

[16] *Id.* at 9.
[17] *Covid-19 Vaccines for Children and Teens,* Ctrs. for Disease Control & Prevention (Aug. 17, 2021 update), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/adolescents.html (last visited Sept. 2, 2021).
[18] *Fully Vaccinated Demographics*, Iowa Dep't of Pub. Health, https://coronavirus.iowa.gov/pages/vaccineinformation (last visited Sept. 2, 2021).
[19] *See How Vaccinations Are Going in Your County and State*, N.Y. Times (Sept. 1, 2021 update), https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Sept. 2, 2021).
[19] *Hospitalization Analysis*, Iowa Dep't of Pub. Health, https://coronavirus.iowa.gov/pages/hospitalization-analysis (last visited Sept. 2, 2021).
[20] *Delta Variant: What We Know About the Science*, Ctrs. for Disease Control & Prevention (Aug. 27, 2021 update), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (last visited Sept. 2, 2021).

PLAINTIFFS' APPENDIX 025

127    **IV.    Conditions That Can Put Children at Greater Risk of Severe Illness from**
128    **COVID-19**

129    17. As noted above, children are particularly vulnerable to COVID-19 as a result of vaccination
130        rates within this population. Of greatest concern are those children who are not or cannot
131        be vaccinated who have underlying medical conditions that increase their risk for severe
132        illness as a result of COVID-19 infection. According to the CDC, "children with medical
133        complexity, with genetic, neurologic, metabolic conditions, or with congenital heart
134        disease," as well as "children with obesity, diabetes, asthma or chronic lung disease, sickle
135        cell disease, or immunosuppression" may fall into this category.[21]

136    18. Most if not all of the children with these conditions are disabled within the meaning of the
137        Americans with Disabilities Act (the ADA).[22] The ADA defines disability as "a physical
138        or mental impairment that substantially limits one or more major life activities of such
139        individual."[23] Major life activities for purposes of the Act "include but are not limited to,
140        caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking,
141        standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking,
142        communicating, and working;" a major life activity "also includes the operation of a major
143        bodily function, including but not limited to, functions of the immune system, normal cell
144        growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine,
145        and reproductive functions."[24] Conditions such as asthma, chronic lung disease, diabetes,
146        sickle cell disease, and congenital heart disease by definition substantially limit a major
147        bodily function.

148    19. These are not the only children at risk of grave harm. Individuals with intellectual
149        disabilities are also at increased risk of contracting COVID-19 and of dying from COVID-
150        19 infection. A recent study published in the New England Journal of Medicine—working
151        with a data set of 64,414,495 patients across more than 500 U.S. healthcare systems, of
152        which "127,003 were patients with intellectual disabilities and 64,287,492 were patients
153        without intellectual disabilities"—concluded that "intellectual disability was the strongest

---

[21] *People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (Aug. 20, 2021 update),
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last
visited Sept. 2, 2021).
[22] 42 U.S.C. § 12101 *et seq.*
[23] 42 U.S.C. § 12102(1).
[24] 42 U.S.C. §§ 12102(2)(A)-(B).

PLAINTIFFS' APPENDIX 026

154    independent risk factor for presenting with a Covid-19 diagnosis and the strongest

155    independent risk factor other than age for Covid-19 mortality."[25] The study found

156    individuals with intellectual disabilities were more likely to contract COVID; if diagnosed

157    with COVID, more likely to be admitted to the hospital; and more likely to die following

158    admission.[26] The risks reflect the risks associated with intellectual disability itself, as well

159    as comorbidities that in the study were overrepresented among those with intellectual

160    disabilities. Notably, the odds of mortality among those with intellectual disabilities in the

161    study were "significantly higher than other conditions such as congestive heart failure,

162    kidney disease, and lung disease."[27]

163    20. During the 2020-2021 school year, the families of many of my patients have expressed

164    significant concerns about their children being exposed to COVID-19 in school. However,

165    they are even more concerned about the 2021-2022 school year due to the Delta variant

166    and lack of mask mandates. The parents of a young child (under the age of twelve) told

167    me they lie awake every night trying to balance the risks of sending their boy to school.

168    The child has a genetic immunodeficiency. Therefore, he is at higher risks of various

169    infections and their complications, including more severe outcomes from COVID-19.

170    These parents are anguished because they know how healthy and important in-person

171    school is for their boy, but they fully understand the likelihood of their child contracting

172    COVID-19 from their unvaccinated peers without masks. Another family of a young girl

173    with leukemia has expressed similar concerns. They no longer believe that our schools are

174    a safe place for their child. I have been caring for a teenage young lady who is on various

175    immunosuppressant medications due to a rheumatologic condition. While she has been

176    vaccinated against COVID-19, she is less likely to be protected from COVID-19 infection.

177    I have sat with the mother of this patient as she cries not seeing a safe avenue for in-person

178    school for her daughter. I have also had to sit with many distraught families of previously

179    healthy children who require hospitalization with post-infectious complications of

180    COVID-19 called Multisystem Inflammatory Syndrome in Children (MIS-C). With MIS-

---

[25] Jonathan Gleason et. al., *Commentary: The Devastating Impact of Covid-19 on Individuals with Intellectual Disabilities in the United States*, New Eng. J. Med. (Mar. 5, 2021), https://catalyst.nejm.org/doi/full/10.1056/CAT.21.0051 (last visited Sept. 2, 2021).
[26] *Id.*
[27] *Id.*

PLAINTIFFS' APPENDIX 027

181 C, children often require continuous infusions of medications that help their heart beat
182 strong enough to maintain life.  Several of these parents have looked me in the eyes while
183 crying and asked, "could we have done something to prevent this from happening?"  If the
184 appropriate risk mitigation steps are not taken in the schools of Iowa, we will almost surely
185 see more cases of MIS-C and other complications of COVID-19 in children this school
186 year compared to last year.

187 21. Finally, when we think about the risk to children in the state, we can't ignore the risk of
188 children developing what has come to be known as long COVID, where symptoms remain
189 months after an initial COVID diagnosis. While study is essential to know the scope of
190 long COVID in children, with current estimates varying significantly, there are increasing
191 concerns about the long-term impact of COVID even among the asymptomatic.[28]

192

193 **V. CDC and State Department of Health Recommendations on Masking in Schools**
194 **and the Efficacy of Masking for Reducing COVID-19 Transmission**

195 22. The CDC recommends "universal indoor masking for all students, staff, teachers, and
196 visitors to K-12 schools, regardless of vaccination status."[29] Underlying the CDC guidance
197 are concerns about "the highly transmissible nature of this variant," the ineligibility of
198 children under twelve for the vaccine, and low levels of vaccination among youth ages
199 twelve to seventeen, all factors present in our state at this time.[30]

200 23. Leading medical organizations, including the American Academy of Pediatrics and the
201 American Medical Association, similarly recommend universal masking as part of school
202 openings.[31]

203 24. In addition to national organizations, the local health departments in each of Iowa's three
204 most populous counties (Polk, Linn, and Scott counties) all recommend universal mask-
205 wearing in indoor settings. The Scott County Health Department simply recommends
206 "[m]asking of all in indoor spaces," and the Polk County Health Department and the Linn

---

[28] *See, e.g.*, Dyani Lewis, *Long COVID and Kids: Scientists Race to Find Answers*, 595 Nature 482 (2021).
[29] *Guidance for Covid-19 Prevention in K-12 Schools*, Ctrs. for Disease Control & Prevention (Aug. 5, 2021 update), https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html (last visited Sept. 2, 2021).
[30] *Id.*
[31] *See, e.g.*, *American Academy of Pediatrics Updates Recommendations for Opening Schools in Fall 2021*, Am. Acad. Pediatrics (July 19, 2021), https://www.aap.org/en/news-room/news-releases/aap/2021/american-academy-of-pediatrics-updates-recommendations-for-opening-schools-in-fall-2021/.

207 County Health Department both explicitly state that schools fall under their universal
208 mask-wearing recommendations.[32] The Iowa Medical Society and the Iowa Chapter of the
209 American Academy of Pediatrics both recommend universal indoor masking by all
210 students (age two and older), staff, teachers, and visitors to K-12 schools, regardless of
211 vaccination status.[33]

212 25. Recent studies have confirmed that wearing masks is one of the most powerful tools to
213 thwart the transmission of COVID-19 in indoor settings, such as schools. Researchers at
214 Duke University conducted a study on COVID-19 transmission within schools following
215 "Plan A" which "provided full, in-person instruction, masking, and minimal physical
216 distancing."[34] Analysis conducted by Duke University researchers using data from North
217 Carolina K-12 schools —data that included more than 1,280,000 students and 160,000
218 staff—found that "there is very limited within-school transmission of COVID-19 in
219 schools participating in Plan A," leading the researchers to conclude that "wearing masks
220 is an effective strategy to prevent in-school COVID-19 transmission."[35]

221 26. This study confirms what the CDC and other studies have reported. The CDC has stated,
222 "Experimental and epidemiological data support community masking to reduce the spread"
223 of the Delta variant.[36] A recent literature review concluded that "nonmedical masks have
224 been effective in reducing transmission of respiratory viruses; and places and time periods

---

[32] *Quad Cities COVID-19 Coalition: August 19 Press Release*, Scott Cnty. (Aug. 19, 2021), https://www.scottcountyiowa.gov/sites/default/files/attachments/posts/20210819_COVID-19_Update_on_Public_Health_Response.pdf (Scott County); *COVID-19 cases and hospitalizations are surging: It is time for our community to step up and do the right thing*, Polk Cnty. (Aug. 24, 2021), https://www.polkcountyiowa.gov/health-department/news-and-press-releases/covid-19-cases-and-hospitalizations-are-surging-it-is-time-for-our-community-to-step-up-and-do-the-right-thing/ (Polk County); Grace King, *Masks should be mandated to be worn in schools, Linn County board of health says*, Gazette (Aug. 30, 2021), https://www.thegazette.com/k/masks-should-be-mandated-to-be-worn-in-schools-linn-county-board-of-health-says/ (last visited Sept. 2, 2021).
[33] Sydney Maras, *IMS & IA AAP: Back to School Face Mask Usage Statement*, Iowa Medical Society (Aug. 19, 2021), https://www.iowamedical.org/news/10941537 (last visited Sept. 2, 2021).
[34] *The ABCs of North Carolina's Plan A*, ABC Science Collaborative (July 1, 2021), https://abcsciencecollaborative.org/the-abcs-of-north-carolinas-plan-a/ (last visited Sept. 2, 2021).
[35] Letter from Danny Benjamin & Kanecia Zimmerman to Joint Legislative Education Oversight Committee et al. (June 30, 2021), https://abcsciencecollaborative.org/wp-content/uploads/2021/06/ABCs-Final-Report-June-2021.06-esig-DB-KZ-6-29-21.pdf (last visited Sept. 2, 2021).
[36] *Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, Ctrs. for Disease Control & Prevention (May 7, 2021 update), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html#anchor_1619456988446 (last visited Sept. 2, 2021).

PLAINTIFFS' APPENDIX 029

225     where mask usage is required or widespread have shown substantially lower community

226     transmission."[37]

227     27. Masking is also critical for the health of those who, for reasons of disability, cannot mask.

228     Those include people who struggle to take a mask off and on, whether because of motor

229     skills or cognitive issues; people with sensory processing disorders; and people with facial

230     deformities incompatible with a mask, among others.[38]

231     28. As noted above, families that I worked with and all of the children not vaccinated are at

232     great risk for a COVID-19 infection. Given the rise in pediatric infections (and adult

233     infections) due to the Delta variant of COVID-19, in my expert opinion, the only safe

234     course at this time is universal masking for children for safe attendance at school and

235     school-related functions until our public health officials declare a safe level of population-

236     wide vaccination. As a pediatric infectious diseases physician, I am concerned about all

237     children but particularly worried about those children with complex medical conditions

238     and/or disabilities since the latter group could more likely sustain severe illness or even

239     death. The risk of death is low overall, but certainly elevated for the vulnerable group. Any

240     severe illness or death is unacceptable for a preventable disease.

## VI.  The Necessity of Allowing Iowa Schools to Set Their Own Mask Policies

243     29. Iowa's Mask Mandate Prohibition denies school districts the ability to require masks to

244     protect their students and staff. In communities where COVID-19 is prevalent, parents with

245     children with conditions that can make them vulnerable to severe illness in particular will

246     face a terrible dilemma of whether to risk their children's health and even life, or to keep

247     the children out of school. That is not a decision they should be forced to make, when we

248     have the option of masks to protect the safety of those in the school.

249     30. My concern is greatest for these children, but it does not stop there. No child should risk

250     serious illness if we can prevent it.

[37] Howard et. al., *An evidence review of face masks against COVID-19*, 118 PNAS 1, 1-12 (2021); Cheng, *et al.*, *Face masks effectively limit the probability of SARS-CoV-2 transmission*, 372 Science 1439, 1439-1443 (2021).
[38] Doron Dorfman & Mical Raz, *Mask Exemptions During the COVID-19 Pandemic—A New Frontier for Clinicians*, JAMA Health Forum (July 10, 2020), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2768376?resultClick=1.

PLAINTIFFS' APPENDIX 030

251    31. Without a mask requirement, children who chose to wear a mask will inevitably be subject
252        to a multitude of negative psychological effects, such as bullying and feeling ostracized
253        from their peers.  Therefore, in the absence of mask mandates, we are not really giving
254        Iowa's children a fair choice.  We are telling them they have to choose between their
255        physical health and emotional/psychological health.
256    32. And it's not just the children. Children who catch the virus at school will bring it home,
257        risking their families' health and security.  Without mask requirements, it is quite possible
258        that schools in Iowa could become hotspots for COVID-19 outbreaks, which then increase
259        the community spread of disease throughout our state.  This is particularly concerning
260        given the state's low vaccination rates and high rates of comorbidities in the adult
261        population.
262    33. In my opinion, the state cannot in good conscience let this policy stand given the threat it
263        poses to children and their families.

264

265    I swear under the penalty of perjury under the laws of the United States that the foregoing is true and
266 correct to the best of my knowledge.
267
268        Dated this 2nd day of September 2021, at _Clive_, Iowa.  6:31 PM
269
270                                    Joel Waddell                                    D.O.

11

Curriculum Vitae
Joel Waddell, D. O.

**EXHIBIT A**

**Date of Preparation**: 08/28/2021

## Citizenship Status

| Country of Citizenship | Type of Visa | Work Authorization End Date |
|---|---|---|
| USA | | |

## EDUCATION

- **Baccalaureate Degree**

| Year | Degree | Institution | City, State |
|---|---|---|---|
| 2004-2009 | Bachelor of Science | East Tennessee State University | Johnson City, TN |

- **Graduate Degrees (Masters/Doctorate)**

| Year | Degree | Institution | City, State |
|---|---|---|---|
| 2009-2013 | D.O. | Des Moines University | Des Moines, IA |

- **Residency/Fellowship Training**

| Year | Specialty | Institution | City, State |
|---|---|---|---|
| 2013-2016 | General Pediatrics | Kansas University | Kansas City, KS |
| 2016-2019 | Pediatric Clinical Pharmacy | University of Missouri-Kansas | Kansas City, MO |
| 2016-2019 | Pediatric Infectious Diseases | City/Children's Mercy Hospital | |

## Practice/Employment History (starting with most recent)

| Years | Practice Organization/Employer | City, State |
|---|---|---|
| 2019-Present | Blank Children's Hospital | Des Moines, IA |

## Certification and Licensure

- **Certifications:**

| Board | Initial Year | Most Recent Cert. Yr. | Certificate No. |
|---|---|---|---|
| American Board of Pediatrics | 2016 | 2016 | 118135 |
| American Board of Pediatrics | 2019 | 2019 | 1747 |

- **Medical Licensure (current)**

| State | Initial Date | License No. |
|---|---|---|
| Iowa | 2019 | DO-05386 |

## Leadership Positions

| Years | Position |
|---|---|
| 2021 – Present | *Pediatric Residency Associate Program Director*<br>Blank Children's Hospital, Des Moines, IA |
| 2021 – Present | *Pediatric Residency Curriculum Committee Chair*<br>Blank Children's Hospital, Des Moines, IA |
| 2020 – Present | *Pediatric Residency Scholarship Oversight Committee Member*<br>Blank Children's Hospital, Des Moines, IA |
| 2020 – Present | *Pediatric Death Review Committee Member*<br>Blank Children's Hospital, Des Moines, IA |
| 2017 – 2019 | *Musculoskeletal Infection Hospital Care Committee Member*<br>Children's Mercy Hospital, Kansas City, MO |
| 2017 – 2019 | *Pediatric Infectious Diseases Society Research Affairs Committee Member* |
| 2016 – 2019 | *Fellow Representative of Graduate Medical Education Committee*<br>Children's Mercy Hospital, Kansas City, MO |
| 2015 – 2016 | *Resident Representative of Clinical Learning Environment Review Program*<br>Kansas University Pediatric Residency, Kansas City, KS |
| 2014 – 2016 | *Resident Representative of Pediatric Hospital Ethics Committee*<br>Kansas University Medical Center, Kansas City, KS |
| 2014 – 2016 | *Clinical Skills Preceptor for Medical Students*<br>Kansas University School of Medicine, Kansas City, KS |
| 2013 – 2016 | *Resident Representative of Pediatric Medical Education Committee*<br>Kansas University Pediatric Residency, Kansas City, KS |
| 2009 – 2011 | *Research Committee Chair of Student Osteopathic Medical Association*<br>Des Moines University, Des Moines, IA |

PLAINTIFFS' APPENDIX 033

## Professional Affiliations and Memberships (currently only)

## Organization

| | |
|---|---|
| 2017 – Present | Society for Pediatric Research |
| 2016 – Present | Pediatric Infectious Diseases Society |
| 2016 – Present | Infectious Diseases Society of America |
| 2016 – Present | The Society for Healthcare Epidemiology of America |
| 2013 – Present | American Academy of Pediatrics |

## Honors and Awards (if any)

| | |
|---|---|
| 2021 | *Most Outstanding Faculty Teaching Award*<br>Blank Children's Hospital Pediatrics Residency, Des Moines, IA |
| 2019 | *Teaching & Academic Excellence Award*<br>Blank Children's Hospital Pediatric Education Department, Des Moines, IA |
| 2019 | *Most Outstanding Fellow Teaching Award Recipient*<br>Children's Mercy Hospital Graduate Medical Education, Kansas City, MO |
| 2018 | *Most Outstanding Fellow Teaching Award Nominee*<br>Children's Mercy Hospital Graduate Medical Education, Kansas City, MO |
| 2017 | *Most Outstanding Fellow Teaching Award Nominee*<br>Children's Mercy Hospital Graduate Medical Education, Kansas City, MO |
| 2016 | *Excellence in Teaching Award: Most Outstanding Pediatric Resident*<br>Kansas University School of Medicine, Kansas City, KS |
| 2016 | *Most Outstanding Pediatric Resident*<br>Kansas University Pediatric Residency, Kansas City, KS |
| 2015 | *Excellence in Residency Award Nominee: Exceptional Student Mentoring*<br>Kansas University School of Medicine, Kansas City, KS |
| 2015 | *Resident Researcher of the Year Award*<br>Kansas University Pediatric Residency, Kansas City, KS |
| 2014 | *Pediatric Hematology/Oncology Intern of the Year Award*<br>Kansas University Pediatric Residency, Kansas City, KS |

**Publications and Presentations** (if any)

- **Papers Published or In Press**

Kathryn E. Kyler, Brian R Lee, Earl F Glynn, Joel P Waddell, Mark A Hoffman, and Jennifer L Goldman. Clinical outcome and antibiotic dosing differences by weight in children with acute osteomyelitis. Hospital Pediatrics. Accepted on 4/27/2021.

Television Interview:  Channel 8 KCCI News, Des Moines, IA.  *COVID-19 Delta variant, upcoming school semester in Iowa, masks, and vaccines.*  August 27, 2021

Television Interview:  Channel 8 KCCI News, Des Moines, IA.  *RSV, other illnesses keep Blank Children's Hospital full, doctor says masks should be worn this fall.*  July 19, 2021.

Radio Interview:  Iowa Public Radio – Talk of Iowa:  *Vaccine Offers Children 'Return To Normalcy,' Iowa Doctors Say.*  May 13, 2021.

Newspaper Interview:  Des Moines Register, Des Moines, IA.  *COVID vaccine will soon be offered to kids ages 12-15 — but will they come in for the shots?*  May 11, 2021.

Radio Interview:  WHO Radio, Des Moines, IA.  *COVID-19 vaccine among adolescents.*  May 6, 2021.

Newspaper Interview:  Des Moines Register, Des Moines, IA.  *Iowa doctor: 'It's going to be extremely difficult' to get COVID herd immunity if kids can't be vaccinated.*  April 28, 2021.

Newspaper Interview:  Des Moines Register, Des Moines, IA.  *COVID-19 rate in kids may be higher than known, experts say, and until they can be vaccinated, pandemic may linger.*  April 25, 2021.

Television Interview:  Channel 8 KCCI News, Des Moines, IA.  *What is PMIS? Rare illness linked to COVID-19 comes to Iowa.*  May 18, 2020.

Television Interview:  Channel 13 WHO News:  *MIS-C among children in Iowa.*  May 18, 2020.

Waddell, J. and McCulloh, R. "Pertussis." From: Ferri's Clinical Advisor. 2018.

Invasive mucormycosis management: mucorales PCR provides important, novel diagnostic information (poster presentation).  IDWeek™2018. San Francisco, CA. October 2018.

Coauthor of hospital's outpatient antibiotic handbook. Children's Mercy Hospital. Kansas City, MO. August 2018.

Clinical course and antibiotic dosing in healthy vs non-healthy weight children with osteomyelitis (poster presentation). 2018 St. Jude/PIDS Pediatric Infectious Diseases Research Conference. Memphis, TN. March 2018.

Coauthor of hospital's outbreak/suspected outbreak investigation policy. Children's Mercy Hospital. Kansas City, MO. January 2018.

- ## Scientific Presentations/Invited Lectures

| 2021 | Blank Children's Hospital, Des Moines, IA:  Pediatric Grand Rounds<br>Topic:  COVID-19 vaccines in children |

| 2021 | Greater Regional Medical Center, Creston, IA:  Lunch and Learn<br>Topic:  COVID-19 in children |

| 2021 | State of Iowa Annual School Nursing Conference, Des Moines, IA:<br>Topic:  COVID-19 in children |

| 2021 | Blank Children's Hospital, Des Moines, IA:  Pediatric Residency didactic lecture series<br>Topic:  COVID-19 associated Multisystem inflammatory syndrome in children (MIS-C) |

| 2021 | Blank Children's Hospital, Des Moines, IA:  Webinar for Blank Children's Hospital Employees<br>Topic:  COVID-19 pandemic and vaccines |

| 2021 | Clark County Hospital, Osceola, IA:  Lunch and Learn<br>Topic:  COVID-19 pandemic and vaccines |

| 2021 | Blank Children's Hospital, Des Moines, IA:  Hospital employee open forum<br>Topic:  Q&A session regarding COVID-19 vaccines |

| 2021 | Blank Children's Hospital, Des Moines, IA:  Pediatric Residency board review lecture series<br>Topic:  Pediatric infectious diseases |

| 2021 | Blank Children's Hospital, Des Moines, IA:  Pediatric Residency didactic lecture series<br>Topic:  Cervical lymphadenitis and skin/soft tissue infections |

| 2021 | Broadlawns Medical Center, Des Moines, IA:  Family Medicine Residency didactic lecture series<br>Topic:  Top 10 outpatient pediatric infectious diseases |

| 2020 | Blank Children's Hospital, Des Moines, IA:  Pediatric Grand Rounds<br>Topic:  Top 10 Vaccine Myths |

| 2020 | Blank Children's Hospital, Des Moines, IA:  Clinical Pathology Conference<br>Topic:  Potts Puffy Tumor |

| 2020 | Blank Children's Hospital, Des Moines, IA:  Pediatric Residency didactic lecture series<br>Topic:  Top 10 general outpatient pediatric infectious diseases |

| 2020 | Blank Children's Hospital, Des Moines, IA:  Pediatric Residency didactic lecture series<br>Topic:  Infections in immunocompromised hosts |

| 2020 | Iowa Lutheran Hospital, Des Moines, IA:  Family Medicine Residency didactic lecture series<br>Topic:  Top 10 general outpatient pediatric infectious diseases |

| 2019 | Blank Children's Hospital, Des Moines, IA:  Pediatric Residency didactic lecture series<br>Topic:  Bugs and Drugs |

| 2019 | Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO:  Fellows' didactic lecture series |

|      | Topic:  Congenital infections |
|------|-------------------------------|
| 2019 | Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO:  Fellows' didactic lecture series<br>Topic:  Recurrent fevers |
| 2019 | Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO:  Fellows' didactic lecture series<br>Topic:  Gastroenteritis |
| 2018 | Progressive disseminated histoplasmosis of infancy (platform presentation).   Kansas City Infectious Diseases Society. Kansas City, KS. September 2018. |
| 2018 | Children's Mercy Hospital, Clinical Pharmacology Mini Masters Course, Kansas City, MO.<br>Topic:  Utilizing big data resources to generate pharmacologic hypotheses |
| 2018 | Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO: Journal Club<br>Topic: Pharmacokinetic cefazolin modeling in bariatric surgery patients |
| 2018 | Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO:  Fellows' didactic lecture series<br>Topic:  Zoonoses |
| 2017 | Comparative analysis of initial antibiotic dosing among healthy weight, overweight, and obese children with osteomyelitis (poster presentation). IDWeek™2017. San Diego, CA. October 2017. |
| 2017 | Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO:  Fellows' didactic lecture series<br>Topic:  Viral CNS infections |
| 2017 | Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO:  Fellows' didactic lecture series<br>Topic:  Bacterial CNS infections |
| 2017 | Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO: Journal Club<br>Topic: Cellulitis, cephalexin, & obesity |
| 2017 | University of Missouri-Kansas City School of Pharmacy, Kansas City, MO: Second year pharmacy student lecture series<br>Topic:  Pediatric community-acquired pneumonia |
| 2017 | Children's Mercy Hospital, General Pediatric and Medicine/Pediatric Residents, Kansas City, MO: Core resident educational lecture series<br>Topic:  Bugs and drugs |
| 2017 | Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO: Research Conference<br>Topic:  Utilizing informatics-based research to answer questions regarding appropriate antibiotic dosing among obese children |
| 2017 | Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO: Fellows' didactic lecture series |

Topic: Antibiotic resistance mechanisms – a three part series

2016     Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO: Journal Club
Topic: Fever in returning traveler

2016     Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO: Journal Club
Topic: Impact of reported beta-lactam allergy on inpatient outcomes
multicenter prospective cohort study

2016     Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO: Journal Club
Topic: Antimicrobial dosing and pediatric obesity: murky waters

2016     Kansas University, Department of Pediatrics, Kansas City, KS: Senior Resident Conference
Topic: Improving resident research in an attempt to further evidence-based medicine within pediatrics

2015     Improving pediatric immunization rates in the inpatient setting: a hospital-based intervention (poster presentation). Academic Pediatric Association Region VI Fall Meeting. Kansas City, KS. September 2015.

2015     Children's Mercy Hospital, Infectious Diseases Department, Kansas City, MO: Laboratory Presentation
Topic: Ceftolozane/tazobactam activity against *Pseudomonas aeruginosa* strains in pediatric cystic fibrosis patients

2015     Kansas University, Department of Pediatrics, Kansas City, KS: Neonatology Conference
Topic: Short & long term management of neonatal HIV

2014     Kansas University, Department of Pediatrics, Kansas City, KS: Board Prep lecture series
Topic: Presented various COMLEX Step 1 topics to incoming 1st year pediatric residents

2013     Kansas University, Department of Pediatrics, Kansas City, KS: Center for Child Health & Development Lecture Series
Topic: Congenital cytomegalovirus infections-neurodevelopmental/behavioral outcomes

2013     Kansas University, Department of Pediatrics, Kansas City, KS: Neonatology Conference
Topic: Neonatal bacterial meningitis

PLAINTIFFS' APPENDIX 038

# Exhibit E

## Declaration of Dr. Megan Srinivas

I, Megan Srinivas, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

## Background

1.  I am currently an infectious diseases physician, clinical instructor, and fifth-year translational health policy research fellow at the University of North Carolina School of Medicine in Chapel Hill, North Carolina. Additionally, I currently serve as the infectious disease consultant for Broadlawns Medical Center in Des Moines, Iowa.

2.  I am licensed to practice medicine in Iowa and North Carolina. I hold degrees from Harvard University (A.B. cum laude, Human Evolutionary Biology, 2009), Carver College of Medicine at the University of Iowa (MD, 2014); and Harvard University.. School of Public Health (MPH, Global Health & Health Policy, 2014). I completed my residency in Internal Medicine at Johns Hopkins School of Medicine (2017) and my fellowship in Infectious Disease at the University of North Carolina (2019). I also hold two board certifications with the American Board of Internal Medicine in 1) Internal Medicine and 2) Infectious Disease.

3.  I worked for 2.5 years at the Fort Dodge Community Health Center as its only infectious diseases and internal medicine physician (January 2018-July 2020). I also have been providing telehealth Hepatitis C care to rural Iowans through Iowa's Project ECHO since March 2019.

4.  I have extensive work and research experience in the areas of infectious disease and public health and have served on numerous state and national boards, committees, and panels.  Most relevant to the this case, I currently sit on the Infectious Disease Society of America (IDSA) Public Health Advisory Board, which represents all infectious disease providers in the nation. I am also a national delegate to the American Medical Association (AMA), which represents all physicians in the United States. I sit on the AMA's 12-person national Council on Medical

1

Services and am one of the leaders of the organization's Mask Up COVID Campaign. Additionally, I sit on the Iowa Board of Directors for the National Alliance on Mental Illness (NAMI) and delivered a statewide talk for NAMI in May 2020 on the impact of the novel coronavirus SARS-CoV-2 (hereinafter, "COVID-19") on mental health.

5. In March 2020, I co-founded the COVID-19 Health Animation Project (CHAP), to help address the racialized disparities in COVID-19 mortality and morbidity in the US. CHAP creates culturally-informed health messaging videos in various languages to deliver COVID-19 public health education to marginalized communities. I recently co-lead a CHAP team that collaborated with child psychologists and mental health professionals to focus on educating caregivers on the anxiety/stress facing children during the COVID-19 pandemic and how these issues can be effectively addressed. CHAP received a grant to pursue this project from the Atlantic Institute based at the Rhodes Trust in the University of Oxford and we have been asked by UNICEF to translate CHAP's mental health videos into Spanish so UNICEF has the opportunity to distribute both the English and Spanish version in the Americas.

6. I have given presentations on and authored or co-authored numerous medical and scientific publications and policy papers on infectious diseases and public health, as well as specifically on COVID-19 and its effects on rural areas and communities at-large.

7. My detailed curriculum vitae is attached as Exhibit A.

8. If called as a witness, I could and would testify competently to the matters set forth below.

9. I am familiar with the provision of Iowa Law recently passed that is known as HF 847 or the "Mask Mandate Ban." In my expert opinion, this provision will hurt the children of this state and their families by denying schools the ability to fashion policies for their districts that attend to the health needs of their students. If students face the prospect of going to school in areas of

substantial or high risk of COVID-19 transmission, with no requirements of masks, they are forced either to attend school at risk to their health and that of their families or to stay out of school, at risk to their well-being. I am especially concerned for those students with disabilities that are at an increased risk for complications from COVID-19.

10. I am not being compensated for my time reviewing materials and preparing this report.

### Increased COVID-19 Transmission and Prevalence of the Delta Variant in Iowa

11. Vaccination rates across Iowa remain low, with only 52% of the population fully vaccinated.[1]

12. The rate is even lower among children; as of August 25, only 30% of those twelve to fifteen are vaccinated, and 37% of sixteen to seventeen year-olds.[2]

13. Iowa is seeing the most hospitalizations since January 2021.[3]

14. More than half of the new cases, 56%, are people younger than 40, and 17% are younger than seventeen. Those age groups also have the lowest vaccination rates.[4]  Data released August 31 shows 22% of new cases in Iowa last week, after one week of school for many, are in school-age children.[5]

15. Each infected individual will, on average, infect six to seven others.[6] There is a median latency to a detectable viral load of four days with the Delta variant rather than six days with the variant

---

[1] *See How Vaccinations Are Going in Your County and State*, N.Y. Times (Sept. 1, 2021 update), https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Sept. 2, 2021).
[2] Nick Coltrain, *Iowa COVID hospitalizations highest since January, 25% increase since last week to nearly 500*, Des Moines Reg. (Aug. 26, 2021), https://www.desmoinesregister.com/story/news/health/2021/08/26/iowa-covid-19-hospitalization-rate-positive-cases-surges-delta-variant/5541193001/ (last visited Sept. 2, 2021).
[3] *Id.*
[4] *Id.*
[5] Tim Webber, *Children make up nearly a quarter of new COVID-19 cases in Iowa*, Des Moines Reg. (Sept. 1, 2021), https://www.desmoinesregister.com/story/news/health/2021/09/01/covid-19-iowa-testing-data-shows-kids-make-up-22-percent-cases/8167419002/.
[6] Michaeleen Doucleff, *The Delta Variant Isn't as Contagious as Chicken Pox. But It's Still Highly Contagious*, NPR (Aug. 11, 2021), https://www.npr.org/sections/goatsandsoda/2021/08/11/1026190062/covid-delta-variant-transmissioncdc-chickenpox (last visited Sept. 2, 2021).

originally dominant in the US.[7] This suggests very rapid dissemination and hyperlocal outbreaks.[8]

16. As of August 30, the data on rolling average hospitalizations shows approximately 633 total hospitalized with confirmed or suspected COVID-19 diagnosis, and this number remains on an upward trajectory.[9]

17. The COVID-19 Delta variant is estimated to account for 99.7% of COVID-19 infections in HHS Region 7, which includes Iowa, as of August 15.[10] This is relevant to the overall COVID-19 transmission landscape given that the Centers for Disease Control and Prevention (CDC) estimates that the Delta variant is at least twice as transmissible as previous variants and that it could likely lead to more severe illness.[11]

### The Spread of COVID-19 in Children

18. The Iowa Department of Public Health (hereinafter "IDPH") and IDPH medical director, Dr. Pedati, have tried to downplay the risk of COVID-19 transmission to children, stating that a paucity of early data equated to no transmission. However, now that we are seeing the emergence of significant data about children and COVID-19, there are some inherent truths that cannot be ignored: 1) children can contract COVID-19; 2) although the limited data demonstrate that children are less likely to die from COVID-19, they can still suffer long-term

---

[7] Baisheng Li et al., *Viral infection and transmission in a large well-traced outbreak caused by the Delta SARS-CoV-2 variant*, medRxiv (July 12, 2021), https://www.medrxiv.org/content/10.1101/2021.07.07.21260122v1 (last visited Sept. 2, 2021).
[8] Kathy Katella, *5 Things to Know About the Delta Variant*, Yale Medicine (Aug. 26, 2021),
https://www.yalemedicine.org/news/5-things-to-know-delta-variant-covid (last visited Sept. 2, 2021).
[9] *Iowa Hospitals and COVID-19,* Iowa COVID-19 Tracker, https://iowacovid19tracker.org/hospitals/ (last visited Sept. 2, 2021).
[10] *COVID Data Tracker: Variant Proportions*, Ctrs. for Disease Control & Prevention (Aug. 28, 2021 update), https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last visited Sept. 2, 2021).
[11] *Delta Variant: What We Know About the Science*, Ctrs. for Disease Control & Prevention (May 7, 2021 update), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.

PLAINTIFFS' APPENDIX 043

and even permanent damage from infection; and 3) children transmit the infection to other children and adults.

19. Children of all ages are fully capable of contracting COVID-19. Per a recent report by the American Academy of Pediatrics (hereinafter, "AAP"), as of August 26, 2021, more than 4.8 million children have been diagnosed with COVID-19, representing 14.8% of all cases in the US.[12] Between August 19-26, 2021, 203,962 children were diagnosed with COVID-19, representing 22.4% of all new cases.[13] And this is prior to school starting in most places, which will hasten the spread in this vulnerable age group.

20. A Centers for Disease Control and Prevention (hereinafter, "CDC") case study analyzed the infection attack rate in a weeklong sleep-away camp during June 2020 in Georgia.[14] The CDC found that of the 597 people attending the camp, 260 contracted COVID-19.[15] The highest rate of infection among the campers was amongst the youngest children between six to ten years of age (51% attack rate in this group as compared to 33% in campers of ages eighteen to twenty one).[16] These findings demonstrate that transmission among children is happening at significantly high rates. This may be behaviorally-based, which is a critical factor in the spread of COVID-19.

21. Children infected with COVID-19 are fully capable of transmitting the virus to others. A study published in the Journal of the American Medical Association (hereinafter, "JAMA") on July 30, 2020, studied the contagiousness of children by estimating the amount of nasopharyngeal

---

[12] *Children and COVID-19: State Data Report: Version: 8/26/21*, Am. Acad. Pediatrics (Aug. 26, 2021 update), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/ (last visited Sept. 2, 2021).
[13] *Id.*
[14] Christine M. Szablewski et al., *SARS-CoV-2 Transmission and Infection Among Attendees of an Overnight Camp — Georgia, June 2020*, Morbidity & Mortality Weekly Rep. (Aug. 7, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6931e1-H.pdf.
[15] *Id.*
[16] *Id.*

viral shedding occurring at various age groups.[17] They found that children younger than five

years of age with mild to moderate symptoms of COVID-19 carry higher amounts of SARS-

CoV-2 viral material in the nasopharynx than adults, suggesting that they may be more

contagious and, thus, more effective at transmitting the virus than adults.[18] Children between

the ages of five and seventeen years appeared to have a similar amount of viral material as

adults (here classified as eighteen years of age or older).[19]

22. Long COVID (post-acute sequelae of COVID-19, or "PASC") can manifest as chronically

disabling fatigue, headache, difficulty concentrating, insomnia and other multisystemic

symptoms following even mild COVID infection (image below illustrates potential

manifestations of long COVID).[20] Moreover, a *Nature* study published in April 2021

demonstrated that COVID-19 survivors had a 60% increased risk of death in the six months

following illness than the general population.[21] Hospitalized survivors had a 50% increased

risk of death in the six months following recovery as compared to influenza survivors.

*Figure 1: Long-Lasting COVID-19 Impacts[22]*

---

[17] Taylor Heald-Sargent, William J. Muller, & Xiaotian Zheng, *Age-Related Differences in Nasopharyngeal Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Levels in Patients With Mild to Moderate Coronavirus Disease 2019 (COVID-19)*, JAMA Pediatrics (July 30, 2020), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2768952 (last visited Sept. 2, 2021).
[18] *Id.*
[19] *Id.*
[20] Julia Evangelou Strait, *Among COVID-19 survivors, an increased risk of death, serious illness*, Wash. Univ. in St. Louis (Apr. 22, 2021), https://source.wustl.edu/2021/04/among-covid-19-survivors-an-increased-risk-of-death-serious-illness/ (last visited Sept. 2, 2021).
[21] Ziyad Al-Aly, Yan Xie & Benjamin Bowe, *High-dimensional characterization of post-acute sequelae of COVID-19*, Nature (Apr. 22, 2021), https://www.nature.com/articles/s41586-021-03553-9 (last visited Sept. 2, 2021).
[22] *Strait, supra* note 21.



23. In the meantime, masks matter. Converging experimental, epidemiological, and modeling evidence consistent with the efficacy of masks in mitigating COVID transmission[23] stand diametrically opposed to the ban on mask mandates at a time when we desperately need to ensure compliance with masking, social distancing, and vaccinations.

24. *The Washington Post* adapted the graphic below from a CDC-funded study demonstrating the impact of different mitigation strategies on spread of COVID within schools.[24] Elementary schools where students are still ineligible for vaccination are the most vulnerable. And in such schools, when universal masking and regular testing/randomized screenings are not being implemented (as is occurring in Iowa), 91% of students will likely be infected within the first 3 months. Even with schools where immunity via vaccines is more prevalent (middle and high schools), there is still a significant risk when mitigation is not appropriately used. Ultimately,

---

[23] Howard et. al., *An evidence review of face masks against COVID-19*, 118 PNAS 1, 1-12 (2021); Cheng, et al., *Face masks effectively limit the probability of SARS-CoV-2 transmission*, 372 Science 1439, 1439-1443 (2021).

[24] Ariana Eunjung Cha, *A Calif. elementary school teacher took off her mask for a read-aloud. Within days, half her class was positive for delta.,* Wash. Post (Aug. 28, 2021), https://www.washingtonpost.com/health/2021/08/28/delta-variant-unvaccinated-children-elementary-schools/.

the study shows a harrowing prediction that 75% of all students (elementary through high school) will likely be infected within 3 months without appropriate mitigation.[25]

*Figure 2: Student Susceptibility*[26]



25. Children are not the only ones at risk of infection with in-person learning. The educators, custodians, bus drivers, and all school staff are at significant risk of illness. Moreover, while children may be asymptomatic or pauci-symptomatic from infection, they can still transmit to others, including bringing the virus home to vulnerable caregivers and family members. From

---

[25] These numbers, highlighted by the Washington Post, were derived from an academic study. *See* Yiwei Zhang et al., *COVID-19 Projections for K12 Schools in Fall 2021: Significant Transmission without Interventions*, medRxiv (Aug. 11, 2021), https://www.medrxiv.org/content/10.1101/2021.08.10.21261726v1.full.
[26] Cha, *supra* note 26.

March 1, 2020 to April 30, 2021 (prior to the onset of the more virulent delta variant), more than 1.5 million children lost a caregiver to COVID-19 globally.[27]

26. Although many schools in Iowa have only been in session for one week, COVID-19 activity in schools is already rampant (47 different schools documented as of August 31, 2021), numbers that will likely significantly worsen given inadequate notification of exposures and the lack of quarantine for those exposed.[28]

**Conditions That Can Put Children at Greater Risk of Severe Illness from COVID-19**

27. The CDC has suggested higher risk for COVID complications in children who are medically complex, have genetic, neurologic, or metabolic conditions, congenital heart disease or, like in adults, chronic obesity, diabetes, asthma or chronic lung disease, sickle cell disease, and immunosuppression.[29] I have reviewed the declarations of the plaintiffs in this case including their ages and diagnoses. All qualify as higher risk per the CDC. Any child who is medically complex (i.e. M.P., S.P., S.V., P.D., E.M.S, V.M.H., N.R.), has Down Syndrome (i.e. A.S., E.C.), has moderate to severe asthma (i.e. C.B, K.G., J.J.B.), as well as any child with chronic heart or lung disease (i.e. M.P., H.J.F.R., V.M.H.) is vulnerable to poorer clinical outcomes with COVID.

28. The American Academy of Pediatrics strongly recommends in-person learning for the mental, emotional, and physical health of children, but emphasizes the critical importance of universal

---

[27] Susan D. Hills et al., *Global minimum estimates of children affected by COVID-19-associated orphanhood and deaths of caregivers: a modelling study*, Lancet (July 20, 2021), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)01253-8/fulltext (last visited Sept. 2, 2021).
[28] *COVID-19 in Our Schools*, Iowa COVID-19 Tracker, https://iowacovid19tracker.org/covid-19-in-our-schools/ (last visited Sept. 2, 2021).
[29] *People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (Aug. 20, 2021 update), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Sept. 2, 2021).

masking (in children > two years) regardless of vaccination status.[30] These are children who have need for in-person instruction. *And* in many school districts, even nominally equivalent educational services are not available through remote learning. The failure to allow local entities to implement universal masking policies will have disproportionate impact on these students.

**Public Health Guidance on Masking to Reduce COVID-19 Transmission in Schools**

29. Ways to mitigate the spread of COVID-19 in schools includes i) universal masking; ii) spacing of three feet with masking or at least 6 feet without masking; iii) testing with isolation and quarantine for positive and exposed individuals, respectively; and iv) maximizing proper ventilation of enclosed spaces.

30. The Delta variant is highly transmissible, which makes masking even more important. In a recent study it was found that while vaccines are effective against the Delta variant, infection risk remains elevated among unvaccinated persons in schools. In addition to vaccination, strict adherence to multiple nonpharmaceutical prevention strategies, including masking, are important to ensure safe school instruction.

31. From May 23 to June 12, 2021, 26 laboratory-confirmed COVID-19 cases occurred among Marin County, California, elementary school students and their contacts following exposure to an unvaccinated infected teacher. There was a 50% infection rate in an elementary classroom where all were masked *except* for the infected teacher who removed her mask for only a short period of time each day.[31] This study demonstrates that the mask is most valuable in preventing

---

[30] *American Academy of Pediatrics Updates Recommendations for Opening Schools in Fall 2021*, Am. Acad. Pediatrics (July 19, 2021), https://www.aap.org/en/news-room/news-releases/aap/2021/american-academy-of-pediatrics-updates-recommendations-for-opening-schools-in-fall-2021/.
[31] Tracy Lam-Hine et al., *Outbreak Associated with SARS-CoV-2 B.1.617.2 (Delta) Variant in an Elementary School — Marin County, California, May–June 2021*, Morbidity & Mortality Weekly Rep. (Sept. 3, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/mm7035e2-H.pdf.

PLAINTIFFS' APPENDIX 049

spread when the infected individual is wearing a mask. It also emphasizes the importance of universal masking in those who are medically able in order to prevent spread to vulnerable students and staff. Additionally, this case study shows that rapid spread within a school and to pediatric populations is possible, especially with the increased infectiousness of the delta variant.

32. The American Medical Association, American Academy of Pediatrics, Infectious Disease Society of America, American Academy of Family Physicians, and CDC all strongly endorse return to in-person learning *only* in the setting of appropriate public health mitigation, including universal masking.[32] The CDC specifically states that there are no known adverse effects from mask use.[33]

## The Importance of Allowing Schools to Set Their Own Mask Policies

33.  With significant inter-county differences in cases, test positivity, vaccinations, and health resources, local authorities, including school districts, should be able to decide, based on the dynamics of this pandemic, how to move on implementing mask mandates and other public health policies to help prevent, contain, and mitigate this disease. While it is generally true that the entire state of Iowa is facing a COVID surge, to illustrate the variation in impact over a single snapshot in time, observe that in Polk County, there are currently 1,427 cases per 100,000, in Linn County, 699 per 100,000 cases, and in Black Hawk County, 353 per 100,000 cases.[34]

---

[32] See, e.g., *American Academy of Pediatrics Updates Recommendations for Opening Schools in Fall 2021*, Am. Acad. Pediatrics (July 19, 2021), https://www.aap.org/en/news-room/news-releases/aap/2021/american-academy-of-pediatrics-updates-recommendations-for-opening-schools-in-fall-2021/.
[33] *Use of Cloth Masks to Control the Spread of SARS-CoV-2*, Ctrs. for Disease Control & Prevention (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html.
[34] *COVID-19 Integrated County View*, Ctrs. for Disease Control & Prevention (Sept. 2, 2021 update), https://covid.cdc.gov/covid-data-tracker/#county-view (last visited Sept. 2, 2021).

PLAINTIFFS' APPENDIX 050

34. Local districts and the boards which serve them need to be able to take action to protect their students and staff, including implementation of mask requirements.

I swear under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this __3rd_ day of September 2021, at _, Iowa.


*Megan L. Srinivas*

_____
Megan L. Srinivas, MD MPH

**MEGAN L. SRINIVAS, MD MPH**
mls329@mail.harvard.edu; Ph. (515)269-9118

**EXHIBIT A**

## EDUCATION/TRAINING

**UNIVERSITY OF NORTH CAROLINA SCHOOL OF MEDICINE** – Infectious diseases physician/clinical instructor and NC TraCS translational health policy research fellow. Completed clinical ID fellowship June 2019. Recipient of NIH T32 grant for STIs/HIV 2019-2020 and NCATS Translational TL1 grant for 2020-2021. 2020 Atlantic Fellow for Health Equity. 2018 New Leaders Council Fellow. Recipient of two 2020 Atlantic Philanthropies Solidary Grant. Asian Pacific American Institute for Congressional Studies (APAICS) 2018 National Leadership Academy. Recipient of Asian and Latino Coalition 2019 Leadership Award. 2020 Girl Scouts of Iowa Inspiring Women of the Year Award. InStyle Magazine's "Bad Ass Women" 2020 Award (featured in August 2020 issue). 2021 Emerge Iowa DAWN Activist Award. 2021 Business Record 40 Under 40 in Iowa Award. 2021 National Minority Quality Forum 40 under 40 Health Leaders in the United States. June 2017 – ongoing.

**JOHNS HOPKINS SCHOOL OF MEDICINE** – Johns Hopkins Bayview Medical Center Internal Medicine Residency Program. American College of Physicians 2015 National Poster Winner. Tel Aviv University Advanced Epidemiology 2015 Summer Fellow. President of Maryland American Medical Association (AMA) Resident/Fellow Section. National resident/fellow delegate to the AMA. Paul Lietman Global Health Fellowship 2016 recipient. Caucus Fellow for Hillary Clinton 2016 campaign. National Delegate to 2016 Democratic National Convention. June 2014 – June 2017.

**HARVARD UNIVERSITY SCHOOL OF PUBLIC HEALTH –** Class of 2014 MPH global health. Student government MPH rep. Student rep to Committee on Admissions and Degrees. David Rockefeller Center for Latin American Studies research grant winner.

**UNIVERSITY OF IOWA COLLEGE OF MEDICINE** – Class of 2014 MD. Teaching Distinction track. 2010 Minority Health and Disparities International Research Training Fellowship winner. Barry Goldman Fellowship recipient.

**HARVARD UNIVERSITY** – Class of 2009 AB *cum laude* Human Evolutionary Bio. 3 minors: Global Health Policy, Spanish, Latin American Studies. Thomas T. Hoopes Prize for Excellence in Undergraduate Work (top undergraduate student award at Harvard), David Rockefeller Center for Latin American Studies Grant, David Roux Fund award, Goelet Fund award, Alex G. Booth award, Harvard Intl Innovation Grant, Americorps Student Leader in Service scholarship, Justine Magazine Women's 2006 Role Model award.

**FORT DODGE SENIOR HIGH** – 2005 Valedictorian. USA Today 1st All-Academic Team, Coca-Cola National Scholar, National Toyota Community Scholar, National Merit Scholar, World Food Prize Foundation John Chrystal International Intern Award, Sports Illustrated Magazine's All-American Teen Award, President Hoover Uncommon Student Award, National Junior Science and Humanities Symposium Winner, Intel International Science and Engineering Fair Prize Winner, 4-year Varsity Letter-Winner and Captain of tennis team, 3-year National Congressional Debate Finalist and Captain of Speech and Debate team.

## BOARD CERTIFICATION/MEDICAL LICENSURE
**AMERICAN BOARD OF INTERNAL MEDICINE INFECTIOUS DISEASE BOARD CERTIFICATION -** December 2019
**AMERICAN BOARD OF INTERNAL MEDICINE BOARD CERTIFICATION -** October 2017
**NATIONAL BOARD OF MEDICAL EXAMINERS -** May 2016
State Licensures: Iowa, North Carolina

## WORK AND RESEARCH EXPERIENCE
**AMERICAN MEDICAL ASSOCIATION (AMA)/CENTER FOR DISEASE CONTROL AND PREVENTION (CDC)**        Remote
**Project First Line Podcast Host.** Podcast focused on the intersection of infection prevention and control and health equity titled, "Stories of Care with Dr. Srinivas." Launching in fall 2021. June 2021 – ongoing.

**COVID HEALTH ANIMATION PROJECT (CHAP)**        Virtual
**Co-founder and health expert** for collaborative effort that produces culturally-informed health messaging on COVID to help address racialized disparities. Designed and created videos to improve COVID Vaccine clinical trial recruitment for Novavax trials at UNC. Funded by two separate 2020 Atlantic Philanthropies Solidarity Grants. (https://www.cfrontiers.co/chap). March 2020 – ongoing.

**UNIVERSITY OF NORTH CAROLINA INSTITUTE OF GLOBAL HEALTH AND INFECTIOUS DISEASE**        Chapel Hill, NC, USA
**Infectious diseases physician/clinical instructor.** NC prison system HIV & general infectious disease telehealth provider. Inpatient infectious disease physician. Translational health policy researcher. July 2019 – ongoing

**WORLD HEALTH ORGANIZATION SEXUAL & REPRODUCTIVE HEALTH RESEARCH**        Virtual & Nairobi, Kenya
**Co-organizer/researcher.** Co-led a WHO project using social innovation/crowdsourcing to create a harmonized global instrument for sexual health research in HICs and LMICs. Aug 2019 – ongoing.

Srinivas . Page 1

**PROJECT ECHO – IOWA**                                                                                          Des Moines, IA, USA
**Infectious Disease Physician Expert.** Project ECHO uses telehealth to extend clinical reach to underserved & rural communities. Working to increase diagnosis & linkage to care for Hepatitis C in rural areas where specialist care is not available.  March 2019-ongoing.

**MEDICAID/TITLE X STI RESEARCH**                                                                                  Chapel Hill, NC, USA
**Principal Investigator.** Investigating reproductive health restrictions in Medicaid and Title X funding and their impact on creation of health care deserts and STI rates.  Received 2019-2021 NIH T32 grant and 2020-2021 NIH TL1 grant to fund research.  December 2018 – ongoing.

**FORT DODGE COMMUNITY HEALTH CENTER**                                                                             Fort Dodge, IA, USA
**Infectious Disease and Internal Medicine Physician.** Employed by rural federally-qualified health center as both the only infectious diseases and internal medicine physician.  January 2018-July 2020.

**INDIAN MINISTRY OF HEALTH HIV/AIDS RESEARCH**                                                                    Bangalore, India
**Researcher and PI.**  Funded by Barry Goldman Fellowship.  Mapped HIV incidence in the state of Karnataka over a 6-year period.  January 2014 – June 2014.

**BRAZILIAN MINISTRY OF HEALTH HIV/AIDS RESEARCH**                                                                 Fortaleza, Brazil
**Research Collaborator**.  Collaboration between Harvard research team and Brazilian government officials. Funded by Harvard's David Rockefeller Center for Latin American Studies grant.  Worked with govt officials and NGOs to assess level of stigma and discrimination against HIV/AIDS in healthcare workers and its effects on HIV testing. Jan 2013 – May 2013.

**HONDURAS PARASITOLOGY RESEARCH**                                                     Tegucigalpa, Honduras and Iowa City, IA, USA
**Researcher.** Member of National Dengue Taskforce during summer 2010 outbreak. Analyzed clinical presentation of leishmaniasis in relation to species. Health educator training on dengue/malaria prevention, diagnosis, treatment.  May – Aug 2010.

**MALARIA POLICY RESEARCH**                                                                         Amazon Basin, Peru and Cambridge, MA, USA
**Principal Investigator.**  Harvard's 2009 Thomas Temple Hoopes Prize winner.  Analyzed factors contributing to the evolution of drug resistance in malaria parasites in Peru. Crafted health policy recommendations adopted by Peruvian govt. May 2007 – May 2009.

**INDIAN INSTITUTE OF SCIENCE**                                                                                    Bangalore, India
**Research Fellow.**  Mathematical modeling to generate estimate of effective HIV population in an individual.  June - Aug 2007

**WEIZMANN INSTITUTE OF SCIENCE**                                                                                  Rehovot, Israel
**Researcher.**  Investigated conformational changes in glycoproteins-41 and -120 & their role in HIV virulence.  June - July 2005.

**NATIONAL ANIMAL DISEASE CENTER, US DEPT. OF AGRICULTURE**                                                        Ames, IA, USA
**Research Fellow.**  Developed novel diagnostic approach to detect the transmissible spongiform encephalopathic prion (causal agent of Mad Cow Disease and its counterparts in other species) content in paraffin-embedded tissues.  June 2004-June 2005.

**INTERNATIONAL CENTER OF INSECT PHYSIOLOGY AND ECOLOGY**                                                          Mbita, Kenya
**Research Intern.** World Food Prize Foundation intern; John Chrystal Award winner for outstanding work on hunger issues.  Analyzed the role of education on house-hold food security in rural Africa.  June-August 2003.

LEADERSHIP AND PUBLIC SERVICE

**IOWA'S BIDEN COVID RESPONSE COUNCIL**                                                                            August-November 2020
**Chair.** Worked with President Biden's Iowa campaign team to chair this group on their COVID response. Traveled Iowa representing the group and discussing the issues surrounding COVID and the policies needed to address the pandemic.

**COVID PUBLIC HEALTH EDUCATION**                                                                                  March 2020-ongoing
Educating the public on safety measures & latest research during the pandemic. Using social media (Twitter, Instagram, and Facebook) and traditional media (television, radio, and newspaper). Invited speaker for local, national, and international panels and media.

**ATLANTIC FELLOW FOR HEALTH EQUITY**                                                                              January 2020-ongoing
Selected as part of 2020 cohort for the Atlantic Institute's health equity fellowship based at George Washington University in the US. Program selects 20 fellows internationally each year to learn about leadership in the health equity sphere and collaborate on projects addressing disparities.

**INFECTIOUS DISEASE SOCIETY OF AMERICA's (IDSA) PUBLIC HEALTH ADVISORY BOARD**                                    October 2019-ongoing
IDSA represents all infectious disease providers in the nation.  Selected to sit on the IDSA's public health board, which makes public health policy decisions for the organization and advocates directly with policymakers.

**IOWA SUPREME COURT'S ACCESS TO JUSTICE COMMISSION**                                                             September 2019-ongoing
Appointed to the commission by the Iowa Supreme Court. Addressing the social determinants of justice and improving access to the legal system for vulnerable populations. Serving on the Rural Access Committee and on the Executive Board.

Srinivas –Page 2

**AMERICAN MEDICAL ASSOCIATION**                                                                      September 2009 – ongoing
**RFS Councilor to AMA Council on Medical Service & National Delegate to AMA House of Delegates**
Elected by residents/fellow membership as a national delegate, helping craft AMA policies on US healthcare. Elected as the resident/fellow member on the 12-person national Council on Medical Service, which focuses on the social & economic policies impacting medicine.

**AMERICAN COLLEGE OF PHYSICIANS**                                                                   December 2014 – ongoing
Former resident physician rep on Maryland Health Policy Committee and current physician member.

**NATIONAL ALLIANCE ON MENTAL ILLNESS (NAMI) IOWA BOARD OF DIRECTORS**                      February 2019-ongoing
Board member of Iowa branch of NAMI, a non-profit that centers on mental illness.  We work to fight stigma about mental health, educate the public on illness, and advocate for resources/access to treatment for patients and families.

**ASIAN AND LATINO COALITION BOARD OF DIRECTORS**                                              January 2019- January 2020
Board member of this Iowa organization focused on advocating for diversity and inclusion in the state.

**2018 DEMOCRATIC NOMINEE FOR IOWA STATE HOUSE OF REPRESENTATIVES – DISTRICT 9**           January-November 2018
Received multiple state and national endorsements.  One of the highest non-incumbent fundraisers in the state.  Won democratic primary June 5, 2018. Lost general election by 384 votes.

**2018 NEW LEADERS COUNCIL (NLC) FELLOWSHIP**                                                       January -May 2018
Selected as a fellow for the NLC, which focuses on creating a pipeline of progressive leaders for the future in both the political arena and in local communities. Undergoing trainings to develop these skills and connect with local, state, and national policy leaders.

**2016 WORLD FOOD PRIZE SYMPOSIUM**                                                                   October 14, 2016
Featured speaker at the 2016 Laureate Ceremony alongside former President of Malawi Joyce Banda, President Ameen Gurib-Fakim of Mauritius, US Secretary of Agriculture Thomas Vilsack, and Iowa Governor Terry Bransted.

**2016 DEMOCRATIC NATIONAL CONVENTION**                                                              February – July 2016
Elected by the constituents of Iowa's 4th Congressional District as National Delegate to the 2016 DNC in Philadelphia, PA in July 2016.

**2016 IOWA CAUCUS FELLOW FOR SECRETARY HILLARY CLINTON**                                       January – February 2016
Grassroots organizer in Iowa. Organized events w/ Sec Clinton, President Clinton, Rep Giffords, Cecile Richards, & other celebrity supporters.

**HARVARD 5th REUNION, CLASS OF 2009**                                                               August 2013-June 2014
**Co-Chair**                                                                                Harvard University, Boston, MA, USA
Selected by committee of peers to co-organize & host 5th reunion.  Highest 5th year reunion attendance & fundraising in Harvard's history.

**HARVARD SCHOOL OF PUBLIC HEALTH STUDENT GOVERNMENT**                                           September 2012 – June 2013
**MPH Co-Representative, Student Representative to the Admissions Committee**                    Harvard University, Boston, MA, USA
Elected by peers. Worked on curriculum & admissions criteria reform, student advocacy issues. Member of admissions deliberations.

**UNIVERSITY OF IOWA COLLEGE OF MEDICINE STUDENT GOVERNMENT**                                     May 2010-May 2012
**Executive Council for Grad/Professional Students; Activities Committee Chair; Diversity Committee**     Iowa City, IA, USA
Elected by peers. Helped to address diversity and cultural competency issues via hosting events and helping with curriculum changes.

**AMERICORPS STUDENT LEADERS IN SERVICE**                                                           October 2007-June 2008
**Student Leader**                                                                          Harvard University, Cambridge, MA, USA
Underwent special trainings with select group of other Harvard campus leaders in public service.  Public service scholarship recipient.

**PEER HEALTH EXCHANGE**                                                                             Boston, MA, USA
**Co-Coordinator and Co-Founder on the Harvard Campus; Health Educator**                          March 2006-June 2009
Co-founded organization's branch at Harvard and Boston.  Trained 50 college students to teach comprehensive health curriculum in socioeconomically disadvantaged high schools in Boston.  Reached >600 students annually between 2006-2009.

**HARVARD MODEL CONGRESS**                                                                           September 2005-June 2009
**Executive Board Member**                           Boston, MA and San Francisco, CA, USA; Athens, Greece; Bangkok, Thailand
Organized and presided over committees at four annual conferences for high school students from around the world.  Taught students about domestic and international political and judicial processes via government simulations and direct mentoring in high schools.

**HARVARD UNDERGRADUATE COUNCIL**                                                                    September 2005 – September 2006
**Student Representative**                                                                  Harvard University, Cambridge, MA, USA
Elected by peers to the Harvard student government.  Worked jointly with Dean's office for curricular reform and student advocacy.

Srinivas –Page 3

**IOWA STATE BOARD OF EDUCATION**
**Board Member**

May 2003-May 2005
Des Moines, IA, USA

Selected and appointed by former Governor Tom Vilsack as first student member on the board. Re-appointed for second term. Responsible for reflecting student opinion and making decisions regarding the education laws and policies throughout the state.

SELECTED PUBLICATIONS/POLICY PAPERS (*denotes first authors)

1. **\*Srinivas ML**, Shim H, Jones DL, et al (2021). "The importance of data accuracy and transparency for policy-making during a public health crisis: a case study in the state of Iowa." Accepted to IDWeek, October 2021, with publication in OFID.
2. **\*Srinivas ML**, Yang EJ, Lin FC, Tang W, Tucker JD (2021). "Impact of Defunding Family Planning Health Centers on Gonorrhea and Chlamydia Cases in Iowa: A Longitudinal Spatiotemporal Analysis of 2000 to 2018." Oral Presentation at IUSTI's STI & HIV World Congress 2021, Virtual and Berlin, Germany, Jul 2021.
3. Gonsalves L, Hunter EC, Tucker JD, **Srinivas ML**, Giatu E, Mercer CH, Bajos N, Collins D (2021). "Cognitive Testing of a Survey Instrument to Assess Sexual Practices, Behaviours,, and Health Outcomes: a Multi-country Study Protocol." *Reproductive Health*. In press.
4. \*Grijalva R, \*Makhlouf MD, **\*Srinivas, ML**, \*Lopez G. "An equitable distribution of COVID-19 vaccine must include noncitizens." *The Hill*, 26 Jan 2021. https://thehill.com/blogs/congress-blog/healthcare/535901-an-equitable-distribution-of-covid-19-vaccine-must-include
5. **\*Srinivas ML**, \*Ritchwood TD et al. (2021). "Social innovation in sexual health: a scoping review to end the HIV epidemic." *Sexual Health*. 2021 Mar; 18(1):5-12. doi: 10.1071/SH20030
6. \*Kpokiri EE, \*Wu D, **\*Srinivas ML**, et al. (2021). "Development of an international sexual and reproductive health survey instrument: results from a pilot WHO/HRP consultative Delphi process." *Sexually Transmitted Infections*. In press.
7. **\*Srinivas ML**, Yang EJ, et al. (2020) "Impact of defunding family planning health centers on sexually transmitted infection rates." Presented at *IDWeek*, Oct. 2020, Philadelphia, PA, USA.
8. **\*Srinivas, Megan L.** "We Don't Have the Data We Need to Reopen Iowa." *Des Moines Register*, 30 Apr. 2020, www.desmoinesregister.com/story/opinion/columnists/iowa-view/2020/04/30/infectious-disease-doctor-we-do-not-have-enough-data-reopen-iowa/3048415001/.
9. **\*Srinivas, Megan L**. "Rural America Is Not Ready for COVID-19." *Des Moines Register*, 2020, www.desmoinesregister.com/story/opinion/columnists/2020/04/07/rural-america-not-ready-covid-19/2952724001/.
10. **\*Srinivas, ML** et al.. (2020) "Social innovation in diagnostics: three case studies." *Infectious Diseases of Poverty*. 9(1):20. doi: 10.1186/s40249-020-0633-6.
11. \*Lachiewicz AM and **Srinivas, ML**. (2019) "Varicella-zoster virus post-exposure management and prophylaxis: A review." *Preventive Medicine Reports*. doi: 10.1016/j.pmedr.2019.101016.
12. \*DeFelice, DS, **Srinivas, ML**, Wobker, SE, and Parr, JB. (2018) "Going bone deep: osseous Rosai-Dorfman Disease in an adult with recurrent, culture-negative osteomyelitis." *Case Reports in Infectious Diseases*, vol 2018. doi: 10.1155/2018/6151738
13. "*Gun Violence as a Public Health Crisis.*" (2016) – co-wrote and co-lead the effort to pass the resolution establishing the AMA policy on gun violence in June 2016.
14. **\*Srinivas, Megan L**. (2015): "Mycophenolate-Induced Disseminated TB in a PPD-Negative Patient." American College of Physicians 2015 National Meeting Poster Competition, Boston, MA, USA. – 1st place winning poster in National Competition.
15. **\*Srinivas, Megan L**. (2009): "*Evolution and Malaria: A Battle for Survival*" – Thomas T. Hoopes award-winning thesis on evolution of drug-resistance in malaria. Bound and available in the Harvard University library system.
16. \*Kunkle, RA.,Nicholson, EM, Lebepe-Mazur, S, Orcutt, DL, **Srinivas, ML**, et al., (2008): "Western-blot Detection of PrP$^{Sc}$ in Archived Paraffin-Embedded Brainstem from Scrapie-affected Sheep." *Journal of Veterinary Diagnostics*. 20(4): pp. 522-526.
17. **\*Srinivas, Megan L**., (2007*)*: "Development and Standardization of a Novel Approach to Detect the Transmissible Spongiform Encephalopathic Prion Content in Paraffin-Embedded Tissues," *Proceedings of the 25th National Army Science Conference*.
18. \*Bussey, M., \*Klapper, J., and **\*Srinivas, M**., (2005): "Isolation, Purification, and Identification of the Structure of the TrpST42 Peptide Chain of gp41 in HIV-1," *Sci Reports*, 37th Intl Summer Sci Inst, Weizmann Inst Science, Rehovot, Israel. pp B11:1–6.
19. **\*Srinivas M.L**. (2003): *"Analysis of the Influence of Education on Household Food Security in Rural Africa"* – John Chrystal Award-winning thesis on research conducted while at the International Center of Insect Physiology and Ecology, Kenya. http://www.worldfoodprize.org/Youthinstitute/03brinterns/papers/srinivas.pdf

# Exhibit F

## HOLLAND, MICHAEL, RAIBER & SITTIG PLC
### Attorneys at Law
123 North Linn Street, Suite 300
Iowa City, Iowa 52245
319-354-0331
www.icialawyers.com

C. Joseph Holland
jholland@icialaw.com

Crystal Raiber
craiber@icialaw.com

Robert Michael
rmichael@icialaw.com

Erek Sittig
esittig@icialaw.com

September 10, 2021

**RE:** **The ARC of Iowa *et al.* vs. Kim Reynolds, in her official capacity as Governor of Iowa *et al.***
**United State District Court**
**Southern District of Iowa       Case No. 4:21–CV–00264**

Our Firm is counsel to the Iowa City Community School District by appointment and employment by the Board of Directors pursuant to Section 279.37 of the Code of Iowa (2021). On behalf of the Iowa City Community School District I am able to represent to the Court the following:

The Iowa City Community School District has no objection or resistance to the Court granting a Temporary Restraining Order and joining enforcement of Section 280.31 of the Code of Iowa (2021).

If the Court does enter that Temporary Restraining Order the Board of Directors of the Iowa City Community School District is prepared to meet as soon as possible to consider a mask requirement in the District in alignment with the provisions of a Temporary Restraining Order.

I have been authorized by the Iowa City Community School District, acting through its Superintendent, to provide this statement for the benefit of the Court.

Respectfully submitted,

C. Joseph Holland

CJH:ses

# Exhibit G

PLAINTIFFS' APPENDIX 058

# Des Moines Register

# Iowa COVID hospitalizations highest since January, 25% increase since last week to nearly 500



**Nick Coltrain**
Des Moines Register

Published 1:05 p.m. CT Aug. 26, 2021 | **Updated 4:52 p.m. CT Aug. 26, 2021**

The number of people hospitalized with COVID-19 in Iowa rose 25% since last week, to nearly 500 people, according to Iowa Department of Public Health data released late Wednesday.

State data shows 498 people were hospitalized with COVID-19 on Aug. 25. Of them, 133 people were in the intensive care unit. It's a steep increase from a summer lull that saw fewer than 50 people hospitalized with COVID-19 two months ago.

It's the most COVID-19 patients in Iowa's hospitals since January, when the state was on a months-long decline after a November surge that threatened to overwhelm health care facilities. The first time Iowa neared 500 people simultaneously hospitalized with COVID-19 was Oct. 19 — about a month before the November peak of 1,500 COVID-19 patients.

The current surge shows no signs of waning. State data shows an average of more than 1,000 new COVID-19 cases daily over the last week, another increase of 25% over the 814 average daily new cases the week before.

**More:** CDC recommends masks in all 99 counties as COVID-19, delta variant surge across Iowa

More than half of the new cases, 56%, are people younger than 40, and 17% are younger than 17. Those age groups also have the lowest vaccination rates.

The update on COVID-19 in the state comes days after the end of the Iowa State Fair, and its 1 million attendees over 11 days, and at the start of school throughout the state.

Dr. Ravi Vemuri, an infectious disease specialist at MercyOne Des Moines Medical Center, noted just under half of Iowans are fully vaccinated. Scientific models show each person infected with the delta variant can infect up to six or seven others — more than double the transmissibility of the world-changing original strain of coronavirus.

"The next 14 days are going to be telling just how much transmission happened (at the fair) as people perhaps come down with infections," Vemuri said. "And then another seven to 10 days after that, we'll see how many of them end up in the hospital. So for the next 21 days, we're kind of holding our breath and hoping for the best, and hopefully we won't surge beyond what we're already surging now."

## 'A surge of the unvaccinated'

Statewide, 79% of hospital patients with a primary COVID-19 diagnosis are not vaccinated against the disease, and it rises to 86% among ICU patients, according to the Iowa Department of Public Health.

That alone is proof the vaccines work, Vemuri said. He called it a "surge of the unvaccinated."

"Had we had a higher percentage of the population vaccinated than we had, we may have avoided this delta surge," Vemuri said. "Or even if we had one, it would be amongst fully vaccinated individuals and we wouldn't have all the hospitalizations and all the excess deaths that we're seeing now."

Nearly all of the so-called breakthrough cases of COVID-19 that required hospitalization at MercyOne's Des Moines-area facilities involved people with weak immune systems, Vemuri said. Breakthrough cases are when a person becomes sick despite being fully vaccinated.

Many of the breakthrough cases involve older people, Vemuri and UnityPoint Health Nurse Epidemiologist Carrie O'Brien said. That's because older people typically have weaker immune systems that come with age, and don't generally take to vaccines as well as younger people.

**More:** Des Moines' sewage is carrying twice as much coronavirus as it did two weeks ago, tests show

People 60 and older are also the most vaccinated age demographic in the state, meaning there's a higher pool of people for breakthrough cases. Older Iowans were targeted for the

its efficacy appears to be waning. Those initial efforts are credited with subduing the winter surge.

About half of all Iowans, 48.6%, are fully vaccinated, though it varies by age demographic. The state's vaccination rates by age are:

30% of 12- to 15-year-olds
37% of 16- to 17-year-olds
39% of 18- to 19-year-olds
40% of 20- to 29-year-olds
49% of 30- to 39-year-olds
56% of 40- to 49-year-olds
62% of 50- to 59-year-olds
73% of 60- to 64-year-olds
82% of people 65 and older

The lower vaccinations rates among younger Iowans are skewing patient demographics younger, O'Brien said, especially compared to early in the pandemic, when COVID-19 ripped through Iowa's elderly population.

At UnityPoint, the average age of an unvaccinated patient is 52; the average age of a fully vaccinated patient is 72. About 74.2% of UnityPoint's COVID-19 admissions over the past six weeks have been unvaccinated, she said.

"When we really started off with COVID, the vast majority of the people seemed like they were much more elderly that we were having as hospitalizations," O'Brien said. "Now, that's not the case. We're seeing a much, much younger population that is hospitalized with COVID. And again, it's a lot of our unvaccinated population."

## COVID vaccinations slow again

The COVID-19 vaccines, which are free and available without an appointment at many Iowa pharmacies, are effective at keeping people from catching the coronavirus and, if they do catch it, keeping viral loads lower, effectively minimizing its ability to spread and keeping the worst symptoms of COVID-19 at bay. In short, it gives a strong layer of protection against COVID-19 to both the individual and the community.

Getting vaccinated is all the more important with in-person school starting, with children mingling indoors and many of them not yet vaccinated. O'Brien said. Children under

12 aren't eligible to receive the vaccine.

Even though children don't generally endure severe cases of COVID-19 — there are no children currently hospitalized with COVID-19, according to the state — they can still spread the virus that causes it, O'Brien said.

**More:** Bublé, Taylor, Incubus to require proof of COVID vaccination, negative test for Des Moines concerts

The number of COVID-19 vaccinations administered in Iowa also dropped off this week after a brief uptick earlier in the month. About 18,500 Iowans received their first dose of vaccine over the prior week, versus more than 22,000 the week before and 21,500 the week before that.

In a news release, Iowa Department of Public Health interim Director Kelly Garcia urged Iowans to get vaccinated, and noted that the Pfizer vaccine is now fully approved by the Food and Drug Administration.

"We have many tools we need to keep ourselves and our loved ones safe and the single most important tool we have is the vaccine, which is highly effective at preventing serious illness, hospitalization and death," Garcia said in a statement. "For anyone who was waiting for the assurance of full FDA authorization, I urge you to schedule your appointment today."

In the release, the department credited the vaccination campaign with keeping the state from again seeing the same hospitalization rates as in November, when more than 1,500 people with COVID-19 were hospitalized in Iowa at the same time.

*Nick Coltrain is a politics and data reporter for the Register. Reach him at ncoltrain@registermedia.com or at 515-284-8361.*

# Exhibit H

# Des Moines Register

HEALTH

# Children make up nearly a quarter of new COVID-19 cases in Iowa

 **Tim Webber**
Des Moines Register

Published 3:42 p.m. CT Sept. 1, 2021 | **Updated 8:56 a.m. CT Sept. 2, 2021**

Nearly a quarter of all new COVID-19 cases in Iowa are children, state data released Wednesday shows.

Of the 8,308 new cases reported by the Iowa Department of Public Health, 22% were kids — a staggering rate considering historical trends. Typically, kids have made up just 12% of new cases on average.

The sharp increase in pediatric cases comes as school resumes across the state.

Since the start of the school year, Des Moines Public Schools have reported 128 total COVID-19 cases among staff and students, as of Wednesday. Students account for 82 of those cases.

The 8,308 new reported cases across the state average out to 1,187 per day during the past week, the highest that number has been since mid-January.

After increasing through most of August, the rate of vaccine doses administered declined for the second week in a row, even after the Pfizer vaccine won full FDA approval. The state reported about 16,200 Iowans receiving the first dose of any vaccine in the past week, down from about 18,500 in the week prior.

**More:**Amid COVID surge, Des Moines hospitals reimpose visitor restrictions

The state on Wednesday reported a total of 408,390 coronavirus cases in Iowa since the start of the pandemic.

The state also reported 39 additional deaths from COVID-19 during the past week. There have been 6,307 confirmed COVID-19 deaths in Iowa.

A total of 1,551,098 Iowans, or 49% of Iowa's population, were fully vaccinated as of Wednesday, having received either both doses of a two-dose sequence or one dose of a single-dose vaccine. Another 119,775 Iowans, or 4%, were partially vaccinated with the first dose of a two-dose sequence.

**Read more on COVID-19 in Iowa:**

> Track the COVID-19 vaccine rollout in Iowa with these graphics
> 80% of Iowa's COVID patients are unvaccinated, new data shows
> Top U.S. health leader urges Iowans to get COVID shots to protect everyone

## The latest COVID-19 numbers in Iowa

The latest data, as of 2 p.m. Wednesday, Sept. 1, compared to the previous Wednesday.

> Confirmed cases: 408,390, an increase of 8,308
> Deaths: 6,307, an increase of 39
> Total tested: 1,912,356
> Total recovered: 376,954
> Statewide 14-day positivity rate: 8.6%

**More:** COVID-19 hospitalizations in Iowa reach levels last seen in January

## How many Iowans are hospitalized with COVID-19?

> Hospitalizations: 524, up from 498 one week ago
> Patients in ICU: 143, up from 133
> Patients on ventilators: 66, up from 51

## How many people in Polk and Dallas counties are vaccinated?

In Polk County, 291,237 people, or 59% of residents, have received at least one dose of the vaccine. 266,594 (54%) are fully vaccinated, an increase of 3,338 (0.7 percentage points) since last week.

In Dallas County, 54,919 people, or 59% of residents, have received at least one dose; 50,746 (54%) are fully vaccinated, an increase of 615 (0.7 percentage points).

The five counties in Iowa with the highest percentage of their population fully vaccinated as of Sept. 1 are Johnson (60%), Linn (56%), Boone (55%), Dubuque (54%) and Polk (54%) counties.

For a county-by-county look at the vaccination rollout, see our COVID-19 vaccine tracker, which is updated weekly.

**More:**Iowa paying $1.7 million to Utah company for new phase of Test Iowa

# Exhibit I

# Des Moines Register

# Can Iowa schools defy the state's COVID mask ban like Florida and Texas schools are?



**Ian Richardson**
Des Moines Register

Published 3:00 p.m. CT Aug. 16, 2021 | Updated 3:40 p.m. CT Aug. 18, 2021

Iowa school districts and their administrators could face repercussions if they follow the lead of the U.S. schools that are requiring students to wear facial coverings in violation of state bans on mask mandates, according to the state's education department.

Iowa school districts haven't publicly shared plans to defy the new state law that prevents schools, cities and counties from having mask requirements. But the law, which Iowa Gov. Kim Reynolds signed after midnight on the final day of this year's legislative session, has sparked an outcry among some parents, educators and medical experts as the delta variant drives up Iowa's coronavirus case numbers and hospitalizations.

"Because the variant has shown an increase — a dramatic increase in several of our counties across the state — it would be very timely for the governor to make a proclamation that would allow school districts to make decisions for themselves," said Mike Beranek, president of the Iowa State Education Association.

Iowa is among eight states that prohibit districts from putting in place universal masking mandates inside school buildings, according to the Pew Charitable Trusts.

While the new law bars school administrators and board members from imposing mandates, it does not prevent the governor from doing so.

►**More:** As COVID surges and families fret, Iowa schools take different tacks as new school year starts

But Reynolds, a Republican who has been critical of the new CDC guidance on masking, has so far signaled she likely won't give schools that option. In a statement to the Des Moines

Register, she said she trusts Iowans to make decisions for themselves and their own families.

And Reynolds told KCRG-TV in an interview that she would need to see more data on the effectiveness of school mask mandates before making changes.

"I think we just want to make sure that we're looking at all of the data, that we're taking everything into account," she said. "Right now, we're not seeing that transfer into hospitalizations with children. But we monitor the data every single day, and we'll continue to monitor the data every day, and we'll respond accordingly."

## Schools that break Iowa law could face penalties from state board

The new law banning local mask requirements, House File 847, does not outline specific penalties for school districts that violate it. But school districts and their leaders could face general consequences for violating state law.

Iowa Department of Education spokesperson Heather Doe said that school districts that choose not to follow the ban could receive a citation for noncompliance. Schools that do not correct those citations "in a timely manner" would be referred to the State Board of Education, she said.

Doe did not answer follow-up questions about the possible penalties, but the lengthy noncompliance enforcement process laid out in Iowa Code allows the state to assume more oversight over a school district, and districts could ultimately risk losing accreditation.

The Iowa Board of Educational Examiners, which has the power to impose licensure penalties on school leaders, could be a separate avenue of discipline. That process has already played out once during the past year on a COVID-related matter after Des Moines Public Schools resisted a state requirement to hold at least 50% of its classes in person at the beginning of the fall semester. The district instead started the first two weeks of the last school year online without a state waiver.

►**More:** From mask recommendations to online options, here's how Iowa schools are preparing for school to start

The Iowa Board of Educational Examiners heard a case against Superintendent Tom Ahart but decided not to take away his license, instead opting to issue a letter of reprimand. The letter was a symbolic slap on the wrist that acknowledged Ahart's motives to keep children

Des Moines Public Schools' decision last year also prompted some of Iowa's Republican legislators to introduce multiple pieces of legislation earlier this year that would have penalized the district.

One bill would have retroactively expanded the grounds for stripping superintendents of their licenses to explicitly include offering primarily remote learning without a waiver. A separate bill outlining additional funding for school districts would have excluded Des Moines Public Schools due to its noncompliance with state law at the beginning of the year. Neither bill became law.

House Minority Leader Jennifer Konfrst, D-Windsor Heights, told reporters Tuesday that she believes Republicans sent a message that will deter schools from taking similar action this year.

"I think that some school districts are going to be pretty reticent to do that again because (of) what they've seen as retaliation by the majority party in the Legislature," she said.

## Frustration mounts for some people in states banning mandates

In Iowa and across the country, school years are starting as the delta variant of the coronavirus continues to spread in Iowa, and as children under 12 remain unable to be vaccinated. As of Wednesday afternoon, Centers for Disease Control and Prevention data showed all but four of Iowa's 99 counties with either "substantial" or "high" community transmission of the virus.

The CDC's website cites studies showing that multi-layer cloth masks are effective in blocking exhaled respiratory droplets that can spread the virus, and that schools have seen success in limiting transmission by using layered prevention strategies, including mask use.

Dozens gathered at the Iowa Capitol Wednesday morning to protest the ban and call on the state's Republican leaders to allow school districts to require masks in order to follow new CDC guidelines that recommend mask wearing in school settings, even among the vaccinated.

President Joe Biden last week voiced frustration with governors that have blocked local mask mandates, singling out Florida and Texas, whose governors have signed executive orders that include a ban on mask requirements in schools.

"I say to these governors, 'Please help,'" he said. "If you aren't going to help, at least get out of the way of the people who are trying to do the right thing. Use your power to save lives."

Some Florida school districts have decided to ignore Republican Gov. Ron DeSantis' executive order by requiring masks. In Texas, some of the state's largest school districts are also defying a similar order by Republican Gov. Greg Abbott.

In Arkansas, the state's Republican governor, Asa Hutchinson, has said he regrets signing a law in April that bans mask mandates. A judge has temporarily blocked the law.

But Republican leaders in Iowa have stood by the state's law after the CDC updated its guidance.

Senate Majority Leader Jack Whitver said late last month that Iowans "have all the tools they need, including an effective vaccine, to manage their own health care related to COVID-19," and that "they are ready to move forward with their choices."

Reynolds told KCRG that cases appeared to spread over the winter regardless of whether states had mask mandates or not.

"Pretty much the whole map of the United States was burning down red in November and December," she said. "There was no variation between the states that had locked down, the states that have remained open, the states that have implemented mask mandates and those that hadn't."

*Ian Richardson covers the Iowa Statehouse for the Des Moines Register. Reach him at irichardson@registermedia.com, at 515-284-8254, or on Twitter at @DMRIanR.*

# Exhibit J

Flag US IA
Status Full Full

COVID-19 Reporting

Test Iowa

Newsroom

Requests and Applications

» Gov. Reynolds issues a statement in response to the Biden Administration's latest letter

# Gov. Reynolds issues a statement in response to the Biden Administration's latest letter

Monday, August 30, 2021

DES MOINES – Gov. Reynolds released the following statement today in response to a new letter we received from President Biden's Administration:

"Iowa was able to reopen schools safely and responsibly over a year ago. President Biden and his team know this, yet they've decided to pick a political fight with a handful of governors to distract from his own failures - Afghanistan, the border, inflation, and more.

"As I've said all along, I believe and trust in Iowans to make the best health decisions for themselves and their families. Iowa's democratically elected legislature endorsed that view as well when they passed a law to support a parent's right to decide what's best for their own children. In Iowa, we will continue to support individual liberty over government mandates."

# Exhibit K

PLAINTIFFS' APPENDIX 074

## DECLARATION OF MICHELLE CROFT

COMES NOW, Michelle Croft and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Michelle Croft, and I am over 18 years old and have personal knowledge of the facts as stated herein.

2. The attached email is a true and correct copy of the email that I received from the Iowa City School District regarding my child.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this 1st day of July 2022, at Iowa City, Iowa.

Michelle Croft
_____
Michelle Croft, Plaintiff

From: Iowa City Community Schools <noreply@iowacityschools.org>

Date: Fri, May 27, 2022 at 11:57 AM

Subject: COVID-19 Health & Safety Update

To: Iowa City Community School District Recipients <recipients@iowacityschools.parentlink.net>

Dear Families and Staff,

Our District has continued to track COVID-19 rates in our schools and in our county while also working closely with Johnson County Public Health and local health experts regarding appropriate COVID-19 safety protocols.  Unfortunately, the Johnson County COVID-19 transmission level has again shifted into the "high" category.

As a reminder, our District continues to follow our health and safety guidelines, which are adjusted based on the county transmission level.  Due to this shift into the "high" transmission category, we encourage you to wear a mask indoors when appropriate, practice social distancing when possible, and stay home when sick as these continue to be effective COVID-19 health and safety measures.  On May 16, the U.S. Court of Appeals for the 8th Circuit ruled that school districts cannot universally require face masks to be worn; however, we continue to strongly encourage their use when COVID-19 transmission rates are high in our community.  In addition, it is recommended to get vaccinated (and boosted) if you are eligible.

We recognize that we are three days from the end of the school year. Many celebrations are taking place today and next week throughout the District. We will allow students to gather in mixed classroom cohorts for these celebrations. In addition, we are going to continue to allow visitors and volunteers into buildings through the last day of school. We strongly encourage all students, staff, and visitors to wear a mask while in a school building or while attending graduation ceremonies.

These health and safety precautions play a critical role in controlling the spread of COVID-19 within our community and protecting those that are most vulnerable to the virus. We appreciate your support and collaboration in keeping our community safe.


Sincerely,

Matt Degner
Superintendent
Iowa City Community School District
*Messages from the District are sent in English, Arabic, French, Spanish, and Swahili based on the language preference for communication that is designated by parents in Infinite Campus. Messages may be distributed through multiple channels, including e-mail, phone, text message, mobile app, district and school websites, and social media. Many of these channels offer multiple language options for users. Through collaboration with our Principals, Teachers, Student & Family Advocates, and Cultural Liaisons, messages may also be distributed through additional channels such as WhatsApp and Remind.*

# Exhibit L

No. 21–3268

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

THE ARC OF IOWA et al.,

Plaintiffs–Appellees,

vs.

KIM REYNOLDS, in her official capacity
as Governor of Iowa; ANN LEBO, in her official capacity
as Director of the Iowa Department of Education,

Defendants–Appellants,

ANKENY COMMUNITY SCHOOL DISTRICT et al.,

Defendants.

Appeal from the United States District Court
for the Southern District of Iowa

# APPELLANTS' BRIEF

THOMAS J. MILLER
Attorney General of Iowa

JEFFREY S. THOMPSON
Solicitor General

SAMUEL P. LANGHOLZ
Assistant Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
sam.langholz@ag.iowa.gov
jeffrey.thompson@ag.iowa.gov

ATTORNEYS FOR APPELLANTS

issue since the pandemic began. House Video, Consideration of H.F. 847 (May 19, 2021, at 6:35:32, 7:11:50 PM), *available at* https://perma.cc/BD9B-2FZ6. In response to questioning from opponents about the possibility of new, more dangerous variants needing mask mandates, *see, e.g.*, *id.* at 6:15:35 PM, he repeatedly explained that the Governor has the authority to impose mandates if she decides they become necessary. *See id.* at 6:18:50, 6:26:30; 7:09:50 PM. And there was even discussion about the exception permitting schools to impose mask mandates when required by other law—with opponents criticizing the inclusion of such a broad exception. *See id.* at 6:15:50.

Section 280.31 contains no enforcement provisions. But a school that violates the statute—like any school law—could eventually be subject to loss of accreditation or other action by the State Board of Education if the violation is not remedied. *See* Iowa Code § 256.11(10)–(12). Similarly, a school administrator that disregards the statute could be subject to professional licensure discipline by the Iowa Board of Educational Examiners. *See* Iowa Code § 272.2(4); Iowa Admin. Code r. 282-25.3(6)(m).

Plaintiffs are eleven parents of children in Iowa public school districts and one nonprofit organization—The Arc of

# SUMMARY OF THE ARGUMENT

The district court preliminarily enjoined enforcement of Iowa Code section 280.31, which generally prohibits schools from mandating the wearing of masks on school property. The court agreed with Plaintiffs that they were likely to succeed on their novel claims that this statute violates title II of the ADA and section 504 of the Rehabilitation Act. But the district court abused its discretion in granting this extraordinary remedy because its conclusion was based on several errors of law.

First, the injunction is unnecessary. Section 280.31 permits schools to impose to mandate the wearing of masks if it "is required by . . . any other provision of law." The statute thus doesn't prevent schools from complying with the ADA and section 504. And Plaintiffs don't suffer any injury from section 280.31 that is protected those federal statutes.

Second, the injunction is insufficient. Even if failing to have a universal mask mandate in schools violates federal law, enjoining enforcement of section 280.31 doesn't provide Plaintiffs such a mandate. That remains an independent decision of the local schools. Plaintiffs thus lack standing.

Third, the district court improperly overlooked Plaintiffs' failure to exhaust their administrative remedies under the Individuals

Appellate Case: 21-3268    Page: 18    Date Filed: 10/19/2021 Entry ID: 5088857

## A. Plaintiffs are not harmed by section 280.31 because it permits schools to mandate facial coverings when required by federal law.

Section 280.31 doesn't prohibit any actions of a school where "the facial covering . . . is required by . . . any other provision of law." Act of May 20, 2021 (H.F. 847), ch. 139, 2021 Iowa Act § 28 (to be codified at Iowa Code § 280.31). So even if Plaintiffs are correct that federal law requires some masks in schools, section 280.31 doesn't prohibit it. No injunction of the statute's enforcement is required. A school already has it within its power to comply with any requirement of federal law.

To be sure, as discussed in Part III, the State disputes that the ADA or the Rehabilitation Act impose any federal requirement that a universal mask mandate be imposed in all Iowa schools—or that they require local school decisionmakers to have the discretion to impose such universal mandates rather than the Governor. And presumably Iowa schools and their lawyers have come to the same conclusion since none acted to impose a district-wide, or building-wide universal mask mandate based on some requirement of federal law before the district court enjoined section 280.31.

Yet the district court enjoined Governor Reynolds and Director Lebo "from enforcing Iowa Code section 280.31 banning local public school districts from utilizing their discretion to mandate masks for students, staff, teachers, and members of the public."

PLAINTIFFS' APPENDIX 081
Appellate Case: 21-3268     Page: 23     Date Filed: 10/19/2021 Entry ID: 5088857

If Plaintiffs are correct that universal mask mandates in schools are required by federal disability law, then section 280.31 doesn't stand in the way of their desired mandates. Their quarrel would be with their schools. Now, a school may well disagree that federal law requires a mask mandate. Or the school may fear that it will be subject to enforcement action by the State and not want to risk waiting until then to find out if the State is correct in its interpretation of federal disability law. Plaintiffs might be able to request some relief other than the granted injunction to seek resolution of these disputes. But enjoining section 280.31 is a mismatch.

An unnecessary injunction, relying primarily on evidence of possible confusion over the text of a statute, is particularly problematic when it is a federal injunction against a state statute. *See Dixon*, 950 F.3d at 1056 (vacating injunction for failure to properly consider "whether a preliminary injunction served the public interest in comity between the state and federal judiciaries"). "'Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies.'" *Id.* (quoting *R.R. Comm'n of Tex. V. Pullman Co.*, 312 U.S. 496, 500 (1941)); *see also id.* ("'[F]ederal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" (quoting *Rizzo v. Goode*, 423 U.S. 362, 378 (1976))).

Appellate Case: 21-3268    Page: 25    Date Filed: 10/19/2021 Entry ID: 5088857

of the Rehabilitation Act. Add. 20.[5] The court reasoned that "section 280.31 seems to conflict with the ADA and section 504 of the Rehabilitation Act because it excludes disabled children from participating in and denies them the benefits of public schools' programs, services, and activities to which they are entitled." Add. 20. But neither the ADA nor the Rehabilitation Act require universal mask mandates in schools or requires schools to have the discretion to implement such mandates.

### A. Section 280.31's prohibition on schools imposing universal mask mandates is a neutral and nondiscriminatory policy that does not violate federal law.

Courts typically analyze disability discrimination claims under title II of the ADA and section 504 of the Rehabilitation Act together. *See, e.g.*, *Davis v. Francis Howell Sch. Dist.*, 138 F.3d 754, 756 (8th Cir. 1998). Under both statutes, "a plaintiff must show that he was a qualified individual with a disability and that he was denied the benefits of a program, activity, or services by reason of that disability." *Id.* (citing 42 U.S.C. § 12132; 29 U.S.C. § 794(a)). And

---

[5] Plaintiffs also brought a claim that the American Rescue Plan Act of 2021 ("ARPA"), agency guidance, and a letter from the Secretary of Education conflict with and supersede Iowa Code section 280.31. App. 42–44 ¶¶ 95–102. The district court didn't rely on this claim in issuing its preliminary injunction. Add. 15 n.7.

Appellate Case: 21-3268    Page: 39    Date Filed: 10/19/2021 Entry ID: 5088857

under both, when the denial occurs because of a neutral nondis-criminatory policy rather than because of a plaintiff's disability, no violation arises. *See Davis*, 138 F.3d at 756–57. It matters not whether the plaintiffs "question the wisdom" of the policy. *Id.* at 756. The policy doesn't violate the federal statutes where it "applies to all students regardless of disability and rests on concerns unre-lated to disabilities or misperceptions about them." *Id.* (cleaned up); *see also Timothy H. v. Cedar Rapids Cmty. Sch. Dist.*, 178 F.3d 968, 971–72 (8th Cir. 1999); *DeBord v. Bd. of Educ.*, 126 F.3d 1102, 1105–06 (8th Cir. 1997).

This Court has thus held that following a policy that all stu-dents in an intra-district transfer program must provide their own transportation is not disability discrimination. *See Timothy H.*, 178 F.3d at 972. Nor is following a policy to administer medication in schools only consistent with the maximum dosage recommended by the Physician's Desk Reference. *See Davis*, 138 F.3d at 756; *DeBord*, 126 F.3d at 1105–06. And these were just *policies* of school dis-tricts—not a duly enacted statute setting statewide education pol-icy that is entitled to even greater respect.

Section 280.31 establishes a uniform nondiscriminatory pol-icy that—unless required by other law or a specific instructional or educational purpose—local schools cannot require students, em-

ployees, or visitors to wear face coverings. There's been no sugges-
tion that the statute was adopted to single out individuals with dis-
abilities. And it imposes no restriction on individuals—whether dis-
abled or not—at all. To be clear, *all* students, employees, and visi-
tors remain free to wear face coverings or take any other health
precautions they (or their parents) choose. The statute is mainly an
allocation of decision-making authority between the State and local
government, disconnected from students with disabilities. After
passage of section 280.31, a universal mask mandate as a public
health precaution can only be imposed by the Governor as a part of
her emergency powers during a public health disaster, rather than
by a school district. *See* Iowa Code §§ 135.144(3), 29C.6.

The alleged denial of Plaintiffs' desired universal mask man-
dates in their children's schools, and their further alleged denial of
education, is not caused because of their disability. If it's caused at
all, it's because of this neutral, nondiscriminatory statute. And
since title II of the ADA and the Rehabilitation Act do not override
neutral local school district policies, they also do not provide a basis
to override this statutory product of Iowa's democratic process.[6]

_____

[6] This argument—like the alternative arguments in subsections
B and C— defeats all of Plaintiffs' ADA and section 504 claims be-
cause they negate the required statutory element of being denied a
benefit because of a disability. *See Davis*, 138 F.3d at 756. These

## B. A universal mask mandate in a school is not a reasonable modification and other reasonable modifications exist.

In granting the preliminary injunction, the Court held that schools are required to make "reasonable modifications" and that "universal masking policies are a reasonable modification, which public schools are required to provide." Add. 16, 20. But this Court has not decided "whether the failure to make reasonable modifications in a policy is itself discrimination even where the policy and its rationale cannot be shown to be discriminatory." *Davis*, 138 F.3d at 757; *see also DeBord*, 126 F.3d at 1106; *cf. CVS Pharmacy, Inc. v. Doe*, No. 20-1374 (U.S. July 2, 2021) (granting certiorari on question, which will be argued on December 7, 2021, whether a private cause of action exists for disparate-impact disability discrimination claim under section 504); *Alexander v. Sandoval*, 532 U.S. 275, 284-86 (2001) (holding that similar Title VI does not create private cause of action for disparate-impact discrimination claims). So Plaintiffs can hardly be likely to succeed on a claim where the law is unsettled.

---

same arguments were made in the district court. App. 318–24. While the State didn't dispute that Plaintiffs' children are qualified individuals with disabilities, the State thus disputed the rest of Plaintiffs' claims. Nothing in the State's briefing limited its argument to only a claim based on denying a reasonable modification. The district court erred in concluding otherwise. Add. 16 & n.8.

Appellate Case: 21-3268    Page: 42    Date Filed: 10/19/2021 Entry ID: 5088857

But even if reasonable modifications are required, a universal mask mandate is not a reasonable modification. A modification that imposes an undue administrative burden or a fundamental alternation in the nature of the State's education program is not reasonable. *See Davis*, 138 F.3d at 757 (holding that request to deviate from medication policy wasn't reasonable because it would "impose undue financial and administrative burdens on the district by requiring it to determine the safety of the dosage and the likelihood of future harm and liability in each individual case"); *Timothy H*, 178 F.3d at 972–73 (holding that request to establish a special free bus route would be "an undue financial burden and a fundamental alteration in the nature of the intra-district transfer program"); *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 929–30 (8th Cir. 1994) (holding that request to participate in high school baseball program as a nineteen year-old despite uniform age limit was not reasonable modification because it would "constitute a fundamental alteration in the nature of the baseball program" given its intent to protect younger athletes, have fair competition, and discouraging delays in education).

Modifying the uniform policy established by section 280.13 to impose a universal mask mandate in schools—or permitting schools to make those decisions—would be an undue burden and fundamentally alter the nature of the educational program established

by the State. Modifying the policy to give schools discretion would void the Legislature's policy decision to take the highly contentious and emotional issue of masks in schools from the responsibility of local schools so that local leadership could devote their time to other important concerns. This fundamentally alters Iowa's education program as set in section 280.31. And imposing a universal mask mandate would impose the administrative and potential financial and legal burdens of enforcing a mask mandate on all students, distracting teachers and school administrators from their educational duties.

A universal mask mandate is also not a reasonable modification because it infringes on the rights of third parties—other students, employees, and visitors. In the employment context, this Court has repeatedly recognized that ADA doesn't require "accommodations that would violate the rights of other employees" and doesn't impose "obligation to terminate other employees or violate a collective bargaining agreement." *Wooten v. Farmland Foods*, 58 F.3d 382, 386 (8th Cir. 1995); *see also Buckles v. First Data Resources, Inc.*, 176 F.3d 1098, 1100–02 (8th Cir. 1999) (rejecting "irritant-free work environment" as a reasonable accommodation for employee with severe sensitivity to strong smells); *Mason v. Frank*, 32 F.3d 315, 319 (8th Cir. 1994) (holding that an accommodation isn't reasonable if it "would violate the rights of other employees

under a legitimate collective bargaining agreement"). Plaintiffs' desired modification of a universal mask mandate is an imposition on the rights of all the other students and visitors to the school. And that is not reasonable.

That's all the more so here, where there are disability interests on both sides of the debate. Imposing a universal mask mandate can harm disabled students with social communication issues, such as those with autism, because it prevents the students from advancing "social skills and understanding the express of those around [the student] due to [the] fellow students and teachers wearing masks." App. 338 ¶ 6; App. 337 ¶¶ 9–10. It can also harm disabled students with anxiety. App. 336 ¶¶ 4–6. And those who struggle with speech and pronunciation. App. 337 ¶ 11. And those with asthma. App. 337 ¶¶ 7–8. And those with severe and painful sensory processing issues. App. 340–41 ¶¶ 4–6, 12 (describing how wearing a mask feels like skin is "on fire or poked with sharp needles" creating "a 'traffic jam' in her brain and she essentially becomes 'paralyzed' in that moment). And those who are deaf. App. 357–62.

The Legislature thus could have reasonably been concerned about balancing all these competing interests, includes the possible negative educational and social consequences. *See* World Health

Organization, *Advice on the Use of Masks for Children in the Community in the Context of COVID-19*, Aug. 21, 2020, *available at* https://perma.cc/TTQ8-PNHU (stating that "the benefits of wearing masks in children for COVID-19 control should be weighed against potential harm associated with wearing masks, including feasibility and discomfort, as well as social and communication concerns").

Even the U.S. Department of Education acknowledges that any universal mask mandates in schools must attempt to provide reasonable accommodations. *See* U.S. Dep't of Educ., *Questions and Answers on Civil Rights and School Reopening in the COVID-19 Environment*, *available at* https://perma.cc/G88U-32SD, at 8–9. The Legislature could conclude that where there are interests such as these on both sides that it would remove the issue of universal mask mandates from the discretion of local schools. And modifying this decision to permit (or require) universal mandates is a fundamental alternation and undue burden of the State's policy choices. It's not reasonable.

Plaintiffs could seek other modifications that would be reasonable. And section 280.31 doesn't prevent schools from engaging with students to provide such modifications. Those could include, for example, greater personal protective equipment for the student (such as a higher quality N95 mask), greater social distancing, or

perhaps if justified by the particular facts even limited masking of teachers or students while interacting closely with the individual.

Some Plaintiffs assert that they have asked for such modifications, but the schools aren't providing or following through on the agreement.[7] For example, one parent sought an accommodation in advance of the school year that her son's teacher wear a mask when she was working one-on-one with him. App. 118 ¶ 9. But after a week of school, her son told her that his teacher wasn't wearing a mask when interacting with him one-on-one. App. 118. ¶ 10; *see also* App. 115 ¶ 18 (requesting that teacher mask and permit student to leave class early to avoid crowded halls); App. 95 ¶ 10 (requesting small groups working with child to be voluntarily masked); App. 110 ¶ 10 (requesting voluntarily masking around child, a smaller classroom, and social distancing). But if this is so, that's a harm being caused by the school, not enforcement of section 280.31 by the State. And such a failure doesn't support a claim against the State or the court's preliminary injunction.

---

[7] Failing to request a modification poses another reason some Plaintiffs claims are unlikely to succeed. *Cf. Ballard v. Rubin*, 284 F.3d 957, 960–61 (8th Cir. 2002).

## C. A contrary interpretation of federal disability law would raise constitutional concerns.

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. V. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *see also Rounds*, 530 F.3d at 732–33.

But education and protection of the public health are at the core of the State's—rather than the federal government's—domain. And the Supreme Court requires "Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). Nothing in the text of either the ADA or section 504 suggests, let alone clearly states, that it authorizes these disability discrimination statutes authorize this injunction's intrusion into the State's authority to set education and public health policy. Plaintiffs' novel interpretation that a State engages in disability discrimination if it chooses to generally ban universal mask mandates should be rejected to avoid this constitutional concern.

To the extent that Plaintiffs can cabin their interpretation of the statutes to only require that schools have discretion to consider mask mandates, the constitutional concerns are even greater.

Appellate Case: 21-3268    Page: 48    Date Filed: 10/19/2021 Entry ID: 5088857

There is even less of a federal interest in merely dictating the allocation of authority between the State and local governments about masks. And under the Tenth Amendment, the federal government cannot intrude on the State's power to structure its internal division of governmental power to school districts. *See Hunter v. Pittsburgh*, 207 U.S. 161, 178 (1907) ("The number, nature, and duration of the powers conferred upon these [political subdivisions] and the territory over which they shall be exercised rests in the absolute discretion of the state."); *see also* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). Such a constitutional problem should also be avoided.

## CONCLUSION

The district court abused its discretion in granting a preliminary injunction against enforcement of Iowa Code section 280.31. Governor Reynolds and Director Lebo respectfully request that this Court vacate the preliminary injunction in an expedited decision and order the issuance of the mandate forthwith.

Respectfully submitted,

THOMAS J. MILLER
Attorney General of Iowa

JEFFREY S. THOMPSON
Solicitor General

*/s/ Samuel P. Langholz*

SAMUEL P. LANGHOLZ
Assistant Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
sam.langholz@ag.iowa.gov
jeffrey.thompson@ag.iowa.gov

ATTORNEYS FOR
APPELLANTS

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this document contains 10,390 words. It also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font. And as required by 8th Cir. R. 28A(h), the brief and addendum have been scanned for viruses and are virus-free.

/s/ *Samuel P. Langholz*
Assistant Solicitor General

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 18th day of October, 2021, this brief was electronically filed with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

/s/ *Samuel P. Langholz*
Assistant Solicitor General

# Exhibit M

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| THE ARC OF IOWA et al., | Case No. 4:21-CV-00264-RP-SBJ |
| Plaintiffs, | |
| v. | **DEFENDANTS GOVERNOR KIM REYNOLDS AND ANN LEBO'S RESISTANCE TO MOTION FOR PRELIMINARY INJUNCTION** |
| KIM REYNOLDS, in her official capacity as Governor of Iowa, et al. | |
| Defendants. | |

COME NOW Defendants Governor Kim Reynolds and Ann Lebo (collectively, "the State") and submit this Resistance to Motion for Preliminary Injunction.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 2

STANDARD FOR PRELIMINARY INJUNCTION .................................................... 4

ARGUMENT ..................................................................................................... 6

   I.  Plaintiffs are not harmed by section 280.31 because it doesn't prevent schools from complying with federal law and enjoining its enforcement doesn't redress Plaintiffs' alleged harms because such relief doesn't provide a universal mask mandate. ................................................................. 6

   II.  Plaintiffs are unlikely to succeed on the merits of their claims because neither federal disability law nor the American Rescue Plan Act of 2021 requires universal mask mandates in schools or requires schools to have the discretion to implement such mandates. ................................................... 9

       A.  Federal disability law doesn't require schools to impose—or to have the discretion to impose—universal mask mandates. ................. 9

          1.  Section 280.31's prohibition on school districts adopting universal mask mandates is a neutral nondiscriminatory policy. ...................................................................... 9

          2.  A universal mask mandate in schools is not a reasonable modification and other reasonable modifications exist. ......... 11

3.  Plaintiffs failed to exhaust their administrative remedies under the IDEA.................................................................... 15

B.  ARPA doesn't require schools to impose—or have the discretion to impose—universal mask mandates. .................................................. 19

III. The balance of the harms and the public interest do not support enjoining a duly enacted statute that has been in effect for nearly four months that upsets the status quo and causes unnecessary confusion and conflict throughout Iowa.............................................................................................. 23

CONCLUSION............................................................................................................ 25

## INTRODUCTION

Nearly four months ago, the Legislature passed, and Governor Reynolds signed, legislation enacting section 280.31 of the Iowa Code into law. *See* Act of May 20, 2021 (H.F. 847), ch. 139, 2021 Iowa Act § 28 (to be codified at Iowa Code § 280.31). That statute became effective immediately, *see id.* § 31, and provides:

> The board of directors of a school district, the superintendent or chief administering officer of a school or school district, and the authorities in charge of each accredited nonpublic school shall not adopt, enforce, or implement a policy that requires its employees, students, or members of the public to wear a facial covering for any purpose while on the school district's or accredited nonpublic school's property unless the facial covering is necessary for a specific extracurricular or instructional purpose, or is required by section 280.10 or 280.11 or any other provision of law.

*Id.* § 28.

Plaintiffs sued Governor Reynolds, Iowa Department of Education Director Ann Lebo, and ten school districts, alleging that section 280.31 violates title II of the Americans with Disabilities Act ("ADA"), section 504 of the Rehabilitation Act, and the American Rescue Plan Act of 2021 ("ARPA"). Compl., Doc. 1 ¶ 76–102. And this Court granted their requested temporary restraining order enjoining all Defendants "from enforcing Iowa Code section 280.31 banning local public school districts from

utilizing their discretion to mandate masks for students, staff, teachers, and visitors." TRO Order at 29; *see also* Compl., Doc. 1, at 37 ¶ 4.

But the extraordinary remedy of preliminary injunctive relief sought by Plaintiffs remains unnecessary and inappropriate. Enforcement of section 280.31 is not the source of Plaintiffs alleged harms and enjoining it will not redress them. Section 280.31 doesn't prevent schools from complying with federal law and enjoining its enforcement won't necessarily provide them a universal mask mandate.

Even looking past these defects, Plaintiffs are unlikely to succeed on the merits of their novel claims. Section 280.31 is a neutral, nondiscriminatory State policy set in statute and thus doesn't violate federal disability law. Universal mask mandates in schools are not a reasonable modification to this policy because it would be an undue burden, fundamentally alter the nature of the State's education program, and infringe on the rights of others. And Plaintiffs are barred from asserting these claims because they haven't exhausted administrative remedies or properly pursued reasonable modifications for their disabilities.

Plaintiffs' alternative claim based on ARPA also fails. Neither the text of the ARPA statute nor the agency guidance requires schools to impose—or have the discretion to impose—universal mask mandates. And interpreting either to impose such a requirement would raise serious constitutional concerns.

Finally, the balance of the harms and the public interest do not support enjoining a duly enacted statute that has been in effect for nearly four months,

upsetting the status quo, and causing unnecessary confusion and conflict throughout Iowa.

Plaintiffs are understandably concerned about the health and education of their children. But this lawsuit is not the proper tool to accomplish their goals. Instead, they could seek appropriate reasonable modifications from their schools to protect their health and meet their educational needs. Or they could advocate for increased public health measures or changes to section 280.31 to their elected Governor and legislators. The law does not provide them the relief they seek. Plaintiffs' request for a preliminary injunction should be denied and the temporary restraining order should be allowed to expire.[1]

## STANDARD FOR PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The power to grant a preliminary injunction has been called "an awesome power" that "necessarily requires the Court to analyze the record carefully to determine whether Plaintiff has shown that it will be irreparably harmed absent the issuance of the requested relief."

---

[1] Because this Court issued the temporary restraining order on September 13 and provided it "shall remain in full force and effect until the Court enters an Order on Plaintiffs' request for a preliminary injunction," this Court must rule on Plaintiffs' request on or before September 27, when the 14-day time limit on temporary restraining orders expires. *See* Fed. R. Civ. P. 65(b)(2). This time limit applies even to a temporary restraining order—like this one—that was entered after a hearing. *See Quinn v. Missouri*, 839 F.2d 425, 426 (8th Cir. 1988); *Waste Mgmt., Inc. v. Defenbaugh*, 534 F.2d 126, 129 (8th Cir. 1976) (holding that a temporary restraining order that had been issued after an evidentiary hearing had "extended beyond the permissible time limit . . . must be treated as if it were a preliminary injunction"); *see also Chicago United Indus. V. City of Chicago*, 445 F.3d 940, 946 (7th Cir. 2006); *Nutrasweet Co. v. Vit-Mar Enters.*, 112 F.3d 689, 692–94 (3d Cir. 1997).

*Mediacom Communications Corp. v. Sinclair Broad. Group, Inc.*, 460 F. Supp. 2d 1012, 1017 (S.D. Iowa 2006).

Courts in the Eighth Circuit apply a four-part test—generally called the *Dataphase* factors—to determine whether preliminary injunctive relief is appropriate. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485–86 (8th Cir. 1993) (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (1981) (en banc)). The four *Dataphase* factors are: "(1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest." *Id.* Ordinarily, "[n]o single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

But when a preliminary injunction seeks to "enjoin the implementation of a duly enacted state statute," a district court must "make a threshold finding that a party is likely to prevail on the merits." *Planned Parenthood Minn., N.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). Only if a plaintiff makes this threshold showing should the court "then proceed to weigh the other *Dataphase* factors." *Id.* at 732. This "more rigorous standard" is intended "to ensure that preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis." *Id.* at 733.

## ARGUMENT

**I.     Plaintiffs are not harmed by section 280.31 because it doesn't prevent schools from complying with federal law and enjoining its enforcement doesn't redress Plaintiffs' alleged harms because such relief doesn't provide a universal mask mandate.**

Section 280.31 doesn't prohibit any actions of a school where "the facial covering . . . is required by . . . any other provision of law." Act of May 20, 2021 (H.F. 847), ch. 139, 2021 Iowa Act § 28 (to be codified at Iowa Code § 280.31). So if Plaintiffs are correct that federal law requires some facial coverings in schools, section 280.31 doesn't prohibit it. No injunction of the statute's enforcement is required. A school already has it within its power to comply with any requirement of federal law.

To be sure, as discussed below in Part II, the State disputes that the ADA, the Rehabilitation Act, or ARPA impose any federal requirement that a universal mask mandate be imposed in all Iowa schools—or that they require local school decisionmakers to have the discretion to impose such universal mandates rather than the Governor. And presumably Iowa schools and their lawyers have come to the same conclusion since none acted to impose a district-wide, or building-wide universal mask mandate based on some requirement of federal law before this Court's temporary restraining order. But it any event, there's no need to enjoin enforcement of section 280.31.

Plaintiffs' requested preliminary injunction isn't just unnecessary—it's also insufficient to redress their alleged irreparable harms. They assert that their irreparable harms are "heightened risk of exposure" to COVID-19 if they attend in-person school or "loss of educational opportunities" if the students are removed from

school. Mem. of Authorities in Support of Mtn. for PI & TRO, Doc. 17, at 13–14. And they believe that "[i]f everyone were wearing a mask," these harms would be avoided and "their children would be safe." *Id.* at 12.

But Plaintiffs are not asking this court for an injunction requiring everyone in their children's schools to wear a mask. They seek only to enjoin Governor Reynolds and Director Lebo from enforcing section 280.31. Compl., Doc. 1, at 37 ¶ 4. That won't remedy their claimed harm. It's dependent on the actions of independently elected school boards to decide whether they will in fact implement a universal mask mandate in their school districts like Plaintiffs hope. This lack of redressability is an Article III standing concern with the relief that Plaintiffs seek. *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (requiring showing that injury is "fairly . . . trace[able] to the challenged action of the defendant"). And it shows that a preliminary injunction granting such relief is inappropriate.

True, since this Court issued its temporary restraining order, some schools attended by some Plaintiffs have imposed a universal mask mandate. *See, e.g.*, Press Release, *Des Moines Public Schools Will Reinstate Mask Mandate* (Sept. 14, 2021), https://perma.cc/CB3R-NBG6; Anthony Watt, *"A Safe Learning Environment: Inside the Davenport School District's Debate to Mask Up*, Quad-City Times (Sept. 16, 2021), https://perma.cc/RJ8N-HXPQ. But the mask mandates might not be maintained— that depends on actions of third parties not being required by court order to provide

such a mandate. Defendant Linn Mar Community School District decided to impose a mandate only for students sixth grade and younger and set it to expire 60 days after vaccines are available for children under twelve. *See* Trevor Oates, *Linn-Mar School Board Approves Mask Mandate for PK-6 Students*, KWWL (Sept. 16, 2021), https://perma.cc/MG3B-VVRU. And other districts have decided not to impose mandates or are delaying any decision, even after the order, showing that this injunction didn't remedy their harms. *See* Scott Carpenter, *Johnston School Board Tables Decision to Institute a Mask Mandate*, KCCI (Sept. 15, 2021), https://perma.cc/8X2L-LH6Z; Teresa Kay Albertson, *Ankeny School Board Debates Mask Mandate as Crowd Voices Concerns about 'Body Autonomy', 'Freedom of Choice,'* Des Moines Reg. (Sept. 14, 2021), https://perma.cc/SH6S-AMNP; *see also Mask Mandate Fails to Pass at Special Sioux City School Board Meeting*, Radio Iowa (Sept. 16, 2021), https://perma.cc/PR5H-VWXE; Taj Simmons, *Waukee School Board Votes in Opposition of Mask Mandate Within the District,* WHO 13 (Sept. 16, 2021), https://perma.cc/55XJ-YKH9.

Plaintiffs' requested injunction is divorced from their alleged harm and any likely valid legal claim. Because of this lack of standing, they are unlikely to succeed on the merits and fail to show the injunction will remedy irreparable harm. Their request for a preliminary injunction should be denied.

II.    **Plaintiffs are unlikely to succeed on the merits of their claims because neither federal disability law nor the American Rescue Plan Act of 2021 requires universal mask mandates in schools or requires schools to have the discretion to implement such mandates.**

Plaintiffs assert that section 280.31 violates three federal laws: title II of the Americans with Disabilities Act ("ADA"), section 504 of the Rehabilitation Act, and the American Rescue Plan Act of 2021 ("ARPA"). Their pleading and briefing is unclear as to whether they assert that these federal laws require universal mask mandates in schools or merely that federal law requires school districts—rather than the Governor—to have discretion to impose such mandates. At the hearing on the temporary restraining order, counsel for Plaintiffs asserted it is only the latter, despite most of the Complaint and Declarations being devoted to showing the alleged need for universal mask mandates in schools. But regardless of the precise formulation of the claims, they fail. Neither federal disability law nor the American Rescue Plan Act of 2021 requires universal mask mandates in schools or requires schools to have the discretion to implement such mandates.

A.    **Federal disability law doesn't require schools to impose—or to have the discretion to impose—universal mask mandates.**

1.    **Section 280.31's prohibition on school districts adopting universal mask mandates is a neutral nondiscriminatory policy.**

Courts typically analyze disability discrimination claims under title II of the ADA and section 504 of the Rehabilitation Act together. *See, e.g., Davis v. Francis Howell Sch. Dist.*, 138 F.3d 754, 756 (8th Cir. 1998). Under both statutes, "a plaintiff must show that he was a qualified individual with a disability and that he was denied the benefits of a program, activity, or services by reason of that disability." *Id.* (citing

42 U.S.C. § 12132; 29 U.S.C. § 794(a)). And under both, when the denial occurs because of a neutral nondiscriminatory policy rather than because of a plaintiff's disability, no violation arises. *See Davis*, 138 F.3d at 756–57. It matters not whether the plaintiff "question the wisdom" of the policy. *Id.* at 756. The policy doesn't violate the federal statutes where it "applies to all students regardless of disability and rests on concerns unrelated to disabilities or misperceptions about them." *Id.* (cleaned up); *see also Timothy H. v. Cedar Rapids Cmty. Sch. Dist.*, 178 F.3d 968, 971–72 (8th Cir. 1999); *DeBord v. Bd. of Educ.*, 126 F.3d 1102, 1105–06 (8th Cir. 1997).

The Eighth Circuit has thus held that following a policy that all students in an intra-district transfer program must provide their own transportation is not disability discrimination. *See Timothy H.*, 178 F.3d at 972. Nor is following a policy to administer medication in schools only consistent with the maximum dosage recommended by the Physician's Desk Reference. *See Davis*, 138 F.3d at 756; *DeBord*, 126 F.3d at 1105–06. And these were just *policies* of school districts—not a duly enacted statute setting statewide education policy that is entitled to even greater respect.

Section 280.31 establishes a uniform nondiscriminatory policy that unless required by other law or a specific instructional or educational purpose, local schools cannot require students, employees, or visitors to wear face coverings. There's been no suggestion that the statute was adopted to single out individuals with disabilities. And it imposes no restriction on individuals—whether disabled or not—at all. To be clear, *all* students, employees, and visitors remain free to wear face coverings or take

any other health precautions they (or their parents) choose. The statute is mainly an allocation of decision-making authority entirely disconnected from disabilities. After passage of section 280.31, a universal mask mandate as a public health precaution can only be imposed by the Governor as a part of her emergency powers during a public health disaster, rather than by a school district. *See* Iowa Code §§ 135.144(3), 29C.6.

The alleged denial of Plaintiff's desired universal mask mandates in their children's schools, and their further alleged denial of education, is not caused because of their disability. If it's caused at all, it's because of this neutral, nondiscriminatory statute. And since title II of the ADA and the Rehabilitation Act do not override neutral local school district policies, they also do not provide a basis to override this statutory product of Iowa's democratic process.

### 2.   A universal mask mandate in schools is not a reasonable modification and other reasonable modifications exist.

In granting the temporary restraining order, this Court concluded that Defendants are required to make "reasonable modifications" and that "[a] universal masking requirement instituted by a school is a reasonable modification." TRO Ruling at 26. But the Eighth Circuit has not decided "whether the failure to make reasonable modifications in a policy is itself discrimination even where the policy and its rationale cannot be shown to be discriminatory." *Davis*, 138 F.3d at 757; *see also DeBord*, 126 F.3d at 1106; *see also* CERT; *cf. Alexander v. Sandoval*, 532 U.S. 275, 284-86 (2001) (holding that similar Title VI does not create private cause of action for

disparate-impact discrimination claims). So Plaintiffs can hardly be likely to succeed on a claim where the law is unsettled.

But even if reasonable modifications are required, a universal mask mandate is not a reasonable modification. A modification that imposes an undue administrative burden or a fundamental alternation in the nature of the State's education program is not reasonable. *See Davis*, 138 F.3d at 757 (holding that request to deviate from medication policy wasn't reasonable because it would "impose undue financial and administrative burdens on the district by requiring it to determine the safety of the dosage and the likelihood of future harm and liability in each individual case"); *Timothy H*, 178 F.3d at 972–73 (holding that request to establish a special free bus route would be "an undue financial burden and a fundamental alteration in the nature of the intra-district transfer program"); *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 929–30 (8th Cir. 1994) (holding that request to participate in high school baseball program as a nineteen year-old despite uniform age limit was not reasonable modification because it would "constitute a fundamental alteration in the nature of the baseball program" given its intent to protect younger athletes, have fair competition, and discouraging delays in education).

Modifying the uniform policy established by section 280.13 to impose a universal mask mandate in schools—or permitting schools to make those decisions— would be an undue burden and fundamentally alter the nature of the educational program established by the State. Modifying the policy to give schools discretion would void the Legislature's policy decision to take the highly contentious and

emotional issue of masks in schools from the responsibility of local schools, allowing that local leadership to devote their time to under important concerns. And imposing a universal mask mandate would impose the administrative and potential financial and legal burdens of enforcing a mask mandate on all students, distracting teachers and school administrators from their educational duties. It also can have negative educational and social consequences. *See* World Health Organization, *Advice on the Use of Masks for Children in the Community in the Context of COVID-19*, Aug. 21, 2020, *available at* https://perma.cc/TTQ8-PNHU (stating that "the benefits of wearing masks in children for COVID-19 control should be weighed against potential harm associated with wearing masks, including feasibility and discomfort, as well as social and communication concerns").

A universal mask mandate is also not a reasonable modification because it requires infringing on the rights of third parties—other students, employees, and visitors. In the employment context, the Eighth Circuit has repeatedly recognized that ADA doesn't require "accommodations that would violate the rights of other employees" and doesn't impose "obligation to terminate other employees or violate a collective bargaining agreement." *Wooten v. Farmland Foods*, 58 F.3d 382, 386 (8th Cir. 1995); *see also Buckles v. First Data Resources, Inc.*, 176 F.3d 1098, 1100–02 (8th Cir. 1999) (rejecting "irritant-free work environment" as a reasonable accommodation for employee with severe sensitivity to strong smells); *Mason v. Frank*, 32 F.3d 315, 319 (1994) (holding that an accommodation isn't reasonable if it "would violate the rights of other employees under a legitimate collective bargaining agreement").

Plaintiffs' desired modification of a universal mask mandate is an imposition on the rights of all the other students and visitors to the school. And that is not reasonable.

That's all the more so here, where there are disability interests on both sides of the debate. Imposing a universal mandatory mask requirement can harm disabled students with social communication issues, such as those with autism, because it prevents the students from advancing "social skills and understanding the express of those around [the student] due to [the] fellow students and teachers wearing masks." Gronau Dec. (attached) ¶ 6; *see also* Givens Dec. (attached) ¶¶ 9–10. It can also harm disabled students with anxiety. *See* Gronau Dec. ¶¶ 4–6. And those who struggle with speech and pronunciation. *See* Givens Dec. ¶ 11. And those with asthma. Givens Dec. ¶¶ 7–8. And those with severe and painful sensory processing issues. *See* Parker Dec. (attached) ¶¶ 4–6, 12 (describing how wearing a mask feels like skin is "on fire or poked with sharp needles" creating "a 'traffic jam' in her brain and she essentially becomes 'paralyzed' in that moment)

Even the U.S. Department of Education acknowledges that any universal mask mandates in schools must attempt to provide reasonable accommodations. *See* U.S. Dep't of Educ., *Questions and Answers on Civil Rights and School Reopening in the COVID-19 Environment, available at* https://perma.cc/G88U-32SD, at 8–9. The Legislature could conclude that where there are interests such as these on both sides that it would remove the issue of universal mask mandates from local schools. And modifying this decision to permit (or require) universal mandates is a fundamental alternation and undue burden. It's not reasonable.

Plaintiffs could seek other modifications that would be reasonable. And section 280.31 doesn't prevent schools from engaging with students to provide such modifications. Those could include, for example, greater personal protective equipment for the student (such as a higher quality N95 mask), greater social distancing, or perhaps if justified by the particular facts even limited masking of teachers or students while interacting closely with the individual. Some Plaintiffs assert that they have asked for such modifications, but the schools aren't providing or following through on the agreement.[2] *See* Preston Dec., Doc. 3-11, ¶ 18; Geest Dec., Doc. 3-12, ¶¶ 9–12; Roise Dec., Doc. 3-5, ¶ 10; Devereaux Dec., Doc. 3-10, ¶ 10. But if this is so, that's a harm being caused by the school, not enforcement of section 280.31 by the State. And such a failure doesn't support a claim against the State or this requested preliminary injunction.

### 3. Plaintiffs failed to exhaust their administrative remedies under the IDEA.

This Court need not even reach these questions about the scope of federal disability law because Plaintiffs have failed to exhaust their administrative remedies under the Individuals with Disabilities Education Act ("IDEA"). This dooms their claims.

The IDEA ensures that children with disabilities receive a "free appropriate public education," known as a FAPE. *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. at 743, 748 (2017). And the IDEA sets up a comprehensive procedure to provide a FAPE,

---

[2] Failing to request a modification poses another reason some Plaintiffs claims are unlikely to succeed. *Cf. Ballard v. Rubin*, 284 F.3d 957, 960–61 (8th Cir. 2002).

starting with the development of an individualized education program ("an IEP") and then progressing through an administrative process to resolve disputes between a school and a family that can ultimately lead to a hearing before a neutral administrative law judge and then judicial review in state or federal court. *See id.* at 748–49; *see also* Iowa Code §§ 256B.2(2), 256B.4, 256B.6; Iowa Admin. Code r. 281-41.321–.328 (IEP process), 281-41.506 (mediations); 281-41.507–.518 (due-process hearings).

While Plaintiffs sue under title II of the ADA and section 504 of the Rehabilitation Act—rather than under IDEA—they must still exhaust the administrative remedies provided by the IDEA if they are "seeking relief that is also available under" the IDEA. 20 U.S.C. § 1415(*l*); *see also Fry*, 137 S. Ct. at 750 ("[A] plaintiff bringing suit under the ADA, the Rehabilitation Act, or similar laws must in certain circumstances—that is, when 'seeking relief that is also available under' the IDEA—first exhaust the IDEA's administrative procedures."). This "exhaustion rule hinges on whether a lawsuit seeks relief for the denial of a free appropriate public education." *Fry*, 137 S. Ct. at 754. If the suit claims discrimination in a way that does not result in denial of a FAPE, then exhaustion is not required "because, once again, the only 'relief' the IDEA makes 'available' is relief for the denial of a FAPE. *Id.* at 755. In conducting this analysis, "[w]hat matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading." *Id.*; *see also J.M. v. Francis Howell Sch. Dist.*, 850 F.3d 944, 948–49 (8th Cir. 2017) (holding that gravamen of claim was denial of FAPE where parent alleged

disabled student was in physical restraints for half of his school days and thus
"'denied . . . because of his disability, participation in and the benefits of a public
education'" (quoting the complaint)).

Plaintiffs allege that the lack of a universal mask mandate—or perhaps the
lack of their schools authority to be able to consider such a mandate—is excluding
them from receiving their education. *See* Compl, Doc. 1, ¶ 56 ("Students with
disabilities who are unable to safely return to brick-and-mortar schools because of
continued health concerns are being excluded from the public school system . . . .");
*id.* ¶ 59 ("Iowa state officials have effectively excluded these students from
participation in the public education system . . . ."); *id.* ¶ 58 ("Thus the Defendants'
actions will have the perverse effect of either placing children with disabilities in
imminent danger or unlawfully forcing those children out of the public school
system."); *id.* ¶ 57 (complaining of lack of "virtual learning" and that "virtual learning,
even if available, is not a viable or adequate substitute for in person learning."

*id.* ¶ 54 (complaining that "Children with disabilities are entitled to learn and
interact with all other children, to receive the same education as all other children");
*id.* ¶ 1 (alleging schools cannot comply with section 280.31 and still provide "equal
access to their education"); *id.* ¶ 2 (alleging student risk harm to health or harm to
"their education and development"); ¶¶ 38–40 (alleging various educational harms
to disabled students because of the pandemic). Their claimed discrimination is thus
an injury that is allegedly denying them a FAPE and that could be remedied by
granting relief under the IDEA. Exhaustion was required.

In its TRO ruling, this Court concluded otherwise by considering two hypothetical questions: Could they have brought this claim against an entity other than a school? And could a teacher or visitor bring a similar claim? TRO Ruling at 17–18. But the Eighth Circuit has explained that it's improper to approach this question at a "higher level of generality" *Nelson v. Charles City Cmty. Sch. Dist.*, 900 F.3d 587 (8th Cir. 2018); *see also Fry*, 137 S. Ct. at 759 (Alito, J., concurring) (explaining that the hypotheticals are "false clues" that "are likely to confuse and lead courts astray" given the overlapping coverage of the statutes).

Given that Plaintiff's claims are driven by the focus on the importance of education for their children and their exclusion from receiving that education, the proper level of comparison is whether a teacher or visitor could bring a claim that they're being forced to choose between their health or receiving an equal education—and they could not. Nor could the students bring that same claim against a different entity, like a county courthouse or public library. But at bottom, asking the true question demanded by the statute and *Fry*, students could get the relief they're asking for—accommodation to their disabilities so they can receive a FAPE through the IDEA administrative process.

Because Plaintiffs have not exhausted their administrative remedies under the IDEA their claims under the ADA or the Rehabilitation Act are subject to dismissal as a matter of law and they are thus unlikely to succeed on these claims.

**B. ARPA doesn't require schools to impose—or have the discretion to impose—universal mask mandates.**

As an alternative basis for enjoining section 280.31, Plaintiffs contend that it conflicts with the American Rescue Plan Act of 2021 ("ARPA"). Compl. Doc. 1, ¶¶ 95–102. They argue that the statute, agency guidance, and a letter from the Secretary of Education are "squarely at odds" with section 280.31 because it "*prohibits* local school districts, including Defendant School Boards, from implementing precisely the type of safe return-to-school policies ARPA expects." *Id.* ¶ 101. But ARPA says nothing of the sort. Neither does the agency guidance. And interpreting either to impose such a requirement would raise serious constitutional concerns. Plaintiffs are unlikely to succeed on this claim.

Plaintiffs rely on section 2001(e)(2)(Q) of ARPA as the source of this purported requirement. PI Brief, Doc. 17, at 25. Section 2001 establishes a $123 billion Elementary and Secondary School Emergency Relief Fund and sets certain requirements for allocation of the funds to the States and then to local schools. It imposes two mandates on schools—that they publicly post "a plan for the safe return to in-person instruction and continuity of services" and that they "shall reserve not less than 20 percent of such funds to address learning loss." American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat 4, § 2001(e)(1), (i). And then it provides that they "shall use the remaining funds for any of" a list of 18 alternative purposes. *Id.* § 2001(e)(2). These include, for example: "Purchasing supplies to sanitize and clean the facilities," *id.* § 2001(e)(2)(I); "Planning for, coordinating, and implementing activities during long-term closures," *id.* § 2001(e)(2)(J); and "repair, replacement,

and upgrade projects to improve the indoor air quality in school facilities." *Id.*
§ 2001(e)(2)(P).

The provision relied on by Plaintiffs is one of these 18 alternative purposes. It
provides the appropriated funds *could* be used for:

> Developing strategies and implementing public health protocols
> including, to the greatest extent practicable, policies in line with
> guidance from the Centers for Disease Control and Prevention for the
> reopening and operation of school facilities to effectively maintain the
> health and safety of students, educators, and other staff.

*Id.* § 2001(e)(2)(Q). Nothing in section 2001 *requires* a school or a State to chose to
spend any of the federal funds it receives for this purpose rather than any of the other
16 authorized purposes. So even if its text could be interpreted to impose some limited
requirement for any funded strategies and protocols "in line" with CDC guidance "to
the greatest extent practicable," it would only apply if when funds are used for that
purpose.[3] It would make no more sense to turn that single alternative into a blanket
mandate than it would to say that the other quoted provisions require schools to close
long-term or replace their HVAC systems.

The agency guidance from the U.S. Department of Education fares no better.[4]
Plaintiffs point to Interim Final Requirements established by the Department
elaborate on the statutory requirement that schools adopt a plan for safe return to
in-person learning by requiring schools to include "how it will maintain the health

---

[3] Indeed, even applying the statute's terms, it's not at all clear that it would be
"practicable" for a school to violate another law, such as section 280.31.
[4] The correspondence from the Secretary of Education has no force of law and is
irrelevant to any preemption analysis.

- 20 -
PLAINTIFFS' APPENDIX 116

and safety of students, educators, and other school and LEA staff, and the extent to which it has adopted policies, and a description of any such policies, on each of the CDC's safety recommendations including Universal and correct wearing of masks." Dep't of Educ. Interim Final Requirements, *American Rescue Plan Act Elementary and Secondary School Emergency Relief Fund*, 86 Fed. Reg. 21,195, 21200 (Apr. 22, 2021); *see also* PI Brief, Doc. 17, at 25–26.

Yet this language as well merely requires a school to *describe* what it is doing. As the Department's guidance itself acknowledges, "[t]he requirement does not mandate that [a school] adopt the CDC guidance, but only requires that the [school] describe in its plan the extent to which it has adopted the key prevention and mitigations strategies." 86 Fed. Reg. 21,195, 21,201. A school can follow this requirement without violating section 280.31.

Neither ARPA nor the agency guidance imposes any requirement that schools have authority to impose universal mask mandates. The analysis could stop there. But if there were any doubt, the Constitution removes it. While Congress has the power to impose requirements on the States through its spending power, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). This is because "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract'" for the federal funds. *Id.* "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the

consequences of their participation." *Id.*; *see also South Dakota v. Dole*, 483 U.S. 203, 208 (1987).

Section 2001(e)(2)(Q) does not clearly and unambiguously alert States that school districts must have discretionary authority to impose universal mask mandates. Neither does the agency guidance—and in any event only *Congress*, not an agency, impose the unambiguous requirement. *See Va Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc) (rejecting use of agency regulation to provide constitutionally required clarity in spending-clause challenge); *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) ("Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous, so that method of analysis would not meet the requirements of *Dole*).

Education and protection of the public health is also at the core of the State's—rather than the federal government's—domain. And the Supreme Court requires "Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, No. 21A23, 2021 WL 3783142, at *3 (U.S. Aug. 26, 2021). And under the Tenth Amendment, the federal government cannot intrude on the State's power to structure its internal division of governmental power to school districts. *See Hunter v. Pittsburgh*, 207 U.S. 161, 178 (1907) ("The number, nature, and duration of the powers conferred upon these [political subdivisions] and the territory over which they shall be exercised rests in the absolute discretion of the state.").

At bottom, this Court cannot imply the requirement alleged by Plaintiffs consistent with these constitutional demands.[5]

III.    **The balance of the harms and the public interest do not support enjoining a duly enacted statute that has been in effect for nearly four months that upsets the status quo and causes unnecessary confusion and conflict throughout Iowa.**

Section 280.31 has been in effect since May 20, 2021. *See* Act of May 20, 2021 (H.F. 847), ch. 139, 2021 Iowa Act § 28 (to be codified at Iowa Code § 280.31). Over these past four months, Plaintiffs have thus been on notice that schools are now generally prohibited from mandating face coverings. They have known that classes would be resuming in August. And more than two months ago, it was publicly known that the Delta Variant of COVID-19 was the dominant strain in the United States. *See* Emily Anthes, *Delta, as Expected, Is Now the Dominant Virus Variant in the U.S., the C.D.C. Estimates*, N.Y. Times, July 7, 2021, *available at* https://perma.cc/BL3W-2DBC.

Yet they filed this lawsuit just two weeks ago and immediately sought the extraordinary remedies of a temporary restraining order and preliminary injunction. Their delay in suing counsels against concluding that enjoining section 280.31 is truly an emergency that cannot wait while this proceeding progresses to full consideration of the merits of their claims. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence."). This is all the more so, when they are unlikely to succeed in this suit.

---

[5] These same constitutional concerns also counsel against interpreting federal disability law as Plaintiffs' suggest to so intrude into the states' domain.

A preliminary injunction—like the temporary restraining order currently in place—would continue to upset the status quo rather maintain it. Schools were providing education to their students with section 280.31 in effect, in many cases for several weeks before this Court's temporary restraining order ruling. Suddenly enjoining that law—as predicted, *see* TRO Resistance, Doc. 21, at 7—has reopened the debate in each school board and management team as to whether to adjust masking requirements in their school, creating significant unnecessary confusion and conflict that will continue until the injunction is dissolved. *See* Tim Johnson, *Shouting, Police Officers and Tears: Bluffs School Board Meeting Turns into an Anti-Mask Demonstration*, The Daily Nonpareil, (Sept. 14, 2021), https://perma.cc/D9N3-HSS5; (Sept. 14, 2021), Teresa Kay Albertson, *Ankeny School Board Debates Mask Mandate as Crowd Voices Concerns about 'Body Autonomy', 'Freedom of Choice,'* Des Moines Reg. (Sept. 14, 2021), https://perma.cc/SH6S-AMNP. Even schools that would choose not to adopt a mask mandate will question whether they are now violating federal law given the implications of this Court's order.

And while Plaintiffs only seek injunction of enforcement of section 280.31, the necessary implications of this Court holding that they are entitled to such an injunction based on any of the federal laws are much broader. If a universal mask mandate is a reasonable modification, is every school district in the state violating federal disability law if it does not impose a universal mask mandate?  For that matter, is every government entity or recipient of federal funds required to do so in all its buildings?  And every employer or public accommodation that is subject to the

ADA? This cannot be. Yet these questions are now present and will continue percolating so long as section 280.31 is enjoined by this Court on the basis of federal disability law.

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. V. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *see also Planned Parenthood Minn., N.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). And so too are those parents, including those of disabled students, who made decisions in reliance on section 280.31's prohibition on local schools imposing universal mask mandates. *See* Gronau Dec. (attached); Givens Dec. (attached) Parker Dec. (attached).

The balance of the harms and the public interest do not support continuing to enjoin section 280.31.[6]

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' Motion for a Preliminary Injunction and allow the temporary restraining order to expire.

---

[6] If this Court nevertheless grants Plaintiffs' motion for a preliminary injunction, Rule 65(c) *requires* the court to set a bond. *See* R. Civ. P. 65(c) (authorizing issuance of preliminary injunction "*only if* the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined") (emphasis added)); *see also Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989). Absent other evidence from the school district Defendants, a bond of $25,000 would likely be appropriate under the circumstances to cover the potential costs and attorney fees incurred by all Defendants in response to the injunction.

PLAINTIFFS' APPENDIX 121

Respectfully submitted,

THOMAS J. MILLER
Attorney General of Iowa

JEFFREY S. THOMPSON
Solicitor General

*/s/ Samuel P. Langholz*
SAMUEL P. LANGHOLZ
Assistant Attorney General
Iowa Department of Justice
1305 E. Walnut Street, 2nd Floor
Des Moines, Iowa 50319
Phone: (515) 281-5164
Fax: (515) 281-4209
sam.langholz@ag.iowa.gov
jeffrey.thompson@ag.iowa.gov

ATTORNEYS FOR DEFENDANTS
GOVERNOR KIM REYNOLDS AND
ANN LEBO

| **PROOF OF SERVICE** | |
|---|---|
| The undersigned certifies that the foregoing instrument was served upon all parties of record by delivery in the following manner on September 17, 2021: | |
| ☐ U.S. Mail | ☐ Email |
| ☐ Hand Delivery | ☐ Overnight Courier |
| ☐ Federal Express | ☐ Other |
| ☒ CM/ECF | |
| Signature: */s/ Samuel P. Langholz* | |

# Exhibit N

## DECLARATION OF JONATHAN CRAIG

COMES NOW, Johnathan Craig and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Johnathan Craig, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2. I am the father of E.C., who is five years old and is in kindergarten and has been diagnosed with Down's syndrome, chronic seizures, and chronic respiratory problems. *See* Exhibit A (Letter from Doctor Lisa Menzies). These conditions put her at higher risk for severe complications if she were to become infected with COVID-19. E.C. is in a wheelchair and is nonverbal.

3. I am also the father of J.C., who is eleven years old and is in fifth grade and has been diagnosed with sickle cell anemia and functional asplenia and has a compromised immune system. *See* Exhibit B (Letter from Doctor Lisa Menzies). These conditions put him at higher risk for severe complications if he were to become infected with COVID-19.

4. I also have two other children who are not disabled and do not have health conditions that put them at greater risk for severe complications should they contract COVID-19—A.C., who is eight years old and in third grade, and A.C., who is five years old and in kindergarten.

5. Because all my children are under the age of twelve, they are not eligible to receive any of the currently authorized COVID-19 vaccines.

6. Last year, my children attended school at the Urbandale School District. We have moved to Waterloo in Black Hawk County, Iowa, and this year they would be attending the Waterloo School District.

7. My children, E.C. and J.C., receive disability supports, services, and accommodations, and J.C. has a 504 plan.

8. The medical provider for my children recommends having J.C. do remote learning due to his medical complexities and a lack of mask or vaccine mandate in school. *See* Exhibit B (Letter from Doctor Lisa Menzies). For E.C., my children's medical provider recommends having her do distance learning at this time, considering the "high risk of severe complications from infection with SARS-CoV-2 infection" due to being "a medically complex child" and the lack of a vaccine for her age group. *See* Exhibit A (Letter from Doctor Lisa Menzies). For my children with no medical conditions, the children's doctor recommends that they do remote learning as well due to the siblings' medical complexities, the lack of a mask mandate or vaccine mandate at school, and the current level of the Delta variant of COVID-19 and the increased infectivity and severity of disease seen in children related to the variant. *See* Exhibits C and D (Letters from Doctor Lisa Menzies).

9. The Waterloo School District for the upcoming school year is offering a 100% remote learning option. The remote learning option does not provide the necessary supports, services, and accommodations for my disabled children, including direct instruction and socialization with peers.

10. My child, J.C., utilized the 100% remote option last year. My child struggled to get the academic help he needed and suffered in terms of his emotional and mental health. He

also fell behind in both reading and math. My child, E.C., attended neither in-person nor 100% online learning last year and was held back due to her health issues and the challenges online learning presented. In-person instruction provides the best mode of instruction for my children's needs.

11. Last year, the Waterloo School District had a mask mandate until the mask mandate ban went into effect. Once the ban went into effect, most teachers and students no longer wore masks.

12. Since the start of school, most teachers and students are not wearing masks at school. There is no social distancing in the classrooms or in the lunchroom.

13. As of August 30, 2021, the Waterloo School District's COVID-19 dashboard shows 12 students and 6 teachers are positive for COVID-19 in all elementary schools. The dashboard shows that 59 students and less than 6 teachers are quarantining due to exposure to someone who tested positive for COVID-19 in all elementary schools.

14. For this school year, we have made the difficult decision to again keep our children at home and do remote learning. I work both in-person and remotely while my wife is staying home with the children to assist with online learning. Like last year, J.C. does not have the socialization he needs with online learning and has difficulty focusing for long periods of time. I fear he may fall further behind this year. Although E.C. has been issued a school computer, she has been unable do to online learning due to the extent of her disabilities.

15. My wife and I have been forced to choose between our children's education and their health.

16. I am seeking to have HF847 blocked so that my school will be able to require universal masking as necessary to meet its obligations to my children.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this $\underline{3}$ day of September 2021, at Waterloo, Iowa.

Jonathan Craig, Plaintiff

## DECLARATION OF MELISSA HADDEN

COMES NOW, Melissa Hadden and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Melissa Hadden, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2. I am the mother of V.M.H., who is 3 years old and is in preschool and has been diagnosed with heart disease, periventricular leukomalacia, autism, cerebral palsy, cortical digital impairments, and optic nerve hypoplasia. My child is at risk of severe illness should she contract COVID-19.

3. Because my child is under the age of 12, my child not eligible to receive any of the currently authorized Covid-19 vaccines.

4. My child attends school at the Council Bluffs School District. We live in Pottawattamie County, Iowa.

5. The doctor for my child has recommended for medical reasons that it would be best for her not to attend school in person; if services can be offered one-on-one or remotely, that would be reasonable. *See* Exhibit A (Letter from Doctor Jamie Drake).

6. The Council Bluffs School District for the upcoming school year is offering a 100% remote learning option; however, the online option is not available for preschool students.

7. My child, V.M.H., went to preschool in-person last year because masks were required at the school. In-person instruction provides the best mode of instruction for my children's needs.

8. Last year, the Council Bluffs School District had a mask mandate until the mask mandate ban went into effect. Once the ban went into effect, mask usage at school dropped off—

none of my child's teachers wore masks and very few children in the school were wearing masks.

9. At the parents' night on August 19, 2021, and the back-to-school night on August 20th, no teachers, staff, or students were wearing masks.

10. Since the start of school, no teachers, staff members, or students are wearing masks at the school. The students are not socially distanced in the classroom.

11. For this school year, I have made the difficult decision to send my child to in-person school. The school district is not offering online learning for children in preschool. I work in-person part-time. Homeschooling is not an option for our family.

12. I am diabetic, which makes me more susceptible to Covid-19 if my child were to become infected at school and bring it home.

13. As a result of Iowa's law, my child is having to take unnecessary risks to her health in order to get an education.

14. I am seeking to have HF847 blocked so that my school will be able to require universal masking as necessary to meet its obligations to my child.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this ___ day of September 2021, at Council Bluffs, Iowa.

_____
Melissa Hadden, Plaintiff

## DECLARATION OF CARISSA FROYUM ROISE

COMES NOW, Carissa Froyum Roise and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.  My name is Carissa Froyum Roise, and I am over 18 years old and have personal knowledge of the facts as stated herein.

2.  I am a member of the ARC of Iowa.

3.  I am the mother of H.J.F.R., who is 10 years old and in fifth grade and has congenital central hypoventilation syndrome, which causes problems with breathing and requires him to use a ventilator when sleeping and sometimes during the day. These conditions put him at higher risk for severe complications if he were to become infected with COVID-19.

4.  I also have two other children who are not disabled and do not have health conditions that make the them at risk of severe illness from COVID-19—I.W.F.R. who is 12 years old and in seventh grade, and L.C.F.R., who is 8 years old and in third grade.

5.  Because my children are under the age of 12, my children are not eligible to receive any of the currently authorized COVID-19 vaccines.

6.  My children attend school at the Denver School District. We live in Bremer County, Iowa.

7.  My child, H.J.F.R., receives disability supports, services, and accommodations and requires a one-on-one nurse.

8.  The Denver School District had a remote option last year. The Denver School District for the upcoming school year is not offering a 100% remote learning option. Students

with extreme medical conditions need to contact the principal for next steps regarding a medically fragile child's educational plan for the upcoming school year.

9.  My children went to school in person last year because the school had a mask mandate in place. When the masked mandate ban went into effect, my children stopped attending school for the last two weeks because it was too dangerous to go to school with unmasked students, teachers, and staff considering H.J.F. R.'s medical conditions. We didn't want to put H.J.F.R. directly at risk by sending him to school, and we worried the other two children, if they went to school, could bring home the virus. In-person instruction provides the best mode of instruction for my child H.J.F.R.'s needs.

10. At a recent meeting, H.J.F.R.'s health plan was amended to include having small groups of persons working with my child, H.J.F.R., be voluntarily masked; however, the district cannot guarantee that all persons working with or coming into contact with my son be masked. My child's wearing a mask while masks are optional for staff, teachers, and children at school is not enough to protect my medically fragile child. He needs all staff, teachers, and children at the school to wear masks.

11. At back-to-school night on August 19, 2021, between 90 to 95% of persons were unmasked, including teachers, staff, parents, and students. School started on August 23, 2021, and only 4 or 5 children out of 20 to 25 children, including H.J.F.R., were wearing masks in H.J.F.R.'s classroom. Some of H.J.F.R.'s teachers are wearing masks, and some were not. The children and teachers in H.J.F.R.'s class are not socially distancing. For L.C.F.R.'s classroom, only about 2 out of 17 children were wearing masks. In terms of lunch, the students are back to eating in the lunchroom unmasked and not socially distanced.

12. I was notified after school had started that there are 9 positive cases of COVID-19 with staff and students.

13. For this school year, we have made the difficult decision to send our children back to in-person school.  The district is no longer offering an online learning option this year.  Both my husband and I work full-time.  Therefore, homeschooling is not an option for our family.

14. Because of Iowa's law, my child is having to take unnecessary risks to his health in order to get an education.

15. I am seeking to have HF847 blocked so that my school will be able to require universal masking as necessary to meet its obligations to my child.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this 2nd day of September 2021, at Denver, Iowa.

Carissa Froyum Roise, Plaintiff

# DECLARATION OF ERIN VERCANDE

COMES NOW, Erin Vercande and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury

that the following is true and correct:

1.  My name is Erin Vercande, I am a resident of Decorah, Iowa, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2.  I am the mother of three children, S.V., C.V., and R.V. who attend school in the Decorah School District.

3.  I am a member of the Arc Iowa.

4.  S.V. is ten years old and should be enrolled in the fourth grade at Decorah Middle School.

5.  C.V. is seven years old and is enrolled in first grade at John Cline Elementary School.

6.  R.V. is three years old and is enrolled in preschool at Little Farmers Pre-school.

7.  Because my children are under the age twelve, they are not eligible to receive any of the currently authorized COVID-19 vaccines.

8.  S.V. has a brain injury, cerebral palsy, and a history of strokes and epilepsy.

9.  The CDC has identified strokes and cerebrovascular diseases as risk factors for severe illness from COVID-19.

10. S.V. has a Health Plan that covers his many special needs related to his medical condition, including transfers throughout the school day. (See Attached Exhibit A).

11. S.V.'s treating doctors and specialists have informed me that because of his underlying medical conditions, he is at risk for severe complications if he contracts COVID-19. (See Attached Exhibits B and C). His neurologist has also indicated that he may also experience more severe seizures and further brain damage if he contracts COVID-19. (See Attached Exhibit C). His doctors have stated that for S.V. to return to school safely, everyone around

1

him should observe strict COVID-19 safety protocols and wear a mask indoors. (See Attached Exhibit B and C).

12. Because of S.V.'s medical and cognitive issues, and the fact that he is nonverbal, he cannot follow instructions easily. It is much more difficult for him to adhere to current mitigation strategies, such as wearing a mask, handwashing independently, or social distancing, so it is even more important that others wear a mask and follow CDC guidelines around him.

13. Last year we had our children enrolled in person because the school provided S.V. with the necessary accommodations to remain safe, including that all staff were required to be masked.

14. I have had phone calls with the principal and superintendent to seek these same accommodations for this school year, but my requests have been denied.

15. I am faced with an impossible choice between my child's safety and education. Because the school is not providing necessary modifications, I have had to make the extremely difficult decision to pull S.V. out of school to avoid sending him in person in an unmasked environment, which would be a very high risk given his medical conditions, as well as against the recommendations of his doctors and the CDC.

16. My husband and I are terrified of sending our children back to school, especially with all of S.V.'s health complications. We have really struggled with the decision, but we do not feel like we have any option.

17. I believe that if everyone was wearing a mask and the school was following the guidance and recommendations from the CDC, my children would be safe in school.

18. I am seeking to have HF847 blocked so that my school will be able to require universal masking as necessary to meet its obligations to my child.

I swear under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this 2 day of September 2021, at Decorah, Iowa.

Erin Vercande, Plaintiff

3

## DECLARATION OF LISA HARDISTY SITHONNORATH

COMES NOW, Lisa Hardisty Sithonnorath and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name Lisa Hardisty Sithonnorath, I am a resident of Des Moines, Iowa, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2. I am the mother of two children who attend Jefferson Elementary School in the Des Moines Public Schools.

3. J.S. is seven years old and is enrolled in the second grade.

4. A.S. is five years old and is enrolled in kindergarten.

5. Because my children are under the age of twelve, they are not eligible to receive any of the currently authorized COVID-19 vaccines.

6. A.S. is diagnosed with Down syndrome, hypothyroidism and has a previous history of viral induced asthma.

7. The CDC has identified these conditions as risk factors for severe illness from COVID-19.

8. A.S. has had an assistant who is assigned to help her with medical and cognitive issues from her Down syndrome.

9. As a pediatric doctor myself, I am aware of the risks of complications from COVID-19 for my child with Down syndrome.

10. A.S.'s treating doctor has also informed me that my child is at risk for severe complications if she contracts a COVID-19 infection. According to her doctors, to decrease her risk, everyone around her should observe strict COVID-19 safety protocols and wear a mask indoors. (See Attached Exhibit A).

1

11. Because of A.S.'s medical and cognitive issues, she will mimic behavior and cannot follow instructions easily. It is much more difficult for her to adhere to current mitigation strategies, such as wearing a mask, handwashing independently, or social distancing, so it is even more important that others wear a mask and follow CDC guidelines around her.

12. Last year A.S. was enrolled in the remote option and I witnessed serious negative consequences to the point that I had to hire an assistant who would come home and work with A.S. throughout the day for individualized instruction. This person is no longer available to assist us with A.S.,' remote learning, and it is difficult to find someone who could help with all of A.S. needs.

13. A.S. could not access education through virtual instruction because children with Down syndrome tend to be visual and hands on rather than verbal learners and have difficulty with focusing for long periods of time, and unfortunately, visual instruction is near impossible to accommodate for a student with Down syndrome in a remote setting. A.S. has regressed in several areas, even with significant parental involvement in both curriculum development and dedicated learning time.

14. A.S. also experienced significant expressive communication regression since she did not have everyday access to her peers at school.

15. This year Des Moines Public Schools is offering an online program through Edgenuity. This online program is pre-recorded and self-taught, and does not provide the necessary supports, services, and accommodations, including direct instruction for child with disabilities.

16. Because of A.S.'s individualized needs, this fall we believe it important to send our children back to school in person.

2

17. I am very anxious about sending my children to school for in person instruction and the thought that they might contract COVID-19, especially with A.S.'s medical history.

18. My son, J.S. has also been anxious about getting COVID-19 at school and exposing others in our household.

19. We also have a medically fragile family. I have asthma, which puts me at risk for severe illness from COVID-19 if our children were to bring it home from their school. My husband is a former smoker which also places him in the high-risk category.

20. I believe that if everyone was wearing a mask and the school was following the guidance and recommendations from the CDC, my children would be safe in school.

21. My child is having to take greater risks – and unnecessary risks – to get her education than other students. I think this unfair.

22. I am seeking to have HF847 blocked so that my school will be able to require universal masking as necessary to meet its obligations to my child.

I swear under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this 2nd day of September 2021, at Des Moines, Iowa.

Lisa Hardesty Sithonhorath

PLAINTIFFS' APPENDIX 138

## DECLARATION OF REBEKAH STEWART

COMES NOW, Rebekah Stewart and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Rebekah Stewart, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2. I am a member of the ARC of Iowa.

3. E.M.S. is 10 years old and entering 4th grade and has Williams Syndrome, which is a genetic condition that results in slow growth, heart problems, gastrointestinal issues, and learning disabilities.  If she needs anesthesia due to a medical issue, she would be at increased danger of going into cardiac arrest.

4. Because my child has heart problems, she meets the CDC guidelines for children who are at risk for severe complications if infected with COVID-19.

5. I also have two other children who are not disabled and do not have health conditions that make the child at risk of serious illness from COVID-19—E.M.S., who is 7 years old and in 1st grade, and L.J.S., who is 2 and a half years old.

6. Because my children are under the age of 12, my children are not eligible to receive any of the currently authorized Covid-19 vaccines.

7. My children attend school at the Linn Mar School District.  We live in Linn County, Iowa.

8. The Linn-Mar School District for the upcoming school year is offering a 100% remote learning option for K-12 students through a third-party vendor, called Edmentum.  For K-5 students, Edmentum uses pre-recorded videos as opposed to live teacher instruction and requires a student to be able to self-pace and relies heavily on parental guidance.  The

remote learning option does not provide the necessary supports, services, and accommodations for my disabled child, including direct instruction and socialization with peers.

9. E.M.S. used the 100% online learning option last year; that program had live instruction. She was unable to keep focused, struggled with lack of socialization with peers, and had an increase in behavior problems. My child remained at baseline and did not make gains in her learning. In-person instruction provides the best mode of instruction for my child's needs.

10. Last year the Linn Mar School District had a mask mandate until the mask mandate ban went into effect. Once the ban went into effect, most teachers wore masks, but most students did not wear masks.

11. For this school year, we have made the difficult decision to send E.M.S. back to in-person school. Online learning this year poses a hardship for the family. My husband and I work hybrid where we are required to work in-person at times and sometimes remotely. The district's remote option this year does not include live teacher instruction and requires my daughter to be able to self-pace, which will be a challenge for her, and would require us to assist her more with her learning, which will be a challenge for us due to our work situations because we cannot work from home full-time.

12. I believe that if everyone was wearing a mask and the school was following the guidance and recommendations from the CDC, my children would be safe in school.

13. As a result of Iowa's law, my child is having to take unnecessary risks to her health in order to get an education.

14. I am seeking to have HF847 blocked so that my school will be able to require universal
masking as necessary to meet its obligations to my child.

I swear under penalty of perjury under the laws of the United States that the foregoing is
true and correct to the best of my knowledge.

Dates this ___ day of September 2021, at Cedar Rapids, Iowa.

Rebekah Stewart, Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

THE ARC OF IOWA et al.,

      *Plaintiffs,*

  v.

KIM REYNOLDS et al.,

      *Defendants.*

Case No. 4:21-cv-264

**SUPPLEMENTAL DECLARATION
OF HEATHER LYNN PRESTON**

COMES NOW, Heather Lynn Preston and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. Following this Court's decision granting the temporary restraining order, the Des Moines school board met to review their masking policy.

2. On September 14, 2021, the Board voted to implement a district wide mask mandate in the Des Moines Public Schools ("DMPS").

3. The DMPS mask mandate includes all students, staff, and visitors, regardless of vaccination status, and was effective as of September 15, 2021.

4. I am glad the Board took this important step to protect children, like S.P. and M.P., who are at high risk of severe illness or complications from COVID-19.

5. It is also reassuring that the teachers are enforcing proper mask wearing which makes me feel that my children are safe in school and gives me peace of mind.

6. My children also feel much safer being in school with masks.

7. Until now S.P. has avoided any after school activities and clubs to minimize his risk of infection. With universal masking in place, he feels much safer and will now be able to attend these after school activities.

1

PLAINTIFFS' APPENDIX 142
Scanned with CamScanner

8. With universal masking in place, I feel much safer sending my children to school in person. My children no longer having to take greater – and unnecessary risks- than other students to get their education.

I swear under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this 24th day of September 2021, at Des Moines, Iowa.

Heather Lynn Preston, Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

Date: 9/26/2021

/s/Rita Bettis Austen
Rita Bettis Austen

2

Scanned with CamScanner

## DECLARATION OF AMANDA DEVEREAUX

COMES NOW, Amanda Devereaux and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.  My name is Amanda Devereaux, and I am over 18 years old.  I have personal knowledge of the facts as stated herein.

2.  I am a member of the ARC of Iowa.

3.  I am the mother of P.D., who is 5 years old and in kindergarten and has symptomatic congenital cytomegalorvirus, polymicrogyria, epilepsy, feeding delay, expressive and language delay, nonverbal, hearing loss, gross and fine motor skill delays, and uses a feeding tube.  P.D. was born with a brain malformation, which was caused intellectual and developmental delays to the extent that she operates at a 1-year-old level.

4.  I also have another child, A.D., who is not disabled and has no health conditions, who is 9 years old and in 3rd grade.

5.  Because my children are under the age of 12, they are not eligible to receive any of the currently authorized Covid-19 vaccines.

6.  My children attend school at the Ankeny School District.  We live in Polk County, Iowa.

7.  P.D.'s medical provider Doctor Mark Schleiss, is a pediatrician at the University of Minnesota and specializes in infectious diseases.  *See* Exhibit A (Letter from Doctor Mark Schleiss).  Because of P.D.'s diagnosis of symptomatic congenital cytomegalovirus, Dr. Schleiss states that P.D. 1) is at higher risk for serious and fatal COVID-19 disease, 2) has an immune system that is affected by the condition, and 3) should not be forced to stay at home and be deprived of learning.  *See* Exhibit A (Letter from Doctor Mark Schleiss).  In addition, Dr. Schleiss has said that unless all students are

wearing masks it is not safe for P.D. at school during the COVID-19 pandemic. *See* Exhibit A (Letter from Dr. Schleiss). Dr. Schleiss has also emphasized that there is no evidence that mask wearing has any negative impact on a child's well-being. *See* Exhibit A (Letter from Dr. Schleiss).

8. The Ankeny School District for the upcoming school year is offering a 100% remote learning option for elementary school aged students through a third-party vendor, called Edgenuity. Edgenuity uses pre-recorded videos; there is no live teacher instruction and students must be able to self-pace. This remote learning option does not provide the necessary supports, services, and accommodations P.D. needs, including direct instruction and socialization with peers. In-person instruction provides the best mode of instruction for P.D., given her needs.

9. P.D. attended school in-person last year because the Ankeny School District required masks. When the mask mandate ban went into effect for schools, I kept P.D. in school only because the persons working with her voluntarily wore masks, but I pulled A.D. out of in-person school because it was no longer safe considering the lack of a mask mandate and his sibling's medical conditions.

10. I reached out to the Ankeny School District about my concerns about masking at the school. The district agreed that persons at the school would be voluntarily masked while doing special education services with P.D. for 2 ½ hours a day for 4 days a week. P.D. would be in a smaller classroom and be socially distanced from other students. The district will not be able to do core curriculum at school due to not being able to require all students to wear masks; therefore, my husband and I would be responsible for doing core instruction at home. We do not think us doing core instruction for P.D. at home is best

for her education. We only agreed to provide core instruction at home because school is not a safe environment for P.D. without mask requirements. If the district were able to require masks, we believe P.D. should be getting her core instruction at school. We are not equipped to modify kindergarten curriculum for our child with an intellectual disability at home, and we both work full-time remotely, which makes providing the core instruction more difficult.

11.  At the meet the teacher night before the beginning of school this year, teachers were wearing masks, but only about 5% of parents and students were wearing masks.

12.  As of August 31, 2021, the Ankeny School District's Covid-19 dashboard shows 7 staff and 15 students district wide have tested positive for Covid-19.

13.  For this school year, we have made the difficult decision to send P.D. to in-person school and have A.D. do online learning to lessen the risk that A.D. is exposed to COVID-19 and brings it home. We can't keep P.D. home because for her online learning is not an option; she can't self-pace while doing Edginuity given her multiple health conditions and developmental delays. My husband and I work full-time remotely and so we can't pick up the instruction.

14.  My husband has ulcerative colitis and takes medication that suppresses his immune system, which makes him more susceptible to Covid-19 if our children were to become infected at school and bring it home.

15.  I believe that if everyone was wearing a mask and the school was following the guidance and recommendations from the CDC, P.D. would be safe in school.

16.  As a result of Iowa's law, my child is having to take unnecessary risks to her health
in order to get an education.

17. I am seeking to have HF847 blocked so that my school will be able to require universal masking as necessary to meet its obligations to my child.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this 2nd day of September 2021, at Ankeny, Iowa.

Amanda Devereaux, Plaintiff

## DECLARATION OF HEATHER LYNN PRESTON

COMES NOW, Heather Lynn Preston and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Heather Lynn Preston, and I am a resident of Des Moines, Iowa. I am over 18 years old and have personal knowledge of the facts as stated herein.

2. I am the mother of M.P. and S.P. who are eleven years old and are both in the sixth grade at Meredith Middle School in the Des Moines Public Schools.

3. Because my children are both under the age of twelve, they are not eligible to receive any of the currently authorized COVID-19 vaccines.

4. M.P. is diagnosed with Heterotaxy. Heterotaxy is an extremely rare condition where many organs in the body can be formed abnormally, in the wrong position, or are even missing.

5. M.P. has several medical complications because of his Heterotaxy, including significant heart defects (right atrial isomerism - bilateral right-sidedness), unbalanced complete atrioventricular septal defect (AVSD) with left ventricular dominance and right ventricular hypoplasia, D-transposition of the great arteries, pulmonary valve stenosis and twin AV node tachycardia), a lung defect (two right lungs) and an absent spleen.

6. The CDC has identified chronic heart and lung conditions such as the ones M.P. has as risk factors for severe illness from COVID-19.

7. M.P. has a 504 Plan to monitor his health conditions while at school. (See Attached Exhibit A).

8. S.P. has been diagnosed with hypertension due to small kidneys, seizures, and a range of other disabilities, including ADHD.

1

Scanned with CamScanner

9. The CDC has identified chronic kidney disease as risk factor for severe illness from COVID-19.

10. S.P. has a 504 plan to address these medical concerns at school. (See Attached Exhibit B).

11. M.P.'s doctor has informed me that it is extremely dangerous for him to return to school without such precautions as following the recommended CDC guidelines of mandatory masking and regular testing in schools. According to his doctor, in order to decrease his risk, everyone around him should observe strict COVID-19 safety protocols and wear a mask indoors. (See Attached Exhibit C).

12. Last year both my children were enrolled in the remote learning option. I witnessed serious negative consequences. They both struggled greatly with mental health as well as academics with the online program. They did not receive the services they require virtually.

13. M.P has regressed in several areas, even with significant parental involvement in both curriculum development and dedicated learning time. M.P faced issues with learning online because of his ADHD since he did not have everyday access to his peers in a classroom setting. With M.P.'s medical needs, remote education is not feasible as he requires individualized attention, and his needs would not be met through online programing where an instructor is not present.

14. S.P. faced mental health issues that were exacerbated by the online learning where he was isolated from his peers.

15. Des Moines Public Schools is offering a remote learning option through a third-party provider, Edgenuity. This online program is largely pre-recorded and self-taught, and does not provide the necessary supports, services, and accommodations for my disabled

2

Scanned with CamScanner

children. Furthermore, in order to assist them with this online program, either my husband or I would have to quit our jobs to teach them.

16. We have no option but to send them back to school this fall.

17. I have emailed teachers for both my children with requests to keep them safe, distanced.

18. I sought accommodations for M.P., which are in M.P.'s 504 plan, such as asking the teacher to mask and allowing M.P. to leave class five minutes early to avoid the crowded hallways. However, M.P. returned to in school learning last week and has told me his teachers are not following these accommodations.

19. I am extremely nervous about M.P. returning to school for in person instruction and the thought that he might contract COVID-19. Recently, due to this stress, I have had difficulty sleeping and have experienced debilitating spells of anxiety. I don't know if I am doing the right thing, but I feel as though I have no choice in the matter.

20. M.P. is extremely scared to return to school; he is very afraid of getting sick and potentially dying.

21. S.P. has had heightened spells of anxiety and fear with his own return to school, but also fear of what might happen to his brother if he is exposed.

22. We also have a medically fragile family. I have Type II diabetes, which puts me at risk for severe illness if I were to get COVID-19 from my children.

23. I believe that if everyone was wearing a mask and the school was following the guidance and recommendations from the CDC, my children would be safe in school.

24. I am seeking to have HF847 blocked so that my school will be able to require universal masking as necessary to meet its obligations to my children.

3

Scanned with CamScanner

I swear under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this $\underline{1^{st}}$ day of September 2021, at Des Moines, Iowa.

Heather Lynn Preston, Plaintiff

4

Scanned with CamScanner

## DECLARATION OF CHARMAINE ALEXANDER

COMES NOW, Charmaine Alexander and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name Charmaine Alexander, I am a resident of Urbandale, Iowa, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2. I am the mother of two children, C.B. who is eleven years old and C.A. who is three years old.

3. C.B.is enrolled in the sixth grade at Summit Middle School in the Johnston Community School District.

4. Because my children are under the age of twelve, they are not eligible to receive any of the currently authorized COVID-19 vaccines.

5. C.B. has asthma, which the CDC has identified as putting him at risk of severe illness from COVID-19.

6. C.B. has a 504 plan to address his asthma as well as his attention deficit hyperactivity disorder (ADHD). (See Attached Exhibit A).

7. C.B.'s treating doctor has informed me that my child is at risk for severe complications if he contracts a COVID-19 infection.

8. Last year C.B. was enrolled in the remote option. While that had some difficulties, at least I knew my child was safe. If the school offered a remote option, I would enroll him through that for this year again.

9. However, the Johnston Community School District is not offering online or remote options this year, so I have no choice but to send C.B. back to school in person.

10. I feel like I cannot keep my own child safe. I am very anxious about sending C.B. to school for in person instruction given the risks if he contracts COVID-19, especially with his medical history.

11. After his first week in person, I am even more concerned, because C.B. has reported that a vast majority of teachers and other students are not wearing masks in the classrooms.

12. C.B. has been anxious about getting COVID-19 because others in his school are not masking, and he is afraid he would get others in our home sick.

13. There have already been at least six positive cases at the middle school, that I am aware of. However, they only notify parents if their child's specific classroom has a positive case, so we do not even have sufficient information to keep our children safe.

14. We also have a medically fragile family. I have asthma, which puts me at risk for severe illness from COVID-19.

15. I believe that if everyone was wearing a mask and the school was following the guidance and recommendations from the CDC, my child would be safe in school.

16. My child is having to take greater risks – and unnecessary risks – to get his education than other students.  I think this unfair.

17. I am seeking to have HF847 blocked so that my school will be able to require universal masking as necessary to meet its obligations to my child.

I swear under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.


Dated this _2_ day of September 2021, at Urbandale, Iowa.

Charmaine Alexander

| | |
|---|---|
| THE ARC OF IOWA et al., | Case No. 4:21-cv-264 |
| *Plaintiffs*, | |
| v. | **SUPPLEMENTAL DECLARATION** |
| KIM REYNOLDS et al., | **OF CHARMAINE ALEXANDER** |
| *Defendants*. | |

COMES NOW, Charmaine Alexander and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. Following this Court's decision granting the temporary restraining order, the Johnston school board met to review their masking policy.

2. On September 21, 2021, the Board voted to implement a district wide universal mask mandate.

3. The mandate includes all students, staff, and visitors, regardless of vaccination status, and was effective as of September 23, 2021.

4. I am glad the Board took this important step to protect children, like C.B., who are at high risk of severe illness or complications from COVID-19.

5. Prior to this mandate, C.B. was one of a few students who wore a mask at school, this made him feel anxious and distracted from his schoolwork. Now he will feel more comfortable masking at school, and this will also allow him to focus on his education while at school.

6. With universal masking in place, I feel much safer sending my child to school in person. My child is no longer having to take greater – and unnecessary risks- than other students to get his education.

I swear under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this __23__ day of September 2021, at Urbandale, Iowa.

_____
Charmaine Alexander

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

Date: 9/26/2021

/s/Rita Bettis Austen
Rita Bettis Austen

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

THE ARC OF IOWA et al.,

      *Plaintiffs,*

    v.

KIM REYNOLDS et al.,

      *Defendants.*

Case No. 4:21-cv-264

**SUPPLEMENTAL DECLARATION OF LISA HARDISTY SITHONNORATH**

COMES NOW, Lisa Hardisty Sithonnorath and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.  Following this Court's decision granting the temporary restraining order, the Des Moines school board met to review their masking policy.

2.  On September 14, 2021, the Board voted to implement a district wide mask mandate in the Des Moines Public Schools ("DMPS").

3.  The DMPS mask mandate includes all students, staff, and visitors, regardless of vaccination status, and was effective as of September 15, 2021.

4.  I am glad the Board took this important step to protect children, like A.S., who are at high risk of severe illness or complications from COVID-19.

5.  Because of A.S.'s medical and cognitive issues, she often mimics behavior and cannot follow instructions easily. With universal masking, A.S. feels more comfortable wearing a mask in school. When she sees other students and staff wearing masks it is easier for her to mimic those behaviors, as she can follow guidelines better when others are doing so as well.

1

6. I have also been informed that the teachers are enforcing proper masking in the classrooms, which is reassuring.

7. With universal masking in place, I feel a sense of relief, and believe that my child is much safer returning to school in person. My child is no longer having to take greater – and unnecessary risks- than other students to get her education.

I swear under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this 25 day of September 2021, at Des Moines, Iowa

Lisa Hardisty Sithonnorath

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk

of Court by using the CM/ECF system.

Date: 9/26/2021

/s/Rita Bettis Austen
Rita Bettis Austen

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

THE ARC OF IOWA et al.,

    *Plaintiffs,*

v.

KIM REYNOLDS et al.,

    *Defendants.*

Case No. 4:21-cv-264

**SUPPLEMENTAL DECLARATION
OF HEATHER LYNN PRESTON**

COMES NOW, Heather Lynn Preston and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. Following this Court's decision granting the temporary restraining order, the Des Moines school board met to review their masking policy.

2. On September 14, 2021, the Board voted to implement a district wide mask mandate in the Des Moines Public Schools ("DMPS").

3. The DMPS mask mandate includes all students, staff, and visitors, regardless of vaccination status, and was effective as of September 15, 2021.

4. I am glad the Board took this important step to protect children, like S.P. and M.P., who are at high risk of severe illness or complications from COVID-19.

5. It is also reassuring that the teachers are enforcing proper mask wearing which makes me feel that my children are safe in school and gives me peace of mind.

6. My children also feel much safer being in school with masks.

7. Until now S.P. has avoided any after school activities and clubs to minimize his risk of infection. With universal masking in place, he feels much safer and will now be able to attend these after school activities.

1

PLAINTIFFS' APPENDIX 158
Scanned with CamScanner

8. With universal masking in place, I feel much safer sending my children to school in person. My children no longer having to take greater – and unnecessary risks- than other students to get their education.

I swear under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this 24th day of September 2021, at Des Moines, Iowa.

Heather Lynn Preston, Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk

of Court by using the CM/ECF system.

Date: 9/26/2021

/s/Rita Bettis Austen
Rita Bettis Austen

2

Scanned with CamScanner

THE ARC OF IOWA et al.,

     *Plaintiffs,*

     v.

KIM REYNOLDS et al.,

     *Defendants.*

Case No. 4:21-cv-264

**SUPPLEMENTAL DECLARATION OF MELISSA HADDEN**

## SUPPLEMENTAL DECLARATION OF MELISSA HADDEN

COMES NOW, Melissa Hadden and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Melissa Hadden, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2. Before the judge issued the temporary restraining order banning enforcement of HF 847, my child, V.M.H., was exposed to COVID-19. Another student in my child's classroom tested positive for COVID-19. No teacher or student in my child's classroom was wearing a mask. As a result of my child's direct exposure to COVID-19 at school, I was forced to quarantine my child at home starting August 31, 2021. My child's doctor recommends that one-on-one or home learning is safest at this time due to my child's medical conditions, my child's increased susceptibility to COVID-19, and the increased rate of spread of COVID-19 in my community.

3. Since the judge issued the temporary restraining order banning enforcement of HF 847, the Council Bluffs School District my child, V.M.H., attends school on September 14, 2021, communicated that it "expect[s] all students, staff and visitors to wear masks at

school during school hours when physical distancing is not possible" effective on September 15, 2021.

4. I am currently working with the school on a plan for my child to return to school, specifically additional accommodations that would make it safer for her to attend school.

5. In the meantime, my child will return to in person learning for her special education coursework after the school day has ended and will work with a teacher who is masked.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this 26 day of September 2021, at Council Bluffs, Iowa.

_____
Melissa Hadden, Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

Date: 9/26/2021

/s/Rita Bettis Austen
Rita Bettis Austen

THE ARC OF IOWA et al.,

        *Plaintiffs,*

    v.

KIM REYNOLDS et al.,

        *Defendants.*

Case No. 4:21-cv-264

**SUPPLEMENTAL DECLARATION OF
REBEKAH STEWART**

COMES NOW, Rebekah Stewart and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Rebekah Stewart, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2. Since the judge issued the temporary restraining order banning enforcement of HF 847, the Linn-Mar School District where my child, E.M.S., attends school passed a mask mandate on September 16, 2021. The mandate applies to pre-K through 6th grade students and was effective starting on September 20, 2021. The mandate is scheduled to expire 60 days after the COVID-19 vaccine is available for children ages 5 to 11 years old. There is an exemption for students with medical conditions if there is a signed note by the doctor submitted to the school principal.

3. The school district is also being flexible about families who want to open enroll in the district or switching between online and in-person learning platforms.

4. My child feels much better being in school where all students and teachers wear masks. My child has sensory issues with wearing masks and can go outside the school for mask wearing breaks. My child feels safe and accommodated by the school in this regard.

5. While I think there should have been a mask mandate for all grade levels, I am pleased that the school district took this important step to protect children like my child who are at high risk of severe illness or complications from COVID-19.

6. With universal masking in place, I feel much safer sending my child to school in person. My child is no longer having to take greater—and unnecessary risks—than other students to get an education.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this 24th day of September 2021, at Cedar Rapids, Iowa.

Rebekah Stewart, Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

Date: 9/26/2021

/s/Rita Bettis Austen

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

THE ARC OF IOWA et al.,

        *Plaintiffs*,

    v.

KIM REYNOLDS et al.,

        *Defendants*.

Case No. 4:21-cv-264

**SUPPLEMENTAL DECLARATION OF LIDIJA GEEST**

COMES NOW, Lidija Geest and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. Following this Court's decision granting the temporary restraining order, the Davenport Community school board held a special meeting on September 16, 2021.

2. The Board voted in favor of a district wide mask mandate.

3. The Davenport Community Schools District mask mandate includes all students, staff, and visitors, regardless of vaccination status.

4. The mask mandate was effective as of September 20, 2021.

5. If students don't bring a mask with them to school, teachers are required to provide them with masks. If a student still refuses to wear a mask, they may be sent home.

6. I am glad the Board took this important step to protect children, like K.G., who are at high risk of severe illness or complications from COVID-19.

7. K.G. has told me that his teacher now wears a mask and has also corrected children who were not properly wearing a mask.

8. I am especially glad that the school nurse is now required to wear a mask as she administers K.G.'s inhaler.

1

9. K.G. is also very relieved that he is no longer one of only two students in his class wearing a mask.

10. With universal masking in place, I feel much safer sending my child to school in person. My child is no longer having to take greater – and unnecessary risks- than other students to get his education.

I swear under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this 24 day of September 2021, at Davenport, Iowa.

Lidija Geest, Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

Date: 9/26/2021

/s/Rita Bettis Austen
Rita Bettis Austen

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

THE ARC OF IOWA et al.,

       *Plaintiffs,*

   v.

KIM REYNOLDS et al.,

       *Defendants.*

Case No. 4:21-cv-264

**SUPPLEMENTAL DECLARATION OF AMANDA DEVEREAUX**

COMES NOW, Amanda Devereaux and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.  My name is Amanda Devereaux, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2.  Since the judge issued the temporary restraining order banning enforcement of HF 847, the Ankeny School District my child, P.D., attends school passed a mask mandate on September 21, 2021. The mandate applies to all students, teachers, and staff and was effective starting on September 23, 2021. The school district has exemptions for students with medical conditions and for students with genuine and sincere religious beliefs. Medical documentation can be submitted in support of a medical exemption. If no medical documentation is submitted with an exemption request, the district reserves the right to ask for additional medical documentation to verify the student's health condition and its impact on the mask requirement.

3.  Prior to the mask mandate, few children besides my child wore masks at school. I feel more comfortable now that all children at school are required to wear masks.

4. I am pleased that the school district took this important step to protect children like my child who are at high risk of severe illness or complications from COVID-19.

5. With universal masking in place, I feel much safer sending my child to school in person. My child is no longer having to take greater—and unnecessary risks—than other students to get an education.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this 24th day of September 2021, at Ankeny, Iowa.

Amanda Devereaux, Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

Date: 9/26/2021

/s/Rita Bettis Austen
Rita Bettis Austen

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

THE ARC OF IOWA et al.,

      *Plaintiffs,*

    v.

KIM REYNOLDS et al.,

      *Defendants.*

Case No. 4:21-cv-264

**SUPPLEMENTAL DECLARATION OF MICHELLE CROFT**

COMES NOW, Michelle Croft and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.  My name is Michelle Croft, and I am over 18 years old. I have personal knowledge of the facts as stated herein.

2.  Since the judge issued the temporary restraining order banning enforcement of HF 847, the Iowa City School District my child, J.J.B., attends school passed a mask mandate on September 14, 2021. The mandate applies to all students, teachers, and staff and was effective starting September 15, 2021. There is an exception for students with certain medical conditions who can fill out and submit a form and a doctor's note to the school nurse. If granted, those students can wear a face shield instead of a face mask.

3.  My child feels much better being in school where all students and teachers wear masks.

4.  I am pleased that the school district took this important step to protect children like my child who are at high risk of severe illness or complications from COVID-19.

5.  With universal masking in place, I feel much safer sending my child to school in person. My child is no longer having to take greater—and unnecessary risks—than other students to get an education.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dates this 24 day of September 2021, at Iowa City, Iowa.

_____
Michelle Croft, Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

Date: 9/26/2021

/s/Rita Bettis Austen
Rita Bettis Austen

# Exhibit O

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - X
THE ARC OF IOWA, et al.,  :
                          :
     Plaintiffs,         :
                          :
vs.                       :      Case No. 4:21-cv-264
                          :
KIM REYNOLDS, In her      :   TRANSCRIPT OF HEARING ON MOTION
Official Capacity as      :   FOR TEMPORARY RESTRAINING ORDER
Governor of Iowa, et al., :
                          :
     Defendants.         :
- - - - - - - - - - - - - X

Courtroom 455, Fourth Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Friday, September 10, 2021
9:59 a.m.

BEFORE:  THE HONORABLE ROBERT W. PRATT, Senior Judge

TONYA R. GERKE, CSR, RDR, CRR
United States Courthouse
123 East Walnut Street, Room 197
Des Moines, Iowa 50309

2

```
APPEARANCES:

For the Plaintiff:          JOHN ARAK FREEDMAN, ESQ.
                            Arnold & Porter LLP
                            601 Massachusetts Avenue Northwest
                            Washington, D.C.  20001

                            JIM T. DUFF, ESQ.
                            Duff Law Firm, P.L.C.
                            The Galleria
                            4090 Westown Parkway, Suite 102
                            West Des Moines, IA 50266

                            LEAH DENISE PATTON, ESQ.
                            ACLU of Iowa Foundation
                            505 Fifth Avenue, Suite 808
                            Des Moines, IA 50309

                            CATHERINE ELLIZABETH JOHNSON, ESQ
                            CYNTHIA ANN MILLER, ESQ.
                            Disability Rights Iowa
                            666 Walnut Street, Suite 1140
                            Des Moines, IA 50309

For State Defendants:       SAMUEL P. LANGHOLZ, ESQ.
                            Assistant Iowa Attorney General
                            1305 East Walnut Street
                            Des Moines, IA 50319

For the School District     KRISTY M. LATTA, ESQ.
Defendants:                 Ahlers & Cooney, P.C.
(Except Iowa City CSD)      100 Court Avenue, Suite 600
                            Des Moines, IA 50309
```

26

1   preliminary injunction and that really when you're looking at

2   whether a TRO should be granted, we're looking at the harm just

3   in this interim time period between when you would otherwise

4   have the opportunity to rule on a temporary injunction.

5           You know, stepping back just a bit, I think it's

6   helpful to remember that this is now the third year that Iowa's

7   students have been affected by the COVID-19 pandemic.  The

8   federal government, the state government, school districts, and

9   parents have all been faced with challenging decisions trying to

10  navigate that, and we're here today now talking about one

11  provision of House File 847, you know, section 280.31, that is,

12  you know, the latest attempt to resolve some of those issues for

13  the benefit of Iowa students, and there's certainly, like all

14  the decisions through the last three years, strong opinions on

15  all of those sides, but it's not a basis for granting the

16  temporary restraining order.

17          I want to kind of address a preliminary issue that

18  struck me as I was listening to the discussion and the specific

19  request here, and there's -- there was talk of enjoining

20  enforcement of House File 847, and although that's the short

21  term that's sort of been used throughout the plaintiffs' briefs,

22  that's a large bill.  So an injunction enjoining House File 847

23  would -- regardless of any other basis would be overly broad and

24  significant.  My understanding from plaintiffs' briefing and

25  discussion is that they're concerned about one section of that

1   bill which is now, you know, Iowa Code section 280.31.

2           THE COURT:  Right.  And I noted that as well.  Because

3   as you just pointed out, 65(d)(1)(C) says -- and it's entitled

4   Contents and Scope of Every Injunction and Restraining Order.

5   It says, (C), Describe in reasonable detail -- and not by

6   referring to the complaint or other document -- the act or acts

7   restrained or required.  So your point is that as you understand

8   the request, they're requesting only that the ban of a local

9   school district's being able to impose a mask mandate be

10  enjoined.

11          MR. LANGHOLZ:  Correct.  That's correct.

12          THE COURT:  And if that's not the case -- excuse me

13  for interrupting.  And if that's not the case, Mr. Freedman is

14  going to tell me in rebuttal that I got it wrong.

15          MR. LANGHOLZ:  That's correct.  And the State cites,

16  you know, at the beginning of our introduction on page 2, you

17  know, what we believe is a proper citation, you know, of that

18  act and what section, you know, ultimately is codified at

19  section 280.31.  And we understand -- you know, and it sounded

20  like there was no change in that position today that the request

21  is to enjoin Governor Reynolds and Director Lebo from enforcing

22  that provision, and this request, you know, whether at a TRO or

23  preliminary injunction, is neither necessary nor sufficient to

24  remedy the alleged harms of plaintiffs.

25          As Your Honor just discussed with counsel, section

28

1  280.31 contains an explicit exception that allows mandates of

2  face coverings when required by any other provision of law.

3  That includes federal law.  There was, in fact, a discussion,

4  you know, about this provision during the debates on the House

5  floor.  You know, the legislators expressed some confusion about

6  what -- you know, how broad that could be; it wasn't fully

7  acknowledged, you know, kind of an acknowledgment.  In fact, one

8  of the opponents, Representative Bohannan, was raising

9  perhaps -- this was a concern perhaps because how do we know

10 what sort of exceptions could come in there, but nonetheless,

11 you know, that's the law that was passed.

12         THE COURT:  Did that include a discussion of the State

13 prohibition against discrimination regarding the disabled, or

14 was that just -- was the discussion of the legislature just

15 limited to the federal law?

16         MR. LANGHOLZ:  It was -- it was a discussion of this

17 provision --

18         THE COURT:  Okay.

19         MR. LANGHOLZ:  -- recognizing that there's an

20 exception for other provisions of law and raising questions.

21 You know, that could be, you know, any number of things, you

22 know, legislators that were complaining, you know, that they had

23 only had a short period of time to -- to consider and hadn't

24 fully thought through all of the provisions of law that might be

25 implicated in that regard.

29

1          THE COURT:  So does the CDC order requiring masks on

2    school buses fall within that exception?

3          MR. LANGHOLZ:  The State has given guidance, I

4    believe -- and I think that's outside the scope of any claim

5    here but has -- has given guidance that that is a -- a mandate

6    that's required that this statute does not prohibit --

7          THE COURT:  Okay.

8          MR. LANGHOLZ:  And as the Court points out as well, I

9    mean -- you know, as a matter of law, you know, leaving aside

10   this injunction, you know, with the Supremacy Clause, regardless

11   of whether or not there's a savings clause in the statute, I --

12   governmental entities, private citizens are required to follow

13   federal law as a matter of the Supremacy Clause regardless of

14   whether the statute acknowledged it.  But when we're talking

15   about an injunction and whether it's necessary to take that

16   extraordinary relief or the even more extraordinary relief of a

17   temporary restraining order while we're sorting things out, the

18   fact that there's a savings clause and that that allows mask

19   requirements without an injunction, if it is required by -- by

20   federal law, you know, is significant for the question before

21   the Court here today.

22          And I want to -- the Court and plaintiffs expressed

23   some confusion about, you know, what the State's position is is

24   contradictory to some of the public statements, and I want to be

25   absolutely clear that the State defendants do not agree that

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

All participants in this case are registered CM/ECF users and will served by the CM/ECF system.

Date: July 1, 2022

/s/Rita Bettis Austen
Rita Bettis Austen